# EXHIBIT B

# U.S. DEPARTMENT OF AGRICULTURE
# General Terms and Conditions for Mutual Interest Agreements

*Effective December 31, 2025*

**1.0    Overview of General Terms and Conditions for Mutual Interest Agreements............................1**

1.1    Introduction ...........................................................................................................................1

1.2    Order of Precedence ..............................................................................................................1

1.3    USDA Responsibilities...........................................................................................................1

1.4    Cooperator Responsibilities and Compliance with Federal Requirements .......................1

1.5    Subagreement and Contract Requirements...........................................................................2

1.6    Internal Controls ....................................................................................................................3

1.7    Conflict of Interest.................................................................................................................3

1.8    Unpaid Federal Tax Liability and Felony Criminal Violations...........................................4

1.9    Funding to Entities or Individuals on Prohibited Lists........................................................4

1.10    Non-Exclusivity.....................................................................................................................5

1.11    No Implied Endorsement.......................................................................................................5

1.12    Employment Eligibility Verification (Immigration and Nationality Act) ..........................5

1.13    National Environmental Policy Act.......................................................................................5

1.14    Agricultural Bioterrorism Protection Act ............................................................................6

1.15    FOIA - Public Access to Records and Personally Identifiable Information.......................6

1.16    Acknowledgement and Information Dissemination .............................................................6

**2.0    System for Award Management and Universal Identifier Requirements ....................................7**

**3.0    Financial Management .........................................................................................................................8**

3.1    Allowable and Unallowable Costs and Activities ................................................................8

3.2    National Security and Unallowable Costs ............................................................................9

3.3    Payments...............................................................................................................................10

3.4    Audit Requirements..............................................................................................................11

3.5    Cost Sharing .........................................................................................................................12

3.6    Interest Earned......................................................................................................................12

3.7    Indirect Costs........................................................................................................................12

3.8    Procurements ........................................................................................................................14

**4.0    Performance Monitoring..................................................................................................................14**

4.1    Periodic Performance Reports.............................................................................................14

4.2    Final Performance Reports ..................................................................................................15

4.3    Subcooperator Monitoring...................................................................................................15

4.4      Site Visits...............................................................................................................................16

**5.0      Financial Monitoring**...............................................................................................................**16**

5.1      Periodic Financial Reports.....................................................................................................16

5.2      Final Financial Report ...........................................................................................................17

5.3      Review of Financial Reports ..................................................................................................17

**6.0      Remedies for Noncompliance**.................................................................................................**17**

**7.0      Debarment and Suspension**....................................................................................................**18**

**8.0      Closeout**...................................................................................................................................**18**

8.1      Agreement Closeout ...............................................................................................................18

8.2      Termination ............................................................................................................................18

8.3      Unused and Returned Funds...................................................................................................20

8.4      Disposition of Real Property, Equipment, Supplies, and Intangible Property ......................20

**9.0      Research & Development, Science & Technology** ...............................................................**21**

9.1      Intellectual Property (Copyright and Patent Rights) ..............................................................23

9.2      Scientific Integrity and Research Misconduct.......................................................................23

9.3      Geospatial Data Management Standards ................................................................................24

9.4      Public Access to Scholarly Publication and Digital Scientific Research Data......................24

9.5      Information Security and Privacy...........................................................................................24

9.6      Research Security Training ....................................................................................................24

9.7      Foreign Ownership, Control or Influence (FOCI) by a Country of Concern .........................25

9.8      Disclosures .............................................................................................................................25

9.9      Malign Foreign Talent Recruitment Program.........................................................................25

9.10     Consequences for Violation of Disclosure Requirements ......................................................25

9.11     Potential Life Sciences Dual Use Research of Concern and Dangerous Gain-of-Function...........26

9.12     Export Control ........................................................................................................................28

9.13     Limitation on Use of Funds for Research Involving Human Subjects ....................................30

**10.0     Records Management** .............................................................................................................**31**

10.1     Record Retention ....................................................................................................................31

10.2     Access to Records...................................................................................................................32

10.3     Licensing and Copyright ........................................................................................................32

**11.0     Other Applicable Terms and Conditions**..............................................................................**32**

11.1     Animal Welfare Act.................................................................................................................32

11.2     Civil Rights Obligations/Nondiscrimination .........................................................................32

11.3     International Travel – Fly America Act.................................................................................33

11.4     Prohibition on Congressional Interest in Agreements ......................................................34

11.5     Lobbying Prohibitions ........................................................................................................34

11.6     Trafficking in Persons ........................................................................................................34

11.7     Environmental Standards....................................................................................................37

11.8     Cooperator Integrity and Performance ..............................................................................37

11.9     Never Contract with the Enemy .........................................................................................39

11.10    Drug Free Workplace ..........................................................................................................40

11.11    Allocation of Liability and Indemnification ......................................................................41

**12.0     Compliance with Executive Orders and Other Presidential Actions ...........................42**

12.1     EO 13043: Increasing Seat Belt Use in the United States .................................................42

12.2     EO 13513: Federal Leadership on Reducing Text Messaging While Driving ...................42

12.3     EO 13642: Making Open and Machine Readable the New Default for Government Information 42

12.4     EO 13706: Establishing Paid Sick Leave for Federal Contractors ....................................43

12.5     EO 14149: Restoring Freedom of Speech and Ending Federal Censorship .......................43

12.6     EO 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.................................................................................................................43

12.7     EO 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity ........43

12.8     EO 14199: Withdrawing the U.S. From and Ending Funding to Certain United Nations Organizations and Reviewing U.S. Support to all International Organizations...........................................43

12.9     EO 14201: Keeping Men Out of Women's Sports..............................................................43

12.10    EO 14204: Addressing Egregious Actions of the Republic of South Africa.....................43

12.11    EO 14218: Ending Taxpayer Subsidization of Open Borders............................................43

12.12    EO 14224: Designating English as the Official Language of the United States ................44

12.13    EO 14292: Improving the Safety and Security of Biological Research .............................44

## 1.0    OVERVIEW OF GENERAL TERMS AND CONDITIONS FOR MUTUAL INTEREST AGREEMENTS

### 1.1    Introduction

These General Terms and Conditions for Mutual Interest Agreements (General Terms and Conditions) outline U.S. Department of Agriculture (USDA) mandatory agreement terms. The General Terms and Conditions are determined by statutory, regulatory, and agency requirements, as well as by administrative policies. Unless otherwise prohibited by law, cooperators and subcooperators of USDA mutual interest agreements (agreements) must comply with these General Terms and Conditions. These General Terms and Conditions are in addition to the assurances and certifications made as part of the agreement and any agency- or program-specific terms, conditions, and restrictions included in the agreement.

The cooperator shall maintain a copy of these General Terms and Conditions, as well as the agreement provisions and any subsequent changes to the agreement. Electronic copies of these General Terms and Conditions are publicly available at: https://www.usda.gov/about-usda/general-information/staff-offices/office-chief-financial-officer/federal-financial-assistance-policy/usda-general-terms-and-conditions.

### 1.2    Order of Precedence

In the event of any inconsistency among the terms and conditions of the Federal Agreement and/or other issuances, the inconsistency will be resolved by giving precedence in the following order:

1. Applicable statutes of the United States
2. Program-specific regulations
3. Federal agreement provisions and specific conditions
4. Program-specific Terms and Conditions
5. Agency-specific Terms and Conditions
6. USDA General Terms and Conditions
7. Approved budget and program plans
8. Notice of Funding Opportunity (if applicable)

### 1.3    USDA Responsibilities

USDA has overall responsibility for USDA-issued agreements, including providing oversight for programmatic, financial, and administrative performance.

### 1.4    Cooperator Responsibilities and Compliance with Federal Requirements

The cooperator is responsible for notifying the USDA agency of any significant problems relating to the administrative, programmatic, or financial aspects of the agreement.

The cooperator has full responsibility for the management of the project or activity supported under the agreement and for adherence to Federal statutes and regulations, all applicable terms and conditions (including these General Terms and Conditions), the agreement provisions, and approved budget and program plans. Although the cooperator is encouraged to seek advice and opinion from the USDA agency on special problems that may arise, such advice does not diminish the cooperator's responsibility for making prudent and sound administrative judgments under the circumstances prevailing at the time the decision was made and should not imply that the responsibility for operating decisions has shifted to the USDA agency.

The cooperator is responsible for submitting full, complete, and timely documentation, as required by applicable Federal statute, regulations, applicable terms and conditions, or upon request of the USDA agency. For elements of cost, documentation must be specific, detailed, and contemporaneous, and it must support all reported or requested expenses, both Federal and non-Federal. The USDA agency may determine that any documentation related to an agreement is not adequate to determine that costs are reasonable, necessary, allowable, and allocable. When a USDA agency makes such a determination, the cooperator must revise and resubmit documentation as requested by the USDA agency. Failure to do so may result in delays or nonperformance of actions related to the agreement, such as requested amendments, nonpayment of disbursements, or determination of noncompliance.

These General Terms and Conditions extend to all entities party to a subagreement, and the cooperator must ensure their inclusion in the corresponding agreements.

## 1.5    Subagreement and Contract Requirements

Cooperators must obtain written approval from the USDA agency prior to issuing subagreements or contracts (including any similar forms of agreement) regarding any segment of a funded agreement. Requests for prior approval must be in writing and identify the subcooperators or contractor, authorized activities, and all anticipated costs. If all such elements are identified in a budget or budget narrative at time of application, approval of the agreement constitutes prior written approval of the subagreement or contract.  The cooperator shall bear sole responsibility for all aspects of any subagreements or contracts. The USDA agency's legal relationship is solely with the cooperator and does not extend to any subagreements or contracts.

The cooperator agrees to the following requirements for all subagreements consistent with principles of sound and prudent business judgment:

- Compliance: Ensure that all subcooperators comply with all applicable Federal laws, regulations, and the terms and conditions of this agreement. Include all relevant provisions of this agreement in all subagreements, ensuring the requirements flow down to the lowest tier.

- Monitoring and Oversight: Actively manage and monitor the performance of subcooperators to ensure they meet programmatic goals, financial obligations, and compliance requirements.

- Intellectual Property and Data: All intellectual property and data rights stipulated in the primary agreement between the cooperator and the USDA agency must be

**2**

appropriately addressed and flowed down to the subcooperator level to ensure compliance with the original terms.

The cooperator remains fully accountable to the USDA agency for the performance and compliance of all subcooperators, as if the work were performed by the cooperator itself. No subagreement shall relieve the cooperator of any obligations under this agreement.

## 1.6    Internal Controls

The cooperator and any applicable subcooperator must maintain effective internal controls over agreements. The internal controls must align with the "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States. The internal controls provide assurance that the cooperator and subcooperators are administering the agreement in compliance with Federal statutes, regulations, and the terms and conditions of the agreement.

## 1.7    Conflict of Interest

The cooperator and subcooperators must maintain written standards of conduct covering conflicts of interest and governing the action of its employees engaged in the selection, award, and administration of agreements. No employee, officer, or agent may participate in the selection or administration of an agreement if she or he has a real or apparent conflict of interest.

If the cooperator has a parent, affiliate, or subsidiary organization that is not a State, local government, or Indian Tribe, the cooperator must also maintain written standards of conduct covering organizational conflicts of interest. If subagreements, contracts, or similar pass-through arrangements are made with a parent, affiliate or affiliated company, or subsidiary organization that is not a State, local government, or Indian tribe, no profit may result from goods or services rendered under such arrangements under the agreement.

"Affiliate" or "affiliated company" of any specified person or entity means any other person or entity directly or indirectly controlling of, controlled by, under direct or indirect common control with, or related to, such specified person or entity, or which exists for the sole purpose of providing any service to one company or exclusively to companies which otherwise meet the definition of affiliate. This definition includes Variable Interest Entities as described in Financial Accounting Standards Board Interpretation (FIN) No. 46(R), Consolidation of Variable Interest Entities. For the purpose of this definition, "control" means the possession directly or indirectly, of the power to direct or cause the direction of the management and policies of a company, whether such power is exercised through one or more intermediary companies, or alone, or in conjunction with, or pursuant to an agreement with, one or more other companies, and whether such power is established through a majority or minority ownership voting of securities, common directors, officers, or stockholders, voting trust, holding trusts (other than money exchanged) for property or services.

The cooperator must disclose any conflict of interest, including organizational conflicts of interest, and the cooperator's approach for resolving the conflict of interest, to the USDA agency within five (5) calendar days of the discovery of the conflict of interest. Upon notice from the cooperator of a potential conflict of interest and the approach for resolving it, the

3

USDA agency will make a determination regarding the effectiveness of the cooperator's actions to resolve the conflict of interest within thirty (30) calendar days of receipt of the cooperator's notice, unless the USDA agency advises the cooperator that a longer period is necessary. The cooperator must not request payment from the USDA agency for costs for transactions subject to the conflict of interest, pending notification of the USDA agency's determination. The cooperator's failure to disclose a conflict of interest may result in cost disallowances and/or termination of the agreement.

### 1.8    Unpaid Federal Tax Liability and Felony Criminal Violations

By accepting the agreement, the cooperator certifies that:

1. It has no unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

2. It has not been convicted of a felony criminal violation under any Federal law within the preceding twenty-four (24) months.

### 1.9    Funding to Entities or Individuals on Prohibited Lists

The cooperator certifies and assures that it will not, directly or indirectly, engage with or provide any funding from the agreement to, including through contracts or subagreements, any entity or individual identified on any of the lists below. USDA identifies the entities and individuals on these lists as "prohibited" (i.e., prohibited entity/individual). This commitment extends to both direct funding, where the cooperator provides funds, and indirect funding, where a subcooperator, contractor, or other third party provides funds, from the agreement, whether for the performance of the agreement or for any other purpose related to the agreement or any of its contracts or other subagreements awarded under the agreement.

1. U.S. Department of War: Entities Identified as Chinese Military Companies Operating in the United States in Accordance with Section 1260H of the William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283). The cooperator must utilize the 2025 list or the most current list published in the Federal Register.

2. U.S. Department of War: Response to Section 1286 of the National Defense Authorization Act for Fiscal Year 2019 (Public Law 115-232), as amended. The cooperator must use the list cleared for publication on June 24, 2025, or the most current list released by DOW.

3. U.S. Department of State: State Sponsors of Terrorism List

4. U.S. Department of State: International Security and Nonproliferation List

5. U.S. Department of State: Foreign Terrorists Organization List

6. U.S. Department of Treasury, Office of Foreign Assets Control (OFAC), Consolidated Sanctions List which includes all OFAC non-SDN sanctions lists.

**4**

7. U.S. Department of Treasury, OFAC: Specially Designated Nationals (SDNs) List

8. U.S. Department of Treasury, OFAC: Additional Sanctions Lists which includes the below and any other similar list released by OFAC.

   a. Sectoral Sanctions Identifications (SSI) List

   b. Foreign Sanctions Evaders (FSE) List

   c. Non-SDN Palestinian Legislative Council (NS-PLC) List

   d. List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List)

   e. Non-SDN Menu-Based Sanctions List (NS-MBS List)

   f. Non-SDN Communist Chinese Military Companies List (NS-CMIC List)

9. Prohibition on certain telecommunications and video surveillance equipment or services: 41 U.S.C. Ch. 39 (Statutory Notes)

## 1.10 Non-Exclusivity

This agreement is non-exclusive, and nothing herein shall be construed to prevent either the USDA agency or the cooperator from entering into similar agreements or arrangements with other entities, provided such agreements do not conflict with the terms and conditions of this agreement or create any actual or apparent conflict of interest in the performance of work under this agreement.

## 1.11 No Implied Endorsement

The cooperator shall not, directly or indirectly, represent or imply that the cooperator (including its products or services) or any associated third parties (including their products or services) is favored, approved, or endorsed by the United States government, USDA, or any component thereof, or is considered by the United States government, USDA, or any component thereof to be superior to other cooperators (including their products or services).

## 1.12 Employment Eligibility Verification (Immigration and Nationality Act)

The cooperator shall ensure that all employees complete the Employment Eligibility Verification Form I-9 to certify that they are eligible for lawful employment under the Immigration and Nationality Act (8 U.S.C. § 1324a). The cooperator shall comply with regulations regarding certification and retention of the completed forms. The requirements also apply to any subagreement or contract awarded under this agreement.

## 1.13 National Environmental Policy Act

All agreements can be subject to environmental review laws. The USDA agency has the responsibility to comply with the National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. § 4321 et seq., and the USDA NEPA regulations at 7 CFR part 1b. All discretionary agreements, unless otherwise specifically exempted by statute, require compliance with NEPA and other relevant environmental laws. The level of NEPA review, and whether environmental analysis is needed, depends on the activity supported by the USDA agency.

The cooperator may not draw down funds or incur expenses under this agreement unless, and until, the NEPA process has been completed and approved by the USDA agency with a determination of whether further review, documentation, and/or mitigation measures are required; and the cooperator has satisfied any requirements contained in the USDA agency's determination. Once these conditions have been successfully completed, the USDA agency will then notify the cooperator that the review is complete. At that time, the distribution and expenditure of funds will be authorized.

When applicable, the USDA agency reserves the right to de-obligate funds obligated under this agreement (or to require the return of such funds) in the event the cooperator breaches or otherwise fails to perform under any of the agreement requirements.

## 1.14    Agricultural Bioterrorism Protection Act

The cooperator assures compliance with the Agricultural Bioterrorism Protection Act of 2002, as implemented at 7 CFR part 331 and 9 CFR part 121, by agreeing that it will not possess, use, or transfer any select agent or toxin without a certificate of registration issued by the USDA agency.

## 1.15    FOIA - Public Access to Records and Personally Identifiable Information

Documents, correspondence, and any products related to the agreement, from any part of the agreement cycle, may be made publicly available through Freedom of Information Act (FOIA) (5 U.S.C § 552) requests. USDA agencies utilize their websites to share accomplishments resulting from agreements with the public. Restrictions on the release of records and information apply for Protected Personally Identifiable Information (PPII) or when exempt from disclosure pursuant to the FOIA, the Privacy Act of 1974 (5 U.S.C. § 552a), or other applicable statute.

Reports must avoid the use of PPII, including the use of an individual's first name or first initial and last name in combination with any one or more types of information, including, but not limited to, social security number, passport number, credit card numbers, clearances, bank numbers, biometrics, date and place of birth, mother's maiden name, criminal, medical and financial records, educational transcripts, etc. Contact information included in performance reports should be limited to the organization name, physical address, and telephone number.

## 1.16    Acknowledgement and Information Dissemination

The cooperator must have an acknowledgement of the USDA agency support placed on any information dissemination products with any mutual interest agreement support, including those which report the results of, or describe, a mutual interest agreement-supported activity. "Information dissemination product" means any recorded information, regardless of physical form or characteristics, disseminated to the public. "Mutual interest agreement support" means the transfer of anything of value by the USDA agency through a mutual interest agreement, inclusive of subagreements and contracts under such instruments, to a cooperator. Such support may be provided as a cash or in-kind contribution.

Unless the provisions of the agreement say otherwise, this requirement does not apply to audiovisuals produced as research instruments or for documenting experimentation or findings that are not intended for presentation or distribution to the public.

The cooperator must request permission before using any agency logos or marks. If a cooperator wishes to use the USDA logo, more formally known as the USDA Symbol, they should request the USDA agency contact the Office of Communications to request permission on their behalf. See Use of Logos/Marks at the United States Department of Agriculture DR 1430-002 (5)(b)(3) and DR 5160-001 4(a)(8). Cooperator agrees to use the USDA logo in accordance with the style guidance found at: https://www.usda.gov/about-usda/policies-and-links/digital/usda-style-guide/logo

For any other agency logo or mark, the cooperator should request permission for use from the appropriate USDA agency using or overseeing the mark.

## 2.0    SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

USDA has adopted the agreement terms—System for Award Management (SAM.gov) and Universal Identifier Requirements except where otherwise exempted by law:

1. *Requirement for System for Award Management.* The cooperator must maintain a current and active registration in *SAM.gov* or otherwise specifically exempted by statute. The cooperator's registration must always be current and active until the cooperator submits all final reports required under this agreement or receives the final payment, whichever is later. The cooperator must review and update its information in *SAM.gov* at least annually from the date of its initial registration or any subsequent updates to ensure it is current, accurate, and complete. If applicable, this includes identifying the cooperator's immediate and highest-level owner and subsidiaries and providing information about the cooperator's predecessors that have received a Federal award, agreement, or contract within the last three years.

2. *Requirement for Unique Entity Identifier (UEI).* If the cooperator is authorized to make subagreements under this agreement, the cooperator:

   (i) Must notify potential subcooperators that no entity may receive a subagreement until the entity has provided its UEI to the cooperator.

   (ii) Must not make a subagreement with an entity unless the entity has provided its UEI to the cooperator. Subcooperators are not required to complete full registration in *SAM.gov* to obtain a UEI.

3. *Definitions.* For the purposes of this agreement term:

   *"System for Award Management (SAM.gov)"* means the federal repository into which a cooperator must provide the information required for the conduct of business as a cooperator. Additional information about registration procedures may be found in *SAM.gov* (currently at *https://www.sam.gov*).

   *"Unique entity identifier"* means the universal identifier assigned by *SAM.gov* to uniquely identify an entity.

   *"Entity"* includes:

7

(1) Whether for profit or nonprofit:
 (a) A corporation;
 (b) An association;
 (c) A partnership;
 (d) A limited liability company;
 (e) A limited liability partnership;
 (f) A sole proprietorship;
 (g) Any other legal business entity;
 (h) Any other cooperator or contractor that is not excluded by paragraph (2);
 (i) Any State or locality; and
 (j) Any subcontractor or subcooperator that is not excluded by paragraph (2);

(2) Does not include:
 (a) An individual recipient of an agreement; or
 (b) A Federal employee.

## 3.0 FINANCIAL MANAGEMENT

The cooperator's financial management system must meet the following standards:

1. Financial Reporting: The cooperator shall provide accurate, current, and complete disclosure of the financial results of each Federally funded project or program in accordance with the financial reporting requirements of the agreement.

2. Accounting Records: The cooperator's accounting records must adequately identify the source and application of Federal funds for Federally funded activities. These records shall contain information pertaining to Federal agreements, authorizations, obligations, unobligated balances, assets, outlays, and income.

3. Internal Control: The cooperator shall maintain effective control and accountability for all Federal funds, property, and other assets to ensure they are used solely for authorized purposes and in compliance with Federal statutes, regulations, and the terms and conditions of the agreement.

4. Source Documentation: Accounting records must be supported by appropriate source documentation (e.g., cancelled checks, paid bills, payrolls, contract documents). These documents must be made available to the USDA agency upon request.

5. Financial management systems and related records of the cooperator, subcooperators, and of any other entity involved in the agreement, must be sufficiently detailed to prepare reports, trace funds, and demonstrate that fund management complies with Federal statutes, regulations, and these general and other program-specific terms and conditions.

## 3.1 Allowable and Unallowable Costs and Activities

The USDA agency, cooperator, and subcooperator must adhere to sound financial management principles for all costs associated with this agreement. This includes both the Federal and non-

**8**

Federal share of project costs. Parties may not structure arrangements or obfuscate details to circumvent these principles.

For a cost to be considered allowable under this agreement, it must meet the following criteria:

1. Necessity and Reasonableness: The cost must be necessary and reasonable for the performance of the agreement. A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost.

2. Allocability: The cost must be allocable to the agreement. A cost is allocable to a particular agreement if the goods or services involved are chargeable or assignable to that agreement in accordance with relative benefits received.

3. Consistency: The cost must be treated consistently. A given cost may not be assigned to an agreement as a direct cost if any other cost incurred for the same purpose in like circumstances has been assigned to the agreement as an indirect cost.

4. Conformity: The cost must conform to any limitations or exclusions set forth in this agreement document.

5. Sound Accounting: The cost must be determined in accordance with generally accepted accounting principles (GAAP) or other consistently applied sound business practices appropriate to the organization's circumstances.

6. Documentation: The cost must be adequately documented to support its necessity, reasonableness, and allocability.

7. No Double Counting: The cost must not be included as a cost or used to meet cost sharing or matching requirements of any other Federally financed program.

Costs must also adhere to principles of federal appropriations law and interpretations of such principles by the Comptroller General, as applicable.

## 3.2 National Security and Unallowable Costs

USDA may periodically identify unallowable elements of cost, whether tangible or intangible, funded or otherwise made available through cash, non-cash, or in-kind contributions through an agreement, due to national security concerns. Such determination of unallowability due to national security may be prescribed by statute, regulation, Executive Order, or administration policy, or may be in furtherance of Secretary's Memorandum (SM) 1078-014, and prevents American taxpayer dollars from supporting countries of concern or other foreign adversaries who want to undermine our national security. A list of unallowable costs due to national security will be published and maintained at the following USDA website: https://www.usda.gov/about-usda/general-information/staff-offices/office-chief-financial-officer/federal-financial-assistance-policy/national-security-and-unallowable-costs.

The cooperator agrees to comply with this term and shall not purchase, use, or make available in any way an unallowable element of cost due to national security for the purposes of a USDA agreement or using funds under the agreement. This term applies to the list of unallowable

**9**

costs published by USDA at the time of the agreement and any subsequent modifications to the list. The cooperator agrees to monitor for communications from the USDA agency concerning modifications to the list and will periodically check the list to ensure compliance with this term.

### 3.3    Payments

The following shall apply to all payments to the cooperator:

1. Payment Method: Payments will be made to the cooperator only for elements of cost as identified on the approved budget and which are in furtherance of the objectives of the agreement.

2. Invoicing: The cooperator is authorized to submit an invoice to the USDA agency as often as necessary when electronic fund transfers are used or at least monthly when electronic transfers are not used, as applicable. Each invoice must include the Federal Award Identification Number (FAIN), cooperator's name and UEI, unique invoice number, invoice date, performance dates of work completed, a description of the work performed, the amount due for the billing period, and any other supporting documentation as specified in the agreement.

3. Payment Due Date: The USDA agency should make payment within 30 calendar days after receipt of a proper invoice.

4. Acceptance of Work: The USDA agency's Program Manager/representative will have ten (10) business days to review a submitted invoice. Such a review must include that completed activities are aligned with the agreement and approved budget.. If the invoice is deemed improper for any reason, the USDA agency will notify the cooperator in writing, detailing the reasons, and the parties will jointly work in good faith to resolve the issue promptly.

5. Advance Payments: If explicitly authorized by law and provided for in the agreement, advance payments may be authorized by the USDA agency. Any interest earned on advance payments must be accounted for as specified in the agreement.

6. Withholding of Payments: The USDA agency may withhold payment, in whole or in part, if the cooperator fails to comply with the terms and conditions of the agreement, including performance quality or reporting requirements. Any withheld funds will be released upon subsequent compliance or resolution of the issue.

7. No Government Obligation to Third Parties: The USDA agency has no obligation to pay any subcooperator of the cooperator. All provisions for payment to third parties are the sole responsibility of the cooperator.

**Advance**—An advance payment is a payment that the USDA agency or a cooperator makes before the cooperator or subcooperator disburses the funds for program purposes. Unless otherwise authorized by statute, requests for advance payments must be limited to the minimum amounts needed to meet actual and immediate cash needs in carrying out the purpose of the approved program. The timing and amount of advance payments must be as close as is administratively feasible (generally, no greater than three (3) calendar days

prior) to the actual disbursements by the cooperator or subcooperator for direct program costs and the proportionate share of any allowable indirect costs, regardless of whether the payment is made by electronic funds transfer or by other means. Except for a limited amount of interest allowed to be retained under Federal guidelines, cooperators and subcooperators may not maintain Federal cash in excess of immediate disbursing needs and must promptly return unused funds to the applicable USDA agency. All requests for advance payments must be accompanied by a written justification with sufficient information to allow the certifying and disbursing officers to verify the actual and immediate cash need of the cooperator.

**Reimbursements**—Reimbursements are transfers of Federal funds to the cooperator or subcooperator after the cooperator disburses funds for approved program activities.

**Invoice Standards**—All invoice and supporting documentation requirements, as set forth in the agreement, must be satisfied before payments are issued. USDA agencies may identify and impose specific invoice and supporting documentation requirements in respective agreements.

## 3.4    Audit Requirements

All non-Federal entities that expend $1,000,000 or more in agreements during the non-Federal entity's fiscal year must have a single or program-specific audit conducted for that year. In addition, the cooperator is subject to the audit requirements found in the Single Audit Act of 1984 as amended, 31 U.S.C. §§ 7501-7506. The cost of an audit may be charged to the agreement.

Audits for agreements are performed in accordance with Generally Accepted Government Auditing Standards (GAGAS) and come in two main forms: a program-specific audit, which focuses on a single Federal program, or a single audit, which comprehensively reviews the cooperator's financial statements of that entity's active agreements.

A foreign cooperator that expends $1,000,000 or more in agreements during the cooperator's fiscal year must have a single or program-specific audit conducted for that year in accordance with these General Terms and Conditions. In the event the cooperator undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the USDA funding was analyzed under the same audit. The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the USDA agency's approval.

The USDA agency and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the cooperator's

**11**

possession pertaining to the agreement. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers, and records of the cooperator. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The USDA agency reserves the right to conduct audits, inspections, excerpts, transcriptions, or other examinations as authorized by law, of the cooperator's documents and facilities.

## 3.5    Cost Sharing

Unless otherwise authorized by statute, the cooperator may only use funds or other resources from non-Federal sources to satisfy any cost sharing requirement. Cost sharing provided in the form of cash and/or in-kind non-Federal resources must be verifiable, provided for in the approved budget, necessary and reasonable for achieving the project's objectives, and may not be included as contributions for any other Federal financial assistance award (as defined at 2 CFR 200.1) or agreement. If a cooperator voluntarily pledges cost sharing above the program's required amount, the total becomes a binding requirement of the agreement at time of the agreement approval and issuance by the USDA agency, which may only be later reduced or waived through prior written approval from the USDA agency.

Documentation must be retained in the cooperator project files and made available upon request. The cooperator must maintain documentation identifying:

- The specific costs or contributions that constitute the cost sharing;

- The funding source or contribution; and

- How the appropriate amount of the contribution was determined for reporting purposes.

A cooperator may use unrecovered indirect costs as part of cost sharing only with written approval from the USDA agency. A cooperator may use Federal funds from a non-USDA Federal program to meet cost sharing requirements of a USDA program only when both expressly authorized by law and with the prior written approval of the USDA agency.

## 3.6    Interest Earned

The cooperator may retain interest earned on Federal payments deposited in interest-bearing accounts up to $500 per year for administrative expenses. Any additional interest earned on Federal funds must be returned annually to the Department of Health and Human Services Payment Management System (PMS) through either the Automated Clearing House (ACH) network or a Fedwire Funds Service payment. All interest in excess of $500 per year must be returned to PMS regardless of whether the cooperator or subcooperator was paid through PMS. Instructions for returning interest can be found at https://pms.psc.gov/grant-recipients/returning-funds-interest.html.

## 3.7    Indirect Costs
**Federally Negotiated Indirect Cost Rates**

Cooperators and subcooperators may elect to apply their current Negotiated Indirect Cost Rate Agreements (NICRAs) to the agreement. Cooperators and subcooperators

**12**

may voluntarily reduce or waive the collection of indirect costs pursuant to a NICRA. However, certain USDA authorities or programs may impose limitations that prevent the cooperator from collecting the full negotiated indirect cost rate. Cooperators must accept all Federally negotiated indirect costs rates for subcooperators. Cooperators must ensure that every subagreement includes the selected indirect cost rate method, which may be:

1. An approved indirect cost rate negotiated between the subcooperator and the Federal government. If no approved rate exists, the Cooperator must determine the appropriate rate in collaboration with the subcooperator. The indirect cost rate may be either:

   a. An indirect cost rate negotiated between the Cooperator and the subcooperator. These rates may be based on a prior negotiated rate between a different Cooperator and the subcooperator, in which case the Cooperator is not required to collect information justifying the rate but may elect to do so; or

   b. The *de minimis* indirect cost rate.

2. The Cooperator must not require the use of the *de minimis* indirect cost rate if the subcooperator has an approved NICRA with the Federal government. Subcooperators may elect to use the cost allocation method to account for indirect costs.

### *De Minimis* Rate Option

A cooperator or subcooperator that does not have a current, negotiated rate, except for a governmental department or agency that receives more than $35 million in direct Federal funding during its fiscal year, may elect to charge a *de minimis* rate of fifteen (15) percent of Modified Total Direct Costs (MTDC). For the purposes of mutual interest agreements, MTDC is defined as all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs, and the portion of each subagreement in excess of $50,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs and with the approval of the cognizant agency for indirect costs. No documentation is required to justify the *de minimis* rate of fifteen (15) percent.

Costs must be consistently charged as either indirect or direct costs but may not be double charged or inconsistently charged as both. If chosen, this methodology, once elected, must be used consistently for all agreements until the cooperator chooses to negotiate for a rate, for which the cooperator may apply at any time.

The cooperator who elects to charge the *de minimis* rate of fifteen (15) percent must use MTDC as the base.

**13**

**Indirect Costs for Subagreements**

The cooperator is also required to accept Federally negotiated indirect cost rates for subcooperators unless otherwise required by statute or regulation. For subcooperators that do not have an approved indirect cost rate negotiated between the subcooperator and the Federal government, the Cooperator may use a negotiated rate between them (including one from previous negotiation) or may allow use of the *de minimis* rate as described above in this section.

## 3.8    Procurements

If not prohibited by the agreement's authorizing statute or the terms of the agreement, the cooperator may acquire commercially available goods and services in connection with this project. The cooperator organization must maintain documented procurement procedures consistent with applicable Federal, State, local, and tribal laws and regulations.

1. General Procurement Standards: Any procurement transaction (i.e., contract) under this agreement must be awarded following the cooperator's own established procurement procedures, ensuring full and open competition to the maximum extent practicable, and structured to avoid any conflict of interest (or the appearance of a conflict).

2. Specific Requirements for State and Indian Tribe Cooperators: A State or Indian Tribe cooperator must follow the same policies and procedures it uses for procurements from non-Federal funds. These procedures must, at a minimum, ensure fair and open competition, cost-effectiveness, and compliance with all applicable Federal laws and executive orders.

3. Flow-down Clauses for All Contracts under the Agreement: The cooperator is responsible for ensuring that all its contracts made in connection with this agreement contain all applicable Federally mandated provisions. These provisions include, but are not limited to, those addressing:

   a. Labor Standards (e.g., Davis-Bacon Act, Contract Work Hours and Safety Standards Act)

   b. Debarment and Suspension

   c. Clean Air and Water Acts

   d. Prohibition on certain telecommunications and video surveillance services or equipment (e.g., 41 U.S.C. Ch. 39 (Statutory Notes))

## 4.0    PERFORMANCE MONITORING

## 4.1    Periodic Performance Reports

USDA requires the submission of periodic performance reports to demonstrate the progress made toward the completion of agreement goals, objectives, and outcomes. Reports must be formatted and submitted according to the instructions of the USDA agency.

**14**

The cooperator and subcooperator must monitor their activities under all agreements to ensure that they are compliant with all agreement requirements and that they are meeting performance expectations. The reports may be required quarterly, semi-annually, or annually. The minimum reporting requirement is annual submission.

## 4.2    Final Performance Reports

No later than one hundred and twenty (120) calendar days after the end date of the period of performance, the termination of the agreement, project completion, or the final disbursement of the agreement by the cooperator, whichever event occurs first, the cooperator must submit the final performance report to the USDA agency. The USDA agency will review performance reports to evaluate the project goals and measurable outcomes, as well as for compliance with Federal statutes and regulations.

## 4.3    Subcooperator Monitoring

The cooperator is accountable for the performance of subcooperators and the appropriate expenditure of Federal funds through projects and activities. This includes maintaining the necessary documentation on all subagreements and making it available to the USDA agency upon request. The cooperator must include subagreements activities in all performance and financial reports.

In general, the requirements that apply to the agreement cooperator flow down to subcooperators. If the cooperator uses subagreements, it must enter into a formal written agreement with each subcooperator that addresses the arrangements for meeting the programmatic, administrative, financial, and reporting requirements of the agreement, including those necessary to ensure compliance with all applicable Federal statutes, regulations, and policies.

The cooperator must evaluate each subcooperator's risk and establish monitoring activities as necessary to ensure each subcooperator complies with Federal statutes, regulations, and the terms and conditions of the subagreements.

Monitoring activities may include but are not limited to:

1.  Review of performance and financial reports;

2.  Onsite reviews of subcooperator program operations; and

3.  Providing training and technical assistance on programmatic activities.

The cooperator is responsible for including the requirements of the USDA agency and agreement-specific terms and conditions in its subagreements, as well as the following:

Agreement identification.

1.  Subcooperator's name (must match the name associated with its unique entity identifier);

2.  Subcooperator's unique entity identifier;

3.  FAIN;

**15**

4. Agreement execution date;

5. Subagreement period of performance start and end date;

6. Subagreement budget period start and end date;

7. Amount of Federal funds obligated in the subagreement;

8. Total amount of Federal funds obligated to the subcooperator by the cooperator, including the current financial obligation;

9. Total amount of the agreement committed to the subcooperator by the cooperator;

10. Agreement project description, as required by the Federal Funding Accountability and Transparency Act (FFATA);

11. Name of the USDA agency, cooperator, and contact information for the signatory official of the cooperator;

12. Assistance Listing title and number. The cooperator must identify the dollar amount made available under each Assistance Listing number at the time of disbursement;

13. Identification of whether the agreement is for research and development; and

14. Indirect cost rate for the agreement (including if the *de minimis* rate is used).

## 4.4 Site Visits

The USDA agency, the USDA Office of the Inspector General, or the Government Accountability Office may conduct in-person or virtual periodic site visits, at its own expense, to review project accomplishments and monitor progress. Site visit agendas may include review of financial and performance records, organizational procedures, and financial control systems. The USDA agency may provide administrative or technical assistance, as necessary.

The USDA agency will make every effort to notify the cooperator of the site visit within a reasonable time frame. Any official site visit on the premises of a cooperator or a subcooperator(s) requires that the cooperator provide, and must require its subcooperators to provide, all reasonable facilities and assistance in order for the USDA agency representatives to perform their duties. All site visits and evaluations are expected to be performed in a manner that does not cause any delay in the implementation of the project.

## 5.0 FINANCIAL MONITORING

## 5.1 Periodic Financial Reports

USDA requires the submission of periodic financial reports. The reports may be required quarterly, semi-annually, or annually. The minimum reporting requirement is annual submission. The cooperator is required to submit a financial expenditure report with each

period's corresponding performance report to account for their financial expenditures during the corresponding reporting period. More detailed reports must be formatted and submitted according to the instructions of the USDA agency.

## 5.2    Final Financial Report

The final financial report must be submitted to the USDA agency no later than one hundred and twenty (120) calendar days after the end date of the period of performance, the termination of the agreement, project completion, or the final disbursement of the agreement by the cooperator, whichever event occurs first. A subcooperator must submit a final financial report to a cooperator no later than ninety (90) calendar days after the conclusion of the agreement period of performance. The USDA agency or cooperator may extend the due date for any financial report with appropriate justification from the cooperator or subcooperator.

## 5.3    Review of Financial Reports

USDA agencies will review performance and financial reports to ensure completeness and progress toward meeting the project goals and measurable outcomes as well as compliance with Federal regulations. USDA agencies will notify the cooperator if additional information is required. The cooperator is responsible for adequately addressing all comments and questions before sending the revised report(s).

## 6.0    REMEDIES FOR NONCOMPLIANCE

The USDA agency or cooperator may implement specific conditions if the cooperator or subcooperator fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the agreement. When the USDA agency or cooperator determines that noncompliance cannot be remedied by imposing specific conditions, the USDA agency or cooperator may take one or more of the following actions:

1. Temporarily withhold payments until the cooperator or subcooperator takes corrective action.

2. Disallow costs for all or part of the activity associated with the noncompliance of the cooperator or subcooperator.

3. Suspend or terminate the agreement in part or in its entirety.

4. Initiate suspension or debarment proceedings as authorized in 2 CFR part 180 and 2 CFR 417, or for cooperators, recommend suspension or debarment proceedings be initiated by the USDA agency.

5. Withhold further Federal funds (new agreements or continuation funding) for the project or program.

6. Pursue other legally available remedies.

**17**

## 7.0    DEBARMENT AND SUSPENSION

USDA has adopted the Office of Management and Budget (OMB) guidance in Subparts A through I of 2 CFR part 180 (and as supplemented by 2 CFR part 417), as the USDA's policy and procedures for nonprocurement debarment and suspension.

## 8.0    CLOSEOUT

### 8.1    Agreement Closeout

The USDA agency will close out the agreement when it determines that all applicable administrative actions and all required work of the agreement are completed by the cooperator. If the cooperator fails to complete the applicable administrative actions or the required work for an agreement, the USDA agency will proceed to close out the agreement with the information available.

After the closeout of an agreement, the cooperator remains responsible for complying with certain post-closeout requirements. The closeout of the agreement does not affect any of the following:

1. The right of the USDA agency to disallow costs and recover funds on the basis of a later audit or other review;

2. The requirement for the cooperator to return any funds due as a result of later refunds, corrections, or other transactions, including final indirect cost rate adjustments;

3. The ability of the USDA agency to make financial adjustments to a previously closed agreement, such as resolving indirect cost payments and making final payments;

4. Ongoing audit requirements;

5. Property management and disposition requirements; or

6. Records retention requirements.

The cooperator may charge the agreement during closeout for the costs of publication or sharing of research results if the costs are not incurred during the period of performance of the agreement.

### 8.2    Termination

This agreement may be terminated, in part or in its entirety, under any of the following circumstances:

1. If the cooperator fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the agreement. Examples of terms and conditions of this agreement for which failure to comply may result in termination include:

   a. SAM.gov: The cooperator shall maintain current organizational information and the original UEI provided for this agreement in SAM until receipt of final

**18**

payment. Any change to the original UEI provided in this agreement will result in termination of this agreement and de-obligation of any remaining funds.

    b. Failure to Report: If financial and performance reports are not submitted timely, according to the terms and schedules outlined in this agreement, this agreement may be terminated and the remaining funds de-obligated.

2. With the mutual consent of the cooperator.

3. For the convenience of the USDA agency, with thirty (30) days written notification to the cooperator.

4. With thirty (30) days written notification by the cooperator to the USDA agency, provided that such notification sets forth the reasons for termination, the effective date, and in the case of partial termination, the portion to be terminated.

    a. In the event of partial termination by the cooperator, if the USDA agency determines that the remaining portion of this agreement will not accomplish the purposes for which it was made, the USDA agency may terminate this agreement in its entirety effective on the date provided in the original notice.

    b. In the event of full or partial termination by the cooperator, including full termination by the USDA agency due to the determination referenced in the preceding sub-provision, the USDA agency may establish a replacement agreement to accomplish similar work as that which has been identified for termination. The cooperator shall be liable to the Federal government for excess costs incurred as a result of the replacement agreement, as identified by the USDA Grants Management Specialist.

5. If this agreement is funded by an interagency agreement that is terminated in whole or in part, by the funding Federal agency, the USDA agency will provide to the cooperator written notice of such termination, which will identify the effective date and, in the case of partial termination, the portion to be terminated.

The cooperator shall not incur any new expenses for the terminated portion of this agreement after the effective date of the termination unless such expenses are expressly authorized in the notice of termination or subsequently. The cooperator shall cancel or discontinue as many outstanding expenses as possible. The USDA agency shall compensate the cooperator for the USDA agency share of expenses that cannot be cancelled, were properly incurred by the cooperator up to the effective date of the termination and were not incurred in anticipation of termination. The USDA agency shall not compensate the cooperator for any expenses continuing after termination due to the negligent or willful failure of the cooperator to immediately discontinue the expenses.

The following terms will apply to any termination:

**19**

1. Any unobligated balance of cash advanced to the cooperator or unexpended program income must be immediately refunded to the USDA agency, including any interest earned.

2. Within a maximum of one hundred and twenty (120) days following the date of termination of this agreement, all financial performance and related reports required by the terms of the agreement must be submitted to the USDA agency by the cooperator. If the reports are not received within one hundred and twenty (120) days, the USDA agency will unilaterally close out the agreement and process the de-obligation of funds without further communication.

When the USDA agency terminates the agreement prior to the end of the period of performance due to the cooperator's material failure to comply with the terms and conditions of the agreement, the USDA agency shall report the termination in SAM.gov.

All subagreements and contracts under this agreement with a total cumulative value in excess of $10,000 must address termination for cause and for convenience by the cooperator, including the manner by which it will be affected and the basis for settlement.

## 8.3    Unused and Returned Funds

**Closeout** —The cooperator must liquidate all financial obligations incurred under the agreement no later than one hundred and twenty (120) days after the end date of the period of performance, the termination of the agreement, project completion, or the final disbursement of the agreement by the cooperator, whichever event occurs first. If the cooperator has a balance of funds the USDA agency previously disbursed, and if those funds were not obligated for allowable expenditures before the end date of the period of performance, and are not authorized to be retained, the cooperator must promptly refund those funds to the USDA agency.

**Termination** —The cooperator must liquidate all financial obligations incurred under the agreement no later than one hundred and twenty (120) calendar days after the effective date of the termination. If the cooperator has a balance of funds the USDA agency previously disbursed, and if those funds were not obligated for allowable expenditures before the effective date of termination, the cooperator must promptly refund those funds to the USDA agency.

**Request to return unobligated balance** —Any Federal funds paid to the cooperator or subcooperator in excess of the amount the cooperator or subcooperator is determined to be entitled to under the agreement constitute a debt to the USDA agency. The USDA debt management procedures can be found at 7 CFR part 3. The USDA agency must collect all debts arising out of its agreements in accordance with 31 CFR part 901.

## 8.4    Disposition of Real Property, Equipment, Supplies, and Intangible Property

The cooperator must use, manage, and dispose of real property, equipment, supplies, and intangible property, acquired or improved under an agreement in accordance with established Federal property management standards. These standards govern aspects such as title, authorized use, maintenance, inventory, safeguarding, and eventual disposition of the property.

20

This also includes ensuring appropriate insurance coverage and managing any intellectual property rights in a manner that respects Federal interests.

The cooperator must maintain property records that include a description of the property, serial number or other identification number (if applicable), the source of funding for the property (including the FAIN), who holds the title, the acquisition date, and cost of the property. Additional information includes the percentage of Federal participation in the project costs for the agreement under which the property was acquired; the location, use, and condition of the property; and any ultimate disposition data including the date of disposal and sale price of the property.

The cooperator is expected to manage equipment for the purpose for which it was purchased, whether acquired in whole or in part under the agreement, until disposition takes place.

## 9.0    RESEARCH & DEVELOPMENT, SCIENCE & TECHNOLOGY

For purposes of agreement terms 9.6 through 9.10 and 9.14, the following definitions shall apply:

"Foreign adversary" means any foreign government or foreign non-government person as defined (see 15 CFR 791.2) or determined (see 15 CFR 791.4) by the Secretary of Commerce to have engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons.

"Foreign country of concern" means the People's Republic of China, the Democratic People's Republic of Korea, the Russian Federation, the Islamic Republic of Iran, or any other country determined to be a country of concern by the Secretary of State.

"Foreign entity" means a foreign government, foreign non-government entity (e.g. foreign corporation, business association, partnership, trust, society), foreign government instrumentality, or multilateral organization whose members are primarily foreign governments or non-government entities (e.g., Group of Twenty (G20)).

"Foreign person" means any natural person who is not a U.S. Citizen as defined herein.

"Foreign talent recruitment program" means any program, position, or activity that includes compensation in the form of cash, in-kind compensation, including research funding, promised future compensation, complimentary foreign travel, things of non *de minimis* value, honorific titles, career advancement opportunities, or other types of remuneration or consideration directly provided by a foreign country at any level (national, provincial, or local) or their designee, or an entity based in, funded by, or affiliated with a foreign country, whether or not directly sponsored by the foreign country, to an individual, whether directly or indirectly stated in the arrangement, contract, or other documentation at issue.

"Individual" means covered individual, senior/key person, or any other individual employed by the cooperator to work on the research arrangement, including an individual who (a) contributes in a substantive, meaningful way to the scientific development or execution of a research project proposed to be carried out as part of a research arrangement with USDA; and (b) is designated as a covered individual by USDA. Consistent with National Security

21

Presidential Memorandum 33 (NSPM-33), this means principal investigators (PIs) and other senior or key personnel seeking or receiving USDA research and development funding (i.e., extramural funding) and researchers at USDA laboratories and facilities (i.e., intramural researchers, whether or not Federally employed), including Government-owned, contractor-operated laboratories and facilities.

"Research" means a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge. Research includes all basic, applied, and demonstration research in all fields of science, technology, engineering, and mathematics. This includes, but is not limited to, research in economics, education, linguistics, medicine, nutrition, psychology, natural sciences, social sciences, statistics, and research involving human subjects, animals, and *in vitro* and *in silico* techniques. Activities which meet this definition constitute research (scientific activity), whether conducted or supported under a program which is considered "research" for other purposes, for example, some demonstration and service programs may include research or scientific activities.

"Research security training" means online research security training modules developed for the research community and participants in the United States research and development enterprise to ensure compliance with NSPM-33 or successor documents, including modules— (a) focused on cybersecurity, international collaboration and international travel, foreign interference, and rules for proper use of funds, disclosure, conflict of commitment, and conflict of interest; and (b) tailored to the unique needs of— (i) covered individuals; (ii) undergraduate students, graduate students, and postdoctoral researchers; and (iii) applicants for agreements under the Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) programs (as such terms are defined in section 9(e) of the Small Business Act (15 USC 638(e)).

"Science Experts Network Curriculum Vitae (SciENcv)" means an electronic system that helps researchers assemble the professional information needed for participation in Federally funded research. SciENcv gathers and compiles information on expertise, employment, education and professional accomplishments (e.g., Common Form for Current and Pending (Other) Support and the Common Form for Biographical Sketch (OMB Control Number: 3145-0279)). Researchers can use SciENcv to create and maintain biosketches that are submitted with applications and annual reports. SciENcv allows researchers to describe and highlight their scientific contributions in their own words. SciENcv is available at: https://www.ncbi.nlm.nih.gov/sciencv/.

"U.S. citizen or entity subject to foreign ownership, control, or influence (FOCI)" means a U.S. citizen or entity when: (a) A foreign interest[1] has the power to direct or decide matters affecting the entity's management or operations in a manner that could: (i) Result in unauthorized access to classified information; or (ii) Adversely affect performance of a contract or agreement requiring access to classified information; and (b) The foreign interest exercises that power: (i) Directly or indirectly; (ii) Through ownership of the U.S. entity's securities, by contractual arrangements, or other similar means; (iii) By the ability to control or influence the election or

---

[1] For the purposes of this definition, the term "foreign interest" includes foreign person or foreign entity.

22

appointment of one or more members to the entity's governing board (e.g., board of directors, board of managers, board of trustees) or its equivalent; or (iv) Prospectively (i.e., is not currently exercising the power, but could).[2]

## 9.1    Intellectual Property (Copyright and Patent Rights)

To the maximum extent permissible by law, the cooperator or subcooperator shall retain the right to assert copyright in any work that is copyrightable and either was developed or for which ownership was acquired under this agreement. However, the USDA agency expressly reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, distribute, or otherwise utilize such copyrighted works for Federal purposes, including the right to authorize third parties to exercise these rights on behalf of the federal government. This reservation of rights includes the authority of the USDA agency to mandate that the cooperator or subcooperator make such works accessible through public access repositories operated, authorized, or designated by the USDA agency.

The cooperator or subcooperator shall adhere to all applicable regulations concerning patents and inventions, including but not limited to the government-wide regulations delineated in 37 CFR Part 401. Should the cooperator or subcooperator fail to disclose or elect to retain title to a subject invention in accordance with 37 CFR Part 401, or decline to do so, the USDA agency reserves the right to obtain title to said subject invention.

## 9.2    Scientific Integrity and Research Misconduct

USDA is committed to the highest levels of integrity in all of its scientific activities and decision making. This includes performing, recording, and reporting the results of scientific activities with honesty, objectivity, and transparency. All individuals and entities performing under this agreement shall adhere to the principles of scientific integrity as articulated in USDA Departmental Regulation 1074-001, "Scientific Integrity".

The cooperator is expected to uphold the principles of scientific integrity when engaging in scientific activities identified in the Departmental Regulation. Scientific integrity is the condition resulting from adherence to professional values and practices when conducting, reporting, and applying the results of scientific activities that ensure objectivity, clarity, and reproducibility, and that provides insulation from bias, fabrication, falsification, plagiarism, inappropriate influence, political interference, censorship, and inadequate procedural and information security.

The cooperator bears the primary responsibility for prevention and detection of research misconduct associated with their institution and for the inquiry, investigation, and adjudication of research misconduct alleged to have occurred in association with their own institution as described per 2 CFR part 422. The cooperator must comply with the reporting requirements outlined in 2 CFR part 422 regarding allegations and findings of research misconduct involving USDA-funded research.

Additional information can be found on the USDA Office of the Chief Scientist website.

---

[2] 32 CFR 2004.34

**9.3    Geospatial Data Management Standards**

The cooperator agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in Departmental Regulation 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA.

**9.4    Public Access to Scholarly Publication and Digital Scientific Research Data**

The cooperator agrees to comply with USDA's public access policy implemented in Departmental Regulation 1020-006, which establishes USDA policy for public access to scholarly publications and digital scientific research data assets. USDA will make all peer-reviewed, scholarly publications and digital scientific research data assets arising from unclassified scientific research supported wholly or in part by USDA accessible to the public, to the extent practicable.

**9.5    Information Security and Privacy**

If the cooperator connects to the USDA network or processes/stores USDA information, it must adhere to all federal and USDA security and privacy mandates. Cooperator personnel granted access to USDA networks, systems, or authorized to use USDA-owned/leased equipment, must complete all mandatory USDA security and privacy training. This includes the Federal Information Security Management Acts (FISMA) of 2002 and 2014, the National Cybersecurity Protection Act of 2014, and the Privacy Act of 1974, all aimed at safeguarding USDA information and information systems from cyber threats and unauthorized access. Detailed USDA control guidelines are provided in the most recent USDA Information System Security Handbook. Furthermore, compliance with USDA email regulations and policies is required. Those regulations and policies specifically prohibit the downloading of copyrighted material without prior authorization or accessing content deemed inappropriate. The cooperator is also prohibited from disseminating or publishing previously unreleased official government information or data without explicit authorization under this agreement.

USDA security and privacy protocols are aligned with the latest National Institute of Standards and Technology (NIST) special publications and are accessible through the USDA Information System Security Program Manager. Where applicable, the cooperator is required to collaborate with the designated USDA Program Unit Information Systems Security Manager and the USDA Information Systems Security Program Manager to meet the FISMA Assessment and Authorization (A&A) requirements for USDA information and information systems, including adhering to the USDA's 6-step risk management framework as described in Departmental Regulation 3540-003: Security Assessment and Authorization.

**9.6    Research Security Training**

The cooperator of a research agreement, whether an institution or individual, must certify that each individual employed by the cooperator to work on the agreement has completed research security training (RST) and must recertify annually for the duration of the agreement. RST must have been completed either at the time of application, where applicable, or within the 12-month period immediately preceding the commencement of work on the agreement. The

**24**

required RST can be satisfied by utilizing the training made available by the National Science Foundation or the SECURE Center.

### 9.7    Foreign Ownership, Control or Influence (FOCI) by a Country of Concern

By accepting the agreement, the cooperator (whether an institution or individual) certifies that they are not currently, and will not in the future, enter into any subagreements, contracts, or other agreements, or otherwise provide any form of benefit (material or non-material) through either funded or unfunded work to any foreign person, foreign entity, U.S. citizen, or U.S. entity, that is subject to FOCI by a foreign country of concern or another foreign adversary.

### 9.8    Disclosures

The cooperator of a research agreement (whether an institution or individual), and all employees of the cooperator who work on the research agreement, must complete the Common Form for Current and Pending (Other) Support and the Common Form for Biographical Sketch using SciENcv, submit the form(s) at time of application, and agree to update the form(s) at any time USDA deems appropriate during the term of the agreement, but no less than annually. The cooperator must provide any supporting documentation, including copies of contracts, grants, or any other agreement, specific to foreign appointments, employment with a foreign institution, participation in a foreign talent recruitment program, and other information reported as current and pending support for all employees working on the agreement.

By accepting the agreement, the cooperator certifies that the forms are current, accurate, and complete.

### 9.9    Malign Foreign Talent Recruitment Program

The cooperator must certify that they (if an individual) or any individual employed to work on the research federal agreement is not participating, and has not participated within the past 10 years, in a malign foreign talent recruitment program (FTRP) as defined in 42 U.S.C. § 19237. Each such individual must certify on the Common Form for Current and Pending (Other) Support and a Common Form for Biographical Sketch (OMB Control Number 3145-0279) via SciENcv that they are not party to a malign FTRP and agree to an annual recertification for the duration of the agreement, complying with 42 U.S.C. § 19232.

### 9.10    Consequences for Violation of Disclosure Requirements

Violation of disclosure requirements may lead to criminal, civil, and/or administrative consequences as may be deemed appropriate based upon the particular facts of the violation. Violations will be thoroughly investigated and referred to criminal and/or civil offices within the Department of Justice, when warranted. Such matters will also be considered for administrative action as deemed appropriate. Administrative actions may include suspension and debarment of individuals or research organizations, where consistent with 2 CFR part 180, 2 CFR part 417, and 48 CFR part 9.4 and appropriate to protect the integrity of government programs.

In addition to suspension and procedures set forth in 2 CFR part 180, 2 CFR part 417, and 48 CFR part 9.4, the USDA agency may consider action pursuant to other authorities, including but not limited to:

**25**

1. The USDA agency review of the risk posed by applicants, prior to issuing agreements;

2. Imposing specific conditions on agreements, for instance, due to an applicant's financial instability, unsatisfactory performance, or noncompliance with terms and conditions;

3. Implementing remedies for noncompliance with federal statutes, regulations, or agreement terms, such as disallowing costs, withholding payments, or requiring return of funds;

4. Termination of agreements, in whole or in part, for cause or convenience; and

5. Requiring notification to subcooperators upon termination of an agreement.

Other Potential Administrative Actions

Depending on the facts surrounding the violation, and consistent with due process requirements, research agencies may consider a range of actions, including upon recommendation of the cognizant Office of the Inspector General. Such actions include, but are not limited to:

1. Rejection of a research arrangement application;

2. Preserving a research arrangement but requiring or otherwise ensuring that individual(s) do not perform work under the arrangement;

3. Ineligibility for participation in U.S. Government review panels and other activities;

4. Suspension or termination of federal employment;

5. Suspension or termination of a research arrangement;

6. Suspension or denial of Title IV funds by the Department of Education; and

7. Placement of the individual or research organization in SAM.gov, including the Federal Awardee Performance and Integrity Information System (Responsibility/Qualification records) to alert other agencies.

## 9.11  Potential Life Sciences Dual Use Research of Concern and Dangerous Gain-of-Function

This term and condition applies to all research for which USDA agreement funds may be used that potentially falls within the scope of the *U.S. Government Policy for Institutional Oversight of Life Sciences Dual Use Research of Concern* (DURC), as published in September 2014, and/or would fall under the Department of Health and Human Services *Framework for Guiding Decisions about Proposed Research Involving Enhanced Potential Pandemic Pathogens (HHS P3CO Framework),* as published in January 2017, hereafter referred to as "the Policy". By accepting this agreement, the cooperator agrees to comply with the Policy.

The cooperator is responsible for monitoring the research progress and for implementation of all appropriate biosafety and biosecurity risk mitigation measures including compliance with all applicable laws and regulations related to that implementation, including the Policy specified above. The cooperator agrees to ensure that the agreement does not support any research that USDA will not fund.

**26**

1. Pursuant to the May 5, 2025, Executive Order on Improving the Safety and Security of Biological Research, USDA will not fund research that could potentially result in dangerous gain-of-function research conducted by foreign entities in countries of concern, as defined by the Executive Order, or foreign countries where there is not adequate oversight. Adequate oversight means the work is conducted in a manner that is compliant with U.S. biosafety and biosecurity standards.

2. USDA will not fund research that would lead to a dangerous gain-of-function except in special circumstances where the potential benefits far outweigh the risks, where other options are not available, and where all other conditions of the Policy are met.

3. USDA will not fund research that involves the creation, transfer, or use of enhanced potential pandemic pathogens except under special circumstances where the potential benefits to society far outweigh the risks and all other conditions of the Policy are met.

Each organization involved in the conduct of USDA-supported research that utilizes select agents or other pathogens specified by the Secretary of Agriculture, must have a standing Institutional Biosafety Committee (IBC) or other Institutional Review Entity (IRE) whose role is the review of research involving agents covered by the Policy.

Use of the select agents or other potential pandemic pathogens as defined by the Policy must be registered with the Centers for Disease Control and Prevention or USDA as directed under the Select Agent Regulations. Documentation demonstrating appropriate registration of the agent must be submitted to USDA prior to the issuance of the agreement.

In the rare cases where USDA funds research that involves the creation, transfer, or use of enhanced potential pandemic pathogens, then special agreement conditions will be applied to ensure adequate oversite by the cognizant USDA Agency and require the establishment of a risk mitigation plan for the research that must be reviewed and approved by the IRE and USDA, as well as the requirement of maintenance of records of institutional review of the research and risk mitigation activities for three years after completion of the project.

The cooperator must establish an Institutional Contact for Dual Use Research (ICDUR), as required by the Policy, to serve as an internal resource for issues regarding compliance with and implementation of the requirements for the oversight of research that falls within the scope of the Policy. The cooperator must maintain records of institutional DURC reviews and completed risk mitigation plans for the term of the research grant or contract plus three years after its completion, but no less than eight years, unless a shorter period is required by law or regulation.

"Dangerous gain-of-function" research means scientific research on an infectious agent or toxin with the potential to cause disease by enhancing its pathogenicity or increasing its transmissibility. Covered research activities are those that could result in significant societal consequences and that seek or achieve one or more of the following outcomes:

1. Enhancing the harmful consequences of the agent or toxin;

2. Disrupting beneficial immunological response or the effectiveness of an immunization against the agent or toxin;

**27**

3. Conferring to the agent or toxin resistance to clinically or agriculturally useful prophylactic or therapeutic interventions against that agent or toxin or facilitating their ability to evade detection methodologies;

4. Increasing stability, transmissibility, or the ability to disseminate the agent or toxin;

5. Altering the host range or tropism of the agent or toxin;

6. Enhancing the susceptibility of a human host population to the agent or toxin; or

7. Generating or reconstituting an eradicated or extinct agent or toxin.

"Dual use research of concern" means life sciences research that, based on current understanding, can be reasonably anticipated to provide knowledge, information, products, or technologies that could be directly misapplied to pose a significant threat with broad potential consequences to public health and safety, agricultural crops and other plants, animals, the environment, materiel, or national security.

"Institutional Contact for Dual Use Research" (ICDUR) means an individual designated by the institution to serve as an institutional point of contact for questions regarding compliance with and implementation of the requirements for the oversight of DURC as well as the liaison (as necessary) between the institution and the relevant funding agency.

"Life sciences" means living organisms (e.g., microbes, human beings, animals, and plants) and their products, including all disciplines and methodologies of biology such as aerobiology, agricultural science, plant science, animal science, bioinformatics, genomics, proteomics, microbiology, synthetic biology, virology, molecular biology, environmental science, public health, modeling, engineering of living systems, and all applications of the biological sciences. The term is meant to encompass the diverse approaches to understanding life at the level of ecosystems, populations, organisms, organs, tissues, cells, and molecules.

## 9.12  Export Control

By accepting this agreement, the cooperator agrees to comply with all applicable laws and regulations regarding export-controlled items, including the Export Administration Regulations (EAR) issued by the Department of Commerce. The cooperator shall establish and maintain effective export compliance procedures throughout the performance of the agreement. At a minimum, these export compliance procedures must include adequate controls of physical, verbal, visual, and electronic access to export-controlled items, including by foreign nationals.

If export-controlled items are used to conduct research or are generated as part of the research efforts, the export control laws and regulations apply to the controlled items.

The cooperator shall control access to all export-controlled items that it possesses or that comes into its possession in performance of this agreement, to ensure that access to, or release of, such items are restricted, or licensed, as required by applicable federal statutes, Executive Orders, and/or regulations, including the EAR.

**28**

To the extent the cooperator wishes to provide foreign nationals with access to export-controlled items, the cooperator shall be responsible for obtaining any necessary licenses, including licenses required under the EAR for deemed exports or deemed re-exports.

Compliance with this section will not satisfy any legal obligations the cooperator may have regarding items that may be subject to export controls administered by other agencies such as the Department of State, which has jurisdiction over exports of munitions items subject to the International Traffic in Arms Regulations (22 CFR part 120 through 22 CFR part 130), including releases of such items to foreign nationals.

Although openly publishable literature is not subject to export control, USDA's policy is to oppose interaction with terrorist and embargoed countries unless there is specific U.S. Government policy support for sponsorship for such interactions.

The cooperator shall include this clause, including this paragraph, in all lower-tier transactions (subagreements, contracts awarded under the agreement, etc.) under this agreement that may involve access to export-controlled items.

"Export-controlled information" means information (which may include technology, technical data, assistance or software), the export (including, as applicable, transfer to foreign nationals within the United States) of which is controlled under the "Export Administration Regulations" (maintained by the U.S. Department of Commerce), the "International Traffic in Arms Regulations" (maintained by the U.S. Department of State), "10 CFR part 810, Assistance to Foreign Atomic Energy Activities" regulations (maintained by the U.S. Department of Energy), or various trade and economic sanctions (maintained by the U.S. Department of Treasury's OFAC).

"Export-controlled items" means items (e.g., commodities, software, or technology), that are subject to the EAR (15 CFR part 730 through 15 CFR part 774), implemented by the Department of Commerce's Bureau of Industry and Security. These are generally known as "dual-use" items, items with a military and commercial application.

"Deemed export/re-export" means the release of export-controlled items (specifically, technology or source code) to a foreign national in the U.S. Such release is "deemed" to be an export to the home country of the foreign national (15 CFR 734.2). A release may take the form of visual inspection, oral exchange of information, or the application abroad of knowledge or technical experience acquired in the United States. If such a release occurs abroad, it is considered a deemed re-export to the foreign national's home country. Licenses from Department of Commerce may be required for deemed exports or re-exports.

Transfer can occur by the transmission of technology/items by physical or electronic means such as:

1. Shipping (by land, sea, or air) of export-controlled information (ECI); hand-carrying on foreign travel; or performing processes or services in a foreign country that convey expertise;

2. Sales, loans, or donations to foreign persons, including associated technical manuals;

**29**

3. Consulting with or training foreign persons;

4. Publications, presentations, and participation in international exchange programs or conferences;

5. Mail, faxes, emails, postings/data transfer on the Internet, or communication through telephone calls;

6. Cooperative Research and Development Agreements (CRADA), patent applications, non-disclosure agreements, procurement specifications, Memoranda of Agreement/Understanding, and contracting instruments; and

7. Sharing export-controlled technology/information with foreign persons in the United States, including visits or assignments of foreign persons to USDA facilities.

If a violation occurs or one is thought to have occurred, self-disclosure is required to USDA and the appropriate export control jurisdictional authority. Each cooperator has or should have an escalation process for such matters. Depending on circumstances and the significance of the violation, penalties can include:

1. Fines for the individual and/or legal entity contractor;

2. Denial of export privileges for a specified period of time or indefinitely;

3. Loss of Programs/Projects;

4. Loss of reputation;

5. Debarment, seizure, and/or forfeiture; or

6. Imprisonment.

## 9.13  Limitation on Use of Funds for Research Involving Human Subjects

By accepting this agreement, the cooperator agrees that no work involving human subjects may be undertaken, conducted, or costs incurred and/or charged to this agreement for human subject's research, until the appropriate documentation is approved in writing by USDA. This documentation may include:

1. Documentation establishing approval of the project by an institutional review board (IRB) approved for federal-wide use under Department of Health and Human Services guidelines;

2. Documentation to support an exemption for the project;

3. Documentation to support deferral for an exemption or IRB review; or

4. Documentation of IRB approval of any modification to a prior approved protocol or to an informed consent form.

5. The cooperator shall obtain and document a legally sufficient informed consent from each human subject involved. No such informed consent shall include any exculpatory language through which the subject is made to waive, or to appear to waive, any of his

or her legal rights, including any release of the cooperator or its agents from liability for negligence.

If approved, the cooperator agrees to comply with U.S. Department of Health and Human Services' regulations regarding human subjects, appearing in 45 CFR part 46 (as amended) and USDA regulations appearing in 7 CFR part 1c. The cooperator and any subcooperator, as appropriate, must maintain appropriate policies and procedures for the protection of human subjects. The cooperator will provide assurance that the risks do not outweigh either potential benefits to the subjects or the expected value of the knowledge sought and selection of subject or groups of subjects shall be made without regard to sex, race, color, religion, or national origin unless these characteristics are factors to be studied.

The protection of human subjects (the "Common Rule") as codified in 45 CFR part 46, subpart A, defines a human subject as a living individual about whom an investigator conducting research obtains (1) information or biospecimens through intervention or interaction with the individual (e.g., surveys and focus groups), and uses, studies, or analyzes the information or biospecimens or (2) uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

## 10.0   RECORDS MANAGEMENT

## 10.1   Record Retention
The cooperator must retain all records relating to the agreement for three (3) years after the submission of the final financial report. If any litigation, claim, or audit is started before the expiration of the three (3) year period, records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken, to include when appeal rights have lapsed and no appeal was filed. Following are exceptions and qualifications to the retention requirement and period for other types of Federal-related records:

1.  Property Records: Records for real property and equipment acquired with Federal funds must be retained for three (3) years after final disposition of the property.

2.  Transferred Records: When records are transferred to or maintained by the USDA agency or cooperator, the cooperator or subcooperator is relieved of the three (3) year retention requirement for those specific records.

3.  Program Income: Records for program income transactions occurring after the period of performance must be retained for three (3) years from the end of the cooperator or subcooperator's fiscal year in which the program income is earned. This requirement is only applicable if the USDA agency or cooperator requires the cooperator or subcooperator to report on program income earned after the period of performance in the terms and conditions of the agreement.

4.  Indirect Cost Rate Proposals/Cost Allocation Plans: Records related to indirect cost rate proposals and cost allocation plans must be retained until such proposals and plans have been submitted and approved, or for the three (3) year general retention period, whichever is later.

5.  As Directed: The cooperator or subcooperator may also be notified in writing by the USDA agency or cooperator, cognizant agency for audit, oversight agency for audit, or cognizant agency for indirect costs to extend the retention period.

## 10.2   Access to Records

The USDA agency, Inspectors General, the Comptroller General of the United States, and the cooperator, or any of their authorized representatives, must have right of access to any documents, papers, or records of cooperators and subcooperators which are pertinent to the agreement, to make audits, examinations, excerpts, and transcripts. Compliance with this requirement includes timely and reasonable access to the cooperator's and subcooperator's personnel for interviews and discussion related to such documents.

## 10.3   Licensing and Copyright

The Federal government reserves a royalty-free, nonexclusive and irrevocable license to reproduce, make public or otherwise use, and to authorize others to use for Federal purposes:

1.  The copyright in all information dissemination products, which means any recorded information, regardless of physical form or characteristics, disseminated to the public, developed under an agreement; and

2.  Any rights of copyright to which the cooperator purchases ownership under an agreement.

# 11.0   OTHER APPLICABLE TERMS AND CONDITIONS

## 11.1   Animal Welfare Act

The cooperator agrees to comply with the Animal Welfare Act (7 U.S.C. § 54) and corresponding regulations in 9 CFR part 1 through 9 CFR part 4 pertaining to the care, handling, and treatment of vertebrate animals held or used for research.

## 11.2   Civil Rights Obligations/Nondiscrimination

The cooperator must comply, and certifies that it will comply, with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the agreement, to include the following without limitation:

1.  Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq;

2.  Presidential Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*;

3.  Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and applicable implementing regulations at 7 CFR part 15, subpart A;

4.  Presidential Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*; and

5.  Age Discrimination Act of 1975 (42 U.S.C. §§ 6101 et seq.).

**32**

By accepting the agreement, the cooperator certifies that it does not, and will not during the term of the agreement, operate any programs that advance or promote Diversity, Equity, and Inclusion in violation of Federal anti-discrimination laws. The cooperator must include the provisions of this term in all subagreements.

The above requirements are conditions of payment that go to the essence of the agreement, and they are therefore material terms of the agreement. The cooperator acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this agreement. Payments under the agreement are predicated on compliance with the above requirements, and therefore the cooperator is not eligible for funding under the agreement or to retain any funding under the agreement absent compliance with the above requirements. USDA reserves the right to terminate agreements and recover all funds if the cooperator, during the term of this agreement, operates any program in violation of Federal anti-discrimination laws.

If the cooperator either fails to comply with above requirements, or makes a knowing false statement related to compliance with the above requirements and/or eligibility for the agreement, the cooperator may be subject to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. § 287 and 18 U.S.C. § 1001.

For more information about USDA Civil Rights requirements, please visit https://www.usda.gov/about-usda/general-information/staff-offices/office-assistant-secretary-civil-rights.

## 11.3    International Travel – Fly America Act

All Federal government financed international air transportation is required by 49 U.S.C. § 40118, commonly referred to as the "Fly America Act," to use U.S. air carrier service for all air travel and cargo transportation services. One exception to this requirement is transportation provided under a bilateral or multilateral air transport agreement, to which the U.S. government and the government of a foreign country are parties, and which the Department of Transportation has determined meets the requirements of the Fly America Act.

Current "Open Skies Agreements" that are in effect can be found here: https://www.gsa.gov/policy- regulations/policy/travel-management-policy/fly-america-act.

It is the cooperator's responsibility for making determinations and documenting the decision as to whether an exemption to this requirement applies.

Exceptions vary depending on the direction of travel and are outlined in 41 CFR 301-10.135 and 41 CFR 301-10.136.

**33**

## 11.4   Prohibition on Congressional Interest in Agreements

Pursuant to 41 U.S.C. § 6306, no Member of, or Delegate to, Congress shall be admitted to any share or part of this agreement, or any benefit that may arise therefrom, either directly or indirectly, except as expressly provided by law.

## 11.5   Lobbying Prohibitions

In accordance with 31 U.S.C. § 1352, the cooperator is required to abide by the policy and procedures codified at 22 CFR part 138. By accepting the agreement, the cooperator agrees that:

1. No Federal appropriated funds have been paid or will be paid, by or on behalf of the cooperator, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the cooperator shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. The cooperator shall require that the language of this certification be included in the agreement documents for all pass-through agreements at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subcooperators shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $25,132 and not more than $251,322 for each such failure.

## 11.6   Trafficking in Persons

Pursuant to 22 U.S.C. 7104(g), USDA agencies are authorized to terminate an agreement or take remedial actions if a private entity receiving funds under a Federal agreement engages in trafficking in persons.

Trafficking in Persons

1. *Provisions applicable to a cooperator that is a private entity.*

**34**

a. Under this agreement, the cooperator, its employees, subcooperators under this agreement, and subcooperator's employees must not engage in:

   i. Severe forms of trafficking in persons;

   ii. The procurement of a commercial sex act during the period of time that this agreement or any subagreement is in effect;

   iii. The use of forced labor in the performance of this  agreement or any subagreement; or

   iv. Acts that directly support or advance trafficking in persons, including the following acts:

      (1)   Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

      (2)   Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

         (a)   Exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant or cooperative agreement; or

         (b)   The employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

      (3)   Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

      (4)   Charging recruited employees a placement or recruitment fee; or

      (5)   Providing or arranging housing that fails to meet the host country's housing and safety standards.

b. The Federal agency may unilaterally terminate this agreement or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if any private entity under this agreement:

   i. Is determined to have violated a prohibition in paragraph 1.a. of this term; or

   ii. Has an employee that is determined to have violated a prohibition in paragraph 1.a. of this this term through conduct that is either:

      (1)   Associated with the performance under this agreement; or

**35**

      (2)    Imputed to the cooperator or the subcooperator using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 417.

2. *Provision applicable to a cooperator other than a private entity.*

   a. The Federal agency may unilaterally terminate this agreement or take any remedial actions authorized by 22 U.S.C. 7104b(c), without penalty, if a subcooperator that is a private entity under this agreement:

      i. Is determined to have violated a prohibition in paragraph 1.a. of this term; or

      ii. Has an employee that is determined to have violated a prohibition in paragraph 1.a. of this term through conduct that is either:

         (1)    Associated with the performance under this agreement; or

         (2)    Imputed to the subcooperator using the standards and due process for imputing the conduct of an individual to an organization , as established by federal government-wide guidelines for debarment and that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Government-wide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 417.

3. *Provisions applicable to any cooperator.*

   a. The cooperator must inform the Federal agency and the Inspector General of the Federal agency immediately of any information you receive from any source alleging a violation of a prohibition in paragraph 1.a. of this term.

   b. The Federal agency's right to unilaterally terminate this agreement as described in paragraphs 1.b. or 2.a. of this term:

      i. Implements the requirements of 22 U.S.C. 78, and

      ii. Is in addition to all other remedies for noncompliance that are available to the Federal agency under this agreement.

         (1)    The cooperator must include the requirements of paragraph 1.a. of this agreement term in any subagreement it makes to a private entity.

         (2)    If applicable, the cooperator must also comply with the compliance plan and certification requirements in 2 CFR 175.105(b).

4. *Definitions.* For purposes of this agreement term:

   *"Employee"* means either:

   a. An individual employed by the cooperator or a subcooperator who is engaged in the performance of the project or program under this agreement; or

**36**

b. Another person engaged in the performance of the project or program under this agreement and not compensated by the cooperator including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing requirements.

*"Private entity"* means any entity, including for-profit organizations, nonprofit organizations, institutions of higher education, and hospitals. The term does not include foreign public entities, Indian Tribes, local governments, or States.

The terms "severe forms of trafficking in persons," "commercial sex act," "sex trafficking," "Abuse or threatened abuse of law or legal process," "coercion," "debt bondage," and "involuntary servitude" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

In addition, for agreements related to research and development (R&D) or science and technology (S&T), the cooperator certifies that they are not party to utilizing forced labor or partnering with non-parties to this agreement who are party to utilizing forced labor.

## 11.7 Environmental Standards

The cooperator agrees to comply with all applicable standards, orders, regulations, and requirements issued under Section 306 of the Clean Air Act (42 U.S.C. 7606), Section 508 of the Clean Water Act (33 U.S.C. 1368), and Executive Order 11738.

The cooperator certifies that no facility to be used in the performance of this agreement is on the Environmental Protection Agency (EPA) List of Violating Facilities. The cooperator will not use any facility designated by the EPA Administrator as having given rise to a criminal conviction under either the Clean Air Act or the Clean Water Act.

## 11.8 Cooperator Integrity and Performance

If the total value of the cooperator's currently active grants, cooperative agreements, agreements, and procurement contracts from all Federal agencies exceeds $10,000,000 for any period of time during the period of performance of the agreement, the cooperator must comply with the requirements set forth below:

Reporting of Matters Related to Cooperator Integrity and Performance

1. *General Reporting Requirement.*

    a. If the total value of the cooperator's active grants, cooperative agreements, agreements, and procurement contracts from all Federal agencies exceeds $10,000,000 for any period of time during the period of performance of this agreement, then the cooperator must ensure the information available in the responsibility/qualification records through *SAM.gov*, about civil, criminal, or administrative proceedings described in paragraph 2. of this agreement term is current and complete. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in responsibility/qualification records

**37**

in *SAM.gov* on or after April 15, 2011 (except past performance reviews required for Federal procurement contracts) will be publicly available.

2. *Proceedings About Which the Cooperator Must Report.*

   a. The cooperator must submit the required information about each proceeding that—

      i. Is in connection with the agreement or performance of a grant, cooperative agreement, agreement, or procurement contract from the Federal Government;

   b. Reached its final disposition during the most recent 5-year period; and

   c. Is one of the following—

      i. A criminal proceeding that resulted in a conviction;

      ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

      iii. An administrative proceeding that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

      iv. Any other criminal, civil, or administrative proceeding if—

         (1) It could have led to an outcome described in paragraph 2.a.i. through iii.;

         (2) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

         (3) The requirement in this agreement term to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. *Reporting Procedures.* The cooperator must enter the required information in *SAM.gov* for each proceeding described in paragraph 2. of this agreement term. The cooperator is not required to submit the information a second time under grants and cooperative agreements that were received if you already provided the information in *SAM.gov* due to a requirement under Federal procurement contracts previously awarded to the cooperator.

4. *Reporting Frequency.* During any period of time when the cooperator is subject to the requirement in paragraph 1. of this agreement term, the cooperator must report proceedings information in *SAM.gov* for the most recent 5-year period, either to report new information about a proceeding that the cooperator has not reported previously or affirm that there is no new information to report. If the cooperator has a Federal contract, grant, cooperative agreement awards or agreement with a cumulative total value greater than $10,000,000, the cooperator must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**38**

5. *Definitions.* For purposes of this agreement term—

*"Administrative proceeding"* means a non-judicial process that is adjudicatory in nature to make a determination of fault or liability (for example, Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with the performance of a Federal contract, agreement, or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

*"Conviction"* means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

*"Total value of currently active grants, cooperative agreements, agreements, and procurement contracts"* includes the value of the Federal share already received plus any anticipated Federal share under those agreements (such as continuation funding).

## 11.9   Never Contract with the Enemy

In accordance with P.L. 113-291 (as amended), the following terms apply if the agreement exceeds $50,000 and is performed outside the United States, including U.S. territories, and is in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities. It does not apply to the authorized intelligence or law enforcement activities of the Federal Government.

1. Prohibition on Providing Funds to the Enemy

   a. The cooperator must—

      i. Exercise due diligence to ensure that no funds, including supplies and services, received under this agreement are provided directly or indirectly (including through subagreements or contracts) to a person or entity who is actively opposing the United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, which must be completed through 2 CFR 180.300 prior to issuing a subagreement or contract and;

      ii. Terminate or void in whole or in part any subagreement or contract with a person or entity listed in SAM as a prohibited or restricted source pursuant to subtitle E of Title VIII of the NDAA for FY 2015, unless the Federal agency provides written approval to continue the subagreement or contract.

   b. The cooperator may include the substance of this term, including paragraph (a) of this term, in subagreements under this agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

   c. The USDA agency has the authority to terminate or void this agreement, in whole or in part, if the USDA agency becomes aware that the cooperator failed to

**39**

exercise due diligence as required by paragraph (a) of this term or if the USDA agency becomes aware that any funds received under this agreement have been provided directly or indirectly to a person or entity who is actively opposing coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

2. Additional Access to Cooperator Records

   a. In addition to any other existing examination-of-records authority, the Federal Government is authorized to examine any of cooperator records and the records of subcooperators or contracts to the extent necessary to ensure that funds, including supplies and services, available under this grant or cooperative agreement are not provided, directly or indirectly, to a person or entity that is actively opposing the United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, except for awards awarded by the Department of Defense on or before December 19, 2017, that will be performed in the United States Central Command (USCENTCOM) theater of operations.

   b. The substance of this term, including this paragraph (b), must be included in subagreements or contracts under this agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

## 11.10 Drug Free Workplace

General Requirement. As a condition of receiving Federal funds under this agreement, the cooperator must maintain a drug-free workplace.

Individuals. If the cooperator is an individual, they must not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in connection with the performance of any agreement.

Organizational Cooperators. If the cooperator is an organization, it must do all of the following:

(1) Policy Statement. Publish a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the cooperator's workplace and specifying the actions that will be taken against employees for violation of such prohibition.

(2) Awareness Program. Establish a drug-free awareness program to inform employees about:

(i) The dangers of drug abuse in the workplace;

(ii) The cooperator's policy of maintaining a drug-free workplace;

(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and

**40**

(iv) The penalties that may be imposed upon employees for drug abuse violations.

(3) Employee Notification. Provide a copy of the statement required by paragraph (1) of this term to each employee who will be engaged in the performance of the agreement.

(4) Employee Conviction Reporting. Require that each employee who will be engaged in the performance of the agreement notify the cooperator in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five (5) calendar days after such conviction.

(5) Agency Notification. Notify the Federal agency in writing within ten (10) calendar days after receiving a notice under paragraph (4) of this section from an employee or otherwise receiving actual notice of such a conviction.

(6) Action on Conviction. Within thirty (30) calendar days after receiving a notice under paragraph (4) of this section from an employee or otherwise receiving actual notice of such a conviction, the cooperator must either:

(i) Take appropriate personnel action against such an employee, up to and including termination; or

(ii) Require such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency.

(7) Good Faith Effort. Make a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (1) through (6) of this section.

(8) Failure to Comply. Failure to comply with these requirements may result in the suspension or termination of this agreement or debarment of the cooperator.

## 11.11 Allocation of Liability and Indemnification

1. Prohibition on Federal Indemnification: Nothing in this agreement shall be construed to create an obligation on the part of the Federal government to indemnify, defend, or hold harmless any Party or third party by implication or otherwise. Notwithstanding Section 1.2, any provision in this agreement, or in any document incorporated by reference herein, that purports to obligate the Federal government to indemnify, defend, or hold harmless any Party or third party, is hereby declared null and void and of no force or effect as against the Federal government. The cooperator acknowledges and agrees that no such provision shall be construed as a waiver of the Federal government's sovereign immunity or as an agreement to assume liability not otherwise authorized by law.

2. Federal Government Liability: The Parties acknowledge and agree that the Federal government's liability for tort claims is governed solely by the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, and other applicable Federal statutes. Under the FTCA, the United States may be liable for money damages for injury or loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Federal government while acting within the scope of

**41**

his or her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

3. Non-Federal Party's Independent Actions: This agreement does not create an employer-employee relationship between the Federal government and the cooperator or its employees, agents, or subcooperators. The cooperator and its employees, agents, and subcooperators are not employees of the Federal government for purposes of the FTCA.

4. No Extension of Federal Liability: The Federal government shall not be responsible or liable under the FTCA, or any other statute or common law principle, for any tortious acts, omissions, or negligence committed by the cooperator or its employees, agents, or subcooperators in connection with the performance of this agreement.

5. Non-Federal Party's Responsibility: The cooperator shall be solely responsible for any claims, liabilities, losses, damages, costs, or expenses, including but not limited to those arising from personal injury, death, or property damage, caused by the negligent or wrongful acts or omissions of the cooperator or its employees, agents, or subcontractors during or in connection with the performance of this agreement.

6. Mutual Non-Indemnification: Neither Party assumes the duty to insure, defend, or indemnify the other Party against any liabilities arising from its own conduct, and each specifically retains all immunities and defenses available to it by law (including sovereign immunity, if applicable).

## 12.0  COMPLIANCE WITH EXECUTIVE ORDERS AND OTHER PRESIDENTIAL ACTIONS

USDA must comply with Executive Orders (EOs) and other Presidential Actions. When incorporated into agreements, the cooperator must comply with EOs or Presidential Actions, as well as USDA agency policies and regulations. The following EOs are expressly incorporated into this agreement:

## 12.1  EO 13043: Increasing Seat Belt Use in the United States

The cooperator is encouraged to adopt and enforce on-the-job seat belt policies and programs for its employees when operating company-owned, rented, or personally owned vehicles. USDA encourages individuals to use seat belts while driving in connection with the agreement. See full text.

## 12.2  EO 13513: Federal Leadership on Reducing Text Messaging While Driving

The cooperator is encouraged to adopt and enforce policies that ban text messaging while driving company-owned or -rented vehicles or Federal government owned vehicles, or while driving personally owned vehicles when on official Federal government business or when performing any work for or on behalf of the Federal government. See full text.

## 12.3  EO 13642: Making Open and Machine Readable the New Default for Government Information

In order to ensure government information is easy to find, accessible, and usable, Federal government information resources shall be open and machine readable. The cooperator should, whenever practicable, collect, transmit, and store agreement-related information in open and machine-readable formats rather than in closed formats or on paper. See full text.

## 12.4 EO 13706: Establishing Paid Sick Leave for Federal Contractors

Parties that enter into covered contracts with the federal government must provide covered employees with up to seven days of paid sick leave annually. The parties assure compliance with the implementing regulations at 29 CFR Part 13, and Appendix A to Part 13 is incorporated by reference into the agreement as if fully set forth in the agreement. The regulations shall also apply to any subagreements or contracts under the agreement, unless an exception applies. See full text.

## 12.5 EO 14149: Restoring Freedom of Speech and Ending Federal Censorship

No funding shall be directed towards activities that are contrary to section 2 of EO 14149. See full text.

## 12.6 EO 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

No funding shall be used to promote gender ideology. See full text and Section 11.2.

## 12.7 EO 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity

The cooperator shall comply fully with all applicable Federal anti-discrimination laws and acknowledges said compliance is material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4). The cooperator certifies they do not operate any programs that promote Diversity, Equity, or Inclusion (DEI) that violate any applicable Federal anti-discrimination laws. See full text and Section 11.2.

## 12.8 EO 14199: Withdrawing the U.S. From and Ending Funding to Certain United Nations Organizations and Reviewing U.S. Support to all International Organizations

No funding shall be used for a contribution, grant, or other payment to United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNWRA). See full text.

## 12.9 EO 14201: Keeping Men Out of Women's Sports

No funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities. No funding shall be directed towards male competitive participation in women's sports. See full text.

## 12.10 EO 14204: Addressing Egregious Actions of the Republic of South Africa

No aid or assistance shall be provided to South Africa. See full text.

## 12.11 EO 14218: Ending Taxpayer Subsidization of Open Borders

No funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide

incentives for illegal immigration by demonstrating the availability of public benefits. See full text.

## 12.12 EO 14224: Designating English as the Official Language of the United States

English is the official language of the United States. All USDA agreement announcements, applications, and information should be in the English language. See full text.

## 12.13 EO 14292: Improving the Safety and Security of Biological Research

No funding shall be used for dangerous gain-of-function research conducted by foreign entities in countries of concern pursuant to 42 U.S.C. 6627(c), or in other countries where there is not adequate oversight to ensure that the countries are compliance with United States oversight standards and policies. No funding shall be used for other life-science research that is occurring in countries of concern or foreign countries where there is not adequate oversight to ensure that the countries are compliance with United States oversight standards and policies and that could reasonably pose a threat to public health, public safety, and economic or national security. See full text.