# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al. <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF AGRICULTURE, et al. <br><br> Defendants. | Case No. 1:26-cv-11396 <br><br><br> LEAVE TO FILE GRANTED ON MARCH 25, 2026 |

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

      A.     USDA's funding affects millions of people in Plaintiff States on a daily basis...... 3

      B.     USDA's funds are now subject to vague conditions regarding social policies that are unrelated to USDA programs. .......................................................................... 4

      C.     Plaintiff States are left to reconcile vague terms with longstanding State law and policy. ...................................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

  I.  Plaintiffs are likely to succeed on the merits. .................................................... 7

      A.     The Challenged Conditions are unconstitutionally vague and coercive. ............... 7

           1.     None of the Challenged Conditions satisfy the constitutional clarity requirement. ........................................................................................... 8

           2.     The Challenged Conditions are not reasonably related to the applicable programs. ............................................................................................ 14

           3.     The Challenged Conditions are unconstitutionally coercive. ................... 16

      B.     The imposition of the Challenged Conditions is arbitrary and capricious............ 17

           1.     USDA ignored the States' reliance interest on the substantial sums affected by its action. ........................................................................................ 18

           2.     USDA provided no reasons for the Challenged Conditions. .................... 20

           3.     USDA completely ignored the conflicts of law it has created.................. 21

           4.     USDA failed to consider alternatives to its one-size-fits-all approach ..... 22

      C.     The Policy Condition and Immigration Condition were issued in excess of statutory authority. ....................................................................................................... 233

           1.     USDA lacks general authority to impose the Policy Condition and Immigration Condition............................................................................ 24

           2.     USDA lacks specific authority to impose the Policy Condition and Immigration Condition............................................................................ 25

      D.     The Immigration and Gender Conditions are contrary to law governing multiple USDA programs......................................................................................... 26

      E.     Any effort by USDA to smuggle reinterpretations of federal law into funding conditions would violate required APA procedures............................................ 27

  II.  The equities compel preliminary relief. ........................................................... 30

      A.     Preliminary relief is needed to avert irreparable harm......................................... 30

      B.     The balance of equities and public interest favor preliminary relief ................... 34

CONCLUSION................................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ..............................14

*Ardente v. Standard Fire Ins. Co.*, 744 F.3d 815 (1st Cir. 2014) ..................................................24

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) ............................................................29

*California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291 (D.R.I. 2025) ...........................15, 21, 32

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .................................................................................23

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ...............................................30

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ...........................................................34

*City of Chicago v. U.S. Dep't of Just.*, No. 25 C 13863, 2026 WL 114294 (N.D. Ill. Jan. 15, 2026) ...................................................................................................................................................9–10

*City of Fresno v. Turner*, No. 25-cv-07070, 2025 WL 2721390 (N.D. Cal. Sep. 23, 2025) .........11

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, (E.D. Pa. 2017) ..................................30, 33

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ...........................................................23, 26

*Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212 (2022) .................................................23

*Commonwealth of Va. Dep't of Educ. v. Riley*, 106 F.3d 559 (4th Cir. 1997) ..............................25

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) .......................................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................18–19, 20, 22

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) ..................................................26

*Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1 (1st Cir. 2009) ..............................34–35

*Hous. Auth. of San Francisco v. Turner*, No. 25-cv-8859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025) ....................................................................................................................................11, 21

*Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025) ......14, 16, 20–23, 34

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6 (1st Cir. 1991) .35

*Int'l Org. of Masters v. NLRB*, 61 F.4th 169 (D.C. Cir. 2023)......................................................20

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ...........................................................32

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ....................................................23

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ................................................23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025) ......23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ...........................................8, 16–17

*Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61 (D.C. Cir. 2025) ..............................11

*Nieves-Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003) .......................................8

*NLRB. v. Wyman-Gordon Co.*, 394 U.S. 759 (1969). .....................................................28

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) ...............7

*Massachusetts v. United States*, 435 U.S. 444 (1978) .....................................................14

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .........................................30

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)
.....................................................................................................................................18, 22

*Ohio v. Env't Prot. Agency*, 603 U.S. 279 (2024) .....................................................17, 32

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ......................................................9

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ...................................8

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ......................................................29

*R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705 (D.R.I. Oct. 23, 2025) .................................................................................................................11

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc*, 102 F.3d 12 (1st Cir. 1996)................34

*South Dakota v. Dole*, 483 U.S. 203 (1987) ..............................................8, 11, 14, 17

*Steward Machine Co. v. Davis*, 301 U.S. 548 (1937)......................................................17

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ......................................29, 32

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,* 588 U.S. 504 (2019) .....................6, 31

*Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34 (1st Cir. 2020), amended on reh'g, 973 F.3d 143 (1st Cir. 2020) ...................................................................................26

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ....................................................................8

*United States v. Lopez,* 514 U.S. 549 (1995) ..............................................................3

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ........................................17–18

*United States v. North Carolina*, 192 F. Supp. 3d 620 (M.D.N.C. 2016) ....................34

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301 (1987) ............34–35

*Wallace v. Christensen*, 802 F.2d 1539 (9th Cir. 1986) ..................................................26

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..............................................34

**Statutes and Regulations**

Pub. L. No. 88-525, 7 U.S.C. §§ 2011, *et seq*..................................................................25

5 U.S.C.
    § 553..........................................................................................................28–29
    § 706..........................................................................................18, 23, 26, 28

7 U.S.C.
    § 2014..............................................................................................................25
    § 2015..............................................................................................................25

8 U.S.C. § 1615..................................................................................................................26

20 U.S.C. § 1681................................................................................................................28

42 U.S.C.
    § 1751 ..............................................................................................................26
    § 1753 ..............................................................................................................25
    § 1773 ..............................................................................................................26

7 C.F.R.
    § 251.5..............................................................................................................27
    § 272.2........................................................................................................24, 27

Cal. Educ. Code
    § 200................................................................................................................22
    § 220................................................................................................................22

Cal. Gov't Code
    § 12940............................................................................................................22
    § 12955 ............................................................................................................22

2 Cal. Code Reg. § 11034 ................................................................................................22

Cal. Health & Safety Code
    § 103426................................................................................................................22
    § 103430................................................................................................................22

Cal. Veh. Code § 12800 ............................................................................................22

775 Ill. Comp. Stat.
    5/1-102 ................................................................................................................22
    5/1-103 ................................................................................................................22
    5/2-102 ................................................................................................................22

410 Ill. Comp. Stat. 535/17 ......................................................................................22

77 Ill. Adm. Code 500.43 .........................................................................................22

Mass. Gen. Laws
    ch. 272 ................................................................................................................22
    ch. 151B  ..............................................................................................................22
    ch. 22C ................................................................................................................22
    ch. 90 ..................................................................................................................22

N.J. Stat. § 10:5-3 ....................................................................................................22

**Other Authorities**

Exec. Order No. 14,168, 90 Fed. Reg. 8165 (Jan. 20, 2025) ....................................1, 5, 10, 12–13

Exec. Order No. 14,201, 90 Fed. Reg. 9280 (Feb. 5, 2025)  .....................................................1, 5

Exec. Order No. 14,218  90 Fed. Reg. 10581 (Feb. 19, 2025)  ......................................................5

NIFA Quarterly Civil Rights Call: Understanding New Federal Requirements, NIFA: USDA,
    https://youtu.be/F23pYlD71ZY?t=1059 ..........................................................................7

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020)  .................................................28

PRWORA: Interpretation of "Federal Public Benefit," 90 Fed. Reg. 30,621, 30,622 (July 10,
    2025)  ............................................................................................................26–27

U.S. Dep't of Agric., *Agriculture and Food Research Initiative (AFRI)*,
    https://www.nifa.usda.gov/grants/programs/agriculture-food-research-initiative ..................16

U.S. Dep't of Agric., *Emergency Citrus Disease Research and Extension Program Pre-
    Applications*, https://www.nifa.usda.gov/grants/funding-opportunities/emergency-citrus-
    disease-research-extension-program-pre-applications.........................................................16

U.S. Dep't of Agric., *Pesticide Data Program*, https://www.ams.usda.gov/datasets/pdp ...........15

U.S. Dep't of Agric., *Secretary Rollins' Vision for the Department's 16 Nutrition Program* (last visited Mar. 29, 2026), https://perma.cc/HP2F-KETJ. ..........................................................16

U.S. Dep't of Agric., *Veterinary Services Grant Program*, https://www.nifa.usda.gov/grants/programs/veterinary-services-grant-program ....................16

**INTRODUCTION**

For over a century, funding from the U.S. Department of Agriculture ("USDA") has supported a federal-state partnership critical to the nation's welfare. USDA funds enable Plaintiff States to provide breakfast and lunch to students in schools, at times the only nutritious meals that some children receive. They support infants, mothers, and families. They sustain the farm ecosystem by directly supporting American farmers, increasing firefighting capacity in rural communities, and funding university research to support the agricultural sector. And Plaintiff States have proudly administered such programs for decades without limitations based on any individual's race, gender identity, or citizenship status, unless otherwise required to do so by federal law. This federal-state partnership, which USDA describes as "vast" and "critical" to the country's welfare, has had a tremendous impact for decades.

Now, USDA threatens to transform these well-established funding streams—totaling billions of dollars annually—into a blank check to underwrite the administration's social policy agenda. Specifically, USDA has launched an effort to impose its vision for a "Golden Age of Civil Rights" through the promulgation of new funding conditions. With these new conditions, USDA seemingly intends to force States to take the agency's side in hotly contested debates over gender, diversity, and the availability of public services for non-citizens. For instance, the agency appears to be trying to impose the view that "gender identity . . . cannot be recognized as a replacement for sex," and that "eligibility for participation in women's sporting events [must be] determined according to sex and not gender identity." Exec. Order No. 14,168, 90 Fed. Reg. 8165 (Jan. 20, 2025) (internal quotation marks omitted); Exec. Order No. 14,201, 90 Fed. Reg. 9280 (Feb. 5, 2025). It apparently seeks to advance "this administration's national assimilation goals." Ex. 1.[1]

---

[1] Citations herein to "Ex. __" are to the Declaration of Nita K. Klunder, unless otherwise indicated.

1

And to do so, it threatens to pull billions of dollars from States and subrecipients who do not get on board.

But the U.S. Constitution and the Administrative Procedure Act ("APA") protect the States from overreaching federal agency action, including USDA's new funding conditions. First, USDA's approach runs afoul of three fundamental constitutional principles: (1) that the federal government must speak clearly when it requires compliance with funding conditions; (2) such conditions must be related to the purposes of the program to which they are attached; and (3) such conditions cannot be used to effectively compel a State to adopt federal policy. Second, the APA stands between overzealous federal agencies and the States whose rights the administration aims to displace. USDA violates at least four fundamental APA principles here: federal agencies (1) must reason through their decisions when breaking sharply from past practices, particularly where States have reasonably relied on the status quo; (2) must act within the limits of their statutory authority; (3) cannot act contrary to existing law; and (4) must follow carefully delineated procedures that provide opportunities for public input when reinterpreting settled laws. USDA met none of these requirements when imposing new conditions on Plaintiff States. Instead, it seeks to lock Plaintiff States into complying with vague and novel conditions that are largely unrelated to the underlying funding's purpose and goals, without providing any reason for its change in practice, while disregarding entirely the States' reliance interests. In doing so, USDA ignores the complex web of statutes and regulations governing these funding programs and flouts its procedural obligations under the APA.

The agency's failure to abide by its constitutional and statutory obligations is not a mere oversight. USDA has rolled out a scheme to coerce States to align with USDA's social policies by inducing acceptance of hastily implemented and overbroad funding conditions, deputizing de facto

informers to monitor "compliance," and pulling funding from any recipient who maintains policies and practices the agency disfavors. This puts States in an untenable bind. Either they accede to USDA's "Golden Age" implementation scheme, despite the vague overbreadth of its conditions and the sharp conflict between Secretary Rollins's new policy goals and Plaintiff States' existing law and policies, or they lose billions in funding for food and other essentials. The stakes are incredibly high—one-third of all children in this country eat meals funded by USDA on a daily basis. The choice USDA has imposed inflicts direct harm on Plaintiff States, which enjoy separate authority under the U.S. Constitution. When it comes to complex questions involving anti-discrimination, gender, and immigration, Plaintiff States are free to "perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez,* 514 U.S. 549, 581 (1995) (Kennedy, J., concurring). Plaintiffs seek immediate relief from this Court to alleviate this injury and to free them from USDA's coercive attempt to displace State policies with its own policy preferences.

## BACKGROUND

### A.    USDA's funding affects millions of people in Plaintiff States on a daily basis.

USDA funding undergirds a breathtaking swath of modern American life. The grants and programs authorized by Congress and administered by USDA support Plaintiff States in fighting food insecurity, preventing and suppressing wildfires, conducting critical agricultural research, and performing a host of other activities to ensure our Nation's farms and natural resources are secure and our people are fed.

Consistent with statutes created by Congress across more than a century, Plaintiff States receive over $74 billion annually from USDA. The vast majority of these funds are allocated by USDA to Plaintiff States and their residents based on formulas established by Congress and enacted in statutes. These programs include food and nutrition programming (including Child

Nutrition Programs, the Supplemental Nutrition Assistance Program ("SNAP"), and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC")) agricultural, forestry and rural support programming, and programs to support academic research and programming in agricultural sciences. *E.g.*, (Doc No. 1 at ¶¶ 49-135).

> **B.    USDA's funds are now subject to vague conditions regarding social policies that are unrelated to USDA programs.**

On December 31, 2025, USDA issued its updated General Terms and Conditions ("2026 Conditions"). (Doc No. 1-1; Doc No. 1-2). That same day, Secretary of Agriculture Brooke L. Rollins issued Secretarial Memorandum 1078-021 ("Rollins Memo"), which instructed "all USDA agencies and staff offices that issue awards" to adopt the 2026 Conditions within 45 days of the memorandum and to apply the 2026 Conditions to "all future awards and for all significant modifications (as determined by [the Office of the Chief Financial Officer]) to existing and future awards." (Doc No. 1-3 at 3). The Rollins Memo defines "awards" as "grants, cooperative agreements, and other similar arrangements, including mutual interest agreements." *Id.* at 2. She also directed agency staff to monitor noncompliance or otherwise face disciplinary action. *Id.* at 3. On January 8, 2026, Secretary Rollins announced to all USDA employees that the "Golden Age of Civil Rights is here," touting the agency's mission to cancel funding relating to initiatives of which the administration disapproves. Ex. 1.

The 2026 Conditions mark a sharp break from the agency's past practice, imposing novel requirements on funding recipients, including States, that broadly align with the current administration's policy priorities. Section 12.2[2] of the 2026 Conditions (the "Policy Condition")

---

[2] Unless otherwise indicated, the references in the text to the 2026 Conditions will use the section numbering from the General Terms and Conditions for Federal Awards. (Doc No. 1-1). The corresponding citation to the General Terms and Conditions for Mutual Interest Agreements, (Doc No. 1-2), will be noted in the citation only.

4

requires recipients to comply with all "Federal anti-discrimination . . . policies," including "without limitation" Executive Order 14,168, 90 Fed. Reg. 8165 (Jan. 20, 2025) ("Gender Ideology EO") and Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("DEI EO"). (Doc No. 1-1 at § 12.2; Doc No. 1-2 at § 11.2). The Gender Ideology EO makes it "the policy of the United States to recognize two sexes" and to reject the reality of gender identity. 90. Fed. Reg. at 8615. Moreover, on its face the Policy Condition "reflects a change in the government's position regarding the materiality of the [aforementioned] requirements." (Doc No. 1-1 at § 12.2; Doc No. 1-2 at § 11.2).

Section 13 of the 2026 Conditions "expressly incorporate[s]" twelve Executive Orders and directs recipients that "[w]hen incorporated into Federal awards, the recipient must comply with EOs . . . ." (Doc No. 1-1 at § 13; Doc No. 1-2 at § 12). Three of the funding restrictions in Section 13, as well as the underlying Executive Orders, are particularly problematic and ambiguous in the context of threatened USDA enforcement. First, Section 13.5 references the Gender Ideology EO and then states that "[n]o funding shall be used to promote gender ideology" ("the Gender Condition"). (Doc No. 1-1 at § 13.5; Doc No. 1-2 at § 12.6). Second, Section 13.8 references Executive Order 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ("Sports EO"), and states, "[n]o funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities. No funding shall be directed towards male competitive participation in women's sports" (the "Sports Condition"). (Doc No. 1-1 at § 13.8; Doc No. 1-2 at § 12.9). Third, Section 13.10 references Executive Order 14,218, *Ending Taxpayer Subsidization of Open Borders,* 90 Fed. Reg. 10581 (Feb. 19, 2025) ("Open Borders EO") and states, "[n]o funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits" (the "Immigration

5

Condition"). (Doc No. 1-1 at § 13.10; Doc No. 1-2 at § 12.11). The 2026 Conditions provide recipients no guidance about what conduct is prohibited by the Policy, Gender, Sports, or Immigration Conditions (together, the "Challenged Conditions").

On March 23, 2026, the day Plaintiff States filed this lawsuit, USDA revised the standard terms and conditions governing USDA Food and Nutrition grants to require compliance with the 2026 Conditions. Ex. 2. And the agency has begun incorporating the 2026 Conditions into particular funding streams, including funding for educational research, disaster relief, and agricultural infrastructure and pest management. *See, e.g.*, Ex. 70 ¶¶ 12-13, 24; Ex. 40 ¶¶ 41-52; Ex. 44 ¶¶ 12–18, 29; Ex. 64 ¶¶ 12-15; Ex. 34 ¶ 21; Ex. 10 ¶ 33; Ex. 27 ¶ 66.

**C.      Plaintiff States are left to reconcile vague terms with longstanding state law and policy.**

The 2026 Conditions represent an abrupt change in agency practice that upends the federal-state relationship, leaving Plaintiff States to sort through the mess.

Consistent with the principles of federalism, Plaintiff States have enacted laws and adopted social programs to further their interests relating to the health and general welfare of the people within their borders. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas,* 588 U.S. 504, 521 (2019) (noting that the Supreme Court has "staunchly affirmed the rights of the States in exercising their police power to protect the health, morals, and safety of their people") (citation modified). Throughout the past calendar year, USDA has repeatedly attacked such interests. For example, in March 2025, Secretary Rollins sent a letter to the governor of the State of California regarding concerns that "students" could "fall victim to a radical transgender ideology." Ex. 3. In April 2025, Secretary Rollins sent a letter to the governor of the State of Maine alleging that the state's failure to "protect[] women and girls" violated Title IX of the Education Amendments of 1972 and warranted a complete freeze on USDA funds. Ex. 4. USDA has also terminated research funding

6

solely on the basis that the study mentioned the existence of transgender people. Exs. 5, 6. Now, in place of these targeted efforts, USDA has pivoted to across-the-board, vague funding conditions that, if allowed to stand, would afford it virtually unlimited discretion to arbitrarily cut state programming. For example, in a December 2025 training, a USDA sub-agency informed universities that, in its view, "best compliance practices entail" that "participation and access [to restrooms, changing rooms, sleeping accommodations, or locker rooms] [be] based solely on biological sex rather than gender identification."[3] USDA's implementation scheme, rooted in the vague 2026 Conditions, thus runs headlong into important state laws and policies.

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (internal quotation marks omitted). All four factors overwhelmingly support granting a preliminary injunction here.

## I.    Plaintiffs are likely to succeed on the merits.

### A.    The Challenged Conditions are unconstitutionally vague and coercive.

Under the Constitution's Spending Clause, conditions placed on federal funding must be unambiguous, and when they are not, they must be stricken. Plaintiff States cannot be forced to accept conditions on funding regarding consequential issues like diversity, gender, and public services for non-citizens, without knowing what they are agreeing to. Notice of each condition's

---

[3] NIFA Quarterly Civil Rights Call: Understanding New Federal Requirements, NIFA: USDA, https://youtu.be/F23pYlD71ZY?t=1059 ("NIFA Training").

meaning is particularly important here, where Plaintiff States have their own web of laws and policies governing many of the same issues. Even if the Challenged Conditions were clear, they still violate the Spending Clause in two other ways: they are insufficiently related to the funding programs and are unduly coercive.

> **1.    None of the Challenged Conditions satisfy the constitutional clarity requirement.**

Under the Spending Clause, when the federal government seeks to "impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That way, States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (plurality opinion); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003). Ambiguous conditions like the ones that USDA advances "undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577. Each of the Challenged Conditions is unconstitutionally ambiguous.

**The Policy Condition.** The Policy Condition is impermissibly vague in at least three ways. First, and most fundamentally, the Condition does not define the set of policies to which Plaintiff States must certify. The Condition requires Plaintiff States to certify compliance with "*all* applicable Federal anti-discrimination laws, regulations, and *policies* for the duration of the Federal award." (Doc No. 1-1 at § 12.2; Doc No. 1-2 at § 11.2) (emphasis added). Interpretive rules indicate "policies" must mean something different than antidiscrimination laws and regulations. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (noting the "cardinal principle of statutory construction" that no "word shall be superfluous"). Yet, the Policy Condition does not identify the set of anti-discrimination "policies" applicable to the States. It neither defines the

applicable policies nor explains where States might find them. Although the Policy Condition names three laws and two executive orders that apply, it explicitly notes that the Condition is not limited to those laws and orders.

The federal government has issued—and continues to issue—countless policies across hundreds of agencies, including many policies USDA may view as related to "anti-discrimination." Without knowing what specific "policies" are implicated, States cannot make informed decisions about whether these unidentified policies are consistent with how States approach the same topics—and whether they must reject funding given any inconsistency. The confusion is heightened because the word "policy" has a broad definition that could—or could not, depending on USDA's approach—apply to countless actions of the federal government, and the Policy Condition provides no guidance on what USDA means by "applicable." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (defining "policy" as a "decision to adopt [a] particular course of action [that] is properly made by that government's authorized decisionmakers"). For example, if USDA's Food and Nutrition Service ("FNS") issues amended anti-discrimination guidance in FNS-funded nutrition programs and activities, as it has indicated it will, *see* Ex. 7, it is unclear if USDA would construe that guidance to be a "policy" that now binds all USDA funding recipients (thereby creating an end-run on the limitation that agency guidance is non-binding).

Second, even if the five-item list included in the Policy Condition were exhaustive, the Policy Condition still would be unconstitutionally vague. To the extent "policies" refers to the two named executive orders, compliance with those orders is also unclear in the context of the Policy Condition. The Gender Ideology EO and the DEI EO primarily direct federal agencies to undertake various activities to implement the President's policy preferences. *See City of Chicago v. U.S. Dep't of Just.*, No. 25 C 13863, 2026 WL 114294, at *8 (N.D. Ill. Jan. 15, 2026) (reference to Executive

9

Order violated Spending Clause because it "incorporates the equally vague language of the Executive Orders themselves" and did not "explain *how* the Executive Orders are applicable to grantees.") (citation modified) (emphasis in original). For example, the Gender Ideology EO directs that the federal "Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes . . ." 90 Fed. Reg. at 8,616. Thus, the 2026 Conditions leave vague what requirements USDA seeks to impose on Plaintiff States through the EOs as part of the Policy Condition. *See, e.g.*, Ex. 15 ¶ 12; Ex. 50 ¶ 20; Ex. 52 ¶ 23; Ex. 67 ¶ 84.

Each executive order also contains a policy section, but the sections, by their own terms, also apply only to the federal government. *See* 90 Fed. Reg. at 8,615–16 (announcing the policy for "the United States" and providing directions to the federal executive branch); 90 Fed. Reg. at 8,633 (same). To the extent USDA seeks to apply those policies to the States, contrary to the text of the executive orders, it is unclear what is required of States to comply. Must States acknowledge that the policy of the federal government is to recognize two sexes? Or must they adopt the policy itself? Furthermore, given that the Policy Condition is a certification applicable to the recipient's operations as a whole—and not just a restriction on the use of the funding—the scope of the uncertainty created by this condition is staggering.

It is also unclear whether USDA expects Plaintiff States to agree to comply with policies that do not yet exist. Because the Policy Condition requires compliance with policies "for the duration" of the award, USDA might enact purported "anti-discrimination" policies in the future, pursuant to its vision of the "Golden Age of Civil Rights," and demand that the States comply with them. For example, as noted above, FNS plans to issue amended anti-discrimination guidance at some unknown point in the future. Ex. 7. If USDA unilaterally considers that guidance to be an anti-discrimination policy within the scope of the Policy Condition, Plaintiff States will have

10

certified compliance to it numerous times across many programs—without ever having seen it and even though it is otherwise merely non-binding guidance. Attempting to make States comply in advance with policies that have yet to be enacted is facially illegal regardless of what policies USDA eventually enacts because it prevents States from making a knowing choice as to the benefit of the award. *See Dole,* 483 U.S. at 207.

In sum, the agency has attempted to write itself a blank check. Not only does the open-ended language give USDA wide latitude to decide if a recipient is in violation of the funding conditions, it also provides USDA with unlawful leverage over States through the threat of freezing funds due to a violation.

Plaintiff States also challenge three conditions in Section 13.0, which "expressly" incorporate the listed executive orders.

**The Gender Condition.** This condition prohibits Plaintiff States from using USDA funding "to promote gender ideology." (Doc No. 1-1 at § 13.5; Doc No. 1-2 at § 12.6). As three federal courts have already found in the context of the Due Process Clause, this condition is unduly vague. *See City of Fresno v. Turner*, No. 25-cv-07070, 2025 WL 2721390, at *17–18 (N.D. Cal. Sep. 23, 2025); *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *9 (D.R.I. Oct. 23, 2025); *Hous. Auth. of City & Cnty. of San Francisco v. Turner*, No. 25-CV-08859-JST, 2025 WL 3187761, at *14 (N.D. Cal. Nov. 14, 2025). *But see Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61, 96 (D.C. Cir. 2025) (suggesting in dicta that the term may not be vague). There is no obvious meaning to "gender ideology," and the term's definition in the Gender Ideology EO provides much inflammatory rhetoric but little guidance. Nor is it clear how States do or do not "promote" what the administration calls "gender ideology"—or how using USDA funding could do so. Plaintiff States have laws and policies that protect gender identity and

gender expression. (Doc No. 1 at ¶ 214). But the mere phrase "promote gender ideology" leaves Plaintiff States guessing whether such laws and policies, and many other routine activities, jeopardize billions in critical funding.

**The Sports Condition.** The scope and meaning of this condition are equally vague in the context of USDA-funded programs. The text leaves wholly unclear what it means to deprive someone of "fair athletic opportunities" in this context, aside from the Sports EO's assertion that allowing girls who are transgender to compete on girls' sports teams is "unfair" to other girls. (Doc No. 1-1 at § 13.8; Doc No. 1-2 at § 12.9); *see* 90 Fed. Reg. at 9279. Yet "fair" is a notoriously capacious and vague word. The confusion is compounded by the term "directed towards," the scope of which is unclear. For example, the Child Nutrition Programs provide nutritious meals at schools for millions of students. *E.g.*, Ex. 75 ¶ 12; Ex. 17 ¶¶ 9-10; Ex. 72 ¶¶ 9-10. If schools use USDA funds to feed students lunch, and later that day offer afterschool programs that deviate from USDA's expectations regarding sports participation, it is not clear whether the funds were "directed towards" the sports programming. Does it matter whether the students who ate USDA-funded lunches participated in certain school sports later in the day? What if USDA-funded foods are consumed at the sporting event? It is also unclear whether the Sports Condition is USDA's attempt to summarize what the Sports EO requires, or whether the Sports Condition adds the agency's gloss to further prohibit States from directing funding, without limitation, "towards educational programs that deprive women and girls of fair athletic opportunities." (Doc No. 1-1 at § 13.8; Doc No. 1-2 at § 12.9). Further confusing matters, the terms of the Sports Condition depart from the executive order it is supposedly based on. The Sports EO refers to programs that "result[] in the endangerment, humiliation, and silencing of women and girls and deprive[] them of privacy," 90 Fed. Reg. at 9279, but the Sports Condition speaks of "educational programs that deprive women

and girls of fair athletic opportunities," (Doc No. 1-1 at § 13.8; Doc No. 1-2 at § 12.9). It is not clear which version applies.

**The Immigration Condition.** This condition is similarly vague. It is unclear whether funding recipients must verify eligibility for public services based on immigration status, whose eligibility must be verified, or how Plaintiff States would be expected to conduct such verifications. Plaintiff States may not know the immigration status of beneficiaries in many instances. *E.g.*, Ex. 27 ¶ 86; Ex. 65 ¶¶ 24, 28; Ex. 29 ¶ 15. It is unclear whether providing benefits in these circumstances "provide[s] public resources to meet the needs of illegal aliens" or "provide[s] incentives for illegal immigration." (Doc No. 1-1 at § 13.10; Doc No. 1-2 at § 12.11). For example, food pantries stock food provided by USDA, and generally welcome anyone in need, such that some of this food may end up being taken by those without lawful immigration status. Ex. 13 ¶¶ 8, 16, 23; Ex. 49 ¶¶ 8, 13, 18; Ex. 56 ¶¶ 45, 50. Similarly, the scope of the phrase "directed towards programs" also is vague in this context, especially because it may be interpreted to cover entire programs rather than just the use of funds. For example, firefighters may use equipment purchased through USDA funds to extinguish a fire at the residence of a family without lawful immigration status. Would this "provid[e] public resources to meet the needs of illegal aliens"? Lastly, the term "provide incentives" is exceptionally vague. Would USDA find that federal funding cannot be "directed towards" programming where State funds are used to provide benefits without regard to immigration status? The text of the Immigration Condition does not answer such questions.

Plaintiff States cannot be forced to accept these conditions under such uncertainty, particularly when the broadest interpretations may directly conflict with state law and even some federal laws and regulations. Plaintiff States comply with federal anti-discrimination laws and also have enacted a variety of anti-discrimination laws and policies. *E.g.*, Ex. 10 ¶¶ 39, 43-44; Ex.

13

20 ¶¶ 14, 16; Ex. 34 ¶¶ 27, 33; Ex. 38 ¶¶ 15, 17; Ex. 46 ¶¶ 21, 24; *see also infra* 21–22. The Constitution affords Plaintiff States the right to certainty regarding the meaning of the agency's conditions in the case of such potential conflicts (though the conditions' vagueness violate the Spending Clause even without such conflicts). Plaintiff States must either risk critical funding or disregard their own duly enacted laws and policies to comply with their best guess at what Secretary Rollins means by the Challenged Conditions.

### 2.    The Challenged Conditions are not reasonably related to the applicable programs.

Furthermore, even if the Challenged Conditions were unambiguous, they are not "directly related" to the purposes of the funding programs, in violation of the Spending Clause's requirement that any conditions imposed on federal funding be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion); *accord Dole*, 483 U.S. at 207.

Here, the Challenged Conditions impermissibly "seek to leverage funding to regulate [States' activities] outside the contours of the [funding] program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (applying similar principle in First Amendment context). When USDA seeks to impose conditions across its programs, regardless of statutory purpose, the conditions "lack the necessary tailoring" to satisfy the Spending Clause's relatedness requirement. *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 96 (D.R.I. 2025). For example, efforts to strengthen fire departments in rural communities have nothing to do with the administration's views on "gender ideology," whatever that term may mean under §§ 12.2.2 and 13.5. Such critical funding is meant to purchase life- and property-saving equipment that volunteer fire departments rely on to protect residents and essential crops, and the States intend to use the funding to do just that. *E.g.*, Ex. 27 ¶ 12; Ex. 60 ¶¶ 16-19. Furthermore, the

administration's views of DEI, whatever USDA believes that term may encompass under § 12.2.4, are unrelated to USDA-funded program purposes such as protecting community tree management in Massachusetts, poultry inspection in Maine, enhancing specialty crops in Michigan, or surveilling zoonotic diseases in Virginia. Ex. 31 ¶ 68, 59; Ex. 40 ¶¶ 32-33; Ex. 44 ¶ 10; Ex. 66 ¶ 14. While USDA can attach conditions that ensure funds are being used for their stated purpose—in the case of funding for rural fire departments, that the funding is spent on radios, protective clothing, and other essential firefighting equipment, *see e.g.*, Ex. 31 ¶ 71; Ex. 47 ¶ 11—that is not the case here. Defendants instead aim to tie funding for such critical programs to their unrelated policy views—a restriction the Spending Clause does not allow.

Similarly, the Immigration Condition imposes an unrelated substantive condition on the receipt of federal funds. For example, USDA's Agricultural Marketing Service recently issued funding via cooperative agreements to state agencies for the Pesticide Data Program, which funds data collection on pesticide residues in food.[4] Ex. 44 ¶¶ 12–18, 19. These cooperative agreements incorporate the Immigration Condition. *See, e.g.*, *id*. However, this grant is entirely unrelated to immigration, and USDA has no basis to impose the Immigration Condition on state agencies receiving this funding. *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 311 (D.R.I. 2025). Other USDA grants similarly have no relation to immigration, including, for example, grants that

---

[4] U.S. Dep't of Agric., *Pesticide Data Program*, https://www.ams.usda.gov/datasets/pdp (last visited Mar. 28, 2026). The program emphasizes "commodities highly consumed by infants and children." *Id*.

support veterinary services,[5] combat citrus disease,[6] or fund agricultural sciences research.[7] *See, e.g.*, Ex. 66 ¶ 14; Ex. 42 ¶ 2; Ex. 78 ¶ 7.

Finally, to the extent that the Policy, Sports, and Immigration Conditions purport to reach beyond the mere use of USDA funds and require modifications of the entirety of a recipient's programs and activities, they plainly are not "reasonably calculated" to "advance the purposes for which the funds are expended." *Illinois*, 801 F. Supp. 3d at 96; *see also NFIB*, 567 U.S. at 580 (plurality opinion). Because the Challenged Conditions cannot be justified as advancing the programs' purposes, they must be stricken.

### 3. The Challenged Conditions are unconstitutionally coercive.

Beyond the lack of clarity in the conditions and their lack of relation to the programs USDA governs, the Challenged Conditions violate the Spending Clause's prohibition on coercive conditions. A condition is coercive if it exerts a "power akin to undue influence" and turns pressure "into compulsion." *NFIB*, 567 U.S. at 577 (plurality opinion). To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *Id.* at 580, 585.

The programs at issue here, in USDA's own words, serve "our most vulnerable families and communities" and are "critical."[8] A choice to either give USDA unwarranted and virtually

---

[5] U.S. Dep't of Agric., *Veterinary Services Grant Program*,
https://www.nifa.usda.gov/grants/programs/veterinary-services-grant-program (last visited Mar. 28, 2026).

[6] U.S. Dep't of Agric., *Emergency Citrus Disease Research and Extension Program Pre-Applications*, https://www.nifa.usda.gov/grants/funding-opportunities/emergency-citrus-disease-research-extension-program-pre-applications (last visited Mar. 18, 2026).

[7] U.S. Dep't of Agric., *Agriculture and Food Research Initiative (AFRI)*, https://www.nifa.usda.gov/grants/programs/agriculture-food-research-initiative (last visited Mar. 11, 2026).

[8] U.S. Dep't of Agric., *Secretary Rollins' Vision for the Department's 16 Nutrition Program* (last visited Mar. 29, 2026), https://perma.cc/HP2F-KETJ.

16

unlimited discretion over matters of social policy, or to let children go hungry at school, is no choice at all. Plaintiff States have relied on this critical funding—billions annually—for decades. Plaintiff States stand to lose not only the vast majority of their child nutrition funding but the entirety of *all* funding from USDA, because USDA intends to apply the Challenged Conditions to *all* awards and agreements with the Plaintiff States. *Cf. Dole*, 483 U.S. at 211 (concluding a condition was not coercive because the state would only lose five percent of highway funds). Adding to Plaintiff States' injuries, the Policy Condition applies to every aspect of recipient entities, instead of merely controlling how funds are used, effectively commandeering state policymaking. *See Printz v. United States*, 521 U.S. 898, 933 (1997) ("The Federal Government may not compel the States to enact or administer a federal regulatory program.") (citing *New York v. United States*, 505 U.S. 144, 188 (1992)); *NFIB*, 567 U.S. at 580 (plurality opinion) (when conditions threaten "to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes"). USDA is threatening to create a gaping hole in state budgets by holding hostage some of the most critical funding, with the well-being of state residents hanging in the balance. *See, e.g.*, Ex. 24 ¶ 8 (in FY25 Illinois received over $1 billion in CNP funds, 99% of the agency's overall funding for food programs); Ex. 41 ¶ 3 (in FY25 Michigan residents received over $3 billion in SNAP funds). Plaintiff States are not "free at pleasure to disregard or to fulfill" the conditions, as the Constitution requires. *Steward Machine Co. v. Davis*, 301 U.S. 548, 595 (1937).

**B.      The imposition of the Challenged Conditions is arbitrary and capricious.**

USDA not only failed to comply with its constitutional obligations in imposing the Challenged Conditions, but it also disregarded its obligations under the APA.

The APA serves as a "check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton*

17

*Salt Co.*, 338 U.S. 632, 644 (1950). The APA forecloses "arbitrary or capricious" agency actions—actions that are not "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (internal quotation marks omitted). Under Section 706(2)(A), the Court's "scope of review is narrow: [it] determine[s] only whether [the agency] examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (citation modified). Courts also examine whether the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard is more exacting when an agency changes positions. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). In such circumstances, an agency "must consider the alternatives that are within the ambit of the existing policy" and must consider "potential reliance interests" implicated. *Id*. at 30 (citation modified).

Here, USDA's across-the-board imposition of the Challenged Conditions is arbitrary and capricious because the agency (1) ignored the States' reliance interests on federal funding; (2) provided no valid reasons for imposing the Challenged Conditions; (3) neglected an important part of the problem, namely the web of state laws and policies implicated by its vague conditions; and (4) overlooked obvious alternatives to its one-size-fits-all approach.

### 1. USDA ignored the States' reliance interest on the substantial sums affected by its action.

One glaring problem with USDA's imposition of the Challenged Conditions is the agency's "fail[ure] to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (internal quotation marks omitted). "When an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id*. at 30,

18

33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id*. at 30 (citations omitted).

USDA completely ignored the Plaintiff States' reliance interests here. The States rely heavily on annual receipt of the USDA funding. In Massachusetts, over 500,000 of the 900,000 enrolled students are eligible for USDA-funded meals. Ex. 30 ¶ 15. In California, "approximately 2.5 million economically disadvantaged residents rely on TEFAP to meet their nutritional needs each month." Ex. 82 ¶ 8. In Illinois, the SNAP program serves an average of 1.9 million individuals each month—more than one in seven Illinoisians including 675,000 children. Ex. 26 ¶¶ 7-9. Oregon supports almost 120,000 Oregonians with its WIC program during pregnancy and early life and funds the programs almost exclusively with USDA dollars. Ex. 58 ¶ 17. And Plaintiff States reasonably rely on accessing such vital funds—including the vast array of other programs that support public health and safety infrastructure—without needing to reinvent infrastructure that has ensured compliance with federal requirements for decades.

Despite such reliance, Plaintiff States now face substantial disruption. If Plaintiff States accept the Challenged Conditions, they face the possibility USDA will use its newfound enforcement authority—made possible through overbroad and vague conditions—to freeze or terminate funding. This possibility is not hypothetical given the agency's actions over the past year. *See, e.g.,* Exs. 2, 3, 5. And the other option before the States—declining the funds entirely—similarly leads to chaos, as billions in funding for food, nutrition, education, and the public welfare would evaporate. *See infra* 30–34. USDA did not "weigh" these reliance interests against its "competing policy concerns." *Regents*, 591 U.S. at 30–33. It ignored them altogether.

19

### 2. USDA provided no reasons for the Challenged Conditions.

Furthermore, when a policy change disrupts the status quo, an agency must provide reasons for its change. *Regents*, 591 U.S. at 30–33. But here, USDA did not "justify [] its adoption" of the new conditions, so they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

Start with the Policy Condition. USDA has never explained why it needs additional authority and discretion—above and beyond what federal law and regulations already provide it—to craft and enforce anti-discrimination "policies" against funding recipients. Its "Golden Age of Civil Rights" memo says nothing about USDA's authority to impose any "policy" in addition to existing law. Ex. 1. Nor did Secretary Rollins explain the Policy Condition in the Rollins Memo when announcing the 2026 Conditions. (Doc No. 1-3) Rather, the document sets out four generalized agency priorities motivating the 2026 Conditions, including "[e]nsuring no recipients . . . engage with or provide funding to entities or individuals on prohibited lists," "[s]tandardizing termination language" related to grants that do not meet "performance benchmarks or demonstrate substantial progress," "prevent[ing] foreign adversaries from . . . exploiting taxpayer funds," and "[s]trengthening USDA control and oversight of obligated funds." *Id*. The document further states that the conditions will lessen "unchecked paperwork burden[s]." *Id*. None of these stated reasons for the agency's new across-the-board conditions relate to anti-discrimination policies. Elsewhere in the memorandum, Secretary Rollins announces USDA's commitment to "advance policies that put America First" or "generate the largest possible benefit to the American people." *Id*. But "such platitudes cannot substitute for an actual explanation of why it is necessary to attach sweeping. . . conditions to all the grants at issue here, regardless of their statutory purpose or programmatic objectives." *Illinois*, 801 F. Supp. 3d at 93.

20

USDA is also silent regarding the reasons for the Gender, Sports, and Immigration Conditions. The agency has not explained what "gender ideology" is or why USDA must police its "promotion" by withholding billions in funding. It has never explained any rational relationship between these funds and youth sports. Nor has it discussed how USDA-funded programming does or could "incentivize" immigration. Such complex issues require analysis, not rushed ignorance, particularly with billions of dollars at stake. USDA's references to the EOs within the text of the conditions cannot cure its failure to provide reasons for the Challenged Conditions, as an executive order is "no explanation at all" for an agency action. *Hous. Auth. of San Francisco v. Turner,* No. 25-cv-8859-JST, 2025 WL 3187761, at *19 (N.D. Cal. Nov. 14, 2025).

USDA's failure to provide a reasoned explanation is compounded by the Challenged Conditions' vagueness. The Challenged Conditions' broad language lacks clarity and invites arbitrary enforcement. *See, e.g.*, Ex. 18 ¶ 22 ("uncertain as to what is required by the 2026 Conditions"); Ex. 26 ¶ 19 (same); Ex. 28 ¶ 41 (same); Ex. 34 ¶ 29 (same); Ex. 37 ¶ 19 (same); Ex. 62 ¶ 70 (same). But funding recipients are owed explanations, rather than "vague and confusing language in the challenged conditions, which makes compliance a nearly impossible-to-achieve moving target." *Illinois*, 801 F. Supp. 3d at 94. When "states are left to guess at what conduct satisfies the requirements under threat of losing billions in essential funding," the agency imposing the condition violates its obligations under the APA. *Id.*; *see also California*, 808 F. Supp. 3d at 309 (the "ambiguity of the extent of the [challenged condition's] requirements . . . lend[s] support to the Court's finding that Defendants acted arbitrarily and capriciously").

### 3.   USDA completely ignored the conflicts of law it has created.

Furthermore, USDA's imposition of the new conditions not only disrupts the funding status quo, but it also runs counter to state laws and policies that apply to recipient institutions. For

example, Massachusetts has a law protecting the rights of all people to use sex-segregated facilities in places of public accommodation (including public schools, colleges, and other educational institutions) consistent with their gender identity. G.L. c. 272, §§ 92A, 98. USDA's request for a blank check to impose novel policies creates a conflict between the agency action and law. *See also, e.g.,* Cal. Educ. Code §§ 200, 220; Cal. Gov't Code §§ 12940(a), 12955; 2 Cal. Code Reg. § 11034(e)(2), (h), (i)(4); Cal. Health & Safety Code §§ 103426, 103430; Cal. Veh. Code § 12800; 775 Ill. Comp. Stat. 5/1-102(A); 775 Ill. Comp. Stat. 5/1-103(O-1); 775 Ill. Comp. Stat. 5/2-102(A); 410 Ill. Comp. Stat. 535/17 (1)(e); 77 Ill. Adm. Code 500.43; Mass. Gen. Laws ch. 151B, § 4; Mass. Gen. Laws ch. 22C, § 32; Mass. Gen. Laws ch. 90, § 8N; N.J. Stat. § 10:5-3. USDA has "entirely failed to consider" this "important aspect of the problem." *State Farm*, 463 U.S. at 43. The agency has not submitted any reinterpretation of federal anti-discrimination law through notice-and-comment, which would allow for analysis and discussion of such potential conflicts, *see infra* 27–29, and a handful of nonbinding agency communications cannot force the States to abandon such laws and policies to ensure access to USDA funds. USDA has not met its burden of considering such an "important aspect" of the problem. *State Farm*, 463 U.S. at 43. USDA's "failure to even consider reasons to not impose the contested conditions highlights the arbitrariness of the process." *Illinois*, 2025 WL 2716277, at *12.

### 4.  USDA failed to consider alternatives to its one-size-fits-all approach.

Finally, USDA completely overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51). As *Regents* makes clear, it is arbitrary and capricious for an agency to change a program in its entirety without first assessing whether it should instead alter only certain parts of the program. *See id*. at 26–30. Here, a targeted approach was *plainly* available to USDA. As the agency has explained, there used

to be 106 documents covering the terms and conditions that applied to 287 different grants and agreements. (Doc No. 1-3). These terms were rightly varied because they cover programs from pest management, to local cranberry farm advertisement, to 4-H clubs. USDA's abrupt shift away from this targeted approach is further evidence of its unreasoned decision-making. *See Illinois*, 801 F. Supp. at 93–94 ("The indiscriminate application of these conditions across the entire spectrum of DHS-administered grants demonstrates the absence of tailoring and the failure to consider whether such conditions are appropriate for particular programs."). Instead of "taking a measured approach," USDA seeks to "cut the fuel supply" "without any consideration for the consequences of that decision," an approach that is "not—and could never be—rational." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 124 (D.D.C. 2025).

**C.      The Policy Condition and Immigration Condition were issued in excess of statutory authority.**

USDA and its agencies are "charged with administering congressional statutes," meaning "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 30 (1st Cir. 2020); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

### 1. USDA lacks general authority to impose the Policy Condition and Immigration Condition.

Here, USDA asserts the authority to (1) impose novel anti-discrimination requirements through "policies" rather than through law or regulation and (2) impose immigration-related restrictions on programs that have been administered without regard to immigration status for decades. Defendants have never identified any statute that could plausibly authorize such sweeping "policies" or "immigration" restrictions.[9] Congress has provided no such authority. As to the Policy Condition, the defect is clear from the plain language of the condition, which lists "policies" as something separate and distinct from the authority given to the agency by law or regulation. *See Ardente v. Standard Fire Ins. Co.*, 744 F.3d 815, 819 (1st Cir. 2014) (describing statutory canon that "urges courts to give each word meaning, thereby avoiding surplusage"). While Congress sets the scope of USDA's authority through "laws," and agencies promulgate "regulations" consistent with the authority they have received from Congress, there is no source of authority for additional antidiscrimination "policies" that can attach to federal funding. *See, e.g.*, 7 C.F.R. § 272.2 (setting forth required contents of State Plan of Operation and providing that "[t]he Federal/State Agreement is the legal agreement between the State and the Department of Agriculture" and "the means by which the State elects to operate SNAP and to administer the program *in accordance with the Food and Nutrition Act of 2008, as amended, regulations issued pursuant to the Act and the FNS-approved State Plan of Operation*" (emphasis added)).

Congress also never provided USDA with any general authority to impose novel immigration-status based restrictions on the funding it administers. Instead, Congress has spoken

---

[9] To the extent Defendants defend the Gender Condition and Sports Condition as interpretations of Title IX of the Education Amendments Act, that argument fails for the distinct reason that Defendants were required to employ notice-and-comment procedures before issuing that interpretation, *see* Section E below.

specifically about which benefit programs are subject to immigration conditions in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and in the Food and Nutrition Act of 2008, Pub. L. No. 88-525, 7 U.S.C. §§ 2011, *et seq*. Those laws provide, in detailed statutory text, which categories of noncitizens may or may not receive benefits and under what circumstances. *See, e.g.* 7 U.S.C. §§ 2014(a), 2015(f). USDA exceeds its statutory authority because no law or regulation authorizes it to impose the Immigration Condition, which far exceeds any statutory eligibility requirements. *See Commonwealth of Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc). USDA cannot impose additional or different immigration-related conditions through grant terms—rather than through the procedures and limits set forth in PRWORA and the Food and Nutrition Act. An agency may not rewrite or expand statutory eligibility rules through generalized funding conditions where Congress has enacted a specific and comprehensive framework governing the subject.

### 2. USDA lacks specific authority to impose the Policy Condition and Immigration Condition.

Not only does USDA lack any general authority from Congress to impose the Policy and Immigration Conditions, but no specific authorizing statute for the grants at issue provides it such authority. Rather, many of these grant statutes impose a specific duty on USDA to distribute funds, without reference to novel anti-discrimination "policies" and without any immigration restrictions. For example, in giving USDA authority to administer the Child Nutrition Programs, Congress said the Secretary of Agriculture "*shall* make… payments to each State… from the sums appropriated for such purpose, in a total amount equal to [the formula]." 42 U.S.C. § 1753(b) (emphasis added). Congress has spoken clearly about the terms pursuant to which agencies must make payments under these programs, none of which relate to agency anti-discrimination policies or immigration. As the First Circuit explained, when funds are subject to "statutory formula[s]," the programs

25

"simply do[] not allow" federal agencies to "impose by brute force" conditions on federal funds to further the agency's unrelated priorities. *Providence*, 954 F.3d at 34–35.

> **D.**  **The Immigration and Gender Conditions are contrary to law governing multiple USDA programs.**

Under the APA, courts are "to set aside federal agency action that is 'not in accordance with law.'" *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). This "means, of course, any law, and not merely those laws that the agency itself is charged with administering," *id.* (emphasis in original), including an agency's own regulations. *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir. 2020), amended on reh'g, 973 F.3d 143 (1st Cir. 2020); *see also Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (a federal agency is "bound by its own regulations so long as they remain in force").

The Immigration Condition is contrary to the statutes and regulations governing various USDA programs. For example, the Immigration Condition contradicts 8 U.S.C. § 1615, which provides that "an individual who is eligible to receive free public education benefits under State or local law shall not be ineligible to receive benefits provided under the school lunch program under the Richard B. Russell National School Lunch Act (42 U.S.C. §§ 1751, *et seq.*) or the school breakfast program under section 4 of the Child Nutrition Act of 1966 (42 U.S.C. § 1773) on the basis of citizenship, alienage, or immigration status." Section 1615 also provides that "[n]othing in this Act shall prohibit or require a State to provide to an individual who is not a citizen or a qualified alien…benefits under programs established under…the Child Nutrition Act of 1966," which includes WIC and The Emergency Food Assistance Program ("TEFAP"). Indeed, USDA itself recently acknowledged that this provision remains governing law, and thus that the National School Lunch and School Breakfast programs and WIC cannot be limited based on citizenship status. PRWORA: Interpretation of "Federal Public Benefit," 90 Fed. Reg. 30,621, 30,622 (July

26

10, 2025) ("July 2025 Notice") (noting that USDA "continues to administer" the school lunch and breakfast programs "in accordance with the superseding provisions of § 1615" regarding immigrant eligibility). Application of the Immigration Condition to the National School Lunch Program, the School Breakfast Program, WIC, or TEFAP based on citizenship, alienage, or immigration status, is therefore contrary to law.

The Immigration Condition contravenes USDA regulations governing TEFAP, which provide that "identification documents shall not be used as an eligibility criterion" for the program. 7 C.F.R. § 251.5(b)(3). The Immigration Condition's application to TEFAP would likely require state agencies to use identification documents to confirm immigration status. This directly contradicts existing TEFAP regulations as well as the USDA's existing TEFAP guidance which clarifies that eligibility for TEFAP cannot be conditioned based on immigration status. July 2025 Notice at 30,622. USDA has therefore violated the APA by issuing the Immigration Condition, which is contrary to the laws governing multiple USDA programs.

Finally, the Gender Condition contravenes USDA regulations governing SNAP, which require States to administer the SNAP program in compliance with the requirement that "no person in the United States shall, on the grounds of sex, *including gender identity* and sexual orientation, race . . . be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under SNAP." 7 C.F.R. § 272.2(b)(1). To the extent that USDA understands "gender identity" to be captured by "gender ideology," its attempt to prohibit the promotion of "gender ideology" directly contravenes this regulation.

**E.    Any effort by USDA to smuggle reinterpretations of federal law into funding conditions would violate required APA procedures.**

The Gender and Sports Conditions fall short of the U.S. Constitution's requirements for funding conditions and are unsupported by reasoned agency decision-making. But they are also

unlawful to the extent they reflect USDA's re-interpretation of Title IX of the Education Amendments Act of 1972 ("Title IX") that USDA never submitted to the required APA notice and comment procedures. *See generally*, 5 U.S.C. § 553. The Sports Condition cites an EO that purports to find its authority within Title IX. (Doc No. 1-1, § 13.8; Doc No. 1-2, § 12.9). And USDA has expressly tied its investigations into state promotion of "radical transgender ideology" to Title IX. Ex. 3. Having reinterpreted Title IX to *require* certain prohibitions on sports participation and on "gender ideology," USDA now appears to be trying to *implement* the reinterpretation through these particular conditions. This skips an essential step required by law. The purpose of notice and comment is to "assure fairness and mature consideration of rules of general application." *NLRB. v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969). Because the reinterpretation of federal law in a manner that imposes new duties on regulated parties requires adherence to notice-and-comment rulemaking procedures, USDA's failure to follow such procedures here violates 5 U.S.C. § 706(2)(D).[10]

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. When the first Trump Administration sought to clarify the obligations of federal funding recipients under such language, it undertook notice-and-comment rulemaking that resulted in Title IX regulations governing sexual harassment in federally funded schools. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (2020 Title IX regulations adopted by the first Trump Administration).

---

[10] To the extent USDA asserts these conditions do not flow from the agency's reinterpretations of federal law, then these conditions were imposed in excess of statutory authority, violating the APA for the same reasons the Policy and Immigration Conditions violate the APA, *see supra* 23 – 26.

When the Biden administration sought to clarify the terms of Title IX following the Supreme Court's decision in *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) through publication of a non-binding guidance document in the Federal Register, the notice of interpretation was vacated as a procedurally unlawful legislative rule that failed to conform to the APA's notice-and-comment procedures, in part because "[f]ailure to comply comes with the risk of . . . loss of funding." *Tennessee v. Dep't of Educ*., 104 F.4th 577, 609 (6th Cir. 2024). The court explained that "Congress did not list *any* specific discriminatory practices when it wrote Title IX," thus when an agency imposes *new* obligations—some of which "obligate [States] to stop the enforcement of their own contrary laws and policies," the notice-and-comment requirements apply. *Id*.

Here, as with the deficient approach in *Tennessee*, USDA has never subjected any reinterpretation of Title IX to the APA's vital notice-and-comment procedures. Yet, despite skipping this step, it now appears to take the position that Title IX authorizes it to withhold funding because of "male competitive participation in women's sports" and to pull funding where a funding recipient's actions "promote gender ideology." Because USDA threatens to enforce these vague conditions in a manner that will "impose new rights or duties and change the legal status of regulated parties," the agency must follow the APA rulemaking steps. *Tennessee*, 104 F.4th at 608. This means that, if the agency believes it is promulgating these conditions as interpretations of Title IX, it must publish a notice of the proposed rule, allow the public to comment on the proposal, consider the comments, and issue a final rule setting forth the basis and purpose of the rule. 5 U.S.C. § 553(b)–(c); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015). None of that has happened here.

29

**II.      The equities compel preliminary relief.**

### A.      Preliminary relief is needed to avert irreparable harm.

Absent preliminary relief from this Court, Plaintiff States will be severely and irreparably harmed by USDA's decision to impose the 2026 Conditions. Defendants have explicitly refused to stay enforcement of the Challenged Conditions during the pendency of this litigation. Ex. 8. With no injunction, Plaintiff States face an untenable choice. On the one hand, they may forgo potentially billions of dollars in federal funding to feed hungry children and protect our Nation's resources and agricultural industry. That option, needless to say, would be devastating to Plaintiff States and its most vulnerable residents. Alternatively, Plaintiff States may accept the Challenged Conditions, notwithstanding the ambiguities they impose and the ways in which they are procedurally and substantively contrary to law. If they do so, they will simultaneously be under constant threat of aggressive enforcement action and also relinquish their right to set their own policies regarding social equity, inclusion, and public welfare. This forced choice inflicts irreparable harm on the States. *See*, *e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("a 'Hobson's choice' can establish irreparable harm") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *see also City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (being faced with a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds [one] plans to use for life-saving projects" establishes irreparable harm).

The coercive effect of the 2026 Conditions is being felt right now and grows worse by the day. Agencies in Plaintiff States presently face decisions about whether to accept the 2026 Conditions or lose access to USDA-administered funding. *See, e.g.*, Ex. 34 ¶ 21 (2026 Conditions expressly incorporated in five awards), Ex. 10 ¶ 33 (same as to four awards, several via modification). For example, Michigan has received funding under USDA's Pest Data Program

30

("PDP") Cooperative Agreement for 32 years. Ex. 44 ¶¶ 12-15. The PDP performs an essential role including "evaluating dietary pesticide exposure and ensuring a safe food supply." *Id.*, ¶ 17. In March 2026, USDA conditioned participation in the PDP on acceptance of the 2026 Conditions and requested that acceptance "promptly." *Id.*, ¶ 18. Likewise, Maine's receipt of $62 million for farmers and businesses who sustained losses following severe weather events, an agreement it hoped to finalize with USDA this month, is also conditioned on acceptance of the 2026 Conditions. Ex. 40 ¶¶ 41-52. Illinois has been asked to sign a grant modification for its Revegetation Grant Program, but it is holding off because it includes the 2026 Conditions. Ex. 27 ¶ 66.

Adding to the confusion and chaos, and contrary to Secretary Rollins' directive that the 2026 Conditions would apply to "future awards" and "significant modifications" to existing awards, (Doc No. 1-3), USDA has begun imposing the Conditions on programs in the middle of ongoing funding absent any change to the program. *See, e.g.*, Ex. 28 ¶¶ 31-33; Ex. 42 ¶ 20 (2026 Conditions even applied to no cost extensions); Ex. 57 ¶ 29. For example, the University of Wisconsin-Madison ("UW") received a notice of award ("NOA") in January 2026 that did not incorporate the 2026 Conditions. Ex. 70 ¶ 24. Weeks later, on March 4, 2026, UW received an amended NOA incorporating the 2026 Conditions. *Id.* Because of the ambiguity in the 2026 Conditions, UW is pausing any draw of funds on this $9.8 million USDA award; if that continues, loss of this funding could result in needing to initiate layoff procedures for over 100 positions as soon as August 1, 2026. *Id.*, ¶¶ 36, 38.

Without intervention from this Court, Plaintiff States will either have to forgo the receipt of critical funding on which they have relied for years or forgo an essential component of their sovereign authority "to protect the health, morals, and safety of their people." *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 521. Either choice leads to irreparable harm.

First, acceding to the Challenged Conditions to preserve access to critical USDA funds would intrude on Plaintiff States' authority. *Cal.*, 808 F. Supp. 3d at 312–13. It is well-established that States suffer an irreparable injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Tennessee*, 104 F.4th at 613; *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). And the harm to Plaintiff States' authority that would result from accepting the Challenged Conditions is hardly abstract, as USDA seeks to dictate social policy, notwithstanding Plaintiff States' own laws and policies. *Supra* pp. 4–7; 20–22. Acceding to the Challenged Conditions would also create untenable uncertainty for Plaintiff States, given the overbreadth and vagueness of the Challenged Conditions and USDA's threat to pull funding if it determines that a condition has been violated.

The other choice available to Plaintiff States—forgoing USDA funding—also leads to irreparable harm. The consequences of losing USDA funding are immense. USDA's Child Nutrition Programs are an essential component of Plaintiff States' fight against child hunger. *See, e.g.*, Ex. 63 ¶ 76; Ex. 17 ¶ 14. For example, in New York, "[a] funding loss could leave hundreds of thousands of children across the City facing hunger and malnutrition, and could place enormous additional financial pressures on their families." Ex. 55 ¶ 35. Similarly, WIC funding provides critical nutrition to children and mothers, a loss of which would result in "increase[d] risk of short- and long-term health consequences and chronic disease, increasing the impact of individual harm incurred, costs to Medicaid, and strain on the local healthcare system." Ex. 58 ¶ 17. Losing access to SNAP would be catastrophic to the Plaintiff States and would "force individuals and families to scramble for alternatives—including possibly going into debt or failing to meet other financial commitments, like rent, utilities, and medications, to continue meeting their

basic needs." Ex. 41 ¶ 25; *see also* Ex. 52 ¶¶ 13, 25-41; Ex. 46 ¶¶ 10-12, 26-41. The USDA funds that sustain forests and farms are also essential. Massachusetts uses USDA funds to pay staff to protect farms and crops from invasive pests, which cost North America more than $26 billion per year, and the state also uses USDA funds to cover 71% of the operational funding for its Forest Fire Control Programs. Ex. 31 ¶¶ 100, 105. Food safety would also be compromised without USDA funding. For example, the University of Delaware uses USDA funding to, among other things, "monitor every chicken flock in Delaware for poultry diseases including avian influenza" and absent that funding, Delaware would "no longer be able to test every flock... for poultry diseases, monitor the flocks, and treat and manage outbreaks." Ex. 19 ¶¶ 7-8. Rhode Island operates a USDA-funded program called TickEncounter to track diseases spread by ticks. Ex. 62 ¶ 13. Finally, the loss of USDA funding for university research would be catastrophic. Colorado State University "would have to shut down all ten agricultural research stations, lay off all agricultural experiment station staff, and approximately half of the agricultural sciences faculty." Ex. 10 ¶ 8; *see also* Ex. 28 ¶ 45 (loss of USDA funds would deny 92 researchers funding and support for over 100 graduate and 110 undergraduate students and may result in the termination of 83 staff positions); Ex. 78 ¶ 8 ("If these federal funds were withheld, the [University of Hawaiʻi] would be forced to shut down or severely curtail multiple critical research, education, and extension programs that directly support Hawaiʻi's food and agriculture sector").

Further, the functions for which Plaintiff States use these USDA funds are, at least in some instances, matters of life and death. *See Philadelphia*, 280 F. Supp. 3d at 579 (potential loss of human life constitutes irreparable harm). For example, the United States Forestry Service's Fire Capacity Programs are essential to allowing Plaintiff States to meet their critical fire management needs, especially in rural areas. Ex. 45 ¶ 10; Ex. 36 ¶¶ 13-32; Ex. 47 ¶ 11. In Wisconsin, these

federal funds support the training and readiness of nearly 700 firefighters annually and help protect hundreds of communities, including approximately 574 Wisconsin communities identified for elevated wildfire risk. Ex. 73 ¶ 16. The loss of these funds will "have an immediate impact on [Plaintiff States'] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding is subsequently reinstated." *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016); *see also Illinois*, 801 F. Supp. 3d at 98 ("[T]he effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable.").

**B.    The balance of equities and public interest favor preliminary relief.**

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The balance of equities weighs in favor of enjoining the Challenged Conditions because "the hardship to the nonmovant" pales in comparison to "the hardship to the movant if no injunction issues." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*, 102 F.3d 12, 15 (1st Cir. 1996). Without an injunction, Plaintiff States face the severe and irreparable harms outlined above. On the other side of the ledger, an injunction would impose no cognizable hardship on Defendants: it would simply maintain the status quo, that has been in place for decades, in which Defendants disburse these congressionally mandated funds without the Challenged Conditions. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on Defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers); *see also Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo before the merits have

34

been resolved."). Defendants cannot complain of an injunction that merely bars them from imposing funding conditions that did not exist prior to December 31, 2025.[11]

The public interest, too, sharply favors an injunction, as millions of individuals, including children, will lose benefits and access to critical programs if Plaintiff States are unable to receive USDA funding. A loss of child nutrition funding "makes it hard for children to concentrate in school and decreases their ability to perform well academically." Ex. 24 ¶ 73. A loss agricultural resilience funding leaves states unable to "protect and enhance both the farm economy and food security for all residents." Ex. 31 ¶ 11. The loss of SNAP funding not only affects nutritional benefits but also impacts public health. *See, e.g.*, Ex. 46 ¶ 12 (adult SNAP recipients incur nearly $100 less of Medicaid spending each month). Without funding to protect our forests, diseases would spread and "wildfire occurrence and severity would increase, and public safety risks would rise—especially in small and rural communities." Ex. 47 ¶ 4.

## CONCLUSION

The Court should preliminarily enjoin defendants from applying and enforcing the Challenged Conditions to Plaintiff States and their instrumentalities and subdivisions. A proposed order is attached to the accompanying motion.

---

[11] For similar reasons, the Court should not require payment of a bond. *See Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) (court has discretion whether to require a bond and in what amount).

March 30, 2026

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

By: */s/ Nita K. Klunder*
Nita K. Klunder (BBO No. 689304)
  *State Trial Counsel*
Hannah C. Vail (BBO No. 698577)
Jak Kundl (BBO No. 713951)
  *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2394
Nita.Klunder@mass.gov
Hannah.Vail@mass.gov
Jak.Kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
  *Attorney General of California*

*/s/ Brian Bilford*
BRIAN BILFORD*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
ALYSSA ZHANG*
LUKE FREEDMAN*
DANIEL SHEEHAN*
Deputy Attorneys General
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov
Joel.Marrero@doj.ca.gov
Alyssa.Zhang@doj.ca.gov
Luke.Freedman@doj.ca.gov
Daniel.Sheehan@doj.ca.gov

*Counsel for Plaintiff State of California*

Respectfully submitted,

KWAME RAOUL
  *Attorney General of Illinois*

By: */s/ Vikas Didwania*
Vikas Didwania*
Aleeza Strubel*
  *Complex Litigation Counsels*
Michael M. Tresnowski*
  *Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Aleeza.Strubel@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
  *Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Counsel for the State of Wisconsin*

36

PHILIP J. WEISER
  *Attorney General of Colorado*

By: */s/ Sam Wolter*
Sam Wolter*
  *Assistant Attorney General*
Kristopher Brambila*
  *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Samuel.wolter@coag.gov
Kristopher.brambila@coag.gov

*Counsel for the State of Colorado*


WILLIAM TONG
  *Attorney General of Connecticut*

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati*
  *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov


*Counsel for the State of Connecticut*

KATHLEEN JENNINGS
  *Attorney General of the State of Delaware*

By: */s/ Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Rose E. Gibson*
Vanessa L. Kassab*
  *Deputy Attorneys General*
Delaware Department of Justice

JENNIFER DAVENPORT
  *Attorney General for the State of New Jersey*

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
  *Assistant Attorney General*
Dianna Shinn*
Jonathan Allen*
  *Deputy Attorneys General*
New Jersey Office of the Attorney General
Division of Law – Environmental & Clean Energy Practice Group
25 Market Street
Trenton, New Jersey 08625-0093
(609) 696-4607
jessica.palmer@law.njoag.gov
dianna.shinn@law.njoag.gov
jonathan.allen@law.njoag.gov

*Counsel for the State of New Jersey*


RAÚL TORREZ
  *Attorney General of New Mexico*

By: */s/ Amy Senier*
Amy Senier (BBO No. 672912)
  *Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov


*Counsel for the State of New Mexico*

LETITIA JAMES
  *Attorney General for the State of New York*

By: */s/ Natasha M. Korgaonkar*
Rabia Muqaddam*
  *Chief Counsel for Federal Initiatives*
Natasha M. Korgaonkar (BBO 704129)
Matthew Faiella*
  *Special Counsel*
28 Liberty St.

37

820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*


ANNE E. LOPEZ
  *Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


BRIAN L. SCHWALB
  *Attorney General for the District of
  Columbia*

By: */s/ Samantha Hall*
Samantha Hall*
  *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 788-2081
samantha.hall@dc.gov

*Counsel for the District of Columbia*


ANTHONY G. BROWN
  *Attorney General for the State of Maryland*

By: */s/ James C. Luh*
James C. Luh*
  *Senior Assistant Attorney General*
Office of the Attorney General

New York, NY 10005
(212) 416-6557
rabia.muqaddam@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov
matthew.faiella@ag.ny.gov

*Counsel for the State of New York*


DAN RAYFIELD
  *Attorney General for the State of Oregon*

By: */s/ Leanne Hartmann*
Leanne Hartmann, MA BBO #667852
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*


PETER F. NERONHA
  *Attorney General of Rhode Island*

By: */s/ Paul T.J. Meosky*
Paul T.J. Meosky*
    *Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2064
pmeosky@riag.ri.gov

*Counsel for the State of Rhode Island*


CHARITY R. CLARK
  *Attorney General of Vermont*

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
Office of the Attorney General

38

200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

AARON M. FREY
  *Maine Attorney General*

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
  *Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for the State of Maine*

DANA NESSEL
  *Attorney General of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

KEITH ELLISON
  *Attorney General for the State of Minnesota*

  By: */s/ Brian S. Carter*
Brian S. Carter*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403

109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

JAY JONES
  *Attorney General of Virginia*

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
  *Solicitor General*
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

NICHOLAS W. BROWN
  *Attorney General of Washington*

*By: /s/ Zane Muller*
Zane Muller*
Erica Franklin*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Erica.Franklin@atg.wa.gov

*Counsel for the State of Washington*

Brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*


*\*pro hac vice admitted, pending, or forthcoming*