**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF AGRICULTURE, et al., <br><br> Defendants. | Case No. 1:26-cv-11396-MJJ |

# EXHIBIT 14

**DECLARATION OF PETER HADLER**

I, Peter Hadler, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of the State of Connecticut. I am over the age of 18 and make this declaration based on personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff.

2.      I am the Deputy Commissioner for the Connecticut Department of Social Services ("DSS" or "Department"). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families block grant, the Low-Income Home Energy Assistance block grant, the Community Services Block Grant (CSBG), and numerous other public assistance programs.

3.      DSS is statutorily designated in Connecticut General Statutes section 17b-2 as the state agency responsible for "the administration of (1) the Connecticut energy assistance program pursuant to the Low Income Home Energy Assistance Act of 1981; (2) the state plan for vocational rehabilitation services for the fiscal year ending June 30, 1994; (3) the refugee assistance program pursuant to the Refugee Act of 1980; (4) the legalization impact assistance grant program pursuant to the Immigration Reform and Control Act of 1986; (5) the temporary assistance for needy families program pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (6) the Medicaid program pursuant to Title XIX of the Social Security Act (also

1

referred to as "HUSKY Health" in Connecticut); (7) the supplemental nutrition assistance program pursuant to the Food and Nutrition Act of 2008; (8) the state supplement to the Supplemental Security Income Program pursuant to the Social Security Act; (9) the state child support enforcement plan pursuant to Title IV-D of the Social Security Act; (10) the state social services plan for the implementation of the social services block grants and community services block grants pursuant to the Social Security Act; and (11) services for persons with autism spectrum disorder."

**Background on SNAP and Other Nutritional Programs in Connecticut**

4.      Connecticut's SNAP program, administered through DSS, is Connecticut's version of the federal Supplemental Nutrition Assistance Program authorized under the Food and Nutrition Act of 2008, 7 U.S.C. § 2011 *et seq*. SNAP is the nation's largest nutrition assistance program and is designed to "permit low-income households to obtain a more nutritious diet" through normal channels of trade. 7 U.S.C. § 2011. SNAP benefits are 100 percent federally funded, while administrative costs are shared between the federal government and the State. The program operates as an entitlement: eligible households that apply must receive benefits. *See* 7 U.S.C. § 2014(a); *see also* 7 U.S.C. § 2015(f). SNAP is the second largest social services program in Connecticut after HUSKY Health, Connecticut's Medicaid program, and serves as a core component of Connecticut's anti-poverty and public health infrastructure. SNAP benefits stretch food budgets, allowing individuals and families to afford nutritious food, including more fruits, vegetables, and other healthy foods.

5.      SNAP is a key part of Connecticut's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food.  For Federal Fiscal Year 2025, Connecticut issued approximately $70.8 million in SNAP benefits per month, totaling over

$849.9 million annually in federally funded food assistance. These benefits help 369,300 individuals each month.[1] The majority of SNAP recipients in Connecticut spend the majority of their benefits within the first two weeks of issuance. This rapid expenditure cycle means that any disruption in funding would immediately reverberate through local economies and food supply chains.

6.      SNAP serves more than one in ten individuals in the state each month and is Connecticut's most effective anti-hunger intervention.  Exemplifying the wide reach and impact of SNAP, a 2025 Connecticut survey identified that one in five adults in Connecticut report that they or someone in their household has received SNAP within the past five years.[2] For every meal the statewide food bank provides, SNAP provides nine.

7.      SNAP plays a particularly critical role in supporting children. Approximately 120,000 SNAP recipients in Connecticut – or 1 in 3 recipients – are children each month. Research has shown that children with access to SNAP experience improved long-term health, higher educational attainment, and improved lifetime earnings outcomes.[3] Any disruption in benefits would therefore have not only immediate nutritional consequences but long-term developmental and economic consequences.

8.      In addition to improving access to healthier foods, SNAP serves as an anti-poverty program. SNAP benefits are critical to needy Connecticut residents, particularly for low-income

---

[1] U.S. Dep't of Agric., *SNAP Data Tables*, https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (last visited Mar. 12, 2026).

[2] DataHaven, *Understanding How SNAP Impacts Connecticut Communities Through New Data from DataHaven and State Sources*, https://ctdatahaven.org/report/understanding-how-snap-impacts-connecticut-communities-through-new-data-datahaven-and-state/ (last visited Mar. 12, 2026).

[3] *See* Steven Carlson & Brynne Keith-Jennings, Center on Budget and Policy Priorities, *SNAP Is Linked with Improved Nutritional Outcomes and Lower Health Care Costs*, https://www.cbpp.org/research/food-assistance/snap-is-linked-with-improved-nutritional-outcomes-and-lower-health-care (last visited Mar. 12, 2026); Council of Econ. Advisers, *Long-Term Benefits of the Supplemental Nutrition Assistance Program* (Dec. 2015), https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/SNAP_report_final_nonembargo.pdf (last visited Mar. 12, 2026).

communities, those working low-wage jobs, and older adults on fixed incomes. Nutrition benefits allow SNAP beneficiaries to use their limited financial resources to cover other necessary expenses including housing, healthcare, and childcare. The amount of SNAP benefits a household receives depends on the household size, countable income, and monthly expenses, such as housing and utilities.

9.     SNAP functions not only as a nutrition benefit but as a public health intervention. Food insecurity is associated with increased rates of chronic disease, obesity, and negative health outcomes in children, including mental health.[4]  For households receiving benefits through HUSKY Health, loss of SNAP benefits would likely increase healthcare costs borne by the State and federal government. Because SNAP allows families to redirect limited income toward rent, medications, and preventive care, the loss of SNAP benefits would increase financial instability and negatively affect medication adherence and chronic disease management, placing additional strain on Connecticut's healthcare delivery systems.

10.     DSS also administers related programs such as SNAP Outreach, an optional federal-State program that Connecticut has chosen to operate to promote awareness of and participation in SNAP amongst eligible populations. Connecticut's SNAP Outreach program seeks to ensure that all eligible individuals are aware of and able to access SNAP. Through SNAP Outreach, DSS oversees a network of statewide contractors conducting targeted outreach and application assistance.

11.     Another DSS-administered nutrition benefit program, Disaster SNAP, is available to eligible residents when a major disaster is declared by the President and Individual Assistance is approved. In these types of emergencies, program eligibility criteria are simplified, providing

---

[4] *See, e.g.*, U.S. Dep't of Health & Hum. Servs., *Food Insecurity*, https://odphp.health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/food-insecurity (last visited Mar. 12, 2026).

households impacted by a disaster who would not normally be eligible for SNAP with one month of food benefits based on their residency, income, and disaster impact.

12. DSS also administers the federally authorized Summer EBT program to support children's nutritional needs during the summer months when meals are not available in school. Summer EBT provides Connecticut children who are eligible for free or reduced-price meals in schools with a monthly benefit during the summer months.

13. SNAP, Summer EBT, and Disaster SNAP all use the same Electronic Benefit Transfer (EBT) system, which provides participants with a card, similar to a debit card, used to purchase groceries at participating retail vendors.

14. On or about January 9, 2026, I received a notification that USDA had released General Terms and Conditions ("Conditions") that would be applicable to all USDA grants.

15. I am deeply concerned that USDA's Conditions, as applied to SNAP funding, would impose requirements unrelated to SNAP's statutory purpose of alleviating hunger and would create operational conflicts with Connecticut law. The Conditions require Connecticut to comply with federal "policies" and other conditions on federal funding, including (1) federal policies on anti-discrimination that differ dramatically from our long-standing interpretations of federal laws, (2) the Executive Order on diversity, equity, and inclusion programs, (3) the Executive Order on gender identity, as well as (4) the prohibition on using grant funds "towards educational programs that deprive women and girls of fair athletic opportunities" and "towards programs that allow illegal aliens to obtain taxpayer-funded benefits."

16. The Conditions do not define or explain the terms used therein.

17. SNAP is governed by detailed federal statutes and regulations that define eligibility, benefit calculation, and nondiscrimination requirements. Conditioning SNAP funding on

5

compliance with executive orders or policy interpretations that alter eligibility, nondiscrimination frameworks, or program operations risks directly conflicting with this statutory entitlement structure. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. §§ 2011, 2015(f), 2024(d). The Conditions would require Connecticut to modify eligibility systems, outreach efforts, or program administration to conform to such conditions, which would disrupt the uniform statewide administration required under federal SNAP regulations.

18.    In my years with DSS, I am not aware of DSS staff ever being required by USDA to certify DSS's compliance with unnamed Federal anti-discrimination policies as a precondition of receiving USDA funding. I am also not aware of DSS staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

19.    DSS operates its programs in compliance with Federal anti-discrimination laws and regulations.

20.    My understanding is that DSS is uncertain what is required by the 2026 Conditions and therefore may be unable to certify compliance with USDA's Conditions.

21.    In order to comply with any understanding of the Conditions that differs from existing Federal anti-discrimination laws and regulations, DSS would require additional resources, both time and money, to establish new guidelines and train employees on how to comply with the Conditions.

**Human Costs of Potential Termination of SNAP Benefits**

22.    If DSS is unable to comply with USDA's new funding conditions, the State would be unable to receive entire funding streams to which USDA now claims the Conditions apply.  If

USDA were to terminate or reduce its federal funding for Connecticut's SNAP program based on these conditions or based on Connecticut's inability to certify compliance with them, this would cause direct, immediate, and irreparable harm across Connecticut, both at the State and local level.

23.     Connecticut relies heavily on federal funding to operate SNAP. SNAP benefits are currently entirely federally funded, and the federal government currently reimburses approximately 50 percent of allowable administrative costs. USDA's longstanding federal funding has shaped SNAP's design and funding expectations in Connecticut for decades. Because benefit costs alone exceed $849 million annually, Connecticut does not possess the fiscal capacity to replace lost federal SNAP funding with State general funds. Even short-term disruption would create immediate budgetary shortfalls at the State level. DSS relies on federal administrative reimbursements to fund eligibility workers, call centers, fraud prevention systems, and EBT infrastructure. The sudden withdrawal of these funds could necessitate layoffs, contract terminations, and system shutdowns.

24.     SNAP is a significant economic driver in Connecticut. With over $70.8 million in benefits distributed monthly in Connecticut, SNAP supports millions of dollars annually in downstream economic activity across grocery retailers, agricultural producers, transportation providers, and food manufacturers.[5] Over 2,400 Connecticut retailers are authorized SNAP vendors.[6] Failure to fund SNAP benefits will harm these businesses as well as nonprofits and social services agencies that support already-overwhelmed food pantries and other community-based organizations that will simply not be able to meet the significant surge in need, nor make up for

---

[5] Per USDA research, SNAP has an economic multiplier of $1.50 to $1.80 for every $1.00 of SNAP benefits issued. *See* U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research*, https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research (last visited Mar. 12, 2026).
[6] *See* U.S. Dep't of Agric., *USDA SNAP Retailers*, https://usda-snap-retailers-usda-fns.hub.arcgis.com/datasets/ 8b260f9a10b0459aa441ad8588c2251c/explore?location=6.440261%2C-14.737150%2C2 (last visited Mar. 12, 2026).

the loss of over $70.8 million in monthly food benefits. Abrupt cessation of benefits would result in immediate revenue losses to these businesses and would disproportionately affect low-income communities where SNAP spending constitutes a meaningful share of grocery sales.

25.     Termination of SNAP benefits would produce immediate food insecurity for approximately 369,300 individuals in Connecticut. Food insecurity is associated with diet-related chronic disease, higher rates of emergency department use, longer lengths of hospital stay, and avoidable hospital admissions.[7] Children in food-insecure households are more likely to experience a wide range of significant negative health outcomes, such as asthma, anemia, cognitive and behavioral problems, depression, suicide ideation, and worse oral health.[8] Families would be forced to ration any remaining benefits, turn to lower cost, but less nutritious, alternatives, and in many cases, skip meals entirely. Termination of SNAP benefits will force individuals and families to scramble for alternatives, including possibly going into debt or failing to meet other financial commitments, like the cost of rent, utilities, and medications, to continue meeting their basic needs. Accordingly, a sudden loss of SNAP benefits would have cascading health consequences that extend beyond hunger alone.

26.     SNAP is also an economic driver for Connecticut local businesses. If over 200,000 Connecticut SNAP households are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of retailers across Connecticut. The negative impact extends to the agriculture industry, including farmers, growers, and producers.

---

[7] *See* Center on Budget and Policy Priorities, *SNAP Food Assistance Is a Sound Investment in Our Nation's Health, Well-Being, and Economy*, https://www.cbpp.org/blog/snap-food-assistance-is-a-sound-investment-in-our-nations-health-well-being-and-economy (last visited Mar. 12, 2026) (discussing studies).
[8] *See* Craig Gunderdsen & James P. Ziliak, *Food Insecurity and Health Outcomes*, https://pubmed.ncbi.nlm.nih.gov/26526240/ (last visited Mar. 12, 2026).

**Fiscal Impacts on Connecticut from the Loss of SNAP Benefits**

27.     In addition to direct harm to families, the loss of SNAP benefit funding would have a significant fiscal impact on Connecticut itself. For example, the loss of these benefits will result in greater need and requests for state-funded assistance programs, such as the Connecticut Nutrition Assistance Program, which allocates State general funds to the statewide food bank and other, independent, food pantries in Connecticut.

28.     The loss of SNAP benefit funding will cause significant strain on Connecticut's emergency food safety net, forcing Connecticut to dedicate State resources to supporting community organizations, such as food banks, that will see sharply increased demand.

29.     Publicly available research has consistently demonstrated that food insecurity increases healthcare expenditures.[9]   Because many SNAP recipients are also HUSKY Health beneficiaries, increased healthcare utilization would directly increase public expenditures. Thus, termination or disruption of SNAP benefits would not only harm beneficiaries but would likely increase costs within Connecticut's healthcare system, including HUSKY Health.

30.     Upon information and belief, Connecticut does not readily have the fiscal resources available to replace federally funded SNAP benefits with equivalent state-funded benefits, nor could it do so without creating other downstream fiscal impacts.

**Administrative and Operational Burdens on DSS**

31.     If DSS was unable to certify compliance with the Conditions, and unable to receive funding for SNAP benefits, that would significantly erode trust between Connecticut and its residents, built over many years and through the dedication of significant resources.

---

[9] *See* footnotes 7 and 8, *supra.*

32.    To properly effectuate its safety net programs, DSS has devoted years of work to overcome stigma, misinformation, and other barriers to access. If households experience a disruption in benefits at this scale, they are likely to feel that the government has failed in fulfilling its responsibilities.  DSS has fostered trust with residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to the receipt of benefits. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust. If USDA terminates or withholds funding based on its novel imposition of these extreme restrictions, it will have acted in disregard of those reliance interests of Connecticut.

33.    DSS anticipates that any disruption of SNAP funding would unduly burden its already limited administrative resources. DSS would have to take significant steps to prepare for a disruption in SNAP benefits for an indefinite period. A disruption of any length will burden DSS and the extent of this burden increases in relation to the duration of the disruption, as the scale of resources required to manage the disruption mount over time.

34.    The potential indefinite disruption to SNAP benefit issuances would result in additional administrative burden for DSS as a result of the need for extensive consultation with the State's eligibility system and EBT vendors, system enhancements, additional policy guidance to counties, and communications to recipients.

35.    DSS anticipates it would have to spend significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits. A significant number of staff across multiple divisions would have to redirect their attention to this effort, in lieu of other important initiatives.

36.     If DSS was unable to receive SNAP funding it would experience higher call volume, foot traffic and disruptions at DSS resource centers as hungry individuals and families learn they cannot access their benefits. DSS staff would need to explain to recipients that they will not receive the SNAP funds needed to feed their children and put food on the table. These local office staff will face significant burdens on their time and will likely need to divert their attention from other critical work.

**Impact on Connecticut's Provision of Other Public Benefits**

37.     SNAP eligibility is integrated into Connecticut's broader public benefits eligibility systems, including Medicaid, TANF cash assistance, and other assistance programs. DSS often determines eligibility for multiple programs simultaneously using shared technology platforms and caseworkers. A disruption in SNAP funding would therefore destabilize integrated eligibility operations, requiring system reprogramming, retraining of staff, and reissuance of public communications. This would divert resources from the administration of other safety net programs.

38.     DSS will be required to reallocate significant operational resources to crisis management, including emergency policy development, coordination with USDA, legislative engagement, vendor contract renegotiation, and public communication strategies. This diversion would delay modernization initiatives, delay implementation of federal reporting requirements, and impede improvements to other benefit delivery systems. The administrative disruption would be substantial even if SNAP funding were later restored.

11

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of March 2026.

_____
Peter Hadler
Deputy Commissioner
Connecticut Department of Social Services