**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, et al.,<br><br>Defendants. | Case No. 1:26-cv-11396-MJJ |

# EXHIBIT 33

## DECLARATION OF GLORIA BROWN BURNETT

I, Gloria Brown Burnett, pursuant to 28 U.S.C. § 1746, hereby declare:

a.    I am over the age of 18 and competent to testify as to the matters herein.

b.    I am the interim Secretary at the Maryland Department of Human Services (MDHS). I am a cabinet-level official appointed by the Governor on February 23, 2026 in an acting capacity to serve through March 31, 2026, and responsible for leading the state's primary social service agency. In this role, I direct the MDHS major program administrations, including Family Investment, Child Support, and Social Services. These duties involve overseeing programs offering economic assistance, child and adult protective services, and the child welfare system, while managing a workforce of almost 6,000 employees and coordinating with local departments of social services to serve over 1 million Marylanders annually.

1.    I make this declaration based on my personal knowledge, on information I acquired through the performance of my duties at MDHS, and on my review of records maintained in the ordinary course of business by MDHS. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2.    MDHS is responsible for the administration of public social services, including the federal Supplemental Nutrition Assistance Program (SNAP), throughout Maryland. We are honored to serve more than one million Marylanders to empower them and to unlock opportunities. We serve to ensure all can reach their full potential by helping with preventive and supportive services, economic assistance, and meaningful connections to employment development and career opportunities. Our team consists of nearly 6,000 employees across the

1

state, who are supported by our many partners in the communities we serve. Our 24 local departments of social services administer 80% of all activities in our $3.8 billion budget.

3.    As Interim Secretary, I am responsible for the administration of MDHS, the state's primary social services provider, managing programs for over one million residents, including SNAP, Temporary Cash Assistance (TANF), Medicaid eligibility, and energy assistance. Operating through 24 local departments, MDHS protects vulnerable children and adults, provides foster care, and handles child support services. I oversee the Family Investment Administration, the division of MDHS responsible for administering the federal Supplemental Nutrition Assistance Program (SNAP).

**Background on the Maryland SNAP Program and Other Nutritional Programs**

4.    The Maryland SNAP Program is Maryland's version of the federal Supplemental Nutrition Assistance Program (SNAP) authorized under the Food and Nutrition Act of 2008, 7 U.S.C. § 2011 et seq. SNAP is the nation's largest nutrition assistance program and is designed to "permit low-income households to obtain a more nutritious diet" through normal channels of trade. 7 U.S.C. § 2011. SNAP benefits are 100 percent federally funded, while administrative costs are shared between the federal government and the State. The program operates as an entitlement: eligible households that apply must receive benefits. *See* 7 U.S.C. § 2014(a). The Maryland SNAP Program is the second largest social services program in Maryland after the Maryland Medical Assistance Program, Maryland's Medicaid program, and serves as a core component of Maryland's anti-poverty and public health infrastructure. Maryland SNAP Program benefits stretch food budgets, allowing individuals and families to afford nutritious food, including more fruits, vegetable, and other healthy foods.

2

5.      The Maryland SNAP Program is overseen by MDHS and is administered by the State's 23 counties and Baltimore City pursuant to a USDA-approved State Plan of Operation. For Federal Fiscal Year 2025, MDHS issued approximately $1.6 Billion in Maryland SNAP Program benefits annually in federally funded food assistance. These benefits help 680,000 Marylanders each year. The majority of SNAP recipients in Maryland spend the majority of their benefits within the first two weeks of issuance. This rapid expenditure cycle means that any disruption in funding would immediately reverberate through local economies and food supply chains.

6.      The Maryland SNAP Program serves more than one in nine Marylanders and is Maryland's most effective anti-hunger intervention.[1] SNAP lifted 80,000 people above the poverty line in Maryland, including 39,000 children, per year between 2015 and 2019, on average. [2]

7.      The Maryland SNAP Program plays a particularly critical role in supporting children. Approximately 262,248 SNAP recipients in Maryland are children each year. It is one of the most effective programs for reducing both the rate and severity of poverty for children, often lifting them out of "deep poverty" (defined as households with income below 50% of the poverty line).[3] Research has shown that children with access to SNAP experience improved long-term health, higher educational attainment, and improved lifetime earnings outcomes. Any disruption in benefits would therefore have not only immediate nutritional consequences but long-term developmental and economic consequences.

---

[1]USA Facts, How many people receive SNAP benefits in Maryland every month?, https://usafacts.org/answers/how-many-people-receive-snap-benefits-in-the-us-every-month/state/maryland/ accessed March 12, 2026.
[2]Ctr. on Budget & Pol'y Priorities, Maryland Supplemental Nutrition Assistance Program (2025), https://www.cbpp.org/sites/default/files/atoms/files/snap_factsheet_maryland.pdf accessed March 12, 2026.
[3] Id.

3

8. In addition to improving access to healthier foods, the Maryland SNAP Program serves as an anti-poverty program. The Maryland SNAP Program benefits are critical to Marylanders in need, particularly for low-income communities, those working low-wage jobs, and older adults on fixed incomes. Nutrition benefits allow Marylanders to use their limited financial resources to cover other necessary expenses including housing, healthcare, and childcare. The amount of Maryland SNAP Program benefits a household receives depends on the household size, countable income, and monthly expenses, such as housing and utilities.

9. The Maryland SNAP Program functions not only as a nutrition benefit but as a public health intervention. Food insecurity is associated with increased rates of diabetes, hypertension, cardiovascular disease, depression, and anxiety. For households receiving Maryland Medicaid benefits, loss of SNAP benefits would likely increase healthcare costs borne by the State and federal government. Because the Maryland SNAP Program allows families to redirect limited income toward rent, medications, and preventive care, the loss of SNAP benefits would increase financial instability and negatively affect medication adherence and chronic disease management, placing additional strain on Maryland's healthcare delivery systems.

10. MDHS also administers related programs such as the Maryland SNAP Outreach Program (known federally as SNAP Outreach), an optional federal-State program that Maryland has chosen to operate to promote awareness of and participation in SNAP amongst eligible Marylanders. The Maryland SNAP Outreach Program seeks to ensure that all eligible individuals are aware of and receiving Maryland SNAP Program benefits. The Maryland SNAP Outreach Program oversees a network of statewide contractors conducting targeted outreach and application assistance.

4

11. Another MDHS-administered nutrition benefit program, Disaster SNAP (DSNAP), is available to eligible Marylanders when a major disaster is declared by the President and Individual Assistance is approved. In these types of emergencies, program eligibility criteria are simplified, providing households impacted by a disaster who would not normally be eligible for Maryland SNAP Program benefits with one month of food benefits based on their residency, income, and disaster impact. For example, in 2025 when Maryland's Allegheny County experienced devastating floods USDA granted simplified reporting.

12. The Maryland SNAP Program and DSNAP all use the same Electronic Benefit Transfer (EBT) system, which provides participants with a card, similar to a debit card, used to purchase groceries at participating retail vendors.

13. On or about January 27, 2026, MDHS received a notification that USDA had released General Terms and Conditions ("Conditions") that would be applicable to all USDA grants.

14. I am deeply concerned that USDA's Conditions, if USDA were to apply them to SNAP funding, would impose requirements unrelated to SNAP's statutory purpose of alleviating hunger and would create operational conflicts with Maryland law. The Conditions require Maryland to comply with federal "policies" and other conditions on federal funding, including (1) federal policies on anti-discrimination that differ dramatically from our long-standing interpretations of federal laws, (2) the Executive Order on diversity, equity, and inclusion programs, (3) the Executive Order on gender identity, as well as (4) the prohibition on using grant funds "towards educational programs that deprive women and girls of fair athletic opportunities" and "towards programs that allow illegal aliens to obtain taxpayer-funded benefits."

5

15. The Conditions do not define or explain the terms used therein.

16. SNAP is governed by detailed federal statutes and regulations that define eligibility, benefit calculation, and nondiscrimination requirements. Conditioning SNAP funding on compliance with executive orders or policy interpretations that alter eligibility, nondiscrimination frameworks, or program operations risks directly conflicting with this statutory entitlement structure. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. §§ 2011, 2024(d). The Conditions, if applied to SNAP funding, would require Maryland to modify eligibility systems, outreach efforts, or program administration to conform to such conditions, which would disrupt the uniform statewide administration required under federal SNAP regulations.

17. In my years with MDHS, I am not aware of MDHS staff ever being required by USDA to certify MDHS's compliance with unnamed Federal anti-discrimination policies as a precondition of receiving USDA funding. I am also not aware of MDHS staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

18. MDHS operates its programs in compliance with Federal anti-discrimination laws and regulations.

19. My understanding is that MDHS is uncertain what specific requirements USDA intends to impose through the 2026 Conditions and therefore may be unable to certify compliance with USDA's Conditions if asked to do so.

20. In order to comply with any understanding of the Conditions that differs from existing Federal anti-discrimination laws and regulations, MDHS would require additional

resources, both time and money, to establish new guidelines and train employees on how to comply with the Conditions.

21.    Moreover, compliance with "policies" that erase the existence of transgender people may violate civil rights laws in Maryland. *See, e.g.*, § 20–101(e) of the Maryland State Government Article.

**Human Costs of Potential Termination of SNAP Benefits**

22.    If MDHS is unable to comply with USDA's new funding conditions, the State would be unable to receive entire funding streams to which USDA now claims the Conditions apply.  If USDA were to terminate or reduce its federal funding for the Maryland SNAP Program based on these conditions or based on Maryland's inability to certify compliance with them, this would cause direct, immediate, and irreparable harm across Maryland, both at the State and local level.

23.    Maryland relies heavily on federal funding to operate the Maryland SNAP Program. SNAP benefits are entirely federally funded, and the federal government reimburses approximately 50 percent of allowable administrative costs. USDA's longstanding federal funding has shaped the Maryland SNAP Program's program design and funding expectations for decades. Because benefit costs alone exceed $1.6 billion annually, Maryland does not possess the fiscal capacity to replace lost federal SNAP funding with State general funds. Even short-term disruption would create immediate budgetary shortfalls at both the State and county levels. Maryland and counties rely on federal administrative reimbursements to fund eligibility workers, call centers, fraud prevention systems, and EBT infrastructure. The sudden withdrawal of these funds would necessitate layoffs, contract terminations, and system shutdowns.

24.     SNAP is a significant economic driver in Maryland. With over $123,000,000 distributed monthly in Maryland, SNAP supports billions in downstream economic activity across grocery retailers, agricultural producers, transportation providers, and food manufacturers. Over 3,866 Maryland retailers are authorized SNAP vendors.[4] Failure to fund SNAP benefits would harm these businesses as well as nonprofits and social services agencies that support already-overwhelmed food banks and other community-based organizations that simply would not be able to meet the significant surge in need, nor make up for the loss of over $123,000,000 in benefits issued monthly. SNAP is the largest anti-hunger program in Maryland. Abrupt cessation of benefits would result in immediate revenue losses to these businesses and would disproportionately affect rural and low-income urban communities where SNAP spending constitutes a meaningful share of grocery sales.

25.     Termination of SNAP benefits would produce immediate food insecurity for approximately 680,000 Marylanders. Food insecurity is associated with higher rates of emergency department use, longer lengths of hospital stay, and avoidable hospital admissions. Children in food-insecure households are more likely to experience developmental delays and behavioral challenges. Families would be forced to ration any remaining benefits, turn to lower cost, but less nutritious, alternatives, and in many cases, skip meals entirely. Termination of SNAP benefits would force individuals and families to scramble for alternatives, including possibly going into debt or failing to meet other financial commitments, like the cost of rent, utilities, and medications, to continue meeting their basic needs. Accordingly, a sudden loss of SNAP benefits would have cascading health consequences that extend beyond hunger alone.

---

[4] U.S. Dep't of Agric., *SNAP Retailer Management Year End Summary FY 2024*, https://www.fns.usda.gov/data-research/data-visualization/snap-retailer-management-dashboard-fy24 (last visited Mar. 3, 2026).

26.     SNAP is also an economic driver for Maryland local businesses. If hundreds of thousands of Marylanders are forced to cut back on food spending at once, it would immediately and drastically affect the economic well-being of retailers across Maryland. The negative impact would extend to the agriculture industry, including farmers, growers, and producers.

**Fiscal Impacts on Maryland from the Loss of SNAP Benefits**

27.     In addition to direct harm to families, the loss of SNAP benefit funding would have a significant fiscal impact on Maryland itself. For example, the loss of these benefits would result in greater need and requests for state-funded assistance programs, such as the Maryland food support programs that allocate State general funds to food banks and food pantries in Maryland.

28.     The loss of SNAP benefit funding would significantly strain Maryland's emergency food safety net, forcing Maryland to dedicate State resources to supporting community organizations, such as food banks, that would see sharply increased demand.

29.     Publicly available research has consistently demonstrated that food insecurity increases healthcare expenditures. Because many Maryland SNAP Program benefits recipients are also Maryland Medicaid beneficiaries, increased healthcare utilization would directly increase public expenditures. Thus, termination or disruption of SNAP benefits would not only harm beneficiaries but would likely increase costs within Maryland's healthcare system, including the Maryland Medicaid Program.

30.     Upon information and belief, Maryland does not readily have the fiscal resources available to replace federally funded SNAP benefits with equivalent state-funded benefits, nor could it do so without creating other downstream fiscal impacts.

9

**Administrative and Operational Burdens on MDHS**

31.    If MDHS were unable to receive funding for SNAP benefits because it was unable to certify compliance with conditions,, that would significantly erode trust between Maryland and its residents built over many years and through the dedication of significant resources.

32.    To properly effectuate its safety net programs, MDHS has devoted years of work to overcome stigma, misinformation, and other barriers to access. If households experience a disruption in benefits at this scale, they are likely to feel that the government has failed in fulfilling their responsibilities. MDHS, along with the 24 local jurisdictions, have fostered trust with MDHS residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to the receipt of benefits. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust. If USDA terminates or withholds funding based on its novel imposition of these radical restrictions, it will have acted in disregard of those reliance interests of Maryland.

33.    MDHS anticipates that any disruption of SNAP funding would unduly burden its already limited administrative resources. MDHS would have to take significant steps to prepare for a disruption in SNAP benefits for an indefinite period. A disruption of any length will burden MDHS and the extent of this burden increases in relation to the duration of the disruption, as the scale of resources required to manage the disruption mount over time.

10

34.    The potential indefinite disruption to SNAP benefit issuances would result in additional administrative burden for MDHS as a result of the need for extensive consultation with the State's eligibility system and EBT vendor, system enhancements, additional policy guidance to counties, and communications to recipients.

35.    MDHS anticipates it would have to spend significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits. A significant number of staff across multiple Divisions would have to redirect their attention to this effort, in lieu of other important initiatives.

36.    If MDHS were unable to receive SNAP funding it would experience higher call volume, foot traffic and disruptions at Maryland's local SNAP offices as hungry individuals and families learn they cannot access their benefits. Local staff would need to explain to recipients that they would not receive the SNAP funds needed to feed their children and put food on the table. These local office staff would face significant burdens on their time and would likely need to divert their attention from other critical work.

**Impact on Maryland's Provision of Other Public Benefits**

37.    SNAP eligibility is integrated into Maryland's broader public benefits eligibility systems, including the Maryland Medicaid Program and Maryland cash assistance programs. Local jurisdictions often determine eligibility for multiple programs simultaneously using shared technology platforms and caseworkers. A disruption in SNAP funding would therefore destabilize integrated eligibility operations, requiring system reprogramming, retraining of staff, and reissuance of public communications. This would divert resources from the administration of other safety net programs.

38.    MDHS would need to reallocate significant operational resources to crisis management, including emergency policy development, coordination with USDA, legislative engagement, vendor contract renegotiation, and public communication strategies. This diversion would delay modernization initiatives, delay implementation of federal reporting requirements, and impede improvements to other benefit delivery systems. The administrative disruption would be substantial even if SNAP funding were later restored.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 19th day of March 2026.


_____

Gloria Brown Burnett
Interim Secretary
Maryland Department of Human Services