# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF AGRICULTURE, et al.,

Defendants.

Case No. 1:26-cv-11396-MJJ

# EXHIBIT 37

**DECLARATION OF IAN YAFFE**

I, Ian Yaffe, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of the State of Maine. I am over the age of 18 and except to those matters stated upon information and belief, I know the following facts based on my own personal knowledge, information I acquired through the performance of my duties for the Maine Department of Health and Human Services, and my review of records maintained in the ordinary course of business by the Maine Department of Health and Human Services.  As to those matters stated upon information and belief, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2.      I am the Director of the Office for Family Independence (OFI) within the Maine Department of Health and Human Services.  OFI determines eligibility for various federally and state funded programs including Supplemental Nutrition Assistance Program (SNAP), Summer Electronic Benefit Transfer (Summer EBT), Medicaid, State Supplement and Temporary Assistance for Needy Families (TANF). Nutritional and cash benefits are issued on a single Electronic Benefit Transfer (EBT) card per household. OFI also oversees child support collection and distribution, social security disability determinations, and the investigation of fraud and overpayments for the various programs previously mentioned.

3.      I have been employed as the OFI Director since October 30, 2023.

1

**Background on Maine's SNAP and Other Nutritional Programs**

4.      OFI operates Maine's Supplemental Nutrition Assistance Program (SNAP) authorized under the Food and Nutrition Act of 2008, 7 U.S.C. § 2011 et seq. SNAP is the nation's largest nutrition assistance program and is designed to "permit low-income households to obtain a more nutritious diet" through normal channels of trade. 7 U.S.C. § 2011. SNAP benefits are 100 percent federally funded, while administrative costs are shared between the federal government and the State. The program operates as an entitlement: eligible households that apply must receive benefits. *See* 7 U.S.C. § 2014(a). Maine's SNAP is the second largest social services program in Maine after MaineCare, Maine's Medicaid program, and serves as a core component of Maine's anti-poverty and public health infrastructure. SNAP benefits allow individuals and families to afford nutritious food, including more fruits, vegetables, and other healthy foods.

5.      SNAP is overseen by OFI and is state administered pursuant to a USDA-approved State Plan of Operation. For Federal Fiscal Year 2025, Maine issued approximately $27,500,000 in SNAP benefits per month, totaling over $330,000,000 annually in federally funded food assistance. Currently, approximately 165,000 people receive SNAP benefits in Maine each month, including over 50,000 children and nearly 40,000 older Mainer people.

6.      SNAP serves more than one in eight Mainers and is Maine's most effective anti-hunger intervention.

7.      SNAP plays a particularly critical role in supporting children. Approximately 50,300 children receive SNAP benefits. Research has shown that children with access to SNAP experience improved long-term health, higher educational attainment, and improved lifetime earnings outcomes. Any disruption in benefits would therefore have not only immediate nutritional consequences but long-term developmental and economic consequences.

2

8.　In addition to improving access to healthier foods, SNAP serves as an anti-poverty program. SNAP benefits are critical to Mainers in need, particularly for low-income communities, those working low-wage jobs, and older adults on fixed incomes. Nutrition benefits allow Mainers to use their limited financial resources to cover other necessary expenses including housing, healthcare, and childcare. The amount of SNAP benefits a household receives depends on the household size countable income, and monthly expenses, such as housing and utilities.

9.　SNAP functions not only as a nutrition benefit but as a public health intervention. Food insecurity is associated with increased rates of diabetes, hypertension, cardiovascular disease, depression, and anxiety. For households receiving MaineCare, loss of SNAP benefits would likely increase healthcare costs borne by the State and federal government. Because SNAP allows families to redirect limited income toward rent, medications, and preventive care, the loss of SNAP benefits would increase financial instability and negatively affect medication adherence and chronic disease management, placing additional strain on Maine's healthcare delivery systems.

10.　OFI also administers related programs such as SNAP Outreach, an optional federal-State program that Maine has chosen to operate to promote awareness of and participation in SNAP amongst eligible Mainers. Maine's SNAP Outreach seeks to ensure that all eligible individuals are aware of and receiving SNAP. Maine's SNAP Outreach oversees a network of statewide contractors conducting targeted outreach and application assistance.

11.　Another Maine-administered nutrition benefit program, Disaster SNAP (D-SNAP), is available to eligible Mainers when a major disaster is declared by the President and Individual Assistance is approved. In these types of emergencies, program eligibility criteria are simplified, providing households impacted by a disaster who would not normally be eligible for SNAP with one month of food benefits based on their residency, income, and disaster impact.

12.    SNAP, D-SNAP, SUN Bucks, TANF, and State Supplement all use the same Electronic Benefit Transfer (EBT) system, which provides participants with a card, similar to a debit card, used to purchase groceries at participating retail vendors.

13.    USDA recently released General Terms and Conditions ("Conditions") that would be applicable to all USDA grants.

14.    I am deeply concerned that USDA's Conditions, as applied to SNAP funding would impose requirements unrelated to SNAP's statutory purpose of alleviating hunger and would create operational conflicts with Maine law. The Conditions require Maine to comply with federal "policies" and other conditions on federal funding, including (1) federal policies on anti-discrimination that differ dramatically from our long-standing interpretations of federal laws, (2) the Executive Order on diversity, equity, and inclusions programs, (3) the Executive Order on gender identity, as well as (4) the prohibition on using grant funds "towards educational programs that deprive women and girls of fair athletic opportunities" and "towards programs that allow illegal aliens to obtain taxpayer-funded benefits."

15.    The Conditions do not define or explain the terms used therein.

16.    SNAP is governed by detailed federal statutes and regulations that define eligibility, benefit calculation, and nondiscrimination requirements. Conditioning SNAP funding on compliance with executive orders or policy interpretations that alter eligibility, nondiscrimination frameworks, or program operations risks directly conflicting with this statutory entitlement structure. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. §§ 2011, 2024(d). The Conditions would require Maine to modify eligibility systems, outreach efforts,

4

or program administration to conform to such conditions, which would disrupt the uniform statewide administration required under federal SNAP regulations.

17.     In my years with OFI, I am not aware of OFI staff ever being required by USDA to certify OFI's compliance with unnamed Federal anti-discrimination policies as a precondition of receiving USDA funding. I am also not aware of OFI staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

18.     OFI operates its programs in compliance with Federal anti-discrimination laws and regulations.

19.     OFI is uncertain what is required by the 2026 Conditions and therefore may be unable to certify compliance with USDA's Conditions.

20.     In order to comply with any understanding of the Conditions that differs from existing Federal anti-discrimination laws and regulations, OFI would require additional resources, both time and money, to establish new guidelines and train employees on how to comply with the Conditions.

21.     Moreover, compliance with "policies" that erase the existence of transgender people would violate civil rights laws in Maine (5 M.R.S. ch. 337, Human Rights Act).

**Human Costs of Potential Termination of SNAP Benefits**

22.     If OFI is unable to comply with USDA's new funding conditions, the State would be unable to receive entire funding streams to which USDA now claims the Conditions apply.  If USDA were to terminate or reduce its federal funding for Maine SNAP based on these conditions

5

or based on Maine's inability to certify compliance with them, this would cause direct, immediate, and irreparable harm across Maine, both at the State and local level.

23.    Maine relies heavily on federal funding to operate SNAP.   SNAP benefits are entirely federally funded, and the federal government currently reimburses approximately 50 percent of allowable administrative costs. USDA's longstanding federal funding has shaped SNAP's program design and funding expectations for decades. Because benefit costs alone exceed $330,000,000 annually, Maine does not possess the fiscal capacity to replace lost federal SNAP funding with State general funds. Even short-term disruption would create immediate budgetary shortfalls at the State level. Maine relies on federal administrative reimbursements to fund eligibility workers, call centers, fraud prevention systems, and EBT infrastructure. The sudden withdrawal of these funds would necessitate layoffs, contract terminations, and system shutdowns.

24.    SNAP is a significant economic driver in Maine. With over $27,000,000 distributed monthly in Maine, SNAP supports millions in downstream economic activity across grocery retailers, agricultural producers, transportation providers, and food manufacturers. Over 1,400 Maine retailers are authorized SNAP vendors.[1] Failure to fund SNAP benefits will harm these businesses as well as nonprofits and social services agencies that support already-overwhelmed food banks and other community-based organizations that will simply not be able to meet the significant surge in need, nor make up for the loss of over $27,000,000 in benefits issued monthly. SNAP is the largest anti-hunger program in Maine. Abrupt cessation of benefits would result in immediate revenue losses to these businesses and would disproportionately affect rural and low-income urban communities where SNAP spending constitutes a meaningful share of grocery sales.

---

[1] U.S. Dep't of Agric., *SNAP Retailer Management Year End Summary FY 2024*, https://www.fns.usda.gov/data-research/data-visualization/snap-retailer-management-dashboard-fy24 (last visited Mar. 3, 2026).

25.    Termination of SNAP benefits would produce immediate food insecurity for approximately 165,000 Mainers. Food insecurity is associated with higher rates of emergency department use, longer lengths of hospital stay, and avoidable hospital admissions. Children in food-insecure households are more likely to experience developmental delays and behavioral challenges. Families would be forced to ration any remaining benefits, turn to lower cost, but less nutritious, alternatives, and in many cases, skip meals entirely. Termination of SNAP benefits will force individuals and families to scramble for alternatives, including possibly going into debt or failing to meet other financial commitments, like the cost of rent, utilities, and medications, to continue meeting their basic needs.  Accordingly, a sudden loss of SNAP benefits would have cascading health consequences that extend beyond hunger alone.

26.    SNAP is also an economic driver for Maine local businesses. If over 100,000 Mainers are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of retailers across Maine. The negative impact extends to the agriculture industry, including farmers, growers, and producers.

**Fiscal Impacts on Maine from the Loss of SNAP Benefits**

27.    In addition to direct harm to families, the loss of SNAP benefit funding would have a significant fiscal impact on Maine itself. For example, the loss of these benefits will result in greater need and requests for state-funded assistance programs, such as General Assistance that allocates State general funds in the form of vouchers to individuals in need.

28.    The loss of SNAP benefit funding will cause significant strain on Maine's emergency food safety net, forcing Maine to dedicate State resources to supporting community organizations, such as food banks, that will see sharply increased demand.

29.    Publicly available research has consistently demonstrated that food insecurity increases healthcare expenditures. Because many SNAP recipients are also MaineCare beneficiaries, increased healthcare utilization would directly increase public expenditures. Thus, termination or disruption of SNAP benefits would not only harm beneficiaries but would likely increase costs within Maine's healthcare system, including MaineCare.

30.    Upon information and belief, Maine does not readily have the fiscal resources available to replace federally funded SNAP benefits with equivalent state-funded benefits, nor could it do so without creating other downstream fiscal impacts.

**Administrative and Operational Burdens on the OFI**

31.    If OFI was unable to certify compliance with the Conditions, and unable to receive funding for SNAP benefits, that would significantly erode trust between Maine and its residents built over many years and through the dedication of significant resources.

32.    To properly effectuate its safety net programs, OFI has devoted years of work to overcome misinformation and other barriers to access. If households experience a disruption in benefits at this scale, they are likely to feel that the government has failed in fulfilling their responsibilities. OFI has fostered trust with Maine residents and stakeholders by representing to them that SNAP eligibility and compliance with programmatic requirements will lead to the receipt of benefits. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust. If USDA terminates or withholds funding based on its novel imposition of these radical restrictions, it will have acted in disregard of those reliance interests of Maine.

8

33.     OFI anticipates that any disruption of SNAP funding would unduly burden its already limited administrative resources. OFI would have to take significant steps to prepare for a disruption in SNAP benefits for an indefinite period. A disruption of any length will burden OFI and the extent of this burden increases in relation to the duration of the disruption, as the scale of resources required to manage the disruption mount over time.

34.     The potential indefinite disruption to SNAP benefit issuances would result in additional administrative burden for OFI as a result of the need for extensive consultation with the State's eligibility system and EBT vendor, system enhancements, additional policy guidance to counties, and communications to recipients.

35.     OFI anticipates it would have to spend significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits. A significant number of staff across multiple divisions would have to redirect their attention to this effort, in lieu of other important initiatives.

36.     If OFI were unable to receive SNAP funding it would experience higher call volume and walk-in visits, and other disruptions at Maine's 16 regional SNAP offices as hungry individuals and families learn they cannot access their benefits. Local staff would need to explain to recipients that they will not receive the SNAP funds needed to feed their children and put food on the table. These local office staff will face significant burdens on their time and will likely need to divert their attention from other critical work.

**Impact on Maine's Provision of Other Public Benefits**

37.     SNAP eligibility is integrated into Maine's broader public benefits eligibility systems, including MaineCare and TANF. A disruption in SNAP funding would therefore

9

destabilize integrated eligibility operations, requiring system reprogramming, retraining of staff, and reissuance of public communications. This would divert resources from the administration of other safety net programs.

38.    OFI will be required to reallocate significant operational resources to crisis management, including emergency policy development, coordination with USDA, legislative engagement, vendor contract renegotiation, and public communication strategies. This diversion would delay modernization initiatives, delay implementation of federal reporting requirements, and impede improvements to other benefit delivery systems. The administrative disruption would be substantial even if SNAP funding were later restored.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 25th day of March 2026 in Skowhegan, Maine.

Ian Yaffe
Director, Office for Family Independence
Maine Department of Health and Human Services

10