**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, et al.,<br><br>Defendants. | Case No. 1:26-cv-11396-MJJ |

# EXHIBIT 41

## **DECLARATION OF ELIZABETH HERTEL (MICHIGAN)**

I, ELIZABETH HERTEL, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of Michigan.  I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director of the Michigan Department of Health and Human Services ("MDHHS").  MDHHS is responsible for providing services and administering programs to improve the health, safety, and prosperity of the residents of the State of Michigan.  In my role as director, I oversee the entire department, including Michigan's Supplemental Nutrition Assistance Program ("SNAP"), its Women, Infants & Children Program ("WIC"), and MDHHS Health Services (which oversees Michigan Medicaid).

### **SNAP in Michigan**

3.      SNAP is a key part of Michigan's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food.  In 2025, an average of 1,412,876 people received SNAP benefits in Michigan each month, including over 548,000 children and over 85,000 elderly individuals.  More than $3.06 billion in SNAP benefits were issued in fiscal year 2025.

4.      Pursuant to federal law, MDHHS is responsible for: the issuance, control and accountability of SNAP benefits and Electronic Benefit Transaction ("EBT") cards; ensuring program integrity; and supervising counties and districts' day-to-day administration of SNAP,

1

including processing applications for SNAP benefits and certifying eligible applicant households. 7. U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2.

5.      In fiscal year 2024, Michigan expended approximately $380 million in administrative costs to run its SNAP program, approximately $190 million of which was reimbursed by the federal government.

6.      MDHHS also administers related programs such as SNAP Outreach, an optional federal-State program that Michigan has chosen to operate to promote awareness of and participation in SNAP amongst eligible Michigan residents.  Michigan's SNAP Outreach Program seeks to ensure that all eligible individuals are aware of and receiving SNAP.  Michigan's SNAP Outreach Program oversees a network of statewide contractors conducting targeted outreach and application assistance.

7.      Another MDHHS-administered nutrition benefit program, Disaster SNAP, is available to eligible Michigan residents when a major disaster is declared by the President and Individual Assistance is approved.  In these types of emergencies, program eligibility criteria are simplified, providing households impacted by a disaster who would not normally be eligible for SNAP with one month of food benefits based on their residency, income, and disaster impact.

8.      Michigan's SNAP program and Disaster SNAP use the same EBT system, which provides participants with a card, similar to a debit card, that can be used to purchase groceries at participating retail vendors.

**WIC in Michigan**

9.      USDA has allocated the following amounts of WIC funding to MDHHS in recent fiscal years:

| FY 2023 | FY 2024 | FY 2025 | FY 2026 |
|---|---|---|---|
| $210,516,170 | $217,521,791 | $215,159,424 | $211,391,845 |

10.      WIC funds are disbursed by USDA quarterly.  MDHHS expects award documents from USDA in December, March, June, and September indicating the amount of its WIC Funding for the current fiscal year.

11.      WIC funds are used to provide a combination of nutrition education, supplemental foods, breastfeeding promotion and support, and referrals to health care.  Participants exchange WIC food benefits at approved retail grocery stores and pharmacies.  The earlier a pregnant woman receives benefits from WIC, the more likely she is to seek prenatal care and deliver a normal weight infant.

12.      Each year, Michigan has approximately 186,544 participants enrolled in WIC programs, further divided as follows: 105,978 children; 39,097 women; and 41,469 infants.

**Harms to Michigan Caused by USDA's New Funding Conditions**

13.      I am aware that USDA issued new General Terms and Conditions, with an effective date of December 31, 2025, that purport to apply to all USDA grants and cooperative agreements (the "Conditions").  The Conditions require funding recipients to certify compliance "with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal awards," including two of President Trump's Executive Orders.  The Conditions do not define or identify the applicable "policies" to which the recipient must certify.  Among other things,

3

the Conditions also prohibit the recipient from directing funding "towards programs that allow illegal aliens to obtain taxpayer-funded benefits." The Conditions do not define what constitutes a "benefit[]" in this context.

14. MDHHS does not understand what is required of it under the Conditions.

15. In my years with MDHHS, I am not aware of MDHHS staff ever being required by USDA to certify MDHHS's compliance with unnamed Federal anti-discrimination policies as a precondition of receiving SNAP or WIC funding.

16. Further, SNAP is governed by detailed federal statutes and regulations that define eligibility, benefit calculation, and nondiscrimination requirements. Conditioning SNAP funding on compliance with executive orders or policy interpretations that alter eligibility, nondiscrimination frameworks, or program operations risks directly conflicting with this statutory entitlement structure. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. §§ 2011, 2024(d). The Conditions may require Michigan to modify eligibility systems, outreach efforts, or program administration to conform, which would disrupt the uniform statewide administration required under federal SNAP regulations.

17. Additionally, for SNAP, federal regulations ensure that only certain eligible non-citizens receive SNAP benefits. *See* 7 C.F.R. § 273.2(f)(1)(ii). Individuals without proper documentation cannot receive SNAP benefits, and MDHHS utilizes the federal Systematic Alien Verification for Entitlements from the U.S. Department of Homeland Security, in addition to paper verification, to confirm that only eligible non-citizens receive SNAP benefits.

18. For WIC, I am also not aware of MDHHS staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefi[t]" through the WIC

4

program.  I am aware that, under 7 C.F.R. § 246.7(c)(3), state agencies have the option to limit participation to United States citizens, nationals, and qualified aliens, but are not required to do so.

19.    MDHHS operates its programs in compliance with Federal anti-discrimination laws and regulations.

20.    If the Conditions apply to MDHHS's SNAP or WIC funding, my understanding is that MDHHS may be unable to certify compliance with them.

21.    Moreover, compliance with "policies" that erase the existence of transgender people would violate civil rights laws in Michigan.  *See, e.g.*, Mich. Comp. Laws § 37.2101 *et seq*.

22.    If MDHHS is unable to receive or spend FY2026 SNAP or WIC funds based on these conditions or based on Michigan's inability to certify compliance with them, this would cause direct, immediate, and irreparable harm across Michigan, both at the State and local level.

23.    Michigan relies heavily on federal funding to operate SNAP and WIC.  SNAP benefits are entirely federally funded, and the federal government reimburses approximately 50 percent of allowable administrative costs.  USDA's longstanding federal funding has shaped Michigan's program design and funding expectations for decades.  Because benefit costs alone exceed $3.06 billion annually, Michigan does not possess the fiscal capacity to replace lost federal SNAP funding with State general funds.  Even short-term disruption in federal SNAP funding would create immediate budgetary shortfalls at both the State and county levels.  The State relies on federal administrative reimbursements to fund eligibility workers, the eligibility determination system, fraud prevention systems, and EBT infrastructure.  The sudden withdrawal of these funds would necessitate layoffs, contract terminations, and system shutdowns.

24.    SNAP is also a significant economic driver in Michigan.  With over $255 million distributed monthly in Michigan, SNAP supports billions in downstream economic activity across

grocery retailers, agricultural producers, transportation providers, and food manufacturers. Over 9,700 Michigan retailers are authorized SNAP vendors. Failure to fund SNAP benefits will harm these businesses as well as nonprofits and social services agencies that support already-overwhelmed food banks and other community-based organizations. These entities will be unable to meet the significant surge in need or make up for the loss of over $255 million in benefits issued monthly. SNAP is the largest anti-hunger program in Michigan. Abrupt cessation of benefits would result in immediate revenue losses to these businesses and would disproportionately affect rural and low-income urban communities where SNAP spending constitutes a meaningful share of grocery sales.

25.    Termination of SNAP benefits would produce immediate food insecurity for approximately 1.4 million people. Food insecurity is associated with higher rates of emergency department use, longer lengths of hospital stay, and avoidable hospital admissions. Children in food-insecure households are more likely to experience developmental delays and behavioral challenges. Families would be forced to: ration any remaining benefits; turn to lower cost, but less nutritious, alternatives; and in many cases, skip meals entirely. Termination of SNAP benefits will force individuals and families to scramble for alternatives—including possibly going into debt or failing to meet other financial commitments, like rent, utilities, and medications, to continue meeting their basic needs. Accordingly, a sudden loss of SNAP benefits would have cascading health consequences that extend beyond hunger alone.

26.    In addition to direct harm to families and businesses, the loss of SNAP benefit funding would have a significant fiscal impact on Michigan itself. For example, the loss of SNAP benefit funding will cause significant strain on Michigan's emergency food safety net, forcing

6

Michigan to dedicate State resources to supporting community organizations, such as food banks, that will see sharply increased demand.

27. Publicly available research has consistently demonstrated that food insecurity increases healthcare expenditures. Because many of Michigan's SNAP recipients are also Michigan Medicaid beneficiaries, increased healthcare utilization resulting from loss of SNAP benefits will directly increase public expenditures. Thus, termination or disruption of SNAP benefits would not only harm beneficiaries, but would likely increase costs within Michigan's healthcare system, including Michigan Medicaid.

28. Michigan does not readily have the fiscal resources available to replace federally funded SNAP benefits with equivalent state-funded benefits, nor could it do so without creating other downstream fiscal impacts.

29. For WIC, losing WIC funds would threaten the essential food benefits, nutrition education, breastfeeding promotion and support, and referrals to health services that Michigan's low and moderate-income residents depend on during the critical life stages of pregnancy, postpartum, infancy, and early childhood. WIC services are proven to reduce premature births, low and very low birth weights, infant mortality, and iron-deficiency anemia, while improving early access to prenatal care and overall diet quality. WIC's targeted food benefits—including fruits and vegetables, whole grains, dairy, eggs, legumes, and iron-fortified infant formula—are critical to healthy development and optimizing long-term health outcomes. Reductions in these supports would increase food insecurity and lead to poorer health outcomes for the State's most vulnerable families. Every dollar invested in WIC generates an estimated $2.48 in healthcare savings; therefore, jeopardized WIC funding not only harms maternal and child health, but also

7

increases healthcare expenditures for Michigan.  Moreover, loss of WIC funds would greatly impact vendors and the local economy.

30.     The longer MDHHS cannot access funds because it cannot certify compliance with the new Conditions, the greater the risk that programs will be interrupted or terminated.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 13th day of March 2026, in Lansing, Michigan.


ELIZABETH HERTEL
Director
Michigan Department of Health and Human
Services