**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF AGRICULTURE, et al.,

Defendants.

Case No. 1:26-cv-11396-MJJ

# EXHIBIT 44

**<u>DECLARATION OF TIMOTHY BORING (MICHIGAN)</u>**

I, Timothy Boring, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am over the age of 18. I know the following facts based on my own personal knowledge, discussions with agency staff, and review of agency records. If called as a witness, I or my designee could testify competently to the matters set forth below.

**<u>Background</u>**

2. I am the Director of the Michigan Department of Agriculture and Rural Development ("MDARD"). My job duties include providing strategic leadership and oversight of departmental programs and budgets, including federal funding.

3. I have been employed by MDARD since March 2023, and I have served as the Department Director since that time. Before starting at MDARD, I served most recently as the State Executive Director for U.S. Department of Agriculture ("USDA") Farm Service Agency.

4. MDARD is the state agency responsible for protecting, promoting, and preserving Michigan food safety and agricultural, environmental, and economic interests through science-backed regulation and support. The mission of MDARD is to improve quality of life by protecting Michiganders from the pump to the plate, supporting farmers and producers who put food on the table, and creating economic opportunities within the agriculture industry.

5. MDARD receives substantial funding from the USDA to support a wide range of programs meant to protect Michigan's food and agriculture systems, promote economic growth, and ensure the safety and quality of agricultural products across the state.

6. I, along with the MDARD budget director Sylvia Renteria, have reviewed past and present USDA award documents issued to MDARD and am familiar with their contents.

1

7.      In total, as of March 12, 2026, MDARD has 19 open, active grants from USDA in the amount of $22,282,848.

**MDARD's Receipt of USDA Grants**

8.      Each year MDARD receives funding from USDA through several grant programs.  These are core grant programs that support essential services. They include grants such as the Pesticide Data Program, Conservation Technical Assistance Initiative, Specialty Crop Block Grants, and Highly Pathogenic Avian Influenza emergency response.

9.      In recent fiscal years, USDA has awarded the following grant amounts to MDARD within these programs, among others:

| Program | FY 2023 Funding | FY 2024 Funding | FY 2025 Funding | FY 2026 Funding |
|---|---|---|---|---|
| Pesticide Data Program (PDP) | $1,267,100 | $1,604,000 | $1,312,000 | $604,370 |
| Specialty Crop Block Grant (SCBG) | $2,255,305 | $2,408,549 | $2,256,268 | Application in progress |
| Highly Pathogenic Avian Influenza (HPAI) - Emergency IMT | $0 | $1,110,000 | $0 | $251,376 |
| Highly Pathogenic Avian Influenza (HPAI) in Livestock | $0 | $0 | $279,544 | $0 |
| Conservation Technical Assistance Initiative Agreement (CTAI) | $927,183 | $979,791 | $1,242,976 | $1,261,095 |
| **Total from USDA Grants Listed Above** | $4,449,588 | $6,102,340 | $5,090,788 | $2,116,841 |

10.      The programs funded by these grants are vital to implementing conservation practices to protect agricultural land, protecting animal health, enhancing the competitiveness of specialty crops, and safeguarding the quality of agricultural products across the state.  These

2

programs support pesticide data analysis to be shared nationally for food quality protection, work with stakeholders to implement conservation strategies to protect productive farmland, work with commodity groups to market and conduct research on specialty crops, and respond to animal disease outbreaks to mitigate the impact on the food and agriculture industry.

11.     If these funds were withheld, MDARD would have to shut down critical capabilities in its laboratory, conservation programs, economic development, and animal health programs.  The department would lose capacity to protect food quality, animal health, and the environment.  One of the programs funded by these specific grants is described further below.

**Pesticide Data Program Grant**

12.     I am familiar with the Pesticide Data Program ("PDP") Cooperative Agreement which provides funds to States to monitor pesticide residues across the U.S. food supply, providing the most comprehensive pesticide residue database in the nation. Managed by the Monitoring Programs Division of the Agriculture Marketing Service ("AMS"), a subagency of USDA, the PDP plays a critical role in safeguarding public health, facilitating trade, and ensuring transparency in the agricultural industry. The program focuses on agricultural commodities with particular emphasis on those frequently consumed by infants and children and operates in partnership with other state agriculture departments and federal agencies.

13.     PDP Cooperative Agreement funding is administered in Michigan by MDARD.

14.     Because PDP Cooperative Agreements are not competitive, participating states are entitled to an allocation.  Each year, MDARD's Laboratory and Consumer Protection Bureau receives a notification from AMS regarding its funding allocation, at which point MDARD enters into an agreement to receive the funds.

15.     MDARD has applied for and received funds under the PDP Cooperative

Agreement model for over 32 years.

16.    As of March 31, 2026, MDARD has no open PDP Cooperative Agreement awards from prior fiscal years.  For the current calendar year, MDARD has been advised of an award and its acceptance is pending.

17.    The PDP provides essential data that supports the U.S. Environmental Protection Agency in evaluating dietary pesticide exposure and ensuring a safe food supply. It also strengthens the global competitiveness of U.S. agricultural products by helping meet international export standards, facilitating trade, and driving economic growth. PDP data informs critical, science-based regulatory decisions for agencies such as the U.S. Food and Drug Administration and offers important insights into human and environmental health risks associated with pesticide exposure. The program evaluates national pesticide use trends, supports compliance with regulations, and measures the effectiveness of existing policies. By offering transparent information on pesticide residues, the PDP fosters consumer confidence while also promoting sustainable agriculture through informed, responsible pest management practices. Last year, Michigan analyzed 1,056 samples for 343 different compounds that provided the program with over 362,000 data points to help in assessing all of the above.

18.    On March 6, 2026, MDARD received a cooperative agreement from AMS that expressly incorporates the USDA's new General Terms and Conditions ("2026 Conditions") into the PDP Grant.  AMS requested MDARD's acceptance of the cooperative agreement "promptly."

**Harms to the State Caused by the 2026 Conditions**

19.    I am aware that the 2026 Conditions have an effective date of December 31, 2025, and purport to apply to all of USDA's grants, cooperative agreements, and mutual interest agreements. The 2026 Conditions require funding recipients to certify compliance "with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal awards," including two of President Trump's Executive Orders. The 2026 Conditions do not define or identify the applicable federal policies to which the recipient must certify. The 2026 Conditions prohibit funding from being "used to promote gender ideology" without explanation. The 2026 Conditions also prohibit the recipient from, among other things, directing funding "towards programs that allow illegal aliens to obtain taxpayer-funded benefits." The 2026 Conditions do not define what constitutes "benefits" in this context, or what it means to direct funding "towards" a program.

20.    In my years with MDARD, I am not aware of MDARD staff ever being required by USDA to certify MDARD's compliance with unnamed Federal anti-discrimination *policies* as a precondition of receiving USDA funding. I am also not aware of MDARD staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

21.    MDARD operates its programs in compliance with Federal anti-discrimination laws and regulations.

22.    MDARD is uncertain what is required by the 2026 Conditions and therefore may be unable to certify compliance with USDA's 2026 Conditions.

23.    In order to comply with any understanding of the 2026 Conditions that differs from existing Federal anti-discrimination laws and regulations, MDARD would require

5

additional resources, both time and money, to establish new guidelines and train employees on how to comply with the 2026 Conditions.

24.    For example, MDARD does not know, and is not able to verify, whether any illegal aliens in Michigan benefit from its USDA-funded programs, including in the areas of conservation assistance, pesticide data monitoring, economic development, and animal health safety.

25.    Moreover, compliance with "policies" that erase the existence of transgender people would violate civil rights laws in Michigan. *See, e.g.*, Mich. Comp. Laws § 37.2101 *et seq*.

26.    If MDARD is unable to comply with USDA's new funding conditions, the State would be unable to receive FY2026 USDA funds, frustrating its ability to maintain the critical programs described above. The elimination of these programs would result in layoff of staff, cancelled contracts with local conservation districts, the discontinuation of economic development opportunities, and the inability to respond to animal disease outbreaks.

27.    MDARD does not have any other appropriation in its budget that could cover the loss of the grants discussed above. If MDARD cannot access USDA funds, MDARD will not have funds to immediately cover the Pesticide Data Program, the Specialty Crop Block Grant, and the Highly Pathogenic Avian Influenza emergency response, among many other programs. This, in turn, will result in the elimination of pesticide data analysis, the reduction of the implementation of conservation practices, the ending of economic development opportunities for specialty crops, and the potential delay in responding to animal disease outbreaks.

28.    Losing these USDA grants would severely obstruct and undermine MDARD's mission even if the funding were restored at a later date.

6

29.    The longer MDARD cannot access funds because it cannot certify compliance with the 2026 Conditions, the greater the risk the programs will be interrupted or terminated.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 16, 2026, in Lansing, Michigan.

Timothy Boring

Director

7