# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF AGRICULTURE, et al.,

Defendants.

Case No. 1:26-cv-11396-MJJ

# EXHIBIT 46

## **DECLARATION OF DR. SHANEEN MOORE**

I, Dr. Shaneen Moore, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Minnesota. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2. The Minnesota Department of Children, Youth, and Families (DCYF) is responsible for the administration of public social services except for healthcare services and Medical Assistance, throughout Minnesota. DCYF administers programs that keep children safe and provides families with supports to care for their children. Among the programs administered by DCYF is the Supplemental Nutrition Assistance Program (SNAP), which issues monthly electronic benefits that can be used to purchase food at authorized retail stores.

3. I am currently employed by DCYF as Assistant Commissioner of the Family Wellbeing Administration and have held this position since July 11, 2024.

4. Prior to my most recent employment with DCYF, I served as a Deputy Assistant Commissioner for the Children and Family Services Administration at the Minnesota Department of Human Services, as Director and Deputy Director of the Child Support Division.

5. My educational background includes a Bachelor of Business degree, Master of Business Administration degree, and a Doctor of Philosophy in Public Service and Management.

1

6. As Assistant Commissioner for the Family Wellbeing Administration of DCYF, I am responsible for the administration of several federal and State social service programs that provide critical financial, food, and employment and training support to individuals and families with low income. Programs within my oversight responsibilities include the Minnesota Family Investment Program, Supplemental Nutrition Assistance Program, Sun Bucks Program (previously Summer EBT Program), SNAP Employment & Training Program, Minnesota Food Assistance Program, and emergency assistance programs. I make this declaration based on personal knowledge and on my review of information and records gathered by agency staff.

**Background on Minnesota's SNAP Program and Other Nutritional Programs**

7. DCYF administers the federal Supplemental Nutrition Assistance Program (SNAP) authorized under the Food and Nutrition Act of 2008, 7 U.S.C. § 2011 et seq. SNAP is the nation's largest nutrition assistance program and is designed to "permit low-income households to obtain a more nutritious diet" through normal channels of trade. 7 U.S.C. § 2011. SNAP benefits are currently 100 percent federally funded, while administrative costs are shared between the federal government and the State. The program operates as an entitlement: eligible households that apply must receive benefits. *See* 7 U.S.C. § 2014(a). SNAP serves as a core component of Minnesota's anti-poverty and public health infrastructure. SNAP benefits stretch food budgets, allowing individuals and families to afford nutritious food, including more fruits, vegetables, and other healthy foods.

8. SNAP is overseen by DCYF and is administered by Minnesota's 87 counties and three Tribal Nations pursuant to a USDA-approved State Plan of Operation. In federal Fiscal Year 2025, spending on annual SNAP benefits was about $875 million; $872 million was

federal funding and about $3 million was spent on state-funded food assistance. These benefits help nearly 440,000 Minnesotans each month.

9.  About 50 percent of adult SNAP recipients in Minnesota who are not elderly or disabled report income from work in an average month. In many cases, SNAP serves as a lifeline for low-wage workers when they lose a job or have their work hours reduced, meaning people not reporting earned income in a given month may have been employed in a previous month or will soon gain employment.

10. SNAP plays a particularly critical role in supporting children. Of the 440,000 Minnesotans enrolled in December 2025, 62 percent of SNAP and MFIP food recipients were in a household with children. Any disruption in benefits would negatively impact this vulnerable population during vital years of development.

11. In addition to improving access to healthier foods, SNAP serves as an anti-poverty program. SNAP benefits are critical to Minnesotans in need, particularly for low-income communities, those working low-wage jobs, and older adults on fixed incomes. Nutrition benefits allow Minnesotans to use their limited financial resources to cover other necessary expenses including housing, healthcare, and childcare. The amount of SNAP benefits a household receives depends on the household size, countable income, and monthly expenses, such as housing and utilities.

12. SNAP functions not only as a nutrition benefit but as a public health intervention. Food insecurity is positively correlated with other health outcomes in Minnesota.  A 2022 Minnesota study found that when adult SNAP recipients were able to retain their SNAP benefits, annual Medicaid health care spending was $98.80 lower for each month of SNAP

3

receipt.[1] For households receiving Medical Assistance, loss of SNAP benefits would likely increase healthcare costs borne by the State and federal government.  In addition, the receipt of SNAP allows families to redirect limited income toward rent, medications, and preventive care.  The loss of SNAP benefits would likely increase financial instability and negatively affect medication adherence and chronic disease management, placing additional strain on Minnesota's healthcare delivery systems.

13. DCYF also administers related programs such as the SNAP Outreach Program (known federally as SNAP Outreach), an optional federal-State program that Minnesota has chosen to operate to promote awareness of and participation in SNAP amongst eligible Minnesotans. SNAP Outreach seeks to ensure that all eligible individuals are aware of and receiving SNAP. SNAP Outreach oversees a network of statewide contractors conducting targeted outreach and application assistance.

14. Another DCYF-administered nutrition benefit program, Disaster SNAP, is available to eligible Minnesotans when a major disaster is declared by the President and Individual Assistance is approved. In these types of emergencies, program eligibility criteria are simplified, providing households impacted by a disaster who would not normally be eligible for SNAP with one month of food benefits based on their residency, income, and disaster impact.

---

1 Kollannoor-Samuel, G., Boelcke-Stennes, K.A., Nelson, J., Martin, E., Fertig, A.R., & Schiff, J. (2022). Supplemental Nutrition Assistance Program Participation is Associated with Lower Health Care Spending among Working Age Adults without Dependents. *Journal of Health Care for the Poor and Underserved 33*(2), 737-750. https://dx.doi.org/10.1353/hpu.2022.0060.

15. SNAP and Disaster SNAP all use the same Electronic Benefit Transfer (EBT) system, which provides participants with a card, similar to a debit card, used to purchase groceries at participating retail vendors.

16. On January 13, 2026, DCYF staff received information that USDA had released General Terms and Conditions ("Conditions") that would be applicable to all USDA grants.

17. I am deeply concerned that USDA's Conditions, as applied to SNAP funding would impose requirements unrelated to SNAP's statutory purpose of alleviating hunger and would create operational conflicts with Minnesota law. The Conditions require Minnesota to comply with federal "policies" and other conditions on federal funding, including (1) federal policies on anti-discrimination that differ dramatically from our long-standing interpretations of federal laws, (2) the Executive Order on diversity, equity, and inclusion programs, (3) the Executive Order on gender identity, as well as (4) the prohibition on using grant funds "towards educational programs that deprive women and girls of fair athletic opportunities" and "towards programs that allow illegal aliens to obtain taxpayer-funded benefits."

18. The Conditions do not define or explain the terms used therein.

19. SNAP is governed by detailed federal statutes and regulations that define eligibility, benefit calculation, and nondiscrimination requirements. Conditioning SNAP funding on compliance with executive orders or policy interpretations that alter eligibility, nondiscrimination frameworks, or program operations risks directly conflicting with this statutory entitlement structure. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. §§ 2011, 2024(d). The Conditions would require

Minnesota to modify eligibility systems, outreach efforts, or program administration to conform to such conditions, which would disrupt the uniform statewide administration required under federal SNAP regulations.

20. In my years with DCYF and other state agencies, I am not aware of DCYF staff ever being required by USDA to certify DCYF's compliance with unnamed Federal anti-discrimination policies as a precondition of receiving USDA funding. I am also not aware of DCYF staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

21. DCYF operates its programs in compliance with Federal anti-discrimination laws and regulations.

22. My understanding is DCYF is uncertain what is required by the 2026 Conditions and therefore may be unable to certify compliance with USDA's Conditions.

23. In order to comply with any understanding of the Conditions that differs from existing Federal anti-discrimination laws and regulations, DCYF would require additional resources, both time and money, to establish new guidelines and train employees on how to comply with the Conditions.

24. Moreover, compliance with "policies" that erase the existence of transgender people would violate civil rights laws in Minnesota. *See, e.g.*, Minnesota Human Rights Act, Minn. Stat. §363.02, subdivision 50, which includes gender identity within its scope of protections.

**Human Costs of Potential Termination of SNAP Benefits**

25. If DCYF is unable to comply with USDA's new funding conditions, the State would be unable to receive entire funding streams to which USDA now claims the Conditions apply. If USDA were to terminate or reduce its federal funding for SNAP based on these

conditions or based on Minnesota's inability to certify compliance with them, this would cause direct, immediate, and irreparable harm across Minnesota, both at the State and local level.

26. Minnesota relies heavily on federal funding to operate SNAP. SNAP benefits are entirely federally funded, and the federal government reimburses approximately 50 percent of allowable administrative costs. Each year, Minnesota expends approximately $160 million in administrative costs to run SNAP, of which approximately $80 million is reimbursed by the federal government. USDA's longstanding federal funding has shaped SNAP's program design and funding expectations for decades. Because benefit costs alone exceed $875 million, Minnesota does not possess the fiscal capacity to replace lost federal SNAP funding with State general funds. Even short-term disruption would create immediate budgetary shortfalls at both the State and county levels. The State and counties rely on federal administrative reimbursements to fund eligibility workers, call centers, collections, quality control, fraud prevention systems, eligibility and case management systems, and EBT infrastructure. The sudden withdrawal of these funds would necessitate layoffs, contract terminations, and system shutdowns.

27. SNAP is a significant economic driver in Minnesota. With between $70 and $75 million in monthly expenditures, SNAP supports millions in downstream economic activity across grocery retailers, agricultural producers, transportation providers, and food manufacturers. Every $1 in SNAP benefits generates up to $1.50 in local economic activity, boosting grocery stores, farmers markets, and food retailers across the state. Over 3,600 Minnesota retailers are authorized SNAP vendors.[2] Failure to fund SNAP benefits will harm these

---

[2] U.S. Dep't of Agric., *SNAP Retailer Management Year End Summary FY 2024*, https://www.fns.usda.gov/data-research/data-visualization/snap-retailer-management-dashboard-fy24 (last visited Mar. 3, 2026).

businesses as well as nonprofits and social services agencies that support already-overwhelmed food banks and other community-based organizations that will simply not be able to meet the significant surge in need, nor make up for the loss of nearly $75 million in benefits issued monthly. SNAP is the largest anti-hunger program in Minnesota. Abrupt cessation of benefits would result in immediate revenue losses to these businesses and rural and low-income urban communities where SNAP spending constitutes a meaningful share of grocery sales.

28. Termination of SNAP benefits would produce immediate food insecurity for approximately 440,000 Minnesotans. Families would be forced to ration any remaining benefits, turn to lower cost, but less nutritious, alternatives, and in many cases, skip meals entirely. Termination of SNAP benefits will force individuals and families to scramble for alternatives, including possibly going into debt or failing to meet other financial commitments, like the cost of rent, utilities, and medications, to continue meeting their basic needs.  Accordingly, a sudden loss of SNAP benefits would have cascading health consequences that extend beyond hunger alone.

29. SNAP is also an economic driver for Minnesota's local businesses. If hundreds of thousands of Minnesotans are forced to cut back on food spending at once, this will immediately and drastically affect the economic well-being of retailers across Minnesota. The negative impact extends to the agriculture industry, including farmers, growers, and producers.

**Fiscal Impacts on Minnesota from the Loss of SNAP Benefits**

30. In addition to direct harm to families, the loss of SNAP benefit funding would have a significant fiscal impact on Minnesota itself. For example, the loss of these benefits will

8

result in greater need and requests for state-funded assistance programs, such as the Minnesota Food Assistance Program and Minnesota Food Shelf Program.

31. The loss of SNAP benefit funding will cause significant strain on Minnesota's emergency food safety net, forcing Minnesota to dedicate State resources to supporting community organizations, such as food banks, that will see sharply increased demand.

32. Publicly available research has consistently demonstrated that food insecurity increases healthcare expenditures. Because many SNAP recipients are also Minnesota Medical Assistance beneficiaries, increased healthcare utilization would directly increase public expenditures. Thus, termination or disruption of SNAP benefits would not only harm beneficiaries but would likely increase costs within Minnesota's healthcare system, including Medical Assistance.

33. Upon information and belief, Minnesota does not readily have the fiscal resources available to replace federally funded SNAP benefits with equivalent state-funded benefits, nor could it do so without creating other downstream fiscal impacts.

**Administrative and Operational Burdens on DCYF**

34. If DCYF was unable to certify compliance with the Conditions, and unable to receive funding for SNAP benefits, that would significantly erode trust between Minnesota and its residents built over many years and through the dedication of significant resources.

35. To properly effectuate its safety net programs, DCYF has devoted years of work to overcome stigma, misinformation, and other barriers to access. If households experience a disruption in benefits at this scale, they are likely to feel that the government has failed in fulfilling their responsibilities. DCYF, along with the 87 counties and Tribal Nations, have fostered trust with Minnesota residents and stakeholders by representing to them that SNAP

9

eligibility and compliance with programmatic requirements will lead to the receipt of benefits. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust. If USDA terminates or withholds funding based on its novel imposition of these radical restrictions, it will have acted in disregard of those reliance interests of Minnesota.

36. DCYF anticipates that any disruption of SNAP funding would unduly burden its already limited administrative resources. DCYF would have to take significant steps to prepare for a disruption in SNAP benefits for an indefinite period. A disruption of any length will burden DCYF and the extent of this burden increases in relation to the duration of the disruption, as the scale of resources required to manage the disruption mount over time.

37. The potential indefinite disruption to SNAP benefit issuances would result in additional administrative burden for DCYF as a result of the need for extensive consultation with the State's eligibility system and EBT vendor, system enhancements, additional policy guidance to counties and Tribal Nations, and communications to recipients.

38. DCYF anticipates it would have to spend significant administrative resources managing communications and inquiries regarding the availability of SNAP benefits. A significant number of staff across multiple Divisions would have to redirect their attention to this effort, in lieu of other important initiatives.

39. If DCYF were unable to receive SNAP funding it would experience higher call volume, foot traffic and disruptions at Minnesota's county SNAP offices as hungry individuals and families learn they cannot access their benefits. Local staff would need to explain to recipients that they will not receive the SNAP funds needed to feed their children and put

food on the table. These local office staff will face significant burdens on their time and will likely need to divert their attention from other critical work.

**Impact on Minnesota's Provision of Other Public Benefits**

40. SNAP eligibility is integrated into Minnesota's broader public benefits eligibility systems, including cash assistance, through the Minnesota Family Investment Program (MFIP). Minnesota's program combines federal and state funded MFIP cash and food benefits. Within this framework, counties determine eligibility for multiple programs simultaneously using shared technology platforms and caseworkers. A disruption in SNAP funding would therefore destabilize integrated eligibility operations requiring system reprogramming, communication to eligibility workers and program recipients, and benefit issuance impacts. This would divert resources from the administration of other safety net programs.

41. DCYF will be required to reallocate significant operational resources to crisis management, including emergency policy development, coordination with USDA, legislative engagement, vendor contract renegotiation, and public communication strategies. This diversion would delay modernization initiatives, delay implementation of federal reporting requirements, and impede improvements to other benefit delivery systems. The administrative disruption would be substantial even if SNAP funding were later restored.

11

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 24th day of March 2026.

DR. SHANEEN MOORE
Assistant Commissioner – Family Wellbeing
Administration
MN Dept. of Children, Youth, and Families