**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF AGRICULTURE, et al., <br><br> Defendants. | Case No. 1:26-cv-11396-MJJ |

# EXHIBIT 61

## <u>DECLARATION OF KIMBERLY MEROLLA-BRITO</u>

I, Kimberly Merolla-Brito, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have personal knowledge of all facts stated herein or have knowledge of the matters based on my review of information and records gathered by my staff.

### <u>Background</u>

3. I am the Director for the Department of Human Services (DHS), a position I have held since June 2022. My educational background includes a Master of Social Work and a Bachelor of Social Work, both from Rhode Island College. Prior to my current role, I served as the Deputy Director of Policy and Operations at DHS from 2017 to 2022, overseeing agency operations, policy initiatives, and staff development. From 2015 to 2017, I was the Associate Director of Policy and Operations, leading policy planning and quality control efforts. Between 2009 and 2015, I served as Administrator of Policy and Research, contributing to the development of the Unified Health Infrastructure Project (UHIP). I began my state service in 1998 as a social caseworker at the Department of Children, Youth & Families (DCYF), where I cultivated my clinical and public service expertise. In addition to my professional experience, I am a Licensed Independent Clinical Social Worker (LICSW) and continue to be engaged in community service through board memberships and leadership development initiatives.

4. DHS coordinates with community and governmental partners to deliver critical benefits, supports, and services to more than 300,000 families, adults, children, seniors, individuals with disabilities, and veterans every year. DHS strives to guarantee that families are strong, productive, healthy, and independent; adults are healthy and reach their maximum potential; children are safe, healthy, ready to learn and reach their full potential; childcare providers

deliver high quality education; seniors and individuals with disabilities receive all necessary services to enhance their quality of life; and veterans are cared for and honored.

5. DHS receives and administers several awards from the United States Department of Agriculture (USDA) that are key to serving the DHS mission and furthering its objectives.

6. In total, as of  March 13, 2026, DHS has 5 open, active grants from USDA in the amount of $11,952,339.77.

### DHS's Receipt of USDA Grants

7. Each year, DHS receives funding from USDA through several large, formula-funded grant programs.

8. In recent fiscal years, USDA has awarded the following grant amounts to DHS within these programs:

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| SNAP Administration | $24,287,975.12 | $23,661,819.97 | $27,355,806.00 |
| Summer EBT Administration |  | $529,861.50 | $470,805.00 |
| SNAP Employment and Training | $1,832,321.47 | $1,671,320.41 | $3,172,369.00 |
| CN Technology Innovation Grant |  |  | 1,100,000.00 |
| TEFAP | $280,164.00 | $247,880.37 | $244,496.00 |
| SNAP EVS |  | $125,265.00 | $127,858.64 |
| CSFP | $208,745.00 | $205,901.00 | $213,544.00 |
| **Total from USDA Grants Listed Above** | $26,609,205.59 | $26,442,048.25 | $32,684,878.64 |

9. In addition to USDA grants, DHS also receives on average approximately $372.8 million  in federal funds each year through its Electronic Benefit Transfer (EBT) vendor to fund Supplemental Nutrition Assistance Program (SNAP) benefits for eligible Rhode Islanders.

10. The programs funded by these specific grants are described further below.

**Supplemental Nutrition Assistance Program**

11. I am familiar with SNAP, which is a federal program providing food assistance to low-income individuals and families in the United States. Formerly known as "food stamps," SNAP benefits are distributed on an Electronic Benefits Transfer (EBT) card, which can be used like a debit card at authorized retailers to purchase food. The program aims to help eligible individuals and families to afford a nutritionally adequate diet through normal channels of trade. *See* 7 U.S.C. § 2011.

12. SNAP benefits are 100% federally funded, while administrative costs are shared between the federal government and the State of Rhode Island (the State or R.I.).

13. The program operates as an entitlement: eligible households that apply must receive benefits. *See* 7 U.S.C. § 2014(a).

14. R.I. SNAP is the second largest social services program in Rhode Island after R.I.'s Medicaid program and serves as a core component of Rhode Island's anti-poverty and public health infrastructure. On average, approximately 75,000 R.I. households rely on R.I. SNAP benefits each month to meet their most basic nutritional needs and avoid the potentially lifelong repercussions of an inadequate diet.

15. R.I. SNAP is administered by DHS pursuant to a USDA-approved State Plan of Operation, as well as applicable state and federal statutes, regulations, and policies. DHS also administers the SNAP related programs, including the R.I. SNAP Outreach, a federal-state program to promote awareness of and participation in SNAP and the SNAP Employment and Training program (SNAP E&T), which provides SNAP recipients a comprehensive set of job readiness services and supports, such as educational certificates and credentials, job training,

employment counseling, transportation and child care supports, interview clothing, services and supports to help individuals succeed in obtaining and maintaining employment. DHS also administers the Summer EBT program, also known as SUN Bucks, a federal program providing eligible families with $120 per child to buy groceries during the summer months when children do not have access to school meals. DHS also relies on federal funding to train the employees and contracted staff implementing R.I. SNAP, and the related programs.

16. For Federal Fiscal Year 2025, Rhode Island has issued approximately $26.4 million in R.I. SNAP benefits per month, totaling over approximately $320 million annually in federally funded food assistance. These benefits help approximately 144,000 Rhode Islanders—about 13% of the State's population—put food on the table each month.[1]

17. Rhode Island families with children are even more likely to rely on R.I. SNAP funding, with over 18% of all households with children participating in SNAP in 2024.[2]

18. Food insecurity is a significant and growing concern in Rhode Island, with approximately 38% of Rhode Islanders experiencing food insecurity in 2024 alone.[3] SNAP reduces food insecurity throughout the State, leading to better health and development outcomes, decreased stress, stronger academic performance, fewer behavioral and mental health issues, and less homelessness for families that would otherwise suffer.[4]

19. SNAP benefits also benefit the State economy as families spend their benefits and then spend the money they save on other essentials, such as rent, utilities, and home goods. It is estimated

---

[1] USA Facts, *How many people receive SNAP benefits in Rhode Island every month?*, https://usafacts.org/answers/how-many-people-receive-snap-benefits-in-the-us-every-month/state/rhode-island/ (last visited Mar. 10, 2026).

[2] *Id.*

[3] https://health.ri.gov/sites/g/files/xkgbur1006/files/2025-04/Enhancing-Nutrition-Security.pdf.

[4] Johns Hopkins Bloomberg School of Public Health, *What is SNAP? And Why does it Matter?*, https://publichealth.jhu.edu/2025/what-is-snap-and-why-does-it-matter (last visited Mar. 10, 2026).

that every dollar of SNAP benefits generates $1.54 in economic activity,[5] and approximately 920 Rhode Island retailers are authorized SNAP vendors who directly benefit from SNAP payments.

20. The majority of SNAP recipients in Rhode Island spend the majority if their benefits within the first two weeks of issuance. This rapid expenditure cycle means that any disruption in funding would immediately reverberate through local economies and food supply chains.

**The Emergency Food Assistance Program (TEFAP)**

21. I am familiar with The Emergency Food Assistance Program (TEFAP), a federally funded program that uses agricultural surpluses to help ensure adequate nutrition for economically disadvantaged individuals. TEFAP supplies Rhode Island with domestically sourced produce, grains, legumes, dairy products, and other proteins (known as USDA foods) to supplement the diets of low-income families.

22. DHS is responsible for administering TEFAP, which delivers USDA foods to the Rhode Island Community Food Bank and food pantries across the State. DHS relies on TEFAP funding to administer the program and cover distribution costs, while local food banks are almost exclusively staffed by volunteers organized by local churches, non-profits, and other groups. Low-income individuals may stop by their local food banks and pantries to pick up food provided by TEFAP alongside donations from the surrounding community.

23. In State Fiscal Year (SFY) 2025, the Rhode Island Community Food Bank and its community partners distributed approximately 18 million pounds of food, with approximately 41% funded by USDA, to approximately 88,000 individuals.

24. Prior to October 1 of each calendar year, FNS notifies Rhode Island of its annual TEFAP

---

[5] *Id.*

5

allocation, which includes food and funding for administrative operating costs. This amount is communicated to DHS through a notice of award.

25. For the last three FFYs, Rhode Island received annual entitlements and administrative funding from TEFAP as follows:

| Federal Fiscal Year | TEFAP Award |
|---|---|
| 2023 | $280,164.00 |
| 2024 | $247,880.37 |
| 2025 | $244,496.00 |

26. The TEFAP regulations require DHS to establish uniform, statewide criteria for determining household eligibility to receive USDA foods. 7 C.F.R. § 251.5(b). At a minimum, the regulations require DHS to include a requirement that the household members seeking USDA foods attest to being a Rhode Island resident at the time of their application. Beyond these criteria, the TEFAP regulations prohibit DHS from requiring an applicant to establish the length of their residency in the state, and from requesting their address or identification documents to establish eligibility. *Id*.

27. USDA awards Rhode Island food in two categories: entitlement food and bonus food. Funding for entitlement food is considered appropriated, mandatory spending that USDA awards Rhode Island and all other states on an annual basis. The cash value of Rhode Island's entitlement food accounts for most of the State's TEFAP funding.

28. When USDA notifies Rhode Island of the State's annual entitlement, DHS uses USDA's standard allocation to distribute funds to the Rhode Island Community Food Bank, who orders the food and works with each of R.I.'s food pantries to obtain their food ordering plan. Food orders are placed in USDA's Web-Based Supply Chain Management with food delivery dates, ranging from 30 days up to 1 year (12 calendar months) in the future. USDA delivers food

directly to the Rhode Island Community Food Bank on a monthly, weekly, or daily basis, which then gets distributed to local member agencies. Food pantries receive a portion of the USDA foods that is proportionate to the number of individuals they serve, and the food available in that food bank.

29. TEFAP administrative funding is used to support the State's regional food distribution of TEFAP foods. Funding helps offset some of the administrative expenses, including personnel costs, food shipping/delivery costs to distribute food within their geographic regions to partnering food pantries, utilities (rent, gas, electric, water), storage, equipment (forklifts, garage doors, truck bay repairs), and other costs of operating food banks.

### Commodity Supplemental Food Program (CSFP)

30. I am familiar with the Commodity Supplemental Food Program (CSFP), which is a federally funded program supplying low-income adults 60-years-old or older with USDA foods to supplement their diets.

31. The DHS Office of Healthy Aging (OHA) administers the CSFP through a subaward to the R.I. Community Food Bank (RICFB). The RICFB partners with various community partners such as senior centers and public housing authorities to distribute the food boxes.

32. Older individuals are more likely to face food insecurity and suffer the consequences thereof. Many older adults live on fixed incomes that are strained by rising costs of living and unexpected health issues. In 2023, more than 12 million seniors and older adults (those over age 50) experienced food insecurity nationwide, and nearly half of all seniors aged 60 to 90 will spend at least one year in poverty or near poverty. In Rhode Island an estimated 28% of older adults report being food insecure. Seniors that are food insecure are more likely to face serious health consequences for poor nutrition, including higher morbidity from falls, more complications from chronic diseases like diabetes, longer hospital stays, and deteriorating

mental health.

33. The CSFP helps bridge the food gap for older individuals by distributing monthly food boxes to over 2,000 participating seniors aged 60 and older with healthy staples, such as dry cereals, canned chicken, shelf-stable milk, peanut butter, pasta, rice, and canned produce. Items in the CSFP food boxes are significantly healthier than the average American diet, contributing to greater nutrition for food insecure seniors.

**Harms to the State Caused by USDA's New Funding Conditions**

34. I am aware that USDA issued new General Terms and Conditions, effective December 31, 2025, that purport to apply to all of USDA's grants, cooperative agreements, and mutual interest agreements (the "2026 Conditions"). The 2026 Conditions require funding recipients to certify compliance "with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal awards," including two of President Trump's Executive Orders. The 2026 Conditions do not define or identify the applicable federal policies to which the recipient must certify. The 2026 Conditions prohibit funding from being "used to promote gender ideology" without explanation. The 2026 Conditions also prohibit the recipient from, among other things, directing funding "towards programs that allow illegal aliens to obtain taxpayer-funded benefits." The 2026 Conditions do not define what constitutes "benefits" in this context, or what it means to direct funding "towards" a program.

35. On March 25, 2026, DHS learned that FNS had updated its Standard Terms and Conditions to incorporate the USDA 2026 Conditions. As of the date of this declaration, DHS has not received any notice of guidance regarding this update from FNS or any other component of USDA.

36. In my years with DHS, I am not aware of DHS staff ever being required by USDA to certify

8

DHS's compliance with unnamed Federal anti-discrimination *policies* as a precondition of receiving USDA funding. I am also not aware of DHS staff ever being required by USDA to verify that no "illegal aliens" will obtain any "taxpayer-funded benefits" as a result of its USDA-funded programs.

37. DHS operates its programs in compliance with Federal anti-discrimination laws and regulations.

38. I understand that DHS is uncertain what is required by the 2026 Conditions and therefore may be unable to certify compliance with USDA's 2026 Conditions.

39. In order to comply with any understanding of the 2026 Conditions that differs from existing Federal anti-discrimination laws and regulations, DHS would require additional resources, both time and money, to establish new guidelines and train employees on how to comply with the 2026 Conditions.

40. For example, DHS does not know, and is not able to verify, whether any undocumented immigrants in Rhode Island benefit from TEFAP. To certify compliance with the immigration condition, if required to do so, DHS would need to invest substantial time and money into changing its entire data collection system before educating both the staff and the public on those changes.

41. Moreover, compliance with "policies" that erase the existence of transgender people would violate Rhode Island law as State agencies are statutorily required to provide services, R.I. Gen. Laws § 28-5.1-7, and licenses, R.I. Gen. Laws § 28-5.1-14, without discrimination based on "gender identity or expression."

42. If DHS is unable to comply with USDA's new funding conditions, the State would be unable to receive FY2026 USDA funds.

9

43. Rhode Island does not appropriate any money to SNAP benefits, and the State does not possess the fiscal capacity to replace lost SNAP funding. Without USDA funding, tens of thousands of families would go hungry. Even a temporary disruption could cause long-lasting harm as individuals may lose their housing, their jobs, their financial security, their health, and their futures as a result of food insecurity.

44. Rhode Island businesses would also suffer from a loss of USDA fundings as they lose the revenue generated from SNAP payments.

45. The loss of SNAP funding would cause significant strain on Rhode Island's emergency food safety net, forcing Rhode Island to dedicate limited resources to supporting community organizations, such as food banks, that will see sharply increased demand.

46. The loss of SNAP funding could also lead to increased State Medicaid costs as the health of SNAP beneficiaries, many of whom are also on State Medicaid, is jeopardized by food insecurity.

47. Rhode Island also relies on federal funding for half of the SNAP administrative costs, and without that funding, this would affect State staffing levels and would result in DHS terminating the contracts that make the distribution of SNAP benefits possible. If and when funding resumed, DHS would then need to rebuild the program, assuming the costs of hiring and training new staff and entering new contracts.

48. SNAP eligibility is integrated into Rhode Island's broader public benefits eligibility systems, including Temporary Assistance to Needy Families (RI Works), Child Care Assistance (CCAP), Long-Term Support Services (LTSS), and Medicaid. DHS determines eligibility for multiple programs simultaneously using shared technology platforms and caseworkers. A disruption in SNAP funding would therefore destabilize integrated eligibility operations,

10

requiring system reprogramming, retraining of staff, and reissuance of public communications. This would divert resources from the administration of other safety net programs.

49. DHS will be required to reallocate significant operational resources to crisis management, including emergency policy development, coordination with USDA, legislative engagement, vendor contract renegotiation, and public communication strategies. This diversion would delay modernization initiatives, delay implementation of federal reporting requirements, and impede improvements to other benefit delivery systems. The administrative disruption would be substantial even if SNAP funding were later restored.

50. Likewise, TEFAP and CSFP are entirely federally funded, and without that funding, Rhode Island lacks the fiscal capacity to replace lost USDA foods and administrative funding with the State's general funds. Even short-term disruptions would create immediate budgetary shortfalls across the state, resulting in layoffs, contract terminations, and the elimination of USDA foods from the food safety infrastructure.

51. Even with current levels of USDA support, thousands of Rhode Islanders are food insecure. Local food banks cannot keep up with growing demand as it is, and many live in "food deserts" without affordable or practical alternatives to the food pantries, food banks, and soup kitchens supported by USDA. Without USDA support, tens of thousands of families, seniors, veterans and other individuals hanging on by a thread will be cut off, and the entire State will bear the repercussions.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 26, 2026 in Cranston, Rhode Island.



Kimberly Merolla-Brito
Director
R.I. Department of Human Services

11