UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al, | |
| Plaintiffs, | Case No. 26-cv-11396-MJJ |
| v. | **Leave to File Excess Pages Granted on March 25, 2026** |
| U.S. DEPARTMENT OF AGRICULTURE, et al, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

In December 2025, the Secretary of the U.S. Department of Agriculture (USDA) announced the establishment of General Terms and Conditions applicable to financial assistance awards made by the agency.  The Secretary explained that these new requirements would help promote the sound stewardship of taxpayer dollars, strengthen USDA's control and oversight of obligated funds, and ensure that grant recipients comply with federal laws, regulations, and policies.  Notwithstanding those sensible goals, twenty States and the District of Columbia filed this lawsuit seeking to vacate certain provisions of the General Terms and Conditions—namely, those that impose antidiscrimination requirements and prohibit the use of funding in contravention of federal policies on gender, women's sports, and immigration (the "Challenged Conditions"). They also filed the instant motion for a preliminary injunction seeking to prevent USDA from applying those same conditions to any funding that Plaintiffs receive throughout this case.  Most of their allegations, however, pertain to funding for nutrition assistance programs that have not been subjected to the Challenged Conditions.  Plaintiffs' arguments on the merits fail regardless. And the equities clearly militate against issuing the extraordinary interim relief that they seek. Accordingly, and for the reasons explained below, the Court should deny Plaintiffs' motion.

## II.    BACKGROUND

### A.  Legal Background

This case involves two distinct categories of federal funding programs implemented by USDA pursuant to broad grants of authority by Congress.  The first involves nutrition assistance programs operated by USDA's Food and Nutrition Service (FNS) in partnership with the States. For example, The National School Lunch Act, as amended, authorizes FNS to provide funds to States to offer low-cost or free lunches to eligible children, 42 U.S.C. § 1754(a), increase the

1

availability of fresh fruits and vegetables in elementary schools, 42 U.S.C. § 1769a(a), maintain food service programs at care centers and emergency shelters, 42 U.S.C. § 1766, and provide eligible children with food assistance during the summer months, 42 U.S.C. § 1761(a)(2)(A). The Child Nutrition Act of 1966, as amended, authorizes FNS to provide funds to States to offer low-cost or free breakfasts to eligible children, 42 U.S.C. § 1773(a), and help administer a special supplemental food program for women, infants, and children (WIC), 42 U.S.C. § 1786(c)(1). The Food Stamp Act of 1964, as amended by The Food and Nutrition Act of 2008, authorizes FNS to provide funds to States to help administer the Supplemental Nutrition Assistance Program (SNAP). 7 U.S.C. §§ 2020, 2025(a). And The Emergency Food Assistance Act of 1983 and The Food and Nutrition Act of 2008, as amended, authorize FNS to provide funds to States to help operate The Emergency Food Assistance Program (TEFAP) to provide emergency food and nutrition assistance to low-income individuals. 7 U.S.C. §§ 2036(a), 7502(a).

The second category involves various programs authorizing the Secretary of USDA to award grants on a discretionary basis to eligible entities—including State agencies and instrumentalities—for specified purposes. For example, The Cooperative Forestry Assistance Act of 1978, as amended, authorizes the Secretary—through USDA's Forest Service—to award grants to "State foresters or equivalent State officials" to help train and equip local firefighting forces. 16 U.S.C. § 2106(b). The Specialty Crops Competitiveness Act of 2004, as amended, authorizes the Secretary—through USDA's Agricultural Marketing Service—to accept (or reject) applications by State departments of agriculture for grants to enhance the competitiveness of specialty crops. 7 U.S.C. § 1621 note. And several statutes authorize the Secretary—through USDA's National Institute of Food and Agriculture—to award grants to States to support agricultural research activities at land-grant institutions, including by approving funding for

projects at agricultural experiment stations, 7 U.S.C. § 361g, and awarding competitive grants supporting cooperative extension activities, 7 U.S.C. § 343.

### B. Factual Background

On December 31, 2025, the Secretary issued a memorandum announcing the establishment of General Terms and Conditions governing awards made by USDA. *See* Doc. No. 1-3 (USDA, Office of the Secretary, *Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements* (Dec. 31, 2025)). In so doing, the Secretary explained the purposes of the General Terms and Conditions, which include "sound stewardship of taxpayer dollars," "advanc[ing] policies that put America First," "[s]trengthening USDA control and oversight of obligated funds," and ensuring that award recipients comply with all applicable laws, regulations, and USDA "policy priorities." *Id.* at 2. To that end, the Secretary directed "all USDA agencies and staff offices that issue awards to adopt and implement" the General Terms and Conditions "for all future awards and for all significant modifications . . . to existing and future awards, to the maximum extent consistent with law." *Id.* at 3.

The General Terms and Conditions outline USDA's "mandatory award terms as required by Title 2 of the Code of Federal Regulations," "are determined by statutory, regulatory, and agency requirements, as well as by administrative policies," and "are in addition to the assurances and certifications made as part of the Federal award and any agency- or program- specific terms, conditions, and restrictions included in the Federal award." Doc. No. 1-1 at 5. "Unless otherwise prohibited by law, recipients and subrecipients of USDA Federal financial assistance grants and cooperative agreements must comply with these General Terms and Conditions." *Id.*

Plaintiffs do not challenge most provisions of the General Terms and Conditions, including those governing issues such as financial management, performance monitoring, and records

management.   They instead seek to enjoin certain provisions that impose antidiscrimination requirements and that prohibit the use of funding in contravention of federal policies on gender, women's sports, and immigration (the "Challenged Conditions").   Relevant here, Section 12.2 provides in pertinent part that the award recipient must comply "with all applicable Federal antidiscrimination . . . policies for the duration of the Federal award," including Executive Orders 14168 and 14173.  *Id.* at 38-39.  Section 13.5 provides that "[n]o funding shall be used to promote gender ideology," as explained in Executive Order 14168.  *Id.* at 48.  Section 13.8 provides that "[n]o funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities" or "towards male competitive participation in women's sports," as explained in Executive Order 14201.  *Id.*  And Section 13.10 provides that "[n]o funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits," as explained in Executive Order 14218.  *Id.*

## III.    STANDARD

To obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).  Even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

4

IV.    **ARGUMENT**

**A.  Plaintiffs are not likely to succeed on the merits.**

   **1.  Plaintiffs' claims challenging the legality of applying the Challenged
        Conditions to FNS Nutrition Assistance Programs are not ripe.**

Plaintiffs' claims are neither ripe under the Constitution nor final agency action under the

Administrative Procedure Act (APA) insofar as they concern the application of the Challenged

Conditions to FNS nutrition assistance programs.  "Ripeness is a justiciability doctrine" that

prevents "courts from 'entangling themselves in abstract disagreements over administrative

policies' and from improperly interfering in the administrative decision-making process." *City of

Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (first quoting *Nat'l Park

Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003), then quoting *Abbott Laby's v.

Gardner*, 387 U.S. 136, 148-49 (1967)).  "The burden to prove ripeness is on the party seeking

jurisdiction." *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st

Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

To determine whether administrative action is ripe for judicial review, courts "evaluate (1)

the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court

consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.  "A claim is not ripe for adjudication if

it rests upon contingent future events that may not occur as anticipated, or indeed may not occur

at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation modified).  And agency action

is not ripe until an agency has made a final decision. *Abbott Laby's*, 387 U.S. at 149; *see also City

of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of

ripeness).  To qualify as "final," an agency action "must mark the consummation of the agency's

decisionmaking process" and "be one by which rights or obligations have been determined, or

from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal

5

quotation marks and citation omitted); *Abbott Laby's*, 387 U.S. at 148-49.  Ripeness thus overlaps with the APA's independent requirement of final agency action. *See* 5 U.S.C. § 704.

Here, USDA has not applied the Challenged Conditions to *any* federal-state agreement governing an FNS nutrition assistance program, such as the National School Lunch Program, the National School Breakfast Program, WIC, SNAP, and TEFAP.  Nor has it made a final decision to do so in the future.  Plaintiffs do not claim that they have had to refuse—or will imminently have to refuse—any federal funding for these programs due to the Challenged Conditions.  The potential and wholly uncertain application of the Challenged Conditions to those programs thus remains "no more than conjecture" at this time.  *Trump v. New York*, 592 U.S. 125, 131 (2020) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).  Moreover, withholding consideration of this aspect of Plaintiffs' claims will not cause Plaintiffs hardship because the hypothetical impact of the Challenged Conditions on the FNS nutrition assistance programs "could not be said to be felt immediately by those subject to it in conducting their day-to-day affairs and no irremediably adverse consequences [will] flow[] from requiring a later challenge." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 810 (2003) (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)) (cleaned up).  The Court should thus deny Plaintiffs' motion insofar as it seeks to enjoin USDA from applying the Challenged Conditions to the FNS nutrition assistance programs.

### 2.  Plaintiffs' Spending Clause claims are unlikely to succeed.

The Spending Clause authorizes Congress to "lay and collect Taxes" to provide for the "general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  This grant of authority vests Congress with "broad power" to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022).  And, in that way, "[t]his grant gives the Federal Government considerable influence even in areas where it cannot directly regulate." *Nat'l*

6

*Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 537 (2012). For instance, "in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions," which may, in turn, "induce the States to adopt policies that the Federal Government itself could not impose." *Id.* To that end, Congress "has repeatedly employed the [spending] power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted).

"The spending power is of course not unlimited," and the Supreme Court has articulated three basic "limitations" on its use. *Id.* at 207. First, "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* (citing *Helvering v. Davis*, 301 U.S. 619, 640–41 (1937)). Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Third, the Supreme Court has "suggested" that "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* (citing *Massachusetts v. United States*, 435 U.S. 444, 461, (1978)).

A violation of the Spending Clause thus occurs—if at all—"when *Congress* imposes a spending or funding condition" that runs afoul of these limitations. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) (emphasis added), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *see, e.g.*, *Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) (citing same); *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 212 (D.D.C. 2025) (observing that the Spending Clause "does not, on its face, purport to limit what the Executive Branch may do under Article II"). Plaintiffs,

however, seek to challenge *USDA*'s imposition of certain funding conditions. Because they do not seek to challenge "Congressional action," Plaintiffs' claim under the Spending Clause "cannot" succeed. *Wilmer Cutler Pickering Hale & Dorr LLP*, 784 F. Supp. 3d at 162.

### a. The Challenged Conditions are not impermissibly vague.

Even if the Spending Clause placed limits on Executive agency action, Plaintiffs' claims would still fail. They first argue that the Challenged Conditions are "impermissibly vague" because they require compliance with "all applicable Federal antidiscrimination laws, regulations, and policies for the duration of the Federal award," without including an exhaustive list of all the applicable "policies." Doc. No. 43 at 15-16. But the General Terms and Conditions clearly identify the relevant category of policies at issue (i.e., antidiscrimination) and list two Executive Orders as applicable examples. Doc. No. 1-1 at 38. Moreover, "a State's potential obligations" under a funding condition may be "largely indeterminate" without violating the Spending Clause so long as the State has been provided "clear notice" that it "would indeed be obligated to comply with" the condition. *Pennhurst*, 451 U.S. at 24–25. And Plaintiffs have undoubtedly been provided with clear notice of their need to comply with the Challenged Conditions.

Plaintiffs cite no authority for the contention that, to comply with the Spending Clause, an agency must comprehensively and individually list each policy falling within a general category. Nor could they, as the federal government "is not required to list every factual instance in which a state will fail to comply with a condition." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see Pennhurst*, 451 U.S. at 24–25. Notably, the General Terms and Conditions similarly require funding recipients to certify compliance with "all applicable" antidiscrimination laws and regulations without listing each antidiscrimination law in the Statutes at Large and each antidiscrimination regulation in the Code of Federal Regulations. *See* Doc. No. 1-1 at 38. Yet,

Plaintiffs do not challenge that requirement—making clear that their informed acceptance of these conditions does not actually require an exhaustive listing of all antidiscrimination requirements.

Insofar as Plaintiffs claim that funding conditions may require compliance with all antidiscrimination *laws and regulations*, but not all antidiscrimination *policies*, that contention conflicts with the Supreme Court's repeated and express approval of using the Spending Power as a means to "induce the States to adopt policies," *NFIB*, 567 U.S. at 537, and comply with "administrative directives," *Dole*, 483 U.S. at 206.  And their characterization of the term "policies" as inherently and impermissibly vague not only lacks support but also ignores the fact that a federal agency may terminate a federal award "if it no longer effectuates the program goals or agency *priorities*."  2 C.F.R. § 200.340(a)(4) (emphasis added).  If an agency may terminate a federal award based on the recipient's failure to adhere to agency priorities without violating the Spending Clause, it follows that an agency may condition federal funding on the recipient's compliance with agency policies without violating the same.

Plaintiffs also assert that the Challenged Conditions are impermissibly vague insofar as they prohibit recipients from using funds to "promote gender ideology," "deprive women and girls of fair athletic opportunities," and "provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits." Doc. No. 43 at 18-20.  But, as an initial matter, agency directives need not define every potentially ambiguous term to survive a vagueness challenge. *Cf. Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2665–66 (2025) (Kavanaugh, J., concurring in part).  That is especially true in the context of competitive grants because, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l*

9

*Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).  Indeed, "[i]n the context of selective subsidies," perfect "clarity" "is not always feasible."  *Id.*

In any event, Plaintiffs' arguments overlook that the Challenged Conditions cite to and incorporate Executive Orders that *do* define terms like "gender ideology," *see* Executive Order 14168, and make clear that "depriv[ing] women and girls of fair athletic opportunities" in this context means "allow[ing] men to compete in women's sports," *see* Executive Order 14201.  And while terms like "promote" might be "broad," they are not "vague" when used in this context. *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 96 (D.D.C. 2025).  Moreover, Plaintiffs' numerous hypotheticals again ignore that the federal government "is not required to list every factual instance in which a state will fail to comply with a condition." *Mayweathers*, 314 F.3d at 1067.  "That there might be 'close cases'" concerning whether some activity promotes gender ideology or incentivizes illegal immigration "is not a vagueness problem," as "such tight calls 'can be imagined under virtually any statute' or regulation." *Nat'l Urb. League*, 783 F. Supp. 3d at 96 (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)).

### b.  The Challenged Conditions are reasonably related to the funding at issue.

Plaintiffs next argue that the Challenged Conditions violate the Spending Clause because they "are not reasonably related to the applicable programs."  Doc. No. 43 at 21.  This reasonable-relation test, however, marks "a rather low-threshold" requiring only that the funding condition "bear *some relationship* to the purpose of the federal spending." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018) (citing *New York v. United States*, 505 U.S. 144, 167 (1992)).  Critically, Plaintiffs do not dispute that compliance with federal antidiscrimination laws and regulations bears a sufficient relationship to the purpose of USDA's provision of funds.  After all, federal agencies have long required compliance with federal antidiscrimination laws and

regulations as a condition to receiving all manner of federal funding. *See Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 629–30 (1983) (Marshall, J., dissenting). And if compliance with federal antidiscrimination laws and regulations bears a sufficient relationship to the funding at issue, compliance with federal antidiscrimination policies does as well. Finally, all of the conditions providing that "[n]o funding shall be" used or directed towards certain specified purposes, by their very terms, bear a direct relationship with the purpose of the federal spending at issue in that they prohibit recipients from using funds for *other* purposes.

### c.  The Challenged Conditions are not unconstitutionally coercive.

Plaintiffs' assertion that "the Challenged Conditions violate the Spending Clause's prohibition on coercive conditions" fails as well. Doc. No. 43 at 23. The Supreme Court has made clear that, even where the federal government may not be able to *compel* States to do a particular activity, it may *encourage* them to implement federal regulatory programs. *See New York*, 505 U.S. at 149. Thus, the federal government can constitutionally use conditions on federal funds to "induce the States to adopt policies that the Federal Government itself could not impose." *NFIB*, 567 U.S. at 537. It may, for example, make certain federal funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. at 205-08 (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one). "[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a [constitutional] violation." *Env't Def. Ctr. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (citation omitted).

Plaintiffs rely on *NFIB*, in which the Supreme Court addressed a provision of the Affordable Care Act (ACA) authorizing the Secretary of Health and Human Services to withhold

11

all of a State's existing Medicaid funds if the State did not agree to participate in the ACA's "transform[ative]" expansion of Medicaid and meet its concomitant requirements. 567 U.S. at 575-585. As the First Circuit has explained, "[t]he plurality found a Spending Clause violation because it determined that the Medicaid program expansion was an entirely new program, participation in which was a condition on continued receipt of pre-ACA Medicaid funds, and because the loss of pre-ACA Medicaid funds would have been so consequential to the states that states had no real option to refuse." *Mayhew v. Burwell*, 772 F.3d 80, 88 (1st Cir. 2014). Put another way, "[t]he plurality found a Spending Clause violation because it . . . found (1) that the expansion placed a condition on the receipt of funds that did not govern the use of those funds *and* (2) that the condition was unduly coercive." *Id.* (emphasis added). Both conclusions were necessary components of the plurality's analysis and neither holds true by comparison here.

First, the Challenged Conditions do not require States to adopt an entirely new federal program as a condition of receiving continued funding for a different program. As described above, the Challenged Conditions relate to and govern a recipient's use of the funds at issue. Second, Plaintiffs have neither alleged nor provided any evidence that the USDA funding in this case remotely approaches the scope of the threatened loss in *NFIB*. As the Supreme Court explained in *NFIB*, "Medicaid spending account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." 567 U.S. at 581. A State's decision to reject the Medicaid expansion therefore "threatened [a] loss of over 10 percent of a State's overall budget," which the Supreme Court characterized as "economic dragooning that [left] the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582. Plaintiffs, by contrast, have not shown that rejecting the Challenged Conditions and forgoing the associated USDA funding would threaten a comparable impact on their overall budgets.

12

This dispute thus represents the "typical case" in which courts "look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own." *NFIB*, 567 U.S. at 579 (citing *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)).

### 3. Plaintiffs' APA claims are unlikely to succeed.

#### a. The Challenged Conditions constitute agency action committed to agency discretion by law.

Plaintiffs also claim that the Court should set aside the USDA's adoption of the Challenged Conditions under the APA as arbitrary and capricious, in excess of statutory authority, and not in accordance with law. *See* Doc. No. 43 at 24-36. The APA does not, however, allow for judicial review of agency actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(1). And, in general, agencies have broad discretion in creating, awarding, and terminating specific grants. In *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), the Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* As the Supreme Court has acknowledged, in such circumstances, it is squarely within an agency's discretion to determine whether to fund any specific program at all to meet permissible statutory objectives. *Id.* at 193. "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* So long as the agency abides by the relevant statutes, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Here, the relevant statutes afford USDA significant discretion to award grants without limiting its ability to impose conditions on the use of those funds. For instance, the Cooperative

13

Forestry Assistance Act of 1978, as amended, provides that "the Secretary is authorized, under whatever conditions the Secretary may prescribe," to provide financial assistance to State agencies to help train and equip local firefighting forces. 16 U.S.C. § 2106(b). Similarly, the Specialty Crops Competitiveness Act of 2004, as amended, directs the Secretary to make grants to States to enhance the competitiveness of specialty crops and broadly provides that "[t]he Secretary may accept or reject applications for [such] a grant." 7 U.S.C. § 1621 note. USDA's determination of how best to condition such funds thus constitutes classic discretionary agency action not subject to APA review. *See Lincoln*, 508 U.S. at 193; *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 750-51 (D.C. Cir. 2002) (applying *Lincoln* in the context of non-lump-sum appropriations).

### b. The Challenged Conditions are not arbitrary and capricious.

Even if the Court could review the Challenged Conditions under the APA, Plaintiffs' claims are still unlikely to succeed on the merits. Plaintiffs first assert that the Challenged Conditions are arbitrary and capricious because USDA failed to consider their reliance interests in this federal funding. Doc. No. 43 at 25-26. The agency has not, however, cut off any State's funding; it has simply issued new terms and conditions on the receipt and use of such funds moving forward. And Plaintiffs have no legitimate reliance interests in the *unconditional* provision of USDA funding. Nor do they have any legitimate reliance interests in the continued provision of USDA funding on the same terms and conditions that governed previous awards. Indeed, Plaintiffs have been on explicit notice that even existing awards may be terminated if they "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Plaintiffs also contend that the Challenged Conditions are arbitrary and capricious because the agency "provided no reasons" for them. Doc. No. 43 at 27. But that is demonstrably incorrect. On December 31, 2025, the Secretary issued a detailed memorandum explaining the need for and

14

purpose of ensuring that USDA award recipients adhere to the General Terms and Conditions—including the "sound stewardship of taxpayer dollars" and the "advance[ment] [of] policies that put America First." Doc. No. 1-3 at 2. The Secretary further explained that the General Terms and Conditions served to "[s]trengthen USDA control and oversight of obligated funds, and compliance with applicable laws, regulation and policy priorities." *Id.* Plaintiffs might disagree with those purposes, but when reviewing agency action under the APA, a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). And, in all events, it is plainly incorrect to suggest that USDA "provided no reasons" for the Challenged Conditions.

Plaintiffs further argue that USDA ignored an important aspect of the problem by not considering that their compliance with the Challenged Conditions might conflict with requirements under their own "state laws and policies." Doc. No. 43 at 28-29. They neglect, however, to even identify the "problem" that USDA set out to solve—and thereby fail to demonstrate how a potential conflict between the Challenged Conditions and their respective state laws and policies forms an "important" aspect of it. As the Secretary's memorandum makes clear, the relevant problem addressed by the General Terms and Conditions consists of award recipients using federal funds in ways that do not, among other things, "put America First" or otherwise further USDA's "policy priorities." Doc. No. 1-3 at 2. Thus, advancing USDA's policy priorities—notwithstanding any contrary state policies—composes part of the *solution*, not an important aspect of the *problem*.[1]

---

[1] Moreover, the Secretary's memorandum directs the establishment of "a deviation process to authorize policies, procedures, terms, or conditions that are inconsistent with the [General Terms and Conditions]." Doc. No. 1-3 at 4.

15

In addition, Plaintiffs argue that USDA did not consider more tailored alternatives to imposing the Challenged Conditions. Doc. No. 43 at 29-30. But, again, that argument fails to appreciate the purpose of the Challenged Conditions. USDA imposed the General Terms and Conditions—including the Challenged Conditions—to create "standard practices consistent with sound stewardship of taxpayer dollars" and strengthen compliance with USDA's "policy priorities." Doc. No. 1-3 at 2. Plaintiffs do not—and could not—identify any more "targeted" or "measured" approach to achieving those goals; they simply insist that USDA should not use funding conditions to pursue those goals. But if Plaintiffs do not wish to "embrace the[se] federal policies as their own," the answer lies in them rejecting the Challenged Conditions, rather than forcing USDA to accommodate state policies via bespoke agreements that would defeat the entire purpose of the Challenged Conditions to begin with. *NFIB*, 567 U.S. at 579 (citation omitted).

### c.  The Challenged Conditions do not exceed USDA's statutory authority.

Plaintiffs also claim that the Policy Condition and the Immigration Condition exceed the agency's statutory authority. Doc. No. 43 at 31-33. Yet, as explained, Plaintiffs' claims challenging the application of these conditions to FNS nutrition assistance programs are unripe. The only other sources of USDA funding that Plaintiffs identify consist of Forest Service grants, Agricultural Marketing Service grants, and National Institute of Food and Agriculture grants. Doc. No. 1 at 29-36. And the statutes authorizing those grants, in turn, afford the Secretary broad discretion in deciding whether and on what conditions to award them. *See, e.g.*, 7 U.S.C. § 1621 note; 16 U.S.C. § 2106(b). Plaintiffs suggest that USDA may not condition the award of grants on requirements other than the eligibility criteria specified in the statutes authorizing them. But if that were true, it is unclear how the agency could condition grants on an applicant's compliance with federal antidiscrimination laws and regulations—an authority which Plaintiffs do not dispute.

16

### d. The Challenged Conditions are not contrary to law.

Finally, Plaintiffs argue that the Immigration Condition and the Gender Condition violate certain federal statutes and regulations. They specifically claim that the Immigration Condition contradicts 8 U.S.C. § 1615, which generally allows States to determine eligibility for the school lunch and breakfast programs without regard to immigration status and to determine qualifications for WIC and TEFAP benefits without regard to citizenship status. They claim that the Immigration Condition also contravenes 7 C.F.R. § 251.5(b)(3), which provides that States may not use "identification documents" "as an eligibility criterion" for TEFAP benefits. And they claim that the Gender Condition violates 7 C.F.R. § 272.2(b)(1), which sets forth model language for federal-state agreements that, if approved, would preclude a State agency from denying SNAP benefits "on the grounds of sex, including gender identity and sexual orientation."

This argument fails at the outset, however, because Plaintiffs' claims challenging the application of the Challenged Conditions to the implicated programs—namely the school lunch and breakfast programs, WIC, and TEFAP—are unripe. Even were it otherwise, these claims would still necessarily fail because the General Terms and Conditions expressly provide that, "[i]n the event of any inconsistency among the terms and conditions of the Federal award and/or other issuances, the inconsistency will be resolved by giving precedence" to federal statutes and regulation *over* the General Terms and Conditions. Doc. No. 1-1 at 5. Thus, even assuming for the sake of argument that the Immigration and Gender Conditions conflict with certain federal laws and regulations (which they do not), any such conflict would dissipate by giving precedence to the implicated federal laws and regulations.

17

### B.  Plaintiffs have failed to demonstrate irreparable harm.

Plaintiffs have also failed to show that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm."  *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–8 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))).

Plaintiffs first assert that they will suffer irreparable harm if they agree to the Challenged Conditions and are thus "forced to abandon their 'sovereign interests and public policies.'"  Doc. No. 43 at 39 (citation omitted).  But any given Plaintiff's decision to agree (or not agree) to the Challenged Conditions constitutes an *exercise*—not an abandonment—of their sovereign authority.  *See NFIB*, 567 U.S. at 579 ("The States are separate and independent sovereigns. Sometimes they have to act like it.").  That remains true even if declining federal funds might prove "difficult, expensive or otherwise unappealing."  *Env't Def. Ctr.*, 344 F.3d at 847 (citation omitted).  If a State "objects to a condition on the receipt of federal funding, its recourse is to decline the funds."  *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  And if a State instead chooses to accept the funding notwithstanding its objection, that decision similarly represents an exercise of the State's sovereign prerogative.

18

Plaintiffs also assert that they will suffer irreparable harm if they "forgo potentially billions of dollars in federal funding." Doc. No. 43 at 37. But they have not set forth any evidence demonstrating that the amount of funding at issue "is *likely*" to approach anywhere near that speculative sum. *Winter*, 555 U.S. at 22. Moreover, the loss of federal funding constitutes an economic loss. And it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics*, 443 F. Supp. 3d at 230 ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction" (citation omitted)); *Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss"). At bottom, if Plaintiffs decide to "forgo" USDA funding, that result flows from their independent decision-making as separate sovereigns—not any wrongdoing by Defendants.

### C. The balance of the equities favor denying Plaintiffs' motion.

Plaintiffs have also failed to show that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). And then it considers whether "[t]he public interest weighs in favor of granting" the preliminary injunction. *Id.* at 285. But where, as here, the government is the defendant, these factors simply "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of the equities and public interest tip decisively in Defendants' favor. Granting a preliminary injunction would significantly disrupt USDA's ongoing consideration of grant applications and would prevent the agency from disbursing finite federal funding to other

applicants (who *would* otherwise accept the Challenged Conditions) for the same discretionary grant programs. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (granting request for stay of injunction "to avoid [] disruptive effect[s]" on government operations). Moreover, if the Court grants a preliminary injunction and Plaintiffs are provided with federal funds, they will draw down the funds throughout the litigation. Defendants will be harmed because they will be unable to "recover the grant funds once they are disbursed" while, conversely, Plaintiffs "can recover any wrongfully withheld funds through suit in an appropriate forum." *Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025). And, in all events, forcing the federal government to financially support causes at odds with its own policies inflicts a distinct and irremediable harm on the public that goes beyond the expenditure of unrecoverable appropriated funds.

**D. The Court lacks jurisdiction to enjoin USDA from withholding or terminating funding under a grant agreement.**

At minimum, the Court lacks jurisdiction to grant Plaintiffs' motion insofar as it seeks to enjoin Defendants from "withholding or terminating federal funding" under a grant agreement based on the Challenged Conditions. Doc. No. 42-1 at 2. As the Supreme Court explained in *California*, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. 604 U.S. at 651 (citing *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And the district court's order in that case substantially mirrors Plaintiffs' requested order here, insofar as it seeks to enjoin Defendants from "withholding or terminating federal funding" under a grant agreement. Doc. No. 42-1 at 2. The Supreme Court's analysis in *California* therefore must "inform" how the Court "should exercise its equitable discretion" in this case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

20

**E. Plaintiffs' requested relief is overbroad.**

Plaintiffs' motion and proposed order also ask the Court to enjoin Defendants from "*implementing* or enforcing" the Challenged Conditions against Plaintiffs. Doc. No. 42-1 at 2 (emphasis added). Although a preliminary injunction would prevent Defendants from *enforcing* the Challenged Conditions against Plaintiffs, the Court should decline to enjoin Defendants from "implementing" the Challenged Conditions insofar as it would prevent them from even *including* the Challenged Conditions in grant agreements executed during the pendency of this lawsuit. That way—if Defendants ultimately prevail—the dissolution of the preliminary injunction will appropriately return the parties to the status quo that existed before the issuance of the preliminary injunction. If, however, the Court were to enjoin Defendants from even *including* the Challenged Conditions in grant agreements—and Defendants ultimately prevail—Plaintiffs will have effectively obtained relief to which they were not entitled, namely, grant agreements that do not include the Challenged Conditions. So long as Defendants are enjoined from *enforcing* the Challenged Conditions, Plaintiffs will suffer no harm from their mere inclusion. If Defendants later prevail, and Plaintiffs decide they do not wish to abide by any grant agreement executed during this litigation, they may choose to terminate the agreement. *See* Doc. No. 1-1 at 25-26.

**V.    CONCLUSION**

The Court should deny Plaintiffs' motion for a preliminary injunction.


Respectfully submitted,

LEAH B. FOLEY
United States Attorney


Dated: April 13, 2026                    By:    */s/ Michael L. Fitzgerald*
                                                MICHAEL L. FITZGERALD

21

Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant U.S. Attorney