**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>COMMONWEALTH OF MASSACHUSETTS,</td><td>)</td><td></td></tr>
<tr><td>et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No. 26-11396-MJJ</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>U.S. DEPARTMENT OF AGRICULTURE,</td><td>)</td><td></td></tr>
<tr><td>et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**MEMORANDUM OF DECISION**

June 24, 2026

JOUN, D.J.

Plaintiff States receive over $74 billion annually from the United States Department of Agriculture ("the Department"), allocated primarily by statutorily enacted formulas passed by Congress. This federal-state partnership has lasted for over a century, feeding hundreds of millions of Americans, funding groundbreaking agricultural research, and directly supporting farmers, among numerous other functions. For decades, states receiving such funding from the Department have understood that to receive such funds, they must comply with the Department's General Terms and Conditions. In December 2025, however, the Secretary of Agriculture updated these terms to include new conditions (the "Challenged Conditions") that states must now comply with in order to receive such funding. This is part of an ongoing effort by the current administration to leverage federal funding to compel states to acquiesce to the administration's policies and preferences about social issues that have little to do with the aims of the Department. As such,

crucial funding used to support the public is now threatened unless Plaintiff States comply with Executive Orders and Department policy on gender ideology, immigration, transgender athletic participation, and diversity, equity, and inclusion. In essence, the Department has forced Plaintiff States to make an unlawful and coercive decision: either forgo billions of dollars in critical funds or accept conditions on those funds that are in conflict with Plaintiff States' own laws and policies. Faced with this choice, Plaintiff States sued the Department alleging that the Challenged Conditions violate the Constitution and the Administrative Procedure Act.

Defendants concede the following: They did not consider data, statistics, or other information regarding the potential consequences that may arise from their decision. The Challenged Conditions would require Plaintiff States to violate their own laws and policies preserving the rights of transgender people and non-citizens. They did not go through any notice-and-comment procedures as an executive agency typically does when imposing a new rule. They did not consider alternatives to imposing the Challenged Conditions. They did not consider the reliance interests of Plaintiff States or their residents on such funding. Further, Defendants have been unable to tie any of the funding, or the purposes of such funding, to the Challenged Conditions themselves. The Department's overarching position is that it has discretion to decide how to allocate funds—full stop. But the Department's discretion is not so unlimited. It must fall within the bounds of our nation's Constitution and federal laws. Because it does not, a preliminary injunction is warranted.

On March 30, 2026, Plaintiff States filed a Motion for Preliminary Injunction, [Doc. No. 42], and this Court heard oral argument on the motion on June 2, 2026, [Doc. No. 62]. Given the immediate nature of the threatened harm, this Court issued the preliminary injunction on June 5, 2026, [Doc. No. 64]. I write now to explain the legal and factual basis for that decision.

I.      **BACKGROUND**

A.      <u>**The Department Of Agriculture**</u>

In 1862, the Department was established by Congress to "acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human nutrition, . . . and to procure, propagate, and distribute among the people new and valuable seeds and plants." 7 U.S.C. § 2201. In 1889, Congress elevated the Department to cabinet status to support areas critical to the nation's welfare, including food and nutrition security, protection of natural resources, farm production, food safety, marketing and regulation of American farm products, and scientific research. [Doc. No. 1 at ¶¶ 41, 43]. Congress appropriates billions of dollars annually to fully fund the Department's programs and meet the nation's needs. [*Id.* at ¶ 2]. For more than 150 years, the Department's funding has provided support to programs and projects that ensure our nation's farms and natural resources are secure and our citizens can put food on the table by preventing food insecurity, fighting and suppressing fires, conducting research, and supporting agriculture. [*Id.* at ¶¶ 44–45]. The appropriation of funds to the Department allows Congress to strengthen the American food ecosystem from farm to table and support our national security by securing a robust domestic agricultural industry for generations to come. [*Id.* at ¶ 1].

The Department of Agriculture has experienced significant growth since its founding. [*Id.* at ¶ 42]. Currently, the Department contains 29 subsidiary agencies, and greater than 100,000 employees are employed domestically and internationally at over 4,500 locations. [*Id.*]. This growth expands the Department's funding reach, as the Department distributes funding to all 50 states, the District of Columbia, and four United States Territories. [*Id.* at ¶¶ 93, 96]. In 2024, the Department granted more than $140 billion in federal funding. [*Id.* at ¶ 44]. While the majority of

the Department's funding provides food to those in need, protects our forests, and supports critical research programs, the Department's reach expands well beyond these areas. [*Id.* at ¶ 46]. Indeed, the Department's funds directly impact citizens from coast to coast, including individuals experiencing food insecurity, school children, pregnant women, low-income households, households dealing with emergencies, farmers, ranchers, foresters, and local communities. [*Id.*].

Since the Department's creation, Congress has enacted statutes authorizing additional functions for the Department and appropriating additional funds for it to administer. [*Id.* at ¶¶ 2, 46]. Congress grants the Department authority to implement federal funding programs. [Doc. No. 49 at 2]. The major statutes administered by the Department include:

a.  The Richard B. Russell National School Lunch Act (NSLA): enacted in 1946 and last amended in 2026 by Whole Milk for Healthy Kids Act of 2025, Pub. L. No. 119–69, 139 Stat. 1997 (codified as amended at 42 U.S.C. §§ 1751, *et seq.*). The NSLA was designed to fund meals for low-income children. [Doc. No. 1 at ¶ 51]. Specifically, the purpose of the NSLA was to "safeguard the health and well-being of our Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States . . . in providing an adequate supply of foods." [*Id.*] (quoting 42 U.S.C. § 1751). The NSLA, as amended, authorizes the Department's Food and Nutrition Service to provide funds to States to offer low-cost or free lunches to eligible children, increase the availability of fresh fruits and vegetables in elementary schools, maintain food service programs at care centers and emergency shelters, and provide eligible children with food assistance during the summer months. [Doc. No. 49 at 2–3] (citing 42 U.S.C. § 1754(a); 42 U.S.C. § 1769(a); 42 U.S.C. § 1766; 42 U.S.C. § 1761(a)(2)(A)). Eligibility for the NSLA is defined by

statute. [Doc. No. 1 at ¶¶ 220, 263] (citing 42 U.S.C. § 1758(b)). The Department's payments to states reimbursing qualifying meals are in line with a statutory formula. [*Id.* at ¶¶ 53, 220, 263] (citing 42 U.S.C. § 1753(b)).

b. The Child Nutrition Act of 1966: enacted in 1966 and last amended in 2026 by Whole Milk for Healthy Kids Act of 2025, Pub. L. No. 119–69, 139 Stat. 1997 (codified as amended at 42 U.S.C. §§ 1771, *et seq.*). The Act expanded federal authority to improve the health of children through the School Breakfast program and the Special Milk Program. [Doc. No. 1 at ¶ 57]. The Act authorizes the Department's Food and Nutrition Service to provide funds to States to offer low-cost or free breakfasts to children and administer a supplemental food program for women, infants, and children. [Doc. No. 49 at 3] (citing 42 U.S.C. § 1773(a); 42 U.S.C. § 1786(c)(1)).

c. The Emergency Food Assistance Act of 1983: enacted in 1983 and last amended in 2025 by Act of July 4, 2025, Pub. L. No. 119–21, 139 Stat. 72 (codified as amended at 7 U.S.C. §§ 7501, *et seq.*). The Act authorized the Department's Food and Nutrition Service to provide funds to States to operate The Emergency Food Assistance Program to provide emergency food and nutrition assistance to low-income individuals. [Doc. No. 49 at 3] (citing 7 U.S.C. § 7502(a)).

d. The Food Stamp Act of 1964: enacted in 1964, as amended by The Food and Nutrition Act of 2008 last amended in 2008, and last amended in 2025 by Act of July 4, 2025, Pub. L. No. 119–21, 139 Stat. 72 (codified as amended at 7 U.S.C. §§ 2011, *et seq.*). The Act, as amended, established a supplemental nutrition assistance program and authorized the Department's Food and Nutrition Service to provide funds to States to operate The Emergency Food Assistance Program. 7 U.S.C. § 2013; 7 U.S.C. § 2036.

e. The Cooperative Forestry Assistance Act of 1978: enacted in 1978 and last amended in 2021 by Infrastructure Investment and Jobs Act, Pub. L. No. 117–58, 135 Stat. 429 (codified as amended at 16 U.S.C. §§ 2101, *et seq.*). The Act authorizes the Department's Forest Service to award grants to help train and equip local firefighting forces. [Doc. No. 49 at 3] (citing 16 U.S.C. § 2106(b)).

f. The Specialty Crops Competitiveness Act of 2004: enacted in 2004 and last amended in 2025 by Act of July 4, 2025, Pub. L. No. 119–21, 139 Stat. 72 (codified as amended at 7 U.S.C. §§ 3101, *et seq.*). The Act authorizes the Department's Agricultural Marketing Service to accept applications by State departments of agriculture for grants to ensure prosperous agriculture and enhance the competitiveness of specialty crops. [Doc. No. 49 at 3] (citing 7 U.S.C. § 1621 note).

Congress granted the Secretary of Agriculture authority to appropriate funds as may be necessary to carry out general duties of the Secretary. 7 U.S.C. § 2204-5. When Congress appropriates funds to the Department, "[t]he Secretary of Agriculture shall direct and superintend the expenditure of all money appropriated to the Department." 7 U.S.C. § 2208. For instance, the Secretary is authorized, under whatever conditions the Secretary may prescribe, to provide financial, technical, and related assistance to State foresters or equivalent State officials for firefighting training and fire prevention, control, and suppression. 16 U.S.C. § 2106(b). Notably, the Secretary is allowed to delegate any part of any regulatory function of the Secretary to any officer or employee of the Department. 7 U.S.C. § 2204-2. However, "[t]here shall not be in the Department at any one time more than two officers or employees designated under this section and vested with a regulatory function or part thereof delegated under this section." *Id*. A revocation of such delegation "shall not be retroactive, and each regulatory function or part thereof performed .

. . by such individual prior to the revocation shall be considered as having been performed by the Secretary." 7 U.S.C. § 2204-3.

**B.    Federal Funding Programs Implemented By The Department Of Agriculture**

The Department's programs touch on many aspects of agriculture. Every year, the Department's School Lunch and School Breakfast programs serve millions of students at over 90,000 schools. [Doc. No. 1 at ¶¶ 56–57]; [Doc. No. 43 at 19]. In addition, the Department's grants have funded more than 10,000 agricultural research projects. [Doc. No. 1 at ¶ 119]. What follows is a description of some of these critical funding programs and functions.

**1.    Nutrition Assistance**

The Department's Food and Nutrition Service (FNS) oversees 15 domestic nutrition assistance programs. [*Id.* at ¶ 48]. Congress's focus of these nutrition programs is to "promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. The primary nutrition assistance programs managed by the FNS include the child nutrition programs, Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), Supplemental Nutrition Assistance Program (SNAP), and the Emergency Food Assistance Program (TEFAP). [Doc. No. 1 at ¶¶ 49, 68, 81, 93].

The federal government has allocated funds to feed children for eighty years. [*Id.* at ¶ 49]. The Department's child nutrition programs are authorized by two statutes, the Richard B. Russell National School Lunch Act (NSLA) and the Child Nutrition Act of 1966. [*Id.* at ¶ 50] (citing 42 U.S.C. §§ 1751, *et seq.*; 42 U.S.C. §§ 1771, *et seq.*). These programs include the National School Lunch Program, School Breakfast Program, Child and Adult Care Food Program, Summer Food Service Program, Seamless Summer Option, Summer Electronic Benefit Transfer for Children

7

Program, Fresh Fruit and Vegetable Program, and Special Milk Program. [*Id.* at ¶ 49]. These child nutrition programs increase the number of whole grains, vegetables, and dairy consumed by participating children while reducing the number of refined grains and empty calories compared with children who do not participate. [*Id.* at ¶ 63]. Congress mandated that all school-aged children are eligible to participate in School Lunch and School Breakfast regardless of "citizenship, alienage, or immigration status." [*Id.* at ¶ 58] (quoting 8 U.S.C. § 1615(a)). Congress appropriated $37.8 billion for child nutrition programs in fiscal year 2026. [*Id.* at ¶ 55] (citing 2026. Pub. L. No. 119-37, 139 Stat. 495, 533). Plaintiff States received between approximately $47.6 million and $3.2 billion in child nutrition program funding in fiscal year 2025, totaling around $11.7 billion. [*Id.* at ¶ 62, Table 1]. These funds are determined based on statutorily prescribed formulas. [*Id.* at ¶ 53]; *see, e.g.*, 42 U.S.C. § 1753(b). For example, Congress appropriated $16.6 billion for School Lunch in fiscal year 2024, reaching 94,149 schools. [Doc. No. 1 at ¶ 56]. Additionally, low-cost or free breakfasts were available to children in 90,475 schools as of 2024. [*Id.* at ¶ 57]. The formula grants are also administered by FNS to provide meals and snacks to children in daycare and emergency shelters, provide fresh fruit and vegetables to school children, and fill the critical gap in nutrition needs over the summer. [*Id.* at ¶ 61]; *see, e.g.*, 42 U.S.C § 1766, 42 U.S.C § 1769a, 42 U.S.C § 1761. These funds then flow to local school districts as subrecipients of the funding. [Doc. No. 1 at ¶ 66]. Specifically, Special Milk provides milk to children in schools or childcare who do not participate in other federal meal service programs and reimburses schools for the milk they serve. [*Id.* at ¶ 59].

Congress first authorized WIC in 1972 as an amendment to the Child Nutrition Act of 1966. [Doc. No. 1 at ¶ 69]. Generally, WIC participation has grown 10% since 2021. [*Id.* at ¶ 74]. The purpose of the program is to alleviate nutritional risks faced by pregnant women and infants

because of inadequate nutrition and income. [*Id.* at 69] (citing 1972. Pub. L. No. 92-433, 86 Stat.724, 729). Congress aimed to prevent the occurrence of health problems by providing supplemental nutritious food during critical times of growth and development. [*Id.*] (citing 1975. Pub. L. No. 94-105, 89 Stat. 511). WIC applies to low-income pregnant and postpartum women, infants, and children up to five years old. [*Id.* at ¶ 68]. WIC provides nutritious foods, breastfeeding support, health care referrals, and other services to lower the risk of inadequate nutrition. [*Id.* at ¶ 68]. Congress requires WIC funds to be distributed according to formulas "prescribed by the Secretary." [*Id.* at ¶ 70] (quoting 42 U.S.C. § 1786(h)(2)(A)). Collectively, Congress appropriated $8.2 billion for WIC in fiscal year 2026. [*Id.* at ¶ 72] (citing 2025. Pub. L. 119-4, 139 Stat. 9, 16). Plaintiff States received between approximately $15.1 million and $1.1 billion in WIC funding in fiscal year 2024, totaling around $3.5 billion. [*Id.* at ¶ 71, Table 2].

The Supplemental Nutrition Assistance Program (SNAP) is an essential safety net for citizens facing food insecurity and the nation's primary response to alleviate hunger. [*Id.* at ¶ 81]. The purpose of SNAP is to "alleviate . . . hunger and malnutrition" and was designed to "promote the general welfare [and] to safeguard the health and well-being of the Nation's population." 7 U.S.C. § 2011. SNAP achieves this purpose by increasing the food purchasing power of low-income households through monthly benefits used to buy food. [Doc. No. 1 at ¶ 81]. Eligibility for these benefits requires that recipient households' net income must be at or below the federal poverty line. [*Id.* at ¶ 82]. For example, a family of four with a net income at or below $31,000 in 2025 would qualify to receive an Electronic Benefit Transfer card that can be spent on food at participating retailers. [*Id.*]. SNAP benefits increased the nutrition levels of more than 41 million people in 2024, with monthly benefits appropriated by Congress averaging approximately $8.3 billion. [*Id.* at ¶ 83]. The Department allocated between approximately $148.3 million and $12.2

billion in SNAP assistance to residents of Plaintiff States in fiscal year 2024, totaling around $59.2 billion. [*Id.* at ¶ 90, Table 3].

Congress authorized the Emergency Food Assistance Program (TEFAP) in the early 1980s to ensure adequate nutrition by repurposing federal food surpluses to meet the needs of individuals and communities with known food insecurity. [*Id.* at ¶ 94]. TEFAP is administered through FNS to supplement the diets of economically disadvantaged people. [*Id.* at ¶ 93]. The States' receipt of federal assistance through TEFAP comes in the form of two groups: food purchased by the Department and cash assistance for administrative and distribution costs. [*Id.* at ¶ 96]. FNS allocates and administers TEFAP entitlement food and administrative funding based on a formula that includes poverty and unemployment rates. [*Id.* at ¶ 97]. Congress appropriated $471.5 million for TEFAP in fiscal year 2026 to be apportioned across these two groups. [*Id.* at ¶ 95]. The Department allocated TEFAP funding to Plaintiff States ranging from around $1.3 million to $69.3 million in fiscal year 2026, totaling approximately $258.7 million. [*Id.* at ¶ 100, Table 4]. TEFAP food assistance operates by FNS purchasing and providing States with Department-approved foods. [*Id.* at ¶ 93]. TEFAP food distribution is divided into two categories: entitlement food and bonus food. [*Id.* at ¶ 96]. Funding for entitlement food is appropriated mandatory spending, whereas bonus food is made available when FNS obtains surplus foods on an ad hoc basis, including seasonally available excess produce. [*Id.*]. These foods are distributed by the States to emergency food distribution organizations, including food banks, food pantries, shelters, and soup kitchens. [*Id.* at ¶ 93]. Through this direct food assistance, the federal government operates TEFAP in partnership with all 50 States, the District of Columbia, and four United States Territories as the primary federal program that supports emergency food distribution. [*Id.*].

## 2. Forest Protection And Wildfire Prevention

The Department allocates funding to protect forests and to prevent and fight wildfires. [*Id.* at ¶ 112]. The Department's Forest Service (USFS) administers formula-based grant programs for state forestry and firefighting programs that are designed to mitigate wildfire risk, support tree planting and management in cities, and to address watershed protection, forest resilience, and sustainability. [*Id.* at ¶ 105]. The primary USFS grant programs are the Community Wildlife Defense Grant, the Urban and Community Forestry Grants, and Innovative Finance for National Forests. [*Id.*]. Many States also rely on USFS grants to fund critical services and emergency preparedness. [*Id.* at ¶ 113]. Specifically, the State Fire Capacity Program and the Volunteer Fire Capacity Program received over $1.5 billion from fiscal year 2022 to fiscal year 2026 in supplemental funding from Congress aimed to improve environmental, recreational, and economic infrastructure; restore healthy, productive forests; and support state forestry activities and reduce wildfire risk. [*Id.* at ¶ 112]. The State Fire Capacity Program enhances firefighting capacity, supports community-based hazard mitigation, and expands outreach and education to homeowners and communities regarding fire prevention by providing financial and technical support directly to the States. [*Id.* at ¶ 108]. Similarly, the Volunteer Fire Capacity Program addresses critical preparedness needs, increases initial attack capability, and provides training for local fire agencies by providing rural communities with financial and technical assistance. [*Id.* at ¶ 109]. These programs ensure that fire prevention and control remain a "high priority to protect human lives, agricultural crops, and livestock, property, and other improvements, and natural resources." [*Id.* at ¶ 107] (quoting 16 U.S.C. § 2106(a)(3)).

11

### 3.  Local Agriculture

The Department's Agriculture Marketing Service (AMS) administers grants to support domestic agriculture products. [*Id.* at ¶ 117]. Congress authorized the Department to "make grants to States . . . to be used by State departments of agriculture to enhance the competitiveness of specialty crops." [*Id.* at ¶ 118] (quoting 2004. Pub. L. 108-465, 118 Stat. 3882, 3883). The purpose of these programs, such as the Specialty Crop Block Grant program, is to "increas[e] fruit, vegetable, and nut consumption and improv[e] the competitiveness of United States specialty crop producers." [*Id.* at ¶ 117] (quoting 2004. Pub. L. 108-465, 118 Stat. 3882, 3883). To be eligible for these grants, States must submit applications demonstrating their agencies will carry out the purpose of the program. [*Id.* at ¶ 118]. Once the States' application is approved, the amount of the grant is determined by a statutory formula that considers factors such as the value and acreage of the specialty crop production in that State and minimum grant sizes. [*Id.*]. The Department has issued over $1 billion in grants, funding more than 12,400 projects, that improve the specialty crop market by increasing market access, enhancing food safety, developing new crop varieties, mitigating pests and disease, increasing knowledge of specialty crops nutrition, and improving sustainability and conservation. [*Id.* at ¶ 119].

### 4.  Agricultural Research

Congress has allocated funds to the Department to establish and support land-grant universities for over 100 years. [*Id.* at ¶¶ 126, 129]. Through its National Institute of Food and Agriculture (NIFA), the Department administers these funding programs as enacted by Congress which provide for mandatory annual appropriations, based on a prescribed formula, to be delivered to the States. [*Id.* at ¶ 126]. NIFA funding goes directly to the establishment and operation of academic departments related to the agricultural sciences, State Agricultural Experiment Stations,

and Cooperative Extension Programs. [*Id.* at ¶ 128]. This funding enables public universities to research and address critical issues, including cold hardiness, forest management activities, and mapping seasonal variation which benefits the environment, farmers, and the communities they serve. [*Id.* at ¶ 129].

## C.    The Challenged Conditions

Since January 2025, executive agencies under the Trump Administration have engaged in direct and sustained efforts to relate federal funding to the Administration's policy goals. [*Id.* at ¶ 136]. The Trump Administration has directed the conduct of federal agencies regarding federal funds. [*Id.* at ¶ 142]. This effort began with President Trump issuing several executive orders upon taking office and culminated in the Department issuing its revised General Terms and Conditions in December 2025. [*Id.* at ¶¶ 137, 162].

### 1.  President Trump's Executive Orders

Upon the commencement of his second term, President Trump issued several executive orders focusing on antidiscrimination policies. The relevant executive orders are as follows:

a. Executive Order 14151*, Ending Radical and Wasteful Government DEI Programs and Preferencing* (Government DEI EO): Issued on January 20, 2025. [*Id.* at ¶ 137]. The executive order terminates all "discriminatory" programs, including "illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government." [*Id.*] (quoting 90 Fed. Reg. 8339). The executive order also directs agencies to terminate environmental justice offices and positions, equity action plans, equity actions, initiatives, or programs, equity-related grants or contracts. [*Id.*].

b. Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Gender Ideology EO): Issued on January 20, 2025. [*Id.* at ¶ 138]. The executive order declares that it is "the policy of the United States to recognize two sexes, male and female." [*Id.*] (quoting 90 Fed. Reg. 8615). The executive order further states that "[f]ederal funds shall not be used to promote gender ideology." [*Id.*].

c. Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (DEI EO): Issued on January 21, 2025. [*Id.* at ¶ 139]. The executive order states that it is "the policy of the United States to protect the civil rights of all Americans" and warns of "so-called 'diversity, equity, inclusion, and accessibility' (DEIA) . . . that can violate the civil-rights laws of this Nation." [*Id.*] (quoting 90 Fed. Reg. 8633).

d. Executive Order 14201, *Keeping Men Out of Women's Sports* (Sports EO): Issued on February 5, 2025. [*Id.* at ¶ 140]. The executive order rescinds "all funds from educational programs that deprive women and girls of fair athletic opportunities" and opposes "male, competitive participation in women's sports." [*Id.*] (quoting 90 Fed. Reg. 9279).

e. Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders* (Open Borders EO): Issued on February 19, 2025. [*Id.* at ¶ 141]. The executive order declares that "no taxpayer funded benefits go to unqualified aliens." [*Id.*] (quoting 90 Fed. Reg. 10581).

**2.  <u>The Department Of Agriculture Implements The Executive Orders</u>**

The Department began implementing the executive orders once they were issued by President Trump. [*Id.* at ¶ 143]. The Department's implementation of the orders began on February 13, 2025, when Secretary of Agriculture Brooke Rollins issued a memorandum ordering the rescission of all DEIA programs. [*Id.*]. Soon thereafter, the Department terminated over 1,000 training programs due to criteria such as DEI, defending women, and environmental justice. [*Id.* at ¶ 144]. The Department's implementation of the executive orders continued on March 7, 2025, when the Department revoked a $600,000 grant to Southern University and A&M College in Louisiana, a public HBCU, for allegedly studying menstrual cycles in transgender men. [*Id.* at ¶ 146]. In addition, the Department cancelled a $397,000 grant on March 12, 2025, that claimed to educate queer, trans, and BIPOC urban farmers. [*Id.* at ¶ 149]. The next day, Secretary Rollins attempted to expand the reach of the DEI EO to the activities of grant recipients by further directing the Department to align its policies with the DEI EO. [*Id.* at ¶ 152]. The memorandum directed that awards considered inconsistent with the Department's priorities must be terminated or modified. [*Id.* at ¶ 154]. The Department instituted the practices laid out in the memorandum, as Secretary Rollins sent a letter to California Governor Gavin Newsom on March 27, 2025, writing that the Department reviewed the State's federal funding because of concerning "forced outing" policies. [*Id.* at ¶ 155]. Furthermore, Secretary Rollins froze Maine's federal funds on April 2, 2025, for certain administrative and technological functions in schools because of the State's defiance of federal law. [*Id.* at ¶ 157]. Maine quickly filed a complaint in the United States District Court for the District of Maine, which ordered the immediate release of the withheld funds. [*Id.* at ¶¶ 159–160].

### 3. <u>The Department Of Agriculture Issues The Challenged Conditions</u>

In December 2025, Secretary Rollins announced the establishment of General Terms and Conditions applicable to financial assistance grants, cooperative agreements, and mutual interest agreements made by the Department. [Doc. No. 49 at 2]. These General Terms and Conditions were published and came into effect on December 31, 2025. [Doc. No. 1 at ¶ 162]. Plaintiff States are specifically challenging a portion of § 12.2 and all of §§ 13.5, 13.8, and 13.10 of the Department's General Terms and Conditions. [Doc. No. 42 at 1]. These same conditions also appear in §§ 11.2, 12.6, 12.9, 12.11 of the General Terms and Conditions for Mutual Interest Agreements. [Doc. No. 1-2]. Taken together, Plaintiff States refer to these as the "Challenged Conditions." [Doc. No. 42 at 1]. The Challenged Conditions read as follows:

a. § 12.2: *Civil Rights Obligations/Nondiscrimination* (The Policy Condition): "The recipient must comply, and certifies that it will comply, with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal award, to include the following without limitation: (1) Title IX of the Education Amendments of 1972, . . . (2) Presidential Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; (3) Title VI of the Civil Rights Act of 1964, . . . (4) Presidential Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*; and 5. Age Discrimination Act of 1975. By accepting the award, the recipient certifies that it does not, and will not during the term of the award, operate any programs that advance or promote Diversity, Equity, and Inclusion in violation of Federal anti-discrimination laws. The recipient must include the provisions of this clause in all subawards and contracts awarded under the Federal award. The above requirements are conditions of

payment that go to the essence of the Federal award, and they are therefore material terms of the Federal award. The recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Federal award. Payments under the award are predicated on compliance with the above requirements, and therefore the recipient is not eligible for funding under the award or to retain any funding under the award absent compliance with the above requirements. USDA reserves the right to terminate Federal financial assistance awards and recover all funds if the recipient, during the term of this award, operates any program in violation of Federal anti-discrimination laws. [Doc. No. 1-1 at 38–39].

b.  § 13.5: *EO 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (The Gender Condition): "No funding shall be used to promote gender ideology." [*Id.* at 48].

c.  § 13.8: *EO 14201: Keeping Men Out of Women's Sports* (The Sports Condition): "No funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities. No funding shall be directed towards male competitive participation in women's sports." [*Id.*].

d.  § 13.10: *EO 14218: Ending Taxpayer Subsidization of Open Borders* (The Immigration Condition): "No funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits." [*Id.*].

The Department directed all agency staff, in an accompanying Secretarial Memorandum, to "adopt and implement" the Challenged Conditions for "all future awards and for all significant modifications . . . to existing and future awards, to the maximum extent consistent with the law." [Doc. No. 1 at ¶ 162] (quoting [Doc. No. 1-3]). The purpose of the Challenged Conditions includes "sound stewardship of taxpayer dollars," "advanc[ing] policies that put America First," "[s]trengthening USDA control and oversight of obligated funds," and ensuring that award recipients comply with all applicable laws, regulations, and USDA "policy priorities." [Doc. No. 49 at 3] (quoting [Doc. No. 1-1 at 2]). To that end, recipients and subrecipients of the Department's Federal financial assistance grants and cooperative agreements must comply with the Challenged Conditions, unless otherwise prohibited by law. [*Id.*]. In addition, § 13 "expressly incorporates" twelve executive orders, which recipients must comply with when incorporated into Federal awards. [Doc. No. 1 at ¶ 166] (quoting [Doc. No. 1-1 at 47]). Notably, § 12.2 warns if the recipient fails to comply with the Section's requirements, the recipient may be subject to liability under the False Claims Act. [*Id.* at ¶ 165].

### D. The Enforcement Of The Challenged Conditions Against Plaintiff States

Plaintiff States allege that the Department's recent statements and actions forecast the ways in which the Department intends to enforce the Challenged Conditions. [*Id.* at ¶ 175]. In the accompanying Secretarial Memorandum, the Department included that the Challenged Conditions "will be applicable to all awards." [*Id.* at ¶ 170] (quoting [Doc. No. 1-3 at 2]). The Memorandum directed all Department agencies and staff offices to adopt and implement the Challenged Conditions no later than forty-five days after the issuance of the Memorandum. [*Id.* at ¶ 172]. Furthermore, Plaintiff States allege that Secretary Rollins directed Department staff to monitor for noncompliance with the Challenged Conditions and either address or report any findings of

18

noncompliance. [*Id.* at ¶ 174]. Should employees fail to take such action, they may be subject to disciplinary or adverse action, up to and including termination. [*Id.*].

At least one Department sub-agency, as alleged by Plaintiff States, has begun enforcing the Challenged Conditions, as NIFA has made publicly available what actions funding recipients should take to ensure substantive compliance with the Challenged Conditions. [*Id.* at ¶ 176]. These actions include eliminating DEI-related offices, titles, positions, duties, programs, and activities prohibited by the Challenged Conditions, as well as prohibited promotions of gender ideology. [*Id.* at ¶ 177]. Best practices involve compliance with the executive orders incorporated in the Challenged Conditions. [*Id.* at ¶ 178]. These best practices encompass revising civil rights training to expunge DEI, equity, and gender ideology based civil rights practices, and ensuring access to places such as restrooms, changing rooms, sleeping accommodations, and locker rooms are based solely on biological sex rather than gender identification. [*Id.* at ¶¶ 180–81]. Moreover, on March 3, 2026, FNS rescinded FNS 113-1: Civil Rights Compliance and Enforcement – Nutrition Program and Activities, which previously provided guidance and direction to FNS program recipients. [*Id.* at ¶ 183]. FNS will therefore release amended guidance to ensure compliance with, and enforcement of, the Challenged Conditions. [*Id.*].

Plaintiff States claim that NIFA's compliance reviews enforce the Challenged Conditions towards land-grant universities as NIFA grant recipients. [*Id.* at ¶ 184]. The 2026 NIFA Compliance Audits are substantially different from previous Department practice, as at least two public universities in Plaintiff States have been notified that NIFA is conducting a civil rights compliance review of their agricultural extension programs. [*Id.* at ¶¶ 184, 186]. The 2026 NIFA Compliance Audits seek to identify whether university programs comply with all applicable executive orders. [*Id.* at ¶ 190]. Specifically, a public university was informed by NIFA in late

February 2026 of a possible misalignment with an executive order, and the university must clarify how the project aligns with the applicable executive orders. [*Id.* at ¶ 192].

### E.      Harm To Plaintiff States

Plaintiff States allege that the Department's imposition of the Challenged Conditions will cause immediate and irreparable harm to their proprietary and sovereign interests. [*Id.* at ¶ 229]. To begin, Plaintiff States claim that they have been given an unlawful choice: either (1) accept the Challenged Conditions, or (2) risk the loss of billions of dollars in federal financial assistance. [*Id.* at ¶ 10]. Accordingly, Plaintiff States claim that they must either accept something that they believe to be ambiguous and contrary to law or lose out on funding that supports essential food, agriculture, forestry, and nutrition programs. [*Id.*]. Therefore, Plaintiff States claim both avenues result in irreparable harm that cannot be remedied after the fact. [*Id.* at ¶ 229].

Plaintiff States presume that the Challenged Conditions apply to all Department funding streams and thus all of Plaintiff States' $74 billion in annual funding from the Department is potentially affected. [*Id.* at ¶ 10]. Plaintiff States' budgets rely on Department funding anticipated for public services, such as school lunches, agricultural research, and fire prevention. [*Id.* at ¶ 229]. If unable to certify compliance with the Challenged Conditions as a prerequisite to receiving funding, Plaintiff States do not have the budgetary flexibility to cover the loss of Department funding. [*Id.* at ¶ 45].

With regard to accepting the Challenged Conditions, Plaintiff States allege significant compliance costs would materialize because the Challenged Conditions could require sweeping changes to state government programs, sometimes in violation of preexisting state laws. [*Id.* at ¶ 232]. For example, these changes represent an administrative burden, as conducting immigration status verifications would require Plaintiff States to incur the costs of developing verification

20

systems and employing the staff to operate these systems. [*Id.* at ¶ 233]. Administrative costs would further arise from the diversion of personnel time, the development and administration of new training programs, and the creation of new guidelines for how staff must comply with the Challenged Conditions. [*Id.* at ¶ 235]. In addition, Plaintiff States claim that accepting the Challenged Conditions would interfere with Plaintiff States' sovereign authority to govern themselves and enact laws because the States would be defending against alleged violations of state law caused by compliance with the Challenged Conditions while enforcing those state laws at the same time. [*Id.* at ¶ 234]. Even if Plaintiff States agree to the Challenged Conditions, they may still unknowingly commit what the Department considers violations. [*Id.* at ¶ 230]. Thus, the fundamental injury alleged by Plaintiff States is that the Challenged Conditions hold federal funding hostage to impose policy preferences on the States. [*Id.*].

Alternatively, Plaintiff States allege if they do not agree to comply with the Challenged Conditions, they risk losing billions of dollars in federal funding. [*Id.* at ¶ 236]. Plaintiff States would bear the cost associated with the loss of funding. [*Id.*]. Accordingly, each Plaintiff State would face substantial harm, as they rely on federal funding for public health programs. [*Id.*]. The Department's funding provides support to programs and projects, such as child nutrition programs, WIC, SNAP, TEFAP, firefighting, local agriculture, and agricultural research. [*Id.* at ¶¶ 45–46].

The loss of funding to child nutrition programs will further harm Plaintiff States, as they have relied on the child nutrition programs to meet the nutritional needs of children. [*Id.* at ¶ 236]. Plaintiff States claim that the farmers and food businesses who rely on these contracts could potentially face a drop in revenue. [*Id.* at ¶ 65]. In addition, the loss of funding to food and nutrition programs would lead to food insecurity, hunger, and malnutrition. [*Id.* at ¶ 236]. For instance, millions of children would lose access to nutritious meals, fruits and vegetables, and milk,

negatively impacting their health and ability to learn. [*Id.* at ¶ 65]. These harms are often associated with negative health outcomes in children, including behavioral problems, blindness, cardiovascular issues, decreased cognitive function, depression, fatigue, insulin resistance, poor concentration, soft bones, stunted growth, and a weakened immune system. [*Id.* at ¶ 236].

Furthermore, Plaintiff States allege significant consequences should they lose WIC funding. [*Id.* at ¶ 78]. A loss of WIC funding would cut off services such as nutrition, infant formula, health services, and breastfeeding support for pregnant and postpartum mothers, and children. [*Id.*]. Without these services, there is a higher risk of adverse birth outcomes, including low birth rates, fetal deaths, and infant mortality. [*Id.*]. For instance, Plaintiff States claim that a loss of WIC funding would increase the risk of negative long-term health consequences for infants enrolled in the program due to poor nutrition, increased food insecurity, and reduced access to healthy foods. [*Id.*].

Plaintiff States allege that low-income adults will also face the consequences of losing Department funding. [*Id.* at ¶ 237]. For instance, low-income adults participating in SNAP incur around $1,400 less in medical care costs each year compared to low-income non-participants. [*Id.*]. These benefits will be lost if residents lose access to food and nutrition programs, and Plaintiff States will bear the burden of the increased healthcare costs. [*Id.*].

The lack of funding allocated to TEFAP will also have an adverse effect on Plaintiff States, who have consistently received TEFAP funds from the Department for decades. [*Id.* at ¶¶ 102–03]. Should Plaintiff States lose TEFAP funding, they would face an immediate and impeding detriment on their ability to slow the spread of food insecurity and hunger. [*Id.* at ¶ 102]. For instance, millions of individuals and households depend on Department foods delivered by TEFAP to the state food bank networks for access to daily food. [*Id.* at ¶ 101].

The loss of Department funding also has economic consequences that reach beyond hunger and public health. [*Id.* at ¶ 238]. If Plaintiff States no longer have access to funding from the Specialty Crop Program—for which Plaintiff States have applied and received funds from the Department since Congress authorized the program in 2002—the States' individual departments of agriculture would struggle to promote the growth, sale, and consumption of agricultural products. [*Id.* at ¶¶ 123–24]. The loss of billions of dollars of Department funds infused in Plaintiff States would threaten local agricultural businesses, such as farmers, ranchers, and grocers, who depend on these funds to stay afloat. [*Id.* at ¶ 238].

Additionally, without funding by USFS grants, which Plaintiff States rely on to maintain our nation's forests and sustain adequate firefighting capacity to protect their residents, Plaintiff States will bear the cost of sustaining these programs, or the costs of losing them. [*Id.* at ¶ 239]. For example, Plaintiff States do not have the budgetary resources or flexibility to make up for the lost Department funding without drawing funding away from other projects and programs. [*Id.*]. Plaintiff States therefore face the risk of lost lives, property damage, and public safety burdens without these programs. [*Id.*]. Moreover, major fires and other climate events continue to increase in frequency and intensity as the environmental and economic consequences of climate change continue to add to these burdens. [*Id.*].

The absence of Department funding risks creating additional harm to Plaintiff States, as losing funds to support agricultural research around the country would pose a threat to the residents of Plaintiff States and future food security. [*Id.* at ¶ 131]. If these funds were no longer allocated to Plaintiff States, the quality and quantity of land-grant university programs and research would suffer. [*Id.* at ¶ 130]. For instance, land-grant universities would have far fewer resources to educate the food scientists of tomorrow, or to collaborate on and advance research that directly

impacts farming practices, food security, and natural resource management locally and nationally. [*Id.*]. Furthermore, lower-income communities will lose valuable programing that provide young children with hands-on learning experiences in farming and animal care, and develop valuable skills in science and technology. [*Id.* at ¶¶ 130, 135]. The economic impacts would not only affect community partners across the Plaintiff States, but also farmers who would lose access to the latest developments in scientific knowledge that could be used to reduce pesticide use, improve soil health, and create more economically efficient production that improve the health and welfare of Plaintiff States' residents. [*Id.* at ¶ 132].

## II.    LEGAL STANDARD

Plaintiff States seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiff States "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. Among these four factors, the likelihood of success is the "main bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013). This Court accepts as true "all of the well-pleaded allegations [in Plaintiffs'] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

## III.   DISCUSSION

I begin with a discussion of the jurisdictional threshold inquiries presented in this case, including ripeness and standing. I then discuss why Plaintiff States have shown that (1) they are likely to succeed on their Spending Clause claim; (2) they are likely to succeed on at least one of

24

their APA claims; (3) without an injunction, they face irreparable harm; and (4) the balance of equities and the public interest weigh in their favor.

### A. Jurisdictional Inquiries

#### 1. Ripeness

Defendants do not contest ripeness with respect to the Challenged Conditions as applied to grants and awards outside of the FNS programs. *See* [Doc. No. 49 at 6]; [Doc. No. 65 at 72:19–25]. The Court thus cabins its ripeness analysis solely to the FNS programs.

"The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–49. A ripeness analysis requires the court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. "Both prongs of the test must be satisfied, although a strong showing on one may compensate for a weak one on the other." *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted).

As to the "fitness" prong, the "critical question . . . is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Id*. "The fact that an event has not occurred can be counterbalanced in this analysis by the fact that a case turns on legal issues not likely to be significantly affected by further factual development." *Id.* As to the

25

"hardship" prong, the inquiry "typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties." *Id*. "This inquiry encompasses the question of whether plaintiff is suffering any present injury from a future contemplated event." *Id.*

Defendants make two conflicting arguments on the fitness prong. First, Defendants argued in their briefing that Plaintiff States' claims are not ripe because USDA has not applied the Challenged Conditions to any FNS program, nor have they "made a final decision to do so in the future." [Doc. No. 49 at 7]. According to Defendants, the "potential and wholly uncertain application of the Challenged Conditions to those programs [] remains 'no more than conjecture' at this time." [*Id*.] (citing *Trump v. New York*, 592 U.S. 125, 131 (2020)). Therefore, Defendants argue the "Court should thus deny Plaintiffs' motion insofar as it seeks to enjoin USDA from applying the Challenged Conditions to the [Food and Nutrition Service ("FNS")] nutrition assistance programs." [Doc. No. 49 at 7]. At the hearing on the preliminary injunction motion, Defendants appeared to change course. *See* [Doc. No. 65 at 72–77]. According to counsel, their decision was made: "[W]e have already started executing the agreements that govern the [FNS] programs, and they don't include the General Terms and Conditions. We just went through this with Summer EBT. And so the agreements, to the extent there are annual agreements governing the child nutrition programs and that Federal State Agreement, it doesn't include the [Challenged Conditions]." [*Id*. at 73:15–25].

Plaintiff States disagree with Defendants' arguments as both "a matter of law" and because they "rest[] on a mischaracterization of the FNS programs." [Doc. No. 52 at 6]. First, "Defendants do not disavow an intent to enforce the Challenged Conditions in the FNS programs." [*Id*.]. Second, "Defendants misstate the nature of Plaintiffs' claim," because Plaintiffs challenge the choice to promulgate the Challenged Conditions in the first place. [*Id*. at 7]. They are final agency

actions, according to Plaintiffs, because they mark the consummation of the agency's decision-making process and determine rights or obligations that give rise to legal consequences. [*Id.*] (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)). Even if "downstream implementation remains outstanding," according to Plaintiffs, the Challenged Conditions are nevertheless ripe for review because "courts routinely review agency rules at the time of promulgation." [Doc. No. 52 at 7] (citing *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 89 (D.R.I. 2025)). Further, "FNS programs are ongoing statutory entitlements," not "discretionary awards to which conditions later may or may not be applied." [Doc. No. 52 at 8]. This "presents a legal conflict," according to Plaintiffs, because the Department's direction to "adopt and implement" the Challenged Conditions for "all future awards" leaves the status of ongoing statutory entitlements up in the air. [*Id.*].

*Illinois v. Fed. Emergency Mgmt. Agency* is instructive. 801 F. Supp. 3d at 88–89. In that case, 20 states and the District of Columbia sued to challenge the revision of the Department of Homeland Security's ("DHS") standard terms and conditions governing all federal grants overseen by DHS. *Id.* at 81–83. The revision added provisions requiring state and local grant recipients to certify compliance with federal immigration law, including that they would assist in enforcing federal immigration law. *Id.* The revision likewise added a provision that would obligate recipients to cease operation of "any program[s] that benefit[] illegal immigrants or incentivize[] illegal immigration." *Id.* at 82. Defendants argued, however, that Plaintiff States' case was not ripe "because DHS continue[d] to review applicability for the remaining programs," *id.* at 84, and, given that DHS had not decided whether the challenged conditions would apply, there was no final agency action, *id.* at 89. The court rejected this argument, finding Defendants' argument unconvincing, explaining that because the new conditions "mark[ed] the consummation of DHS's

rulemaking process and impose[d] legal obligations on states by conditioning [] funding on . . . compliance," both prongs of the finality inquiry were met. *Id*. So, too, is the case here. *See, e.g.*, [Doc. No. 49 at 4] (conceding that the Secretary of Agriculture announced the establishment of General Terms and Conditions governing awards made by the Department, which "ensur[ed]" that "recipients comply").

Regardless of whether the Department currently intends to apply the Challenged Conditions to FNS programs, the inquiry is ripe for at least two reasons. In *Illinois v. Fed. Emergency Mgmt. Agency*, the court noted that a senior official performing the duties of Administrator of FEMA submitted a declaration stating that DHS had made a "final determination" that the challenged conditions would not apply to 40 of the grants listed by Plaintiff States in the complaint. 801 F. Supp. 3d at 81 n.1, 83 n.3. Even if DHS implemented this narrower version of its challenged conditions, according to the court, "Plaintiff States still face ongoing uncertainty and reliance costs that make the dispute sufficiently concrete for judicial review." *Id*. at 89. Plaintiff States here likewise cite enormous reliance costs, along with uncertainty as to how the Challenged Conditions may be applied to FNS spending in the future. *See, e.g.*, [Doc. No. 44-17 at ¶ 21] (noting that if child nutrition funds were withheld, D.C.'s public health and education and early childhood support systems would fall into an "immediate budget shortfall."); [Doc. No. 44-26 at ¶ 7] (any disruption in SNAP funding would lead to immediate food insecurity for Illinoisians, "who rely on SNAP benefits the day they are received to put food on the table."); [Doc. No. 65 at 69:3–20] (Plaintiff States cite "reasonable uncertainty" as to whether the Challenged Conditions will be applied to FNS programs, stating state agencies have received no "concrete answer" from USDA leadership).

Even assuming Defendants are correct that the fitness showing by the Plaintiff States is weak, a position this Court does not accept, a strong showing on the hardship prong may compensate for a weak showing on the fitness prong. *See McInnis-Misenor*, 319 F.3d at 70. Hardship in this context asks "whether the challenged action creates a direct and immediate dilemma for the parties." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 90 (1st Cir. 2013). The record answers this question with a resounding yes. Specifically, Plaintiff States are presently injured by an unavoidable dilemma with no lawful path forward: either comply with the Challenged Conditions and violate existing state law or fail to comply and lose critical Department funding upon which their programs depend. *See, e.g.*, [Doc. No. 44-44 at ¶¶ 25–26] (emphasizing that compliance with Department policies "would violate civil rights laws in Michigan," and the withdrawal of Department funds would eliminate critical state programs and result in "layoff of staff, cancelled contracts with local conservation districts, the discontinuation of economic development opportunities, and the inability to respond to animal disease outbreaks."); [Doc. No. 44-65 at ¶¶ 29, 31] (noting that if Rhode Island Department of Health (RIDOH) were to comply with Department Policies, it "would violate Rhode Island law," and if RIDOH were unable to comply, "thousands of mothers, infants, and young children would go hungry."); [Doc. No. 44-20 at ¶¶ 15–17] (indicating that should the Challenged Conditions apply to Delaware's WIC funding, "Delaware law prohibits discrimination based on gender identity" and the loss of WIC funds would "increase[] the risks of negative long-term health consequences for low income families, greater food insecurity, and reduced access to healthy foods such as milk, whole grains and fruits and vegetables.").

For these reasons, I find that the Plaintiff States' claims are ripe for judicial review as to the application of Challenged Conditions to the FNS programs.

29

## 2. <u>Standing</u>

Neither party briefs standing in their papers, *see generally* [Doc. No. 1]; [Doc. No. 43]; [Doc. No. 49], but Defendants argued for the first time at the preliminary injunction hearing that the Plaintiff States do not have standing "as a threshold because they have not established a sufficiently imminent risk of [the Challenged Conditions] being applied to the [FNS] programs." [Doc. No. 65 at 72: 9–11]. The Plaintiff States disagreed, stating they "have standing based on the breadth of the final agency action." [Doc. No. 65 at 72: 13–14]. I agree with Plaintiff States.

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These elements are (1) an injury in fact, which is "an invasion of a legally protected interest" where the interest is concrete and particularized and actual or imminent; (2) a "causal connection between the injury and the conduct complained of," or, put differently, traceability; and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id*. at 560–61 (internal citations omitted). "An allegation of future injury may suffice [to establish standing] if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). If the material risk of future harm is sufficiently imminent and substantial, the concrete-harm requirement is met. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023) (citations omitted).

The final agency action at issue here does not preclude the Challenged Conditions from reaching the FNS programs. In fact, the Secretarial Memorandum issued in December 2025 "direct[s] all USDA agencies and staff offices that issue awards to adopt and implement" the Challenged Conditions "for all future awards and for all significant modifications . . . to existing and future awards, to the maximum extent consistent with law." [Doc. No. 1-3 at 3]. The Secretary

cites, *inter alia*, the goal of "shining sunlight on a simplified, core set of terms and conditions for the entire Department" as reason for this "centralized award policy." [*Id.*]. Such broad, sweeping language, citing core conditions for the entire Department, is hard to square with the argument that Plaintiff States do not face an imminent risk of these conditions applying to nutrition assistance programs, all of which are implemented by the Department. Further, the Department has given Plaintiff States no written assurances that they will not apply the Challenged Conditions to the FNS programs. [Doc. No. 69 at 65:13–20] ("[W]e haven't received anything from any employee, any one from leadership at USDA that limits the scope of the December 31 conditions. There is no affidavit. There is no declaration. The state agencies haven't received anything . . . They haven't received a concrete answer."). Given the lack of concrete assurances, coupled with the sweeping language used by the Secretary in the December 2025 memorandum, Plaintiff States face a sufficiently imminent risk of these Challenged Conditions reaching the FNS programs.

### B. Likelihood of Success on the Merits

#### 1. Spending Clause Analysis

Art. I, § 8, cl.1 of the U.S. Constitution provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." As part of this power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). However, if Congress wishes to "impose a condition on the grant of federal moneys, it must do so unambiguously," so that States can "exercise their choice knowingly, cognizant of the consequences of their participation."

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003). Ambiguous conditions "undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (plurality opinion). Therefore, five general conditions must be met for a congressional exercise of the spending power to pass constitutional muster: (1) the exercise "must be in pursuit of the general welfare," (2) Congress "must do so unambiguously," (3) the conditions must be related "to the federal interest in particular national projects or programs," (4) there must be no other independent constitutional bar to the conditional grant of funds, and (5) "the financial inducement offered by Congress" cannot be "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 207–08 (internal quotations and citations omitted); *see also Nieves-Marquez*, 353 F.3d at 128 ("Spending Clause legislation must satisfy five requirements," citing *Dole*).

Plaintiff States raise three Spending Clause challenges. First, Plaintiff States argue that none of the Challenged Conditions are sufficiently unambiguous. [Doc. No. 43 at 15]. Defendants disagree, stating that "the General Terms and Conditions clearly identify the relevant category of policies at issue (i.e., antidiscrimination) and list two Executive Orders as applicable examples." [Doc. No. 49 at 9]. Next, Plaintiffs argue that the Challenged Conditions "are not reasonably related to the applicable programs." [Doc. No. 43 at 21]. Defendants argue that this is a "rather low-threshold," requiring only that the condition "bear some relationship to the purpose of federal spending." [Doc. No. 49 at 11] (citing *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018)). Finally, Plaintiffs argue that the Challenged Conditions violate the Spending Clause because they are unduly coercive. [Doc. No. 43 at 23]. Defendants disagree, arguing that the federal government is allowed to encourage states to implement federal regulatory

32

programs, which is what the Challenged Conditions do. [Doc. No. 49 at 12]. While I only need to agree with the Plaintiff States on one of these arguments to sustain a Spending Clause challenge, I address each in turn, finding all three are likely to succeed.

### a. **Vagueness**

If the federal government wants to "impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. Plaintiff States argue the Policy Condition is ambiguous for at least three reasons: (1) it requires states to certify compliance with all "policies" without identifying the scope of policies or where they can be found; (2) even if "policies" were confined to the listed policies, how states can comply with the two named Executive Orders is unclear; and (3) it is unclear whether the Department expects Plaintiff States to agree to comply with policies that do not yet exist. [Doc. No. 43 at 15–17]. All three arguments have merit, despite the Department's arguments to the contrary.

Citing *Pennhurst*, the Department states that "a State's potential obligations" under a funding condition may be "largely indeterminate" without violating the Spending Clause if that state was provided "clear notice" of the requirement to comply. [Doc. No. 49 at 9]. But this cherry-picks what the Supreme Court said in *Pennhurst*. Indeed, the funding mechanism in that case was a specific federal-state grant program aimed at funding state assistance and treatment for individuals with intellectual disabilities. *Pennhurst*, 451 U.S. at 11. The Court ultimately held that they "would be attributing far too much to Congress if we held that it required States, at their own expense, to provide certain kinds of treatment." *Id*. at 31–32. The "crucial inquiry," according to the Court, is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Id*. at 25. It belies credulity to state that the Department's use of the term "policies" in the Policy Condition speaks "so clearly" as to provide Plaintiff States with an

33

informed choice. Not only do the Plaintiff States lack clarity as to where they can find these additional "policies," but even the enumerated policies are vague, at best, and state on their own terms that they apply only to the federal government. [Doc. No. 43 at 17] (citing 90 Fed. Reg. at 8,615–16) (stating the policy "for the United States.").

Other courts have likewise found DEI Executive Orders too vague to pass muster under the Spending Clause. In *Chicago Women in Trades v. Trump*, the court noted that "the meaning of [the anti-DEI language] is left entirely to the grantee's imagination," making the "answer anything but obvious." 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025). Another court came to a similar conclusion. In *City of Chicago v. United States Department of Justice*, the court stated that the "Defendants have failed to shed light on what it might mean for any given program or component of a program to relate to diversity, equity, and inclusion." 822 F. Supp. 3d 873, 890 (N.D. Ill. 2026). Indeed, "vague conditions imposed by" DEI directives are "subject to 'various interpretations,' none of which are 'self-evident.'" *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 748–49 (N.D. Cal. 2025) (quoting *Sch. Dist. Of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 272–73 (6th Cir. 2009)).

The Gender, Sports, and Immigration Conditions fare no better. As an initial matter, Plaintiff States cite reasonable uncertainty as to how they are expected to treat the Gender Ideology Executive Order and the Sports Executive Order. [Doc. No. 43 at 18–19]. Asking Plaintiff States to acknowledge these Executive Orders represent the policy of the federal government is one thing, but asking States to adopt Executive Orders as their own policy is entirely another. Defendants have not offered an explanation on this inquiry. Further, the Immigration Condition perhaps raises more questions than it answers. While this Condition prohibits grantees from "provid[ing] public resources to meet the needs of" undocumented individuals or "incentiviz[ing] illegal immigration,"

34

[Doc. No. 1-1 at § 13.10], it remains unclear whether funding recipients are expected to verify eligibility for resources by checking immigration status—which would run afoul of federal law in some instances. [Doc. No. 43 at 20]; 8 U.S.C. § 1615 ("an individual who is eligible to receive free public education benefits under State or local law shall not be ineligible to receive benefits provided under the school lunch program . . . or the school breakfast program . . . on the basis of citizenship, alienage, or immigration status."). This only scratches the surface of the questions posed by the Challenged Conditions, though is enough to show vagueness under the Spending Clause, because this demonstrates sufficient ambiguity.

### b. Relatedness

The Spending Clause requires that any conditions imposed on the receipt of federal funding be "reasonably related to the federal interest in particular national projects or programs." *Mass. v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion). Both the examples given by Plaintiff States in their memorandum and the examples discussed at the hearing illustrate the striking lack of relationship here. *See* [Doc. No. 43 at 22]; [Doc. No. 65 at 59]. When asked by this Court how the Challenged Conditions relate to the eradication of certain insect species, an example offered by Plaintiff States, Defendants stated: "[I]f the provision is saying no funding shall be used for male participation in female sports, that relates to the long-horned beetle program in that it limits your use of funding or it carves out the uses of funding for prohibitive purposes and focuses it on the purpose for the program." [Doc. No. 65 at 59:10–15]. But if that argument were true, any prohibition, no matter what the prohibition is, would be related. That is incorrect as a matter of law.

The Challenged Conditions are not reasonably related to the federal interest in the Department's programs, and the Conditions therefore violate the Spending Clause.

### c.  **Coerciveness**

"To determine 'where persuasion gives way to coercion,' courts must examine all relevant facts and circumstances, including both 'the programs at issue' and 'the nature of the threat' posed by the condition." [Doc. No. 43 at 23] (citing *NFIB*, 567 U.S. at 580, 585). Plaintiffs argue that the Challenged Conditions violate the Spending Clause because they are unduly coercive. [Doc. No. 43 at 23]. As Plaintiff States put it: "A choice to either give [the Department] unwarranted and virtually unlimited discretion over matters of social policy, or to let children go hungry at school, is no choice at all." [*Id.* at 23–24]. Defendants disagree, first arguing the Challenged Conditions encourage rather than compel Plaintiff States to adopt the policies, and then arguing the Challenged Conditions are unlike the ACA's expansion of Medicaid in *NFIB*, especially because the Plaintiff States have not shown that "forgoing the associated USDA funding would threaten a comparable impact on their overall budgets [as *NFIB* did]." [Doc. No. 49 at 13].

The facts and circumstances here, given the sheer number of programs at issue and the nature of the threat posed by a loss of funding, indicate coercion. Colorado alone issues approximately $1.4 billion annually in federally funded food assistance. [Doc. No. 44-9 at ¶ 8]. The University of Illinois would lose 176 active Department grants, totaling over $131.5 million. [Doc. No. 44-22 at ¶¶ 19–20]. The Massachusetts Department of Resources and related agencies would forgo 54 active grants, including over $75 million in funds. [Doc. No. 44-31 at ¶ 7]. These examples represent only a small swatch of the $74 billion in issue, demonstrating far more than persuasion from the Department. The threat is coercive.

For these reasons, Plaintiff States are likely to succeed on the merits of their Spending Clause claims. A preliminary injunction is warranted for this reason alone. For completeness,

however, I will endeavor to explain why Plaintiff States are also likely to succeed on the merits of their APA claims—specifically, because the Challenged Conditions are arbitrary and capricious.

### 2. <u>Arbitrary and Capricious Analysis</u>

According to Black's Law Dictionary, the term "arbitrary" is defined as "a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." ARBITRARY, Black's Law Dictionary (12th ed. 2024). In the context of a judicial decision, the term "arbitrary" is defined as "founded on prejudice or preference rather than on reason or fact." *Id.* Additionally, "arbitrary" is defined as "[i]nvolving the unrestrained exercise of will; uncontrolled in power or authority; despotic, tyrannical." *Id.* The term "capricious," when pertaining to a decree, is defined as "contrary to the evidence or established rules of law." CAPRICIOUS, Black's Law Dictionary (12th ed. 2024). It is this conduct that the APA prohibits.

"The Administrative Procedure Act was framed against a background of rapid expansion of the administrative process as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices. It created safeguards even narrower than the constitutional ones, against arbitrary official encroachment on private rights." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). By requiring a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the APA preserves our democratic system of checks and balances; agencies are free to make decisions within the bounds of the law, but may not use such freedom to make unreasoned decisions based solely on preferences and without considering the consequences of those decisions. In other words, when a court reviews whether an agency's decision is arbitrary or capricious, its duty is not to determine whether it

agrees or disagrees with the agency's *conclusion*, but whether the agency's *process* in reaching that conclusion comports with the law.

As the First Circuit has explained, the arbitrary and capricious standard "is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). An agency action is arbitrary and capricious only if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiff States argue that the USDA's implementation of the Challenged Conditions across the entire department is arbitrary and capricious because the agency "(1) ignored the States' reliance interests on federal funding; (2) provided no valid reasons for imposing the Challenged Conditions; (3) neglected an important part of the problem, namely the web of state laws and policies implicated by its vague conditions; and (4) overlooked obvious alternatives to its one-size-fits-all approach." [Doc. No. 43 at 25]. Defendants respond that Plaintiff States' APA claims are unlikely to succeed because (1) the Challenged Conditions constitute agency action committed to agency discretion by law, (2) Plaintiff States lack legitimate reliance interests in USDA funding, (3) the USDA provided sufficient reasons for the Challenged Conditions, and (4) Plaintiff States have failed to identify the "problem" that USDA purportedly ignored, or what more tailored alternatives Defendants could have considered in making the decision to impose the Challenged

Conditions. [Doc. No. 49 at 14–17]. For the reasons explained below, I find that Plaintiff States are likely to succeed on the merits of their APA claim.

### a. Agency Discretion

Defendants argue that judicial review under the APA does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). However, "[i]n order to give effect to the command that courts set aside agency action that is an abuse of discretion, and to honor the presumption of judicial review," the Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (citations omitted). Here, the Department argues that this is one of those "rare circumstances" in which their decision to impose the Challenged Conditions is committed to agency discretion. *See* [Doc. No. 49 at 14]. In so arguing, the Department primarily relies on the Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).

In *Lincoln*, Native American children eligible to receive services under the Indian Children's Program (the "Program")—which provided clinical services to handicapped Native American children in the Southwest—sued the Indian Health Service (the "Service") following its decision to discontinue the Program in order to reallocate the Program's resources to a nationwide effort to assist children. 508 U.S. at 184. The Service receives yearly lump-sum appropriations from Congress and expends those funds under the authority of the relevant statutes to provide health care for Native American people. *Id.* at 185. The Court held that the action could not be subject to judicial review under the APA because the Service's decision to discontinue the program was committed to agency discretion by law. *Id.* at 184. The Court held that, "[t]he allocation of

funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court reasoned that, "where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements' on the agency." *Id.* (citing *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)).

Here, Defendants argue that the relevant statutes afford USDA similar discretion in how to award grants. They cite to the Cooperative Forestry Assistance Act of 1978, as amended, which provides that "'the Secretary is authorized, under whatever conditions the Secretary may prescribe,'" to provide financial assistance to State agencies to help train and equip local firefighting forces." [Doc. No. 49 at 15] (citing 16 U.S.C. § 2106(b)). Additionally, the Specialty Crops Competitiveness Act of 2004, as amended, "directs the Secretary to make grants to States to enhance the competitiveness of specialty crops and broadly provides that [t]he Secretary may accept or reject applications for [such] a grant." [*Id.*] (citing 7 U.S.C. § 1621 note). As such, Defendants argue that the USDA's determination as to how best condition funds is discretionary. [*Id.*].

*Lincoln* does not support Defendants' arguments. In reaching their decision in *Lincoln*, the Court held that the agency's allocation of the lump-sum funds required the agency to consider "'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in

fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Based on these factors, the court held that "[a]s in *Heckler* . . . the 'agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.'" *Id.* (citing *Heckler*, 470 U.S. at 831–832). Unlike *Lincoln*, Defendants do not argue that in imposing the Challenged Conditions, the agency undertook the kind of "complicated balancing" described above. In fact, Defendants concede that the Challenged Conditions are meant to be applied across the board; there was no need for the agency to determine where resources would be best spent or whether the imposition of such Conditions would allow the agency to fulfill their statutory mandate. *See* [Doc. No. 49 at 17] ("USDA imposed the General Terms and Conditions—including the Challenged Conditions—to create 'standard practices consistent with sound stewardship of taxpayer dollars' and strengthen compliance with USDA's 'policy priorities' . . . Plaintiffs do not—and could not—identify any more 'targeted' or 'measured' approach to achieving those goals") (citing [Doc. No. 1-3 at 2]).

Additionally, in *Lincoln*, the Court relied heavily on the fact that there was no statutory restriction as to what could be done with the lump-sum funds. While Defendants point to two statutes that provide discretion to the Secretary, they do not point to any statutory authority permitting the Department to impose agency-wide restrictions on grant funding in this manner. *See, e.g., Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 n.5 (1st Cir. 2020) (distinguishing "an agency-wide policy" as not committed to agency discretion with "individual hiring decisions committed to discretion"). As another district court recently held, "unlike the lump-sum funding decisions in *Lincoln* . . . the [funds] at issue here are governed by statutory and

regulatory frameworks that provide judicially manageable standards for review . . . numerous federal courts are presently reviewing discretionary grant conditions under the APA, and this Court finds no merit in Defendants' claim that discretionary grants are somehow categorically unreviewable." *Illinois*, 801 F. Supp. 3d at 91–92.[1]

This is certainly not the type of "rare" circumstance that would preclude judicial review. As such, I find that the Department's decision to impose the Challenged Conditions is not committed to agency discretion by law.

### b. Reasoned Explanation

Having established this Court's authority to review the Challenged Conditions, I now determine "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). At bottom, this deferential standard requires that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That "reasoned explanation requirement . .

---

[1] Defendants also cite *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), where the court held that the Secretary of Agriculture's decision to place a cap on certain funds was committed to agency discretion because "the plain language" in the statute "indicate[d] that Congress left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed consistent with its general policy to provide emergency assistance to dairy farmers." *Milk Train* is inapposite because in that case, there was a statute that plainly left discretion to the Secretary as to how to allocate funds for a discrete purpose—emergency assistance to dairy farmers. Defendants here intend to impose an across-the-board condition to the Plaintiff States to either comply with policies that reflect the administration's priorities or forego millions of dollars of funding for causes that the governing statutes aim to assist.

. is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 588 U.S. at 785.

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). Here, Defendants point to the Secretarial Memorandum issued in December 2025. [Doc. No. 1-3]. According to this Memorandum, adherence to the Challenged Conditions "advance policies that put America First," is "consistent with the sound stewardship of taxpayer dollars, transparency, accountability, and alignment with the national security interests of the United States," and "generate[s] the largest possible benefit to the American people." [*Id.* at 2]. The Department also argues that the General Terms and Conditions serve to "[s]trengthen[] USDA control and oversight of obligated funds, and compliance with applicable laws, regulation and policy priorities." [*Id.*]. The Department argues that these reasons are sufficient. I disagree.

First, the reasons offered by the Government do not relate to the Challenged Conditions at all. The Department has not explained why funding streams used to support educational research, disaster relief, agricultural infrastructure, and pest management are being used as a tool to further the administration's priorities related to immigration, gender ideology, and diversity, equity, and inclusion practices. For instance, the Policy Condition, [Doc. No. 1-1 at 38–39], requires recipients to comply with both federal anti-discrimination laws and the administration's "policies." The Memorandum does not explain why or under what statutory basis recipients must adhere to the administration's policies above and beyond federal anti-discrimination laws already in place.

43

Indeed, the administration's policies and executive orders are not law. Further, there is no explanation for why or how requiring adherence with the administration's policies will protect the national security interests of the United States, provide the largest possible benefit to the American people, or "put America First." It is unclear what it even means to "put America First" or how that priority assists the American people with access to food, nutrition, healthy crops, or pest-free environments. The Department's "explanation" here is as circular as an Ouroboros—do as I say, because I said so. "But such platitudes cannot substitute for an actual explanation of why it is necessary to attach sweeping [] conditions to all the grants at issue here, regardless of their statutory purpose or programmatic objectives." *Illinois*, 801 F. Supp. 3d at 93.

Second, the Challenged Conditions are vague and unclear. For example, the Gender Condition states that "[n]o funding shall be used to promote gender ideology." According to the Complaint, NIFA funding helps states establish and operate academic departments related to the agricultural sciences, placing innovative research and scientific expertise directly in the hands of farmers and the communities they serve. [Doc. No. 1 at ¶ 128]. Would using those funds to hire researchers who identify as non-binary or transgender violate the Gender Condition? The Policy Condition also requires recipients to adhere to Executive Order 14173 banning diversity, equity, and inclusion practices. Would using NIFA funds to study the impact of certain agricultural practices on minority populations violate the Policy Condition? This lack of clarity leaves recipients guessing as to what conduct will violate the Challenged Conditions and leaves recipients vulnerable to arbitrary enforcement, which is exactly the conduct the APA prevents. *See, e.g.*, [Doc. No. 44-10 at ¶ 40] (declaration of the vice president for research at Colorado State University that receives federal funding for agricultural research, stating that the university cannot certify compliance with the Challenged Conditions because it is "uncertain what specific requirements

44

are imposed" by them); *Illinois*, 801 F. Supp. 3d at 94 (The "vague and confusing language in the challenged conditions . . . makes compliance a nearly impossible-to-achieve moving target.").

The Department does not even argue that it "examined the relevant data" such that it could articulate "a fact-based reason for its actions." *Illinois*, 801 F. Supp. 3d at 93. As such, the agency has failed to satisfy its burden of offering a "satisfactory explanation" for its decision. *Id.* at 92 (citation omitted).

### c. Important Aspect of the Problem

In addition to there being no reasoned explanation for the across-the-board implementation of the Challenged Conditions, the Department failed to consider the conflict of laws that their Challenged Conditions have created. "Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Take the example of the transgender researcher. If that researcher was employed by an entity receiving Department funds prior to December 31, 2025, would they need to be fired in order for that entity to continue receiving funds under the Gender Condition? Doing so would violate the Supreme Court's holding that "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020). Implementing the Gender Condition in several other contexts would also be at odds with state laws protecting the rights of people of all gender identities in places of public accommodation. *See, e.g.,* M.G.L. c. 272, §§ 92A, 98; Cal. Educ. Code § 200 ("It is the policy of the State of California to afford all persons in public schools, regardless of their disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation . . . immigration status, equal rights, and opportunities in the educational institutions of the state"). There is no evidence in the

record that USDA considered this problem, and the Department only offers a few responses to this issue.

First, the Department argues that there is no problem at all; the relevant problem addressed by the General Terms and Conditions requires recipients to use federal funds to "put America First" and further the Department's own "policy priorities." Adherence with the Challenged Conditions would offer a "solution" to that problem, according to the Department. [Doc. No. 49 at 16]. Additionally, the Department argues that Plaintiff States have neglected to demonstrate how a conflict between the Challenged Conditions and their respective state laws form an "important aspect" of this problem. [*Id.*]. I disagree, and the problem is this: Plaintiff States must choose whether to comply with Conditions that are fundamentally at odds with their own laws codified to help their residents or forgo billions of dollars of funding that the Department agrees helps the American people. That is why this conflict forms an "important aspect of the problem."

Second, at the hearing, counsel for the Department implied that the "order of precedence" in the General Terms and Conditions would solve this problem. [Doc. No. 1-2 at 5]. The order of precedence states that "[i]n the event of any inconsistency among the terms and conditions of the Federal Agreement and/or other issuances, the inconsistency will be resolved by giving precedence in the following order," and states that the applicable statutes of the United States would apply if there were to be any inconsistency. [*Id.*]. But this order of precedence does not address conflicting state laws or policies. It also leaves open a host of issues that may result when the Challenged Conditions are applied, demonstrating the arbitrary nature of the Challenged Conditions.[2]

_____

[2] The Department's footnote that the Secretarial Memorandum directs the establishment of a "deviation process to authorize policies, procedures, terms, or conditions that are inconsistent" with the General Terms and Conditions does not demonstrate that the Department considered the important aspect of the problem regarding conflicting state laws. [Doc. No. 49 at 16 n.1]. Like the Department's argument regarding "order of precedence," it is unclear how and to what extent this "deviation process" will cure the issues raised here.

Finally, the Department argues that if Plaintiffs do not want to comply with the Challenged Conditions, they simply do not have to. That does not relieve the Department of *its* burden to consider the consequences of their decisions. *Illinois*, 801 F. Supp. 3d at 92 ("[A]n agency action is arbitrary and capricious when the agency . . . failed to consider pertinent aspects of the problem") (citation omitted); *Regents*, 591 U.S. at 30 (Secretary of Homeland Security's failure to consider "important aspect of the problem" rendered his decision arbitrary and capricious) (citation omitted); *Ohio*, 603 U.S. at 293 ("[A]n agency cannot simply ignore an important aspect of the problem") (citation omitted).

### d.   Reliance Interests and Alternatives

The Department's failure to consider important aspects of the problem is further compounded by its failure to consider Plaintiff States' reliance interests. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (citations omitted). "It would be arbitrary and capricious to ignore such matters." *Id.* (citation omitted). Plaintiff States argue that the Department has completely ignored their reliance interests in requiring them to comply with the Challenged Conditions or otherwise forgo funding. [Doc. No. 43 at 26]. The Department argues that because it has not cut off any funding but simply issued new terms and conditions on the receipt of such funding, Plaintiffs have no legitimate reliance interests in the "unconditional provision" of USDA funding. [Doc. No. 49 at 15]. They further note that Plaintiff States do not have reliance interests on the continued provision of USDA funding on the same terms and conditions that governed previous awards. [*Id.*]. The Department does not argue that it even considered the Plaintiff States' reliance interests; as such, this failure violates the APA.

In *Regents*, for example, the Supreme Court held that the Secretary of the Department of Homeland Security's decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program violated the APA. *Regents*, 591 U.S. at 8–9. One of the reasons the Court found that the memorandum rescinding the program was arbitrary and capricious was because DHS and its Secretary failed to consider the reliance interests of the recipients of the DACA program. *Id.* at 30–31. The Court rejected the Government's argument that DACA recipients had "no legally cognizable reliance interests" because the DACA memorandum stated that the program conferred no substantive rights. *Id.* The Court held that even if such disclaimers were present in the memorandum, the recipients' reliance interests were still a "consideration" that "must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* at 31. The Court further held that no such consideration was in the memorandum, but there was evidence that DACA recipients "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the DACA program. *Id.* The Court held that the "consequences of the rescission . . . would radiate outward to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them." *Id.* (citation omitted).

The Department attempts to make a similar argument here—that there are no reliance interests because states are not entitled to any substantive rights or unconditional funding from the USDA. But that does not change the fact that Plaintiff States have and do rely on funding premised on reasonable and clear conditions. As explained more *infra*, describing the irreparable harm suffered by Plaintiff States, the Plaintiff States rely on these funds to support many aspects of their public health and safety infrastructure, feed disadvantaged residents, support low-income women

and children, and even slow the spread of the spongy moth—an invasive species that is eating the leaves in our nation's forests and that requires continuous, long-term management and continued funding in order to contain. [Doc. No. 65 at 16:8–22]. The Department makes no effort to dispute these reliance interests and no effort to state that these interests were even considered. The Department also does not argue that it considered the consequence of the disruption in funds. Plaintiff States argue that if they accept the Challenged Conditions, "they face the possibility USDA will use its newfound enforcement authority—made possible through overbroad and vague conditions—to freeze or terminate funding . . . [a]nd the other option before the States—declining the funds entirely— similarly leads to chaos, as billions in funding for food, nutrition, education, and the public welfare would evaporate." [Doc. No. 43 at 26].

As explained by the Court in *Regents*, failure to consider these consequences is arbitrary and capricious. *See also Illinois*, 801 F. Supp. 3d at 94 ("DHS did not meaningfully evaluate the states' reliance interests, even though the record shows that states have structured their budgets and emergency preparedness planning for decades around consistent federal support."). The Department is not required to "consider all policy alternatives in reaching [its] decision." *State Farm*, 463 U.S. at 51. But, because USDA was "not writing on a blank slate . . . it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (citation omitted).

Similarly, the Department's failure to consider alternatives further demonstrates the arbitrary and capricious nature of their decision. "The APA requires that agencies must consider the alternatives that are within the ambit of existing policy." *Illinois*, 801 F. Supp. 3d at 94 (citing *Regents*, 591 U.S. at 30). The Department argues that the goal of the Challenged Conditions is to impose a standard practice for compliance with USDA's policies and priorities, and as such,

49

Plaintiffs have failed to identify a more "targeted" or "measured" approach to achieving that goal. [Doc. No. 49 at 17]. Again, it is not Plaintiff States' responsibility to consider these alternatives—it is the agency's responsibility in making those considerations when making an agency decision.

In *Illinois*, for example, the court held that conditions attached to the award of federal grants under DHS violated the APA. 801 F. Supp. 3d at 80. Specifically, recipients of Federal Emergency Management Agency ("FEMA") funds were required to certify compliance with an executive order stating that "sanctuary" jurisdictions must not receive access to federal funds. *Id.* at 81. DHS revised its standard terms and conditions governing *all* federal grants to require that recipients certify they will assist in enforcing federal immigration law, or else risk losing all DHS-administered federal funds. *Id.* at 81–82. The court held that "[t]he indiscriminate application of these conditions across the entire spectrum of DHS-administered grants demonstrates the absence of tailoring and the failure to consider whether such conditions are appropriate for particular programs." *Id.* at 93–94. Here, the Department does not argue that it considered application of the Challenged Conditions to certain relevant programs. Instead, it tries to flip the argument on its head, asserting that it is the Plaintiff States' burden to identify such alternatives. It is not.

Defendants have failed to offer a reasoned explanation for their decision, failed to consider multiple important aspects of the problem, failed to consider Plaintiffs' States' reliance interests, and failed to consider any reasonable alternatives. For all of these reasons, I find that Plaintiff States have shown that the decision to impose the Challenged Conditions was arbitrary and capricious and have demonstrated a likelihood of success on the merits of their APA claim.

### C.     Irreparable Harm

Plaintiff States are likely to suffer irreparable harm if the Challenged Conditions are not enjoined. A party seeking a preliminary injunction must "demonstrate that irreparable injury is

50

likely in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). This Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)).

Here, Plaintiff States argue that "Defendants have explicitly refused to stay enforcement of the Challenged Conditions during the pendency of this litigation," leading Plaintiff States to face an "untenable choice." [Doc. No. 43 at 37]. Either the States "forgo potentially billions of dollars in federal funding to feed hungry children and protect our Nation's resources and agricultural industry," or they "may accept the Challenged Conditions, notwithstanding the ambiguities they impose and the ways in which they are procedurally and substantively contrary to law." [*Id.*]. This is exactly the sort of "Hobson's Choice" other courts have found to sustain an irreparable harm showing. *See, e.g., Rhode Island Coal. Against Domestic Violence v. Kentucky*, 812 F. Supp. 3d 180, 198 (D.R.I. 2025) (holding that accepting grant funds subject to challenged conditions or forgoing the funds is a "Hobson's Choice" that was "not lost on" the court); *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) (noting that "a Hobson's Choice can establish irreparable harm") (internal citation omitted).

Defendants' arguments to the contrary, asserting the harm is simply economic loss and a "result [that] flows from [Plaintiff States'] independent decision-making as separate sovereigns," [Doc. No. 49 at 20], is both offensive to the scope of the funds in issue and misunderstands what it means to be a separate sovereign. Indeed, the loss of Department funds would likely cause devastation, by, *inter alia*, cutting dietary pesticide exposure research, [Doc. No. 44-44 at ¶ 17], forcing "hundreds of thousands of children" in New York City to face "hunger and malnutrition," [Doc. No. 44-55 at ¶ 35], and shutting down poultry and tick disease tracking, [Doc. No. 44-19 at

51

¶¶ 7–8]; [Doc. No. 44-62 at ¶ 13]. Separate sovereigns, furthermore, possess the power to enact social programs and laws relating to the general welfare of their population, a power that Plaintiff States would lose if forced to accept and promote the Challenged Conditions. *See, e.g., Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 521 (2019). Thus, Plaintiff States have met their burden of demonstrating the likelihood of irreparable harm.

### D.        Balance of the Equities and Public Interest

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the Government is the opposing party, as here, the balance of the equities and public interest analyses merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Further, Plaintiff States have demonstrated a "high likelihood of success on the merits," which "is a strong indicator that a preliminary injunction would serve the public interest." *Id.* Additionally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id*.

As demonstrated above, Plaintiff States have shown that they will be irreparably harmed if the injunction is not issued, and the Government has not provided any support for its claim that it will be harmed if it is unable to impose the Challenged Conditions. The Department argues that the injunction will "significantly disrupt USDA's ongoing consideration of grant applications and would prevent the agency from disbursing finite federal funding to other applications (who *would* otherwise accept the Challenged Conditions) for the same discretionary grant programs." [Doc. No. 49 at 20–21] (emphasis in original). But the injunction will simply return the USDA to the status quo as it was before the Challenged Conditions were imposed, and the Government does

not explain how applicants who are otherwise willing to accept the Challenged Conditions would be prevented from receiving funding. Additionally, the Government's arguments that it will be unable to recover funds disbursed or that it will be forced to "financially support causes at odds with its own policies" do not outweigh the harm to the public if the injunction were not issued, such as the loss of nutrition, agricultural support, and wildlife protection. [*Id.* at 21]; *see Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006) ("[T]he public has an important interest in making sure government agencies follow the law").

Accordingly, I find that the balance of the equities tips decidedly in favor of Plaintiff States, and that an injunction will be in the public's interest.

## IV.    BOND

Pursuant to Federal Rules of Civil Procedure 65(c), a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "the First Circuit has recognized an exception to the bond requirement in . . . suits to enforce important federal rights or public interests," as is precisely the case here. *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003) (cleaned up). Accordingly, I find that no security is necessary under Rule 65(c). *See also, e.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (cleaned up) (imposing nominal bond of zero dollars where bond would "essentially forestall Plaintiffs' access to judicial review"), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), and *vacated and remanded on other grounds*, 167 F.4th 86 (4th Cir. 2026).

**V.      CONCLUSION**

For the reasons discussed above, Plaintiff States' motion for preliminary injunction,

[Doc. No. 42], is GRANTED.


SO ORDERED.

/s/ Myong J. Joun
United States District Judge