| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF AGRICULTURE, et al, <br><br> Defendants. | Case No. 26-cv-11396-MJJ <br><br> **Leave to File Excess Pages Granted on July 9, 2026** |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## I. INTRODUCTION

In December 2025, the Secretary of the U.S. Department of Agriculture (USDA) announced the establishment of General Terms and Conditions applicable to financial assistance awards made by the agency. The Secretary explained that these new requirements would help promote the sound stewardship of taxpayer dollars, strengthen USDA's control and oversight of obligated funds, and ensure that grant recipients comply with federal laws, regulations, and policies. Twenty States and the District of Columbia subsequently filed this lawsuit seeking to vacate certain provisions of the General Terms and Conditions—namely, those that impose antidiscrimination requirements and prohibit the use of funding in contravention of federal policies on gender, women's sports, and immigration (the "Challenged Conditions"). Plaintiffs' claims, however, largely hinge on speculation that USDA will apply the Challenged Conditions to nutrition assistance programs administered through Federal/State Agreements (FSA). And USDA has clearly affirmed that it "has not applied," "is not applying," and is not "planning to apply" the General Terms and Conditions—including the Challenged Conditions—to the FSA programs. Doc. No. 63-1 at 3. Moreover, Plaintiffs have failed to adequately allege that applying the Challenged Conditions to *other* programs—namely, grant programs over which USDA has broad statutory authority to set the terms and conditions for—is arbitrary and capricious or contrary to law. Accordingly, and for the reasons explained below, the Court should dismiss the complaint.

## II. BACKGROUND

### A. Legal Background

This case involves two distinct categories of federal funding programs implemented by USDA pursuant to broad grants of authority by Congress. The first involves nutrition assistance programs operated by USDA's Food and Nutrition Administration (FNA) in partnership with the

1

States through FSAs—referred to herein as FSA programs. For example, The National School Lunch Act, as amended, authorizes FNA to provide funds to States to offer low-cost or free lunches to eligible children, 42 U.S.C. § 1754(a), increase the availability of fresh fruits and vegetables in elementary schools, 42 U.S.C. § 1769a(a), maintain food service programs at care centers and emergency shelters, 42 U.S.C. § 1766, and provide eligible children with food assistance during the summer months, 42 U.S.C. § 1761(a)(2)(A). The Child Nutrition Act of 1966, as amended, authorizes FNA to provide funds to States to offer low-cost or free breakfasts to eligible children, 42 U.S.C. § 1773(a), and help administer a special supplemental food program for women, infants, and children (WIC), 42 U.S.C. § 1786(c)(1). The Food Stamp Act of 1964, as amended by The Food and Nutrition Act of 2008, authorizes FNA to provide funds to States to help administer the Supplemental Nutrition Assistance Program (SNAP). 7 U.S.C. §§ 2020, 2025(a). And The Emergency Food Assistance Act of 1983 and The Food and Nutrition Act of 2008, as amended, authorize FNA to provide funds to States to help operate The Emergency Food Assistance Program (TEFAP) to provide emergency food and nutrition assistance to low-income individuals. 7 U.S.C. §§ 2036(a), 7502(a).

The second category involves various programs authorizing the Secretary of USDA to award grants on a discretionary basis to eligible entities—including State agencies and instrumentalities—for specified purposes. For example, The Cooperative Forestry Assistance Act of 1978, as amended, authorizes the Secretary—through USDA's Forest Service—to award grants to "State foresters or equivalent State officials" to help train and equip local firefighting forces. 16 U.S.C. § 2106(b). The Specialty Crops Competitiveness Act of 2004, as amended, authorizes the Secretary—through USDA's Agricultural Marketing Service—to accept (or reject) applications by State departments of agriculture for grants to enhance the competitiveness of

specialty crops. 7 U.S.C. § 1621 note. And several statutes authorize the Secretary—through USDA's National Institute of Food and Agriculture—to award grants to States to support agricultural research activities at land-grant institutions, including by approving funding for projects at agricultural experiment stations, 7 U.S.C. § 361g, and awarding competitive grants supporting cooperative extension activities, 7 U.S.C. § 343.

### B. Factual Background

On December 31, 2025, the Secretary issued a memorandum announcing the establishment of General Terms and Conditions governing awards made by USDA. *See* Doc. No. 1-3 (USDA, Office of the Secretary, *Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements* (Dec. 31, 2025)). In so doing, the Secretary explained the purposes of the General Terms and Conditions, which include "sound stewardship of taxpayer dollars," "advanc[ing] policies that put America First," "[s]trengthening USDA control and oversight of obligated funds," and ensuring that award recipients comply with all applicable laws, regulations, and USDA "policy priorities." *Id.* at 2. To that end, the Secretary directed "all USDA agencies and staff offices that issue awards to adopt and implement" the General Terms and Conditions "for all future awards and for all significant modifications . . . to existing and future awards, to the maximum extent consistent with law." *Id.* at 3.

The General Terms and Conditions outline USDA's "mandatory award terms as required by Title 2 of the Code of Federal Regulations," "are determined by statutory, regulatory, and agency requirements, as well as by administrative policies," and "are in addition to the assurances and certifications made as part of the Federal award and any agency- or program- specific terms, conditions, and restrictions included in the Federal award." Doc. No. 1-1 at 5. "Unless otherwise

3

prohibited by law, recipients and subrecipients of USDA Federal financial assistance grants and cooperative agreements must comply with these General Terms and Conditions." *Id.*

Plaintiffs do not challenge most provisions of the General Terms and Conditions, including those governing issues such as financial management, performance monitoring, and records management. They instead seek to enjoin certain provisions that impose antidiscrimination requirements and that prohibit the use of funding in contravention of federal policies on gender, women's sports, and immigration (the "Challenged Conditions"). Relevant here, Section 12.2 provides in pertinent part that the award recipient must comply "with all applicable Federal antidiscrimination . . . policies for the duration of the Federal award," including Executive Orders 14168 and 14173. *Id.* at 38-39. Section 13.5 provides that "[n]o funding shall be used to promote gender ideology," as explained in Executive Order 14168. *Id.* at 48. Section 13.8 provides that "[n]o funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities" or "towards male competitive participation in women's sports," as explained in Executive Order 14201. *Id.* And Section 13.10 provides that "[n]o funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits," as explained in Executive Order 14218. *Id.*

## III.  STANDARD

A district court should dismiss claims under Rule 12(b)(1) when it lacks jurisdiction to decide them. That includes where, as here, the plaintiff lacks standing to sue and obtain the requested relief. *See, e.g.*, *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) ("standing is a prerequisite to a federal court's subject matter jurisdiction"); *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992) ("If a party lacks standing to bring a matter before the

court, the court lacks jurisdiction to decide the merits of the underlying case."). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

In addition, a district court should dismiss claims under Rule 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). A court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true the "well-pleaded factual allegations." *Iqbal*, 556 U.S. at 679. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## IV. ARGUMENT

### A. Plaintiffs lack standing to challenge the legality of applying the Challenged Conditions to the FSA programs.

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). In its preliminary injunction decision, the Court approached this standing analysis by asking whether USDA's actions "*preclude* the Challenged Conditions from reaching the [FSA] programs." Doc. No. 72 at 30 (emphasis added). Respectfully, that was error. The relevant question is not whether *USDA* has shown there is *zero* risk of the Challenged Conditions reaching the FSA programs. Instead, *Plaintiffs* must show there is a *substantial*— indeed, "imminent"—risk of the Challenged Conditions reaching the FSA programs. In other words, to obtain a court order preemptively enjoining USDA from applying the Challenged Conditions to the FSA programs, Plaintiffs must adequately demonstrate that they face an "imminent" threat of this happening.

The Supreme Court has described the "imminence" requirement as "a somewhat elastic concept." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). It does not "uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Rather, in the "pre-enforcement" context, a plaintiff may establish imminence by showing that "it faces 'a credible threat of enforcement.'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164–167 (2014)).

Plaintiffs have not shown that they face a credible threat of USDA applying the General Terms and Conditions—including the Challenged Conditions—to the FSA programs. In assessing this standard, relevant considerations may include "a history of past enforcement" against the litigant, the "rar[ity]" or "frequen[cy]" of enforcement actions in general, and whether at least "administrative action" has been "threatened." *Susan B. Anthony List*, 573 U.S. at 164-166. Plaintiffs do not allege that USDA has a history of conditioning funding for the FSA programs on

their agreement to the General Terms and Conditions. Nor do they suggest that USDA has ever—let alone, frequently—done so for anyone else. To the contrary, "[d]ue to their unique nature, the FSA programs have historically operated through a unique set of terms and conditions"—not the General Terms and Conditions. Doc. No. 63-1 at 3. And, consistent with this approach, USDA has affirmed that it "has not applied," "is not applying," and is not "planning to apply" the General Terms and Conditions—including the Challenged Conditions—to the FSA programs. *Id.* Given that USDA has not applied, is not applying, and has no plans to apply the Challenged Conditions to the FSA programs, it remains difficult to see how Plaintiffs could meet their burden of demonstrating a "credible threat" of that happening.

In its preliminary injunction decision, the Court found that USDA's application of the Challenged Conditions to these programs was "sufficiently imminent" for two reasons, neither of which suffices. Doc. No. 72 at 31. First, the Court cited "sweeping language used by the Secretary" in December 2025 when announcing the new General Terms and Conditions. *Id.* In particular, the Court cited the Secretary's statement directing "all USDA agencies and staff offices that issue awards to adopt and implement" the new General Terms and Conditions—including the Challenged Conditions—"for all future awards and for all significant modifications . . . to existing and future awards, to the maximum extent consistent with law." *Id.* (citing Doc. No. 1-3 at 3). But the Court failed to address the Secretary's qualification of this purportedly "sweeping language," *id.*, which established "a deviation process to authorize policies, procedures, terms, or conditions" that differ from the General Terms and Conditions. Doc. No. 1-3 at 4. That matters because a plaintiff cannot demonstrate standing based on the potential harm from an Executive policy where the Executive Branch official has "qualified [her] directive" and it remains unclear "how the Executive Branch might eventually implement [the] general statement of policy." *Trump*

7

*v. New York*, 592 U.S. 125, 131 (2020). The Secretary's qualification here made it wholly uncertain "whether and to what extent" USDA might "implement" the General Terms and Conditions "with respect to" the FSA programs. *Id.* at 132. And, in fact, USDA subsequently availed itself of this qualification by "request[ing] and receiv[ing] a deviation . . . to authorize alternative terms and conditions in lieu of the GT&Cs for the FNA FSAs." Doc. No. 63-1 at 3. Put another way, at the time that the Secretary announced the General Terms and Conditions, it was at most uncertain whether USDA might apply them to the FSA programs. And time has confirmed that USDA "is not applying the GT&Cs to the FSAs." *Id.* The "sweeping language used by the Secretary in the December 2025 memorandum," Doc. No. 72 at 31, therefore did not— and, in all events, can no longer—demonstrate a credible threat that USDA will apply the Challenged Conditions to the FSA programs.

*Second*, the Court stated that "the Department has given Plaintiff States no written assurances that they will not apply the Challenged Conditions to the FNS programs." Doc. No. 72 at 31. In so doing, the Court (i) misapprehended the relevant level of risk central to the standing inquiry and (ii) improperly flipped the burden of proof. As for the relevant level of risk, the standing inquiry does not ask whether it is *assured* (or certain or guaranteed) that the plaintiff *will not* face the projected harm. Instead, the inquiry asks whether there is a "substantial risk" that the projected harm *will* occur. *Susan B. Anthony List*, 573 U.S. at 158 (citing *Clapper*, 568 U.S. at 414 n.5). As for the burden of proof, the Supreme Court's standing precedents unequivocally hold that, "[a]s the party invoking federal jurisdiction, the *plaintiffs* bear the burden of demonstrating that they have standing." *TransUnion*, 594 U.S. at 430–31 (emphasis added). Article III "require[s]" *Plaintiffs* "to show 'a credible threat' exist[s] that [USDA will], in fact, seek to" apply the Challenged Conditions to FNA nutrition assistance programs. *303 Creative LLC v. Elenis*, 600

8

U.S. 570, 580 (2023).  It is not incumbent upon USDA to demonstrate the absence of a credible threat.  Even were it otherwise, the Court's analysis fails to address USDA's sworn declaration attesting that it "has not applied," "is not applying," and is not "planning to apply" the Challenged Conditions to the FSA programs.  Doc 63-1 at 3.  Accordingly, while USDA has not provided "written assurances" categorically forswearing application of the Challenged Conditions to the FSA programs, this fact cannot, as a matter of law, support Plaintiffs' standing.

**B.  Plaintiffs' first cause of action fails as a matter of law.**

In their first cause of action, Plaintiffs assert that the Challenged Conditions violate the Spending Clause, which authorizes Congress to "lay and collect Taxes" to provide for the "general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  This grant of authority vests Congress with "broad power" to "set the terms on which it disburses federal funds."  *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022).  And, in that way, "[t]his grant gives the Federal Government considerable influence even in areas where it cannot directly regulate."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 537 (2012).  For instance, "in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions," which may, in turn, "induce the States to adopt policies that the Federal Government itself could not impose."  *Id.*  To that end, Congress "has repeatedly employed the [spending] power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'"  *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted).[1]

---

[1] Plaintiffs assert their first cause of action as a standalone claim in equity to enjoin allegedly illegal executive action.  Doc. No. 1 at 67.  But "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), including the limitations on judicial review imposed by the APA.  "Before enactment of the APA, those challenging agency

"The spending power is of course not unlimited," and the Supreme Court has articulated three basic "limitations" on its use.  *Id.* at 207.  First, "the exercise of the spending power must be in pursuit of 'the general welfare.'"  *Id.* (citing *Helvering v. Davis*, 301 U.S. 619, 640–41 (1937)).  Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Third, the Supreme Court has "suggested" that "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"  *Id.* (citing *Massachusetts v. United States*, 435 U.S. 444, 461, (1978)).

### 1.  The Challenged Conditions are not impermissibly vague.

Plaintiffs first claim that "the Challenged Conditions are impermissibly vague in violation of the Spending Clause."  Doc. No. 1 at 66.  And, in its preliminary injunction decision, the Court found this claim likely to succeed for three reasons.  None of those reasons, however, has merit.

First, the Court agreed with Plaintiffs that the Policy Condition is impermissibly vague because "it requires states to certify compliance with all 'policies' without identifying the scope of policies or where they can be found."  Doc. No. 72 at 33.  The Policy Condition does not, however, generically require award recipients to comply with "all" policies without identifying

---

action often lacked a statutory cause of action," and thus courts sometimes "recognized a right to equitable relief where an agency's action was ultra vires—that is, unauthorized by any law and . . . in violation of the rights of the individual."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025) (quotation marks and citation omitted).  Following the enactment of the APA, however, the Supreme Court "strictly limited nonstatutory ultra vires review," and held that it is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'"  *Id.* at 681 (citation omitted).  The fact that Plaintiffs can (and, indeed, do) assert a violation of the Spending Clause *under the APA* in their fifth cause of action, *see* Doc. No. 1 at 73, demonstrates that the APA provides them with a meaningful and adequate opportunity for review, and confirms that they may not separately assert the same violation as a nonstatutory claim in equity.

their scope. Rather, it specifies that recipients must comply with "all applicable Federal *antidiscrimination* laws, regulations, and policies for the duration of the Federal award." Doc. No. 1-1 at 38 (emphasis added). That qualification identifies and thereby limits the types of policies covered by this condition—making clear that it does not broadly capture all types of "policies" whatsoever. The scope of the policies covered by this condition precisely mirrors the scope of the laws and regulations covered by this condition: antidiscrimination. Plaintiffs' insistence that they do not know "where" the federal government's antidiscrimination policies "can be found" is also unavailing, and in no event spells a vagueness problem. The federal government's antidiscrimination policies, as reflected in the executive orders at issue, can be found in the Federal Register. Indeed, the Department has specifically identified (and linked to) the antidiscrimination policies with which it expects recipients to comply. Doc. No. 1-1 at 38-39. Accordingly, Plaintiffs cannot reasonably contend that the do not know "where" those policies "can be found."

Next, the Court found it "unclear" how Plaintiffs "can comply with the two named Executive Orders," which "state on their own terms that they apply only to the federal government." Doc. No. 72 at 33-34. But the relevant condition directs award recipients to comply with "*applicable* Federal antidiscrimination laws, regulations, and policies," Doc. No. 1-1-1 at 38 (emphasis added), and the two cited Executive Orders—just like the cited statutes—have some provisions that clearly do not apply, and some provisions that clearly do apply, to federal funding recipients like Plaintiffs. For instance, Executive Order 14168 states that "[f]ederal funds shall not be used to promote gender ideology." EO 14168 § 3(g). It is therefore clear that Plaintiffs can comply with this order by not using the federal funding to promote gender ideology. And insofar

11

as Plaintiffs contend that a directive not to promote gender ideology is itself impermissibly vague, that claim likewise fails. *See Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 96 (D.D.C. 2025).

Lastly, the Court also credited Plaintiffs' contention that "it is unclear whether the Department expects Plaintiff States to agree to comply with [antidiscrimination] policies that do not yet exist." Doc. No. 72 at 33. But as Defendants' counsel made clear at the hearing on Plaintiffs' motion for a preliminary injunction, USDA does *not* expect Plaintiffs to do so. In other words, Plaintiffs are not being asked to agree *in advance* to comply with antidiscrimination policies that do not yet exist. Defendants agree that Plaintiffs would need to be able to review an antidiscrimination policy (which would obviously require the policy to exist) before they could knowingly agree to comply with it. To be sure, USDA may in the future adopt a new antidiscrimination policy that does not currently exist. But such a policy would not retroactively apply to *prior* awards issued by USDA, and Plaintiffs would have ample opportunity to review such a policy before deciding whether they would agree to *new* awards incorporating it.

### 2. The Challenged Conditions are not unconstitutionally coercive.

Plaintiffs also claim that the Challenged Conditions are "so coercive" that they "pass the point at which 'pressure turns into compulsion.'" Doc. No. 1 at 67-68 (citing *Dole*, 483 U.S. at 211). And the Court agreed that "[t]he facts and circumstances here, given the sheer number of programs at issue and the nature of the threat posed by a loss of funding, indicate coercion." Doc. No. 72 at 36. But Plaintiffs' assertion, and the Court's finding, both rest on the demonstrably incorrect premise that Plaintiffs stand to lose funding to *the FSA programs* if they do not agree to the Challenged Conditions. Plaintiffs allege that they "receive over $74 billion annually in funding from USDA," and that the Challenged Conditions, if not accepted, "threat[en] to restrict *all* agency funding to Plaintiff States." Doc. No. 1 at 67 (emphasis added). The Court similarly stated that

the "threat" to cease providing the "$74 billion in issue" "demonstrat[es] far more than persuasion" and amounts to "coerci[on]." Doc. No. 72 at 36. And it embraced Plaintiffs' unfounded rhetoric warning that the Challenged Conditions, if not accepted, would "let children go hungry at school." *Id.* (citing Doc. No. 43 at 23-24).

To be clear, the Department has *not* threatened to cease funding for the FSA programs—including the School Breakfast Program or National School Lunch Program—unless Plaintiffs agree to the Challenged Conditions. *See* Doc. No. 63-1 at 3 (the Department "has not applied," "is not applying," and is not "planning to apply" the Challenged Conditions to the FSA programs). And Plaintiffs have not alleged any facts plausibly indicating otherwise. Moreover, Plaintiffs' own allegations demonstrate that *nearly all* of the "$74 billion annually in funding" that they receive from the Department pertain to the FSA programs, which again remain unaffected by the Challenged Conditions. Doc. No. 1 at 67; *see also id.* at 16 (alleging that Plaintiffs were allocated $11.66 billion for Child Nutrition Programs in FY2025); *id.* at 19 (alleging that Plaintiffs were allocated $3.5 billion for WIC in FY2024); *id.* at 24 (alleging that Plaintiffs were allocated $59.2 billion for SNAP in FY2024); *id.* at 28 (alleging that Plaintiffs were allocated $258.7 million for TEFAP in FY2026). The remaining amount of funds at issue thus clearly fails to approach the type of economic impact that would amount to *coercion. See NFIB*, 567 U.S. at 582 (finding that a "threatened [a] loss of over 10 percent of a State's overall budget" amounted to "economic dragooning that [left] the States with no real option but to acquiesce"). Plaintiffs have thus failed to state a claim that the Challenged Conditions violate the Spending Clause.

### 3. The Challenged Conditions are reasonably related to the funding at issue.

Plaintiffs further claim that the Challenged Conditions violate the Spending Clause because they "are not related to the federal interest in the projects to which they are attached—namely,

Congress's long commitment to supporting domestic agriculture, protecting forests and preventing wildfires, and feeding hungry Americans." Doc. No. 1 at 67. To start, the Policy Condition requires recipients to certify compliance with "all applicable Federal antidiscrimination laws, regulations, and policies for the duration of the Federal award." Doc. No. 1-1 at 38. Plaintiffs do not dispute that conditions requiring recipients to comply with federal antidiscrimination laws and regulations are reasonably related to the purpose of the federal spending at issue. And they offer no persuasive reason to conclude that conditions requiring recipients to comply with federal antidiscrimination policies are any less related. To be sure, policies embodied in executive orders are not the same as policies embodied in statutes or regulations. But those distinctions do not tend to lessen or affect *the degree of relationship* between antidiscrimination and federal funding.

The remaining Challenged Conditions—namely, the Gender, Sports, and Immigration Conditions—all state that "[n]o funding shall be" used for certain purposes. And as Defendants previously argued, conditions governing *the use of* federal funds necessarily and directly relate to the purpose of those federal funds. For example, and by analogy, a company condition prohibiting employees from using work-issued laptops to book personal travel is necessarily and directly related to the purpose of issuing the laptop (i.e., to conduct work), even if one could say "travel" has nothing to do with the mission of the company. Even Plaintiffs previously appeared to agree with this notion in principle, arguing that the Challenged Conditions were not reasonably related to the purpose of the federal funding at issue "to the extent that" they "purport to reach *beyond the mere use of USDA funds*." Doc. No. 43 at 23 (emphasis added). In its preliminary injunction decision, however, the Court stated that if this view were true, then "any prohibition, no matter what the prohibition is, would be related," and concluded that this view "is incorrect as a matter of law," without citing any law or discussing the issue further. Doc. No. 72 at 35. Insofar as

14

Plaintiffs contend that these use restrictions have *no* relation to the purpose of the federal funding at issue, then it remains unclear why they seek to challenge them. The sheer fact that Plaintiffs seek to lift these prohibitions strongly implies that they wish to use the funds at issue for those prohibited purposes—reinforcing the relationship between the funds and these use restrictions.

**C. Plaintiffs' second cause of action fails as a matter of law.**

Plaintiffs next claim that the Challenged Conditions are arbitrary and capricious "in at least four respects." Doc. No. 1 at 68. First, they assert that Defendants "provided an inadequate explanation for imposing" them. *Id.* But, in announcing the establishment of the General Terms and Conditions, the Secretary issued a detailed memorandum explaining the need for and purpose of ensuring that USDA award recipients adhere to the General Terms and Conditions—including the "sound stewardship of taxpayer dollars" and the "advance[ment] [of] policies that put America First." Doc. No. 1-3 at 2. And she specifically explained that the "[e]ffective stewardship of taxpayer funds" includes ensuring that USDA awards "support[] all Americans" and, as such, do not support initiatives—including DEI initiatives—that "discriminate on the basis of immutable characteristics." *Id.* at 3. Financially supporting such discriminatory initiatives would "conflict with the Department's policy of prioritizing merit, fairness, and excellence in furtherance of the Department's mission." *Id.* The Secretary further explained that the General Terms and Conditions served to "[s]trengthen USDA control and oversight of obligated funds, and compliance with applicable laws, regulation and policy priorities." *Id.* at 2.

The Court found that these reasons "do not relate to the Challenged Conditions at all." Doc. No. 72 at 44. But that conclusion was plainly flawed. As just one particularly clear example, the imposition of the Challenged Conditions obviously relates to the Secretary's stated goal of "[s]trengthen[ing] USDA control and oversight of obligated funds." Doc. No. 1-3 at 2. Plaintiffs

15

do not agree that USDA has the legal authority to strengthen its control and oversight in this manner. And they dispute that strengthening agency control and oversight over funding is in and of itself a sufficient reason for imposing the Challenged Conditions. But it is simply incorrect for the Court to assert that this reason (strengthening USDA control and oversight over funding) "do[es] not relate to the Challenged Conditions at all." Doc. No. 72 at 44.

Second, Plaintiffs contend that "USDA failed to consider 'an important aspect of the problem'"—namely, "whether the federal grant statutes that Congress created and charged it with administering actually allowed it to condition access to grant funds on Plaintiff States' agreeing to the Challenged Conditions." Doc. No. 1 at 68 (citing *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This allegation clearly fails to state an arbitrary-and-capricious claim as a matter of law. The governing statutes either allow USDA to impose the Challenged Conditions or they do not. And if they do not, then Plaintiffs will succeed in demonstrating that they were issued in excess of statutory authority. "Administrative agencies are creatures of statute" and "[t]hey accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). But if the statutes *do* allow USDA to impose the Challenged Conditions, Plaintiffs cannot have them set aside as arbitrary and capricious based on their view that the agency failed to conduct enough legal research into the issue beforehand.

Third, Plaintiffs claim that "USDA 'failed to address whether there was 'legitimate reliance' on' the existing funding landscape." Doc. No. 1 at 69 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020)). But, as an initial matter, this claim rests primarily on their asserted reliance on the "billions of dollars in federal funding annually" for the FSA programs, Doc. No. 1 at 69, to which the Challenged Conditions do not apply. And Plaintiffs

16

cannot reasonably claim reliance interests in discretionary grant awards that they have not yet applied for or received. Moreover, insofar as Plaintiffs maintain that the use restrictions imposed by the Challenged Conditions have nothing to do with the purpose of the funds at issue, they cannot claim that they have any reliance interests in using the funds for those prohibited purposes.

With respect to this aspect of Plaintiffs' claim, the Court also faulted USDA for not "consider[ing] alternatives" to the Challenged Conditions. Doc. No. 72 at 50. Critically, however, no administrative-law principle requires an agency to consider alternatives to its chosen policy to survive arbitrary-and-capricious review. *See Associated Dog Clubs of New York State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014) ("The APA does not . . . require agencies to tailor their regulations [or policies] as narrowly as possible to the specific concerns that generated them."). In *State Farm*, the Supreme Court considered the National Highway Traffic Safety Administration's rescission of a rule that required new cars to have automatic seatbelts or airbags. The agency rescinded the rule based on its view that requiring automatic seatbelts would not produce "significant safety benefits." 463 U.S. at 38. But it did so "without any consideration whatsoever of an airbags-only requirement," even though the agency previously found that "airbags are an effective and cost-beneficial life-saving technology." *Id.* at 51. The Supreme Court explained that an agency need *not* "consider all policy alternatives in reaching [a] decision." *Id.* But an airbags-only requirement was no mere "policy alternative"—it was "a technological alternative" already "within the ambit of the existing standard." *Id.*

Put another way, even if requiring automatic seatbelts would not produce significant safety benefits, it was unclear why the agency needed to rescind the existing standard *in full*. Given that airbags constituted a technological alternative already within the ambit of the existing rule, the agency could have continued to require new cars to have airbags without requiring them to have

17

automatic seatbelts. The agency's rationale for rescinding the existing safety rule—namely, its view that automatic seatbelts would prove ineffective—did "not cast doubt" on the "efficacy of airbag technology" or on "the need for" this type of safety rule generally. *Id.* at 47. Its failure to even *consider* an airbags-only requirement was thus arbitrary and capricious.

Similarly, in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020), the Supreme Court reviewed the Acting Secretary of Homeland Security's termination of the immigration program known as Deferred Action for Childhood Arrivals (DACA). Under DACA, certain individuals could apply for a two-year forbearance of removal, which, if granted, would render the applicant eligible for certain benefits, such as Social Security and Medicare. *Id.* at 9. In deciding to terminate DACA, the Acting Secretary explained that, in her view, the program's *provision of benefits* violated the INA. *Id.* at 24. But, in so doing, she did not consider whether to retain the *forbearance* aspect of the program—even though "removing benefits eligibility while continuing forbearance remained squarely within [her] discretion." *Id.* at 28.

The Supreme Court concluded that the Acting Secretary had "repeated the error" it identified in *State Farm*. *Id.* at 28. "Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only 'disallow[ing]' benefits.'" *Id.* at 29 (citing *State Farm*, 463 U.S. at 47). "It did 'not cast doubt' on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals." *Id.* It was therefore arbitrary and capricious for the Acting Secretary to terminate DACA "in full 'without any consideration whatsoever' of a forbearance-only policy." *Id.*

*State Farm* and *Regents* thus describe a specific category of error: terminating an *entire* program based on a rationale that applies to only *part* of it—without even considering whether to retain aspects of the program unaffected by the agency's termination rationale. *State Farm* and

*Regents* do not, by contrast, impose a general rule requiring an agency to consider "alternatives" any time that it adopts a new policy. The error present in *State Farm* and *Regents* accordingly has no relevance here, where the agency has not terminated a prior program at all.

Fourth, and finally, Plaintiffs claim that USDA "'entirely failed to consider' the adverse impact on state agencies if Plaintiff States were to adhere to the Challenged Conditions." Doc. No. 1 at 69 (citing *State Farm*, 463 U.S. at 43). And the Court agreed that "the Department failed to consider the conflict of laws that their Challenged Conditions have created." Doc. No. 72 at 45. But this contention fails to sufficiently appreciate the point of the Challenged Conditions, which is to "induce the States to adopt policies," *NFIB*, 567 U.S. at 537, and comply with "administrative directives," *Dole*, 483 U.S. at 206, that differ from their own laws and policies. Defendants fully acknowledge that Plaintiffs "do not want to embrace the[se] federal policies as their own." *NFIB*, 567 U.S. at 579 (citing *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). And they do not dispute that complying with the Challenge Conditions may be "difficult, expensive or otherwise unappealing." *Env't Def. Ctr. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (citation omitted). But to say that USDA has "failed to consider the conflict of laws that their Challenged Conditions have created," Doc. No. 72 at 45, would be like saying the government in *Dole* failed to consider the conflict that imposing a minimum drinking age of 21 would create with state laws that enacted a minimum drinking age of 19. The whole point of the Challenged Conditions here—like the challenged condition in *Dole*—is to persuade states to adopt the federal policies *in lieu of* contrary state policies.

The Court's "example of the transgender researcher" is wholly unavailing. Doc. No. 72 at 46. The Court asked whether, "[i]f that researcher was employed by an entity receiving Department funds prior to December 31, 2025, would they need to be fired in order for that entity

to continue receiving funds under the Gender Condition?" *Id.* The answer is no. The Gender Condition does not prohibit the hiring, or mandate the firing, of any individual based on sex—including transgender individuals. It provides that "[n]o funding shall be used to promote gender ideology." Doc. No. 1-1 at 48. And presumably the funding recipient in this hypothetical example did not hire and continue to employ the researcher to promote gender ideology (presumably the funding recipient did so based on the researcher's qualifications for the job). It is therefore difficult to see how the Gender Condition could reasonably be interpreted as requiring the firing of a transgender researcher. Indeed, as the Court observed, "[d]oing so would violate" Title VII as interpreted by the Supreme Court in *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020). Doc. No. 72 at 46. And the General Terms and Conditions provide that, "[i]n the event of any inconsistency among the terms and conditions of the Federal award and/or other issuances, the inconsistency will be resolved by giving precedence" to federal statutes *over* the General Terms and Conditions. Doc. No. 1-1 at 5. Thus, even if the Gender Condition could reasonably be interpreted as requiring the firing of a transgender researcher, Title VII would preclude it, and Title VII would control.

### D. Plaintiffs' third cause of action fails as a matter of law.

Plaintiffs also claim that USDA exceeded its statutory authority in imposing the Policy and Immigration Conditions. Doc. No. 1 at 69-71. But their only specific allegations refer to the "mandatory entitlement programs administered by USDA, including the Child Nutrition Programs and SNAP," *id.* at 70, to which the Challenged Conditions do not apply. Specifically, Plaintiffs allege that the National School Lunch Act (which governs the National School Lunch Program), the Child Nutrition Act (which governs the School Breakfast Program), and the Food and Nutrition Act (which governs SNAP) set "exhaustive" and exclusive eligibility criteria for those programs

and thus "preclude" USDA from "layer[ing] on additional conditions." *Id.* USDA, however, "is not applying" the Challenged Conditions—including the Policy and Immigration Conditions—to these programs (or any of the other FSA programs). Doc. No. 63-1 at 3.

The only other sources of USDA funding that Plaintiffs identify consist of Forest Service grants, Agricultural Marketing Service grants, and National Institute of Food and Agriculture grants. Doc. No. 1 at 29-36. And the statutes authorizing those grants, in turn, afford the Secretary broad discretion in deciding whether and on what conditions to award them. *See, e.g.*, 7 U.S.C. § 1621 note; 16 U.S.C. § 2106(b). For example, the Cooperative Forestry Assistance Act of 1978, as amended, provides that "the Secretary is authorized, under *whatever conditions the Secretary may prescribe,*" to provide financial assistance to State agencies to help train and equip local firefighting forces. 16 U.S.C. § 2106(b) (emphasis added). Plaintiffs therefore do not—and cannot—contend that *these* grant statutes fix "exhaustive" eligibility criteria and thereby "preclude" USDA from "layer[ing] on additional conditions." Doc. No. 1 at 70.

### E. Plaintiffs' fourth cause of action fails as a matter of law.

In addition, Plaintiffs claim that USDA improperly "promulgat[ed] the Gender and Sports Conditions" without following notice-and-comment procedures. Doc. No. 1 at 72. Under the APA, notice-and-comment procedures apply to legislative rules, but not "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Plaintiffs assert that "the reinterpretation of federal law in a manner that imposes new duties on regulated parties" constitutes a legislative rule, and thus contend that the Gender and Sports Conditions are "unlawful *to the extent they reflect USDA's re-interpretation of Title IX of the Education Amendments Act of 1972 ('Title IX') that USDA never submitted to the required APA notice and comment procedures.*" Doc. No. 43 at 34-35 (emphasis added). They argue that,

"if the agency believes it is promulgating these conditions as interpretations of Title IX, it must publish a notice of the proposed rule, allow the public to comment on the proposal, consider the comments, and issue a final rule setting forth the basis and purpose of the rule." *Id.* at 36.

This claim fails at the outset because the agency does not believe or contend that it promulgated the Gender and Sports Conditions as interpretations of Title IX. The agency proposed the Gender and Sports Conditions based on its broad statutory authority to set the terms and conditions on which it will provide financial assistance awards—not based on its authority to enforce Title IX. *See* p. 21, *supra*. To be sure, the General Terms and Conditions *separately* require recipients to comply with Title IX (in a provision that Plaintiffs do not challenge). *See* Doc. No. 1-1 at 38. And if the federal government were to subsequently claim that a recipient violated Title IX (and thus failed to comply with *this* condition) based on a "re-interpretation" of Title IX with which Plaintiffs disagree, the recipient "can challenge that interpretation in a specific enforcement action." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 104 (4th Cir. 2026). But Plaintiffs' speculative concerns about "how the Administration and its agency actors" will "interpret antidiscrimination law," such as Title IX, is not "fertile ground for a facial attack" against the Challenged Conditions. *Id.* Moreover, and in all events, this claim necessarily fails because the APA's notice-and-comment requirements do not apply to "grants, benefits, or contracts." 5 U.S.C. § 553(a)(2).

**F. Plaintiffs' fifth cause of action fails as a matter of law.**

In their fifth cause of action, Plaintiffs repeat their claim that "[t]he Challenged Conditions violate the Spending Clause, for the reasons set forth" in support of their first cause of action. Doc. No. 1 at 73. This claim therefore fails for the reasons discussed above. *See* pp. 9-15, *supra*.

**G. Plaintiffs' sixth cause of action fails as a matter of law.**

Finally, Plaintiffs claim that USDA "could seek to" enforce certain of the Challenged Conditions in ways that would, in their view, contravene federal statutes and regulations. Doc. No. 1 at 73-75. Specifically, they allege that applying the Immigration Condition, the Gender Condition, or the Sports Condition to restrict access to certain FSA programs could violate the statutes and regulations governing those programs. They allege, for example, that applying the Immigration Condition to force Plaintiffs to restrict access to the School Lunch Program or the School Breakfast Program based on citizenship would violate the National School Lunch Act and the Child Nutrition Act. *Id.* at 74. They allege that applying the Immigration Condition to force Plaintiffs to use identification documents as a means of determining eligibility for TEFAP assistance would violate 7 C.F.R. § 251.5(b)(3). *Id.* And they allege that applying the Gender and Sports Conditions to force Plaintiffs to exclude individuals from the SNAP and Summer Food Service Program would violate 7 C.F.R. § 272.2(b)(2) and 7 C.F.R. § 225.7(n)(1). *Id.* at 75.

To start, this claim fails because the General Terms and Conditions expressly provide that, "[i]n the event of any inconsistency among the terms and conditions of the Federal award and/or other issuances, the inconsistency will be resolved by giving precedence" to federal statutes and regulation *over* the General Terms and Conditions. Doc. No. 1-1 at 5. Put another way, this order-of-precedence provision necessarily defeats Plaintiffs' claim that "USDA could seek to" apply these conditions in ways that would "require the Plaintiff States to take action in direct contradiction to [federal] statutes and regulations." Doc. No. 1 at 74. If, for some reason, Plaintiffs ever needed to decide whether to comply with (i) the Challenged Conditions or (ii) federal statutes

and regulations, they must choose the latter. The order-of-precedence provision makes clear that federal statutes and regulations will always control over the General Terms and Conditions.

Moreover, setting aside whether Plaintiffs' interpretations of these statutes and regulations are even correct, the dispositive point remains that USDA "has not applied," "is not applying," and is not "planning to apply" the Challenged Conditions to the FSA programs—including the School Lunch Program, the School Breakfast Program, TEFAP, SNAP, and the Summer Food Service Program. Doc. No. 63-1 at 2-3. Accordingly, Plaintiffs cannot show that they will suffer "imminent" harm resulting from the application of the Challenged Conditions to these programs. *See* pp. 5-9, *supra*. The Court thus lacks jurisdiction to opine on whether Plaintiffs' interpretations of these statutes and regulations are correct. *See Carney v. Adams*, 592 U.S. 53, 58 (2020) (Article III standing requirements "prevent[] the federal courts from issuing advisory opinions").

## V.    CONCLUSION

The Court should dismiss the complaint.


Respectfully submitted,

LEAH B. FOLEY
United States Attorney


Dated: July 10, 2026                    By:    */s/ Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Michael L. Fitzgerald
MICHAEL L. FITZGERALD
Assistant U.S. Attorney