**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF WISCONSIN; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; GOVERNOR JOSH SHAPIRO, in His Official Capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and the STATE OF WASHINGTON,<br><br>            Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture; and the UNITED STATES OF AMERICA,<br><br>            Defendants. | C.A. No. 26-cv-11396<br><br>LEAVE TO FILE GRANTED ON AUGUST 14, 2026 |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Every year, state and local governments rely on billions in federal funding to feed vulnerable students, infants, mothers, families—our neighbors who otherwise would go hungry. As the U.S. Department of Agriculture ("USDA" or "the Department") itself describes it, USDA programs serve "our most vulnerable families and communities," and their scale and scope

"is vast, and their mission, critical."[1] For example, nearly 30 million kids— including 71% of kids in elementary schools—participate in the school lunch program.[2] And USDA programs extend far beyond nutrition and food assistance. They strengthen the American food ecosystem from farm to table and support our national security by ensuring we have a robust and safe domestic agricultural industry. They fund universities that research ways to continue to make advances in our domestic food production. They save lives and infrastructure by funding firefighting programs.

2.      Congress appropriates billions of dollars each year to ensure USDA programs are fully funded to meet the Nation's needs. Many of the major nutrition programs were made permanent or expanded in the 1960s, and since that time Congress has focused on "promot[ing] the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011.

3.      USDA has now thrown unconstitutional and unlawful roadblocks between the programs created by Congress and the States that rely on them, threatening critical nutrition support, vital agricultural research, and the safety of our national food chain and communities. Specifically, USDA has taken steps to impose a set of vague, extraneous, and unreasoned conditions on *all* of USDA's programs, grants, cooperative agreements, and mutual interest agreements under its new General Terms and Conditions For Federal Awards, attached as Exhibit A, and General Terms and Conditions For Mutual Interest Agreements, attached as Exhibit B, (together, the "2026 Conditions"), effective on December 31, 2025. And it has indicated it intends to enforce these conditions aggressively and pursue harsh penalties for violations.

---

[1] https://perma.cc/HP2F-KETJ.
[2] https://perma.cc/S5GY-NCBS.

2

4.      The 2026 Conditions contain a vague set of funding conditions relating to USDA's purported anti-discrimination "policies," "gender ideology," "fair athletic opportunities" for women and girls, and immigration (the "Challenged Conditions"). Specifically, the Challenged Conditions require recipients to certify compliance "with all applicable Federal anti-discrimination laws, regulations, and *policies* for the duration of the Federal award[.]" (emphasis added). But the 2026 Conditions do not specify the set of included "policies," or even confirm that certification is limited to currently existing policies. The Challenged Conditions also prohibit grant recipients from using funds to "promote gender ideology" and from directing funds "towards" programs that "deprive women and girls of fair athletic opportunities," but the 2026 Conditions do not explain what activities are prohibited under these terms. The Challenged Conditions also prohibit directing funding towards programs that "allow illegal aliens to obtain taxpayer-funded benefits… or provide incentives for illegal immigration[.]" But the 2026 Conditions do not define "benefits" or explain how to analyze what kind of "incentive" any particular program creates. Finally, the Challenged Conditions require States to "comply" with certain Executive Orders but fail to explain how the Executive Orders, which on their face apply to federal agencies, would apply to States.

5.      At the same time that the 2026 Conditions seek to impose vague and broad terms, USDA has indicated that it intends to enforce the Challenged Conditions in ways that differ from prior certification requirements and in ways that would be problematic for many States. For instance, an agency of USDA has indicated that the anti-discrimination policy term requires recipients to eliminate offices, titles, and programs related to diversity, equity, and inclusion, even when they do not violate federal antidiscrimination laws. That same agency indicated that the gender ideology term may require funding recipients to eliminate references to transgender individuals in curricula—a requirement that would be incompatible with many States' own laws

3

and policies recognizing and protecting transgender people. And with billions at stake for life-sustaining food and critical funding for their residents, the States may be forced to accept funding conditions that they fundamentally do not understand, that are designed to coerce the States and their instrumentalities to adopt USDA's policies, and which are ultimately unlawful.

6.      The U.S. Constitution requires more from USDA. Specifically, the Spending Clause requires that any funding condition be communicated with sufficient clarity that it can be accepted knowingly and voluntarily, and it prohibits coercive conditions that place a gun to the head of recipients that cannot forgo critical funding. Ambiguous, coercive conditions like the ones that USDA advances "undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J.). The Challenged Conditions fall far short of the Spending Clause's requirements.

7.      Furthermore, USDA's slapdash approach to imposing these conditions violates the agency's obligations under the Administrative Procedure Act ("APA"). That law requires agencies to act in a reasoned manner, rather than through arbitrary and capricious actions, and to account for the reliance interests of the States. Here, the lack of reasoned decision-making is astounding: USDA threatens to withhold billions of dollars in critical funding from the States across *every* grant, cooperative agreement, and other similar arrangements including mutual interest agreements, all without considering the grave harm it inflicts on longstanding reliance interests and without ever considering alternative means of advancing its agency priorities.

8.      Even if USDA went back and cured its vagueness problem and conducted a reasoned analysis before taking final agency action, the Challenged Conditions would still be unlawful. USDA has not identified any source of law empowering it to impose additional anti-discrimination policies above and beyond what federal law requires. And if it purports to find such

authority in federal antidiscrimination statutes such as Title IX of the Education Amendments of 1972 ("Title IX"), then it has conceded a complete disregard for the procedural steps it must take before adopting substantive rules effectuating such laws.

9.      Finally, the Challenged Conditions cannot apply to the many programs that are subject to specific statutes and regulations which cannot be amended or modified by a simple stroke of the Secretary's pen. Because USDA has imposed requirements beyond what is permitted by those statutes and regulations, the action is contrary to law.

10.     Plaintiff States have been given an unlawful choice: either (1) accept the Challenged Conditions, notwithstanding the ambiguities they impose and the ways in which they are procedurally and substantively contrary to law, or (2) risk the loss of billions of dollars in federal financial assistance that supports essential food, agriculture, forestry, and nutrition programs. Significantly, USDA has announced its intent to impose the Challenged Conditions maximally across *all* of the funding it administers, without differentiating based on the type of funding stream. Many USDA funding streams are comprised of competitive and non-competitive grants or cooperative agreements that are expressly governed by federal award terms and conditions. Others—including major nutrition programs such as the Supplemental Nutrition Assistance Program ("SNAP")—are statutory entitlement programs administered not through award agreements but instead pursuant to detailed statutory and regulatory frameworks. USDA has not expressly stated whether it intends that the Challenged Conditions apply to the funding it administers for entitlement programs, but given USDA's stated intent to maximally apply the 2026 Conditions, Plaintiff States are left with no choice but to assume such intent. Altogether, the amount at stake here is enormous: Plaintiff States receive over $74 billion annually from USDA, all of which is potentially affected by USDA's sweeping new conditions.

11.     Plaintiffs Massachusetts, California, Illinois, Wisconsin, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Virginia, Vermont, and Washington bring this action to seek relief from this unlawful choice and to enjoin the imposition of the illegal and unconstitutional Challenged Conditions.

12.     Plaintiff States seek a declaration that Defendants' adoption of the Challenged Conditions was unlawful, vacatur of the Challenged Conditions, as well as prospective relief stopping Defendants from taking any actions to implement or enforce the Challenged Conditions in connection with any funding program administered by USDA or a USDA sub-agency.

13.     Because the Challenged Conditions are categorically unlawful on multiple grounds, Plaintiffs are entitled to vacatur and injunctive and declaratory relief.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702 because this action arises under the laws of the United States, including the U.S. Constitution and the APA, 5 U.S.C. §§ 701, *et seq.*

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are the United States and federal agencies and officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

**PARTIES**

## I.    Plaintiffs

16.    Plaintiff the Commonwealth of Massachusetts is a sovereign State of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

17.    Plaintiff the State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law enforcement officer of California.

18.    Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States. Attorney General Raoul is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

19.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

20.    Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

21.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

22.    Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen

Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

23.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

24.     Plaintiff the State of Hawaiʻi is a sovereign state of the United States of America. Hawaiʻi is represented by Attorney General Anne E. Lopez, Hawaiʻi's chief legal officer and chief law enforcement officer, who is authorized by Hawaiʻi Revised Statutes § 28-1 to pursue this action.

25.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

26.     Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

27.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

28.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

29.     Plaintiff the State of New Jersey, represented by and through its Attorney General, Jennifer Davenport, is a sovereign State in the United State of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

30.     Plaintiff the State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico and is authorized to pursue this action under N.M. Stat. § 8-5-2(B).

31.     Plaintiff the State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

32.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

33.     Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

34.     Plaintiff the State of Vermont is a sovereign state in the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is authorized to bring this action on behalf of the State.

35.     Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

36.     Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code §§ 43.10.005-43.10.801.

37.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State of the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

38.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

39.     Plaintiff States, including their state agencies and instrumentalities, public universities, and schools, collectively receive tens of billions of dollars annually from USDA through a variety of funding mechanisms. Much of this funding is distributed through grants,

10

cooperative agreements, and mutual interest agreements that would be expressly governed by the 2026 Conditions when a new award is issued. Indeed, some Plaintiff States have already received funding documents that incorporate the 2026 Conditions. USDA has also declined to confirm, despite inquiries, that it will *not* apply the 2026 Conditions to certain entitlement programs. Given USDA's stated intent to maximally implement President Trump's Executive Orders and policy directives across all of USDA's programs, Plaintiff States reasonably anticipate that USDA intends to impose the 2026 Conditions on the entitlement programs too.

## II.    Defendants

40.    Defendant United States Department of Agriculture is a cabinet agency within the executive branch of the United States government.

41.    Defendant Brooke Rollins is the Secretary of Agriculture and the head of USDA. She is sued in her official capacity.

42.    The United States of America is responsible for the exercise of executive actions by the named Defendants and all other agencies that are directed to take action with respect to the Challenged Conditions.

**FACTUAL ALLEGATIONS AND LEGAL BACKGROUND**

## I.    USDA Funds a Wide Variety of Programs in Plaintiff States

43.    USDA was founded in 1862 during the administration of President Abraham Lincoln. Dubbed "the People's Department," USDA was created to serve "the largest interest of the nation"[3] by "acquir[ing] and . . . diffus[ing] among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human

---

[3] Abraham Lincoln, *First Annual Message to Congress* (Dec. 3, 1861), available at https://perma.cc/64RA-SXTN.

nutrition, in the most general and comprehensive sense of those terms, and . . . procur[ing], propagat[ing], and distribut[ing] among the people new and valuable seeds and plants." 7 U.S.C. § 2201. USDA was elevated to cabinet status in 1889.

44.     USDA has grown significantly since its founding. Today, USDA oversees 29 subsidiary agencies and offices with more than 100,000 employees working at over 4,500 locations both domestically and abroad.

45.     USDA's purview extends to numerous areas that touch people's daily lives. Core mission areas for USDA include food and nutrition security, protection of natural resources, farm production, food safety, marketing and regulation of American farm products, and scientific research.

46.     Consistent with statutes created by Congress over the course of more than a century, in fiscal year 2024, states received more than $140 billion from USDA to fight food insecurity, support agriculture, conduct research, prevent and suppress fires, and a host of other activities to ensure our Nation's farms and natural resources are secure and our people are fed.

47.     USDA's funding provides substantial support to critical programs and projects that would be gravely impaired without it. Plaintiff States do not have the budgetary flexibility to cover the loss of USDA funding if Plaintiff States are unable to certify compliance with the unlawful Challenged Conditions as a prerequisite to receiving funding.

48.     The bulk of the affected funding provides food to people experiencing food insecurity, including school children, pregnant women, low-income households, and households dealing with emergencies. But USDA dollars go well beyond that, providing essential support to critical programs that support local agriculture; protect our forests; and produce research that

directly impacts farmers, ranchers, foresters, and local communities. Given the breadth of USDA programming, the 2026 Conditions impact a broad swath of the daily lives of everyone in America.

49.    The following sections discuss some of the programs funded by USDA, the purposes they serve, and Plaintiff States' crucial reliance on the assistance they provide. But this discussion is not exhaustive. Plaintiff States seek an injunction against enforcement of the Challenged Conditions as to all funding administered by USDA. Defendants, not Plaintiff States, are best positioned to identify the individual impacted programs, grants, and agreements encompassed within that term. At bottom, Plaintiffs contest Defendants' decision to incorporate the Challenged Conditions into USDA's General Terms and Conditions—which by their terms and Secretary Rollins' accompanying memorandum, purport to apply to all USDA administered funding.

**A. For nearly a century, as directed by Congress, USDA has provided Plaintiff States with nutrition assistance funding to meet the needs of their residents.**

50.    Ensuring access to proper nutrition is the chief goal of the statutes authorizing the 15 domestic nutrition assistance programs managed by USDA's Food and Nutrition Administration (FNA). FNA itself defines its mission as "increas[ing] food security and reduc[ing] hunger in partnership with cooperating organizations by providing children and low-income people access to food, a healthy diet, and nutrition education in a manner that supports American agriculture and inspires public confidence."[4]

**1.    Child Nutrition Programs**

51.    The federal government has provided funds to feed children for eighty years. Today these programs include the National School Lunch Program, School Breakfast Program, Child and

---

[4] About FNA, https://perma.cc/AEY5-PUAF.

13

Adult Care Food Program, Summer Food Service Program, Seamless Summer Option, Summer Electronic Benefit Transfer for Children Program, Fresh Fruit and Vegetable Program, and Special Milk Program (together, the "Child Nutrition Programs").

52.     The Child Nutrition Programs are authorized by two statutes, the Richard B. Russell National School Lunch Act ("NSLA"), 42 U.S.C. §§ 1751, *et seq.*, and the Child Nutrition Act of 1966, 42 U.S.C. §§ 1771, *et seq*.

53.     Beginning in 1946, Congress took steps to fund meals for low-income children. In the NSLA, Congress declared that the purpose of several of the Child Nutrition Programs was "a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States… in providing an adequate supply of foods[.]" 42 U.S.C. § 1751.

54.     Given the success of the NSLA, two decades later Congress passed the Child Nutrition Act of 1966. Congress did so based on the "the demonstrated relationship between food and good nutrition and the capacity of children to develop and learn[.]" 42 U.S.C. § 1771.

55.     Most of the Child Nutrition Programs are referred to as mandatory entitlements because they are funded via statutorily prescribed formulas, typically the number of qualifying meals served multiplied by a per meal reimbursement rate. *See, e.g.*, 42 U.S.C. § 1753(b). USDA has no legal authority to impose the 2026 Conditions on the Child Nutrition Programs. Congress has not permitted USDA discretion to condition or withhold Child Nutrition Programs funds from Plaintiff States. *Id.* ("The Secretary *shall* make… payments to each State… from the sums appropriated for such purpose, in a total amount equal to [the formula].") (emphasis added). *See also* 42 U.S.C. § 1773(b)(1)(A)(i) (same).

56.  Congress appropriated $33.3 billion for the Child Nutrition Programs in fiscal year 2024, Pub. L. 118-42, 138 Stat. 25, 92 (2024), which was kept level in the 2025 continuing resolution. Pub. L. 119–4, 139 Stat 9, 13 (2025).

57.  Congress appropriated $37.8 billion for Child Nutrition Programs in fiscal year 2026. Pub. L. 119–37, 139 Stat. 495, 533 (2025).

58.  The National School Lunch Program ("School Lunch") is the oldest and largest child nutrition program in the country. 42 U.S.C §§ 1751, *et seq*. School Lunch provides funds to states to defray the costs of free or reduced-price lunches to eligible children. In fiscal year 2024, Congress appropriated $16.6 billion for School Lunch. As of fall 2024, 94,149 schools participated in School Lunch.

59.  The Child Nutrition Act of 1966 expanded federal authority to improve child health, specifically through the School Breakfast Program ("School Breakfast") and by expanding the Special Milk Program ("Special Milk"). As of fall 2024, School Breakfast provided low-cost or free breakfasts to children in 90,745 schools.

60.  Congress has mandated that all school-aged children are eligible to participate in School Lunch and School Breakfast regardless of "citizenship, alienage, or immigration status." 8 U.S.C. § 1615(a).[5]

---

[5] Congress left it to the States (not USDA) to determine whether programs under the Richard B. Russell National School Lunch Act, 42 U.S.C. §§ 1751, *et seq*., and the Child Nutrition Act of 1966, 42 U.S.C. §§ 1771, *et seq*. "other than" School Lunch and School Breakfast, including the Special Supplemental Nutrition Program for Women, Infants, and Children could be provided to individuals who were not citizens or qualified aliens. 8 U.S.C. § 1615(b)(1), (b)(2)(A). Congress gave the States the same discretion with regard to The Emergency Food Assistance Program, 7 U.S.C. §§ 7501, *et seq.* 8 U.S.C. § 1615(b)(1), (b)(2)(C).

61.     Special Milk provides milk to children in schools and childcare settings who do not participate in other federal meal service programs. The program reimburses schools for the milk they serve.

62.     As an example of how states use and rely on School Lunch, School Breakfast, and Special Milk funds, USDA allocated over $430 million to Massachusetts in fiscal year 2025 to fund these three programs. That year, about 2,100 schools were enrolled in at least one of the programs, and an average of 590,000 students per day received School Lunch and 292,000 students received School Breakfast. In fiscal year 2024, USDA reimbursed costs related to over 150 million meals, approximately 64% of which qualified as free meals.

63.     FNA also administers congressionally mandated formula grants that provide meals and snacks to children in daycares and emergency shelters, 42 U.S.C § 1766; provide fresh fruit and vegetables to school children, *id.* § 1769a; and fill the critical gap in nutrition needs over the summer, *id.* §§ 1761, 1761(a)(8).

64.     In fiscal year 2025, Plaintiff States were allocated Child Nutrition Programs funding at least in the amounts shown in Table 1 below:

| Table 1: Allocations [6][5][7] | |
| --- | --- |
| **State** | **Federal Funding** |
| California | $3,242,264,772 |
| Colorado | $322,555,268 |
| Connecticut | $241,700,482 |
| Delaware | $81,036,094 |
| District of Columbia | $65,045,619 |
| Hawai'i | $85,026,831 |
| Illinois | $965,519,801 |
| Maine | $67,536,212 |

---

[7] FY 2025 preliminary figures taken from: https://perma.cc/L6CQ-EDFY.

| Maryland | $422,560,943 |
| Massachusetts | $512,143,038 |
| Michigan | $761,543,854 |
| Minnesota | $387,706,030 |
| Nevada | $209,756,455 |
| New Jersey | $658,884,588 |
| New Mexico | $221,543,463 |
| New York | $1,877,919,491 |
| Oregon | $249,843,110 |
| Pennsylvania | $923,266,967 |
| Rhode Island | $61,990,168 |
| Vermont | $47,625,284 |
| Virginia | $622,283,836 |
| Washington | $424,550,585 |
| Wisconsin | $340,065,129 |
| **Total** | **$12,792,368,020** |

65.     Since Congress has mandated nutritional requirements for many of the Child Nutrition Programs, these programs offer the most nutritious food consumed by many children on a given day. These Child Nutrition Programs increase the amount of whole grains, vegetables, and dairy consumed by participating children while reducing the amount of refined grains and empty calories compared with children who do not participate. USDA has noted, "los[ing] access to the reliable meals [children] receive at schools, plac[es] them at risk of hunger and malnutrition."[8] Studies have shown that the nutrition provided in these programs is also linked with long-term educational attainment.[9]

66.     In addition to the measurable benefits the Child Nutrition Programs provide kids, the NSLA also helps support businesses, including farms, in the Plaintiff States. The Buy American provision of the NSLA requires participants to purchase domestic commodities and products to

---

[8] https://perma.cc/R9XG-HN4G.
[9] https://perma.cc/RRN2-ATEZ.

17

the maximum extent practicable. 42 U.S.C. § 1760(n). For example, in Massachusetts, the Child Nutrition Programs annually funnel millions of dollars back into the local food economy.[10]

67.     If Plaintiff States lost statutorily prescribed funds for the Child Nutrition Programs, the consequences would be grave. First, millions of children would lose access to nutritious meals, fruits and vegetables, and milk, negatively impacting their health and ability to learn. Second, the farmers and food businesses who rely on these contracts would face a potentially existential drop in revenue.

68.     Plaintiff States have consistently received Child Nutrition Programs funds from USDA for decades. These funds then flow to local school districts as subrecipients of the funding.

69.     Plaintiff States intend to seek and use Child Nutrition Programs funds in fiscal year 2026.

### 2. Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC")

70.     FNA also administers the Special Supplemental Nutrition Program for Women, Infants, and Children, commonly known as WIC. WIC safeguards the health of low-income pregnant and postpartum women, infants, and children up to five years old by providing nutritious foods, breastfeeding support, health care referrals, and other services to lower the risk of inadequate nutrition.

71.     WIC was first authorized in 1972 as an amendment to the Child Nutrition Act of 1966 with the congressional purpose of making cash grants to States for "providing funds to local health or welfare agencies or private nonprofit agencies . . . to enable such agencies to carry out a program under which supplemental foods will be made available to pregnant or lactating women

---

[10] https://perma.cc/9VZF-78FZ; https://perma.cc/N3XP-GLZL.

and to infants determined by competent professionals to be nutritional risks because of inadequate nutrition and inadequate income." Pub. L. 92-433, 86 Stat.724, 729 (1972). In later amendments to section 17 of the Child Nutrition Act of 1966, Congress found that "substantial numbers of pregnant women, infants, and young children are at special risk in respect to their physical and mental health by reason of poor or inadequate nutrition or health care, or both" and indicated that "the purpose of the program authorized by this section to provide supplemental nutritious food as an adjunct to good health care during such critical times of growth and development in order to prevent the occurrence of health problems." Pub. L. 94-105, 89 Stat. 511 (1975).

72.     Under section 17 of the Child Nutrition Act of 1966 (42 U.S.C. § 1786), Congress requires WIC funds to be distributed pursuant to formulae "prescribed by the Secretary." 42 U.S.C. § 1786(h)(2)(A) (nutrition services and administration), (i)(1) (food benefits). USDA adopted these formulae into the regulations for the WIC program in 7 C.F.R. § 246.16(c)(2) and (3).

73.     In fiscal year 2024, Plaintiff States were allocated WIC funding in the amounts shown in Table 2 below:

| Table 2: WIC Allocations to Plaintiff States in [11][4][12] | |
|---|---|
| **State** | **Federal Funding** |
| California | $1,198,090,682 |
| Colorado | $92,153,740 |
| Connecticut | $52,829,736 |
| Delaware | $17,814,145 |
| District of Columbia | $16,337,160 |
| Hawai'i | $36,555,317 |
| Illinois | $241,975,400 |
| Maine | $20,815,187 |
| Maryland | $139,672,610 |
| Massachusetts | $124,393,616 |
| Michigan | $217,521,791 |
| Minnesota | $117,514,810 |
| Nevada | $57,009,999 |
| New Jersey | $211,308,532 |
| New Mexico | $45,199,466 |
| New York | $577,976,027 |
| Oregon | $86,153,322 |
| Pennsylvania | $224,070,527 |
| Rhode Island | $20,793,055 |
| Vermont | $15,165,513 |
| Virginia | $122,295,673 |
| Washington | $156,286,436 |
| Wisconsin | $100,986,367 |
| **Total** | **$3,791,932,744** |

74.    Congress appropriated $7.6 billion for WIC in fiscal year 2025. Pub. L. 119-4, 139 Stat. 9, 16 (2025).

75.    Less than five months ago, Congress appropriated $8.2 billion for WIC for federal fiscal year 2026. Pub. L. 119-37, 139 Stat. 495, 534 (2025).

---

[12] https://perma.cc/Z5RS-R6QU.

20

76. Critically, the need for WIC benefits has increased in recent years. WIC participation has grown 10% since 2021.[13]

77. As an example of how states use and rely on WIC funds, Wisconsin received approximately $101 million in WIC funding for the 2025 fiscal year, which included $65,872,285 for food costs and $35,585,776 for nutrition services and administrative costs. These funds support 61 local WIC agencies, which in turn provide nutrition education, breastfeeding promotion and support, referrals to other health care and social services, and nutritious supplemental food to low-income pregnant and postpartum women, infants, and children up to age five who are at nutritional risk.

78. WIC funds directly benefit a large percentage of Wisconsin mothers and children. In 2025, the program supported 141,758 Wisconsinites, including 37,906 mothers, 24,365 infants, and 79,487 children between the ages of one and five. More than 40 percent of Wisconsin infants and more than 30 percent of Wisconsin children between the ages of one and five are enrolled in WIC. WIC funds also have a considerable direct economic impact in Wisconsin, as WIC participants spend nearly $53 million in WIC food benefits each year at Wisconsin stores.

79. Extensive research over the last few decades demonstrates WIC's effectiveness. WIC participation contributes to healthier births, more nutritious diets, better health care for children, and higher academic achievement for students.

80. If Plaintiff States were to lose WIC funding, the effects would be devastating. A loss of WIC funding would cut off vital nutrition, infant formula, and health services, as well as breastfeeding support for pregnant individuals, postpartum mothers, and children. Without these valuable services, there is a higher risk of adverse birth outcomes such as low birth rates, fetal

---

[13] https://perma.cc/4G3X-RV3G.

deaths, and higher infant mortality. For infants enrolled in the program, a loss of WIC funding would increase the risk of negative long-term health consequences due to poor nutrition, increase food insecurity, and reduce access to healthy foods.

81.    Plaintiff States have received WIC funds from USDA for decades, in allocations determined by formula, as directed by Congress.

82.    Plaintiff States intend to seek and use WIC funds in fiscal year 2026.

### 3.    Supplemental Nutrition Assistance Program ("SNAP")

83.    First authorized by Congress in 1964 as the "Food Stamp Program," the Supplemental Nutrition Assistance Program ("SNAP") has long been the country's primary response to hunger and an essential safety net for those facing food insecurity. The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). Congress explicitly intended that SNAP was designed "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," without any explicit limitations upon those goals. 7 U.S.C. § 2011. To achieve this end, SNAP provides monthly benefits to low-income households that can be used to buy food.

84.    To be eligible for SNAP benefits, recipient households must have a net income at or below the federal poverty line, which was around $31,000 per year for a family of four in 2025. Families who so qualify receive Electronic Benefit Transfer ("EBT") cards through which they receive benefits each month that can be spent on food at participating retailers. 7 U.S.C. § 2016; 7 C.F.R. §§ 274.2, 274.7.

85.     In 2024, SNAP helped more than 41 million people in America avoid hunger or malnutrition. More than 62 percent of SNAP participants are in families with children, and more than 37 percent are in families with members who are elderly or have disabilities. Nationwide, for federal fiscal year 2024, SNAP benefits averaged about $8.3 billion per month.

86.     Congress has been clear that SNAP funds must be made available to eligible households and left no room for limitations like the Challenged Conditions. *See* 7 U.S.C. § 2014(a) ("Assistance under [SNAP] *shall be furnished to all eligible households* who make application for such participation.") (emphasis added); *see also* 7 U.S.C. § 2015(f). Congress declared it to be its policy that SNAP would "increas[e] food purchasing power for *all eligible households* who apply for participation." 7 U.S.C. § 2011 (emphasis added).

87.     Plaintiff States each administer SNAP through a cooperative federal–state nutrition assistance program established under the Food and Nutrition Act of 2008. SNAP operates through two primary federal funding streams. First, the federal government funds the cost of SNAP benefits provided to eligible households. Those benefits are issued to participants through EBT cards and redeemed at authorized food retailers, which are reimbursed through the federal payment system when benefits are used to purchase eligible food items. Second, the federal government reimburses states for a portion of the costs of administering the program, including eligibility determinations, case management, fraud prevention, and EBT system operations. Under federal law, USDA reimburses states for approximately fifty percent of allowable administrative expenses incurred in operating SNAP. *See* 7 U.S.C. § 2025. Through these funding mechanisms, SNAP enables Plaintiff States to administer one of the nation's largest nutrition assistance programs while ensuring that eligible households have access to food.

88.    The scale of the SNAP program administered by Plaintiff States is enormous. In fiscal year 2024, SNAP benefits issued to households in the Plaintiff States totaled over $44 billion dollars annually.

89.    To illustrate, SNAP is Massachusetts's largest antihunger program and thus is a key part of the Commonwealth's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. As of January 2026, an average of 975,000 people received SNAP benefits in Massachusetts each month, including approximately 603,000 families, 304,000 children, and 260,000 elderly individuals. Households in Massachusetts receive on average $323 per month in SNAP benefits to meet their basic subsistence and nutritional need.

90.    California households received approximately $12.2 billion in SNAP benefits in fiscal year 2024. In addition to these federally funded benefit payments, California receives substantial federal reimbursement for the costs of administering the program. These federal reimbursements amount to well over $1 billion annually in California, reflecting the scale of the program and the millions of residents who rely on it. Together, the federally funded benefit payments and administrative reimbursements support a statewide program that serves millions of California households and channels billions of dollars each year into the State's food economy.

91.    USDA has no legal authority to impose the 2026 Conditions on the SNAP programs in Plaintiff States. SNAP is a mandatory entitlement program whose governing statutes require benefits to be furnished to eligible households. *See* 7 U.S.C. §§ 2011, 2014(a); *see also* 7 U.S.C. § 2015(f). Congress has exhaustively defined the conditions of participation in SNAP, and USDA has no authority to layer on additional conditions, which would function as new eligibility or participation criteria never enacted by Congress. Nonetheless, as of March 2026, USDA has stated an intent to impose the 2026 Conditions broadly across its funding streams. USDA has already

instructed subagencies to enforce compliance with executive orders that impose policies regarding "gender ideology," "DEI," immigration enforcement, and related matters in connection with USDA funding. These actions signal that USDA will attempt to impose the same policy requirements on States administering SNAP and other nutrition programs, including through oversight mechanisms governing State administration of the program.

92.    In fiscal year 2024, USDA allocated SNAP assistance to residents of Plaintiff States in the amounts shown in Table 3 below:

| Table 3: Total Benefits to [14]4[15] | |
| --- | --- |
| **State** | **Federal Funding** |
| California | $12,183,085,552 |
| Colorado | $1,303,172,697 |
| Connecticut | $892,819,650 |
| Delaware | $254,854,243 |
| District of Columbia | $319,119,173 |
| Hawai'i | $731,331,421 |
| Illinois | $4,469,241,818 |
| Maine | $363,838,898 |
| Maryland | $1,498,3008,252 |
| Massachusetts | $2,617,666,701 |
| Michigan | $3,061,361,572 |
| Minnesota | $859,038,624 |
| Nevada | $1,006,600,692 |
| New Jersey | $1,925,707,853 |
| New Mexico | $1,028,090,754 |
| New York | $7,231,611,169 |
| Oregon | $1,569,585,242 |
| Pennsylvania | $4,268,035,433 |
| Rhode Island | $343,066,538 |
| Vermont | $148,302,129 |
| Virginia | $1,616,084,924 |
| Washington | $1,920,375,025 |

---

[15] These numbers are taken from USDA's "National and/or State Level Monthly and/or Annual Data," available here: https://perma.cc/2J2R-7UJ4, and rounded.

| | |
|---|---|
| Wisconsin | $1,363,921,863 |
| **Total** | **$64,459,920,223** |

93.    Plaintiff States and their residents have consistently received SNAP funds from USDA for decades.

94.    Plaintiff States intend to seek and use SNAP funds in fiscal year 2026.

### 4.    The Emergency Food Assistance Program ("TEFAP")

95.    USDA, through FNA, administers the Emergency Food Assistance Program, commonly known as TEFAP. The federal government operates TEFAP in partnership with all 50 States, the District of Columbia, and four U.S. Territories. FNA purchases and provides States with USDA-approved foods (also referred to as "USDA Foods")—which are limited to domestically sourced fruits, vegetables, grains, legumes, dairy products, and other sources of protein—for distribution by the States to emergency food distribution organizations such as food banks, food pantries, soup kitchens, and shelters. Through this vital, direct food assistance, TEFAP partners with States to supplement the diets of economically disadvantaged people, including children and the elderly, across the country. TEFAP is the primary federal program that supports emergency food distribution organizations in the nation, a need that has been growing in recent years.

96.    Initially named the Temporary Emergency Food Assistance Program, Congress authorized TEFAP in the early 1980s to ensure adequate nutrition for individuals and communities with known food insecurity by repurposing federal food surpluses to meet their needs. Although food surpluses in the U.S. largely ended by the late 1980s, food insecurity did not. To address a national food insecurity crisis, Congress enacted the Hunger Prevention Act of 1988. Pub. L. 100-435, 102 Stat. 1645 (1988). This Act authorized funds to be appropriated to TEFAP for the purchase of USDA Foods. TEFAP was formally renamed The Emergency Food Assistance

26

Program as part of the 1990 Farm Bill. Pub. L. 101-624, 104 Stat. 359 (1990). It was most recently reauthorized by the 2018 Farm Bill. Pub. L. 115-334, 132 Stat. 4490, 4648 (2018).

97.     Congress continues to address the nation's food and nutrition crisis by funding TEFAP through the annual appropriations process. Congress appropriated $471.5 million for TEFAP in fiscal year 2026, with $6.3 million being apportioned to pay costs associated with ordering and transporting the food, and the remaining $465.2 million for the purchase of food (and with $94.3 million of that funding, that can be converted by state agencies to use as administrative funds).

98.     Federal assistance through TEFAP is provided to States in the form of both USDA-purchased domestic agricultural commodities ("Food") and cash assistance for administrative and distribution costs. TEFAP Food is divided into two categories: entitlement Food and bonus Food. Funding for entitlement Food is considered appropriated mandatory spending. Bonus Food is made available on an ad hoc basis when FNA obtains specific surplus foods, such as seasonally available excess produce.

99.     TEFAP entitlement Food and administrative funding is allocated and administered by FNA based on a statutory formula that considers poverty and unemployment rates.

100.    Plaintiff States each administer their own emergency food assistance program. In Illinois, TEFAP is a core component of the state's response to growing statewide poverty and food insecurity. The program delivers nutritious, locally sourced, shelf stable foods to Illinoisians across the State to round out household nutrition. In recent years, TEFAP foods provide vital support statewide, and play a significant role in staunching hunger in the State's most food insecure regions. In Illinois, high food insecure communities are increasingly concentrated in rural areas where farmers and agricultural workers supply a large volume of the State's agricultural products

for export, yet residents struggle with insufficient income and limited access to healthy foods. In these parts of the state, food pantries stocked with TEFAP foods are often the only place for miles where Illinoisians can obtain food to put on the table.

101. And an increasing number of Illinoisians rely on TEFAP to meet their nutritional needs, not only in the State's most food insecure communities. For the last three state fiscal years, more than 1 in 20 Illinoisians received TEFAP food. And for the last five consecutive state fiscal years, the percentage of Illinois households that receive TEFAP food increased from 3.9% of the State population in 2022, to 6.4% of the State population in 2026. Further evidence of growing poverty and hunger statewide, the number of Illinois households that rely on both TEFAP and SNAP to meet their nutritional needs rose from 28.51% in 2024 to 31% in 2025. The additional nutrition provided by TEFAP foods to families that already rely on SNAP benefits provides these Illinoisians crucial food without which millions would go hungry.

102. In fiscal year 2026, USDA allocated Plaintiff States TEFAP food funding pursuant to the Food and Nutrition Act, including carryover funding and funds eligible for conversion to administrative funds, in the amounts shown in Table 4 below:

| Table 4: TEFAP Administrative Funds and Food Allocations to Plaintiff States in FY2026 | |
|---|---|
| **State** | **Federal Funding** |
| California | $  69,284,582.32 |
| Colorado | $  15,515,004.09 |
| Connecticut | $   5,252,681.20 |
| Delaware | $   1,356,273.69 |
| District of Columbia | $   1,315,501.14 |
| Hawaiʻi | $   2,007,442.40 |
| Illinois | $  21,593,111.83 |
| Maine | $   2,455,775.63 |
| Maryland | $   7,100,044.01 |
| Massachusetts | $  10,403,235.37 |
| Michigan | $  19,416,300.77 |
| Minnesota | $   7,807,620.67 |
| Nevada | $ 5,065,891.17 |
| New Jersey | $  13,697,561.40 |
| New Mexico | $   4,727,421.67 |
| New York | $  33,364,354.88 |
| Oregon | $   7,872,724.82 |
| Pennsylvania | $ 6,513,490.20 |
| Rhode Island | $   2,730,407.96 |
| Vermont | $   1,495,293.29 |
| Virginia | $  12,200,129.18 |
| Washington | $  11,266,069.01 |
| Wisconsin | $   7,856,147.92 |
| **Total** | **$ 270,297,064.62** |

103.    Across rural and urban areas of the country, working families, farmers, agricultural workers, employed and underemployed individuals, parents, seniors, and our most vulnerable children, depend on USDA Foods delivered by TEFAP straight to the state food bank networks on which millions of individuals and households rely for access to daily food.

104.    The statutes authorizing and regulations applicable to TEFAP do not authorize conditioning funding on the Challenged Conditions. And if Plaintiff States were to lose TEFAP funding, there would be an immediate and devastating effect on their ability to slow the spread of food insecurity and hunger.

105. Plaintiff States have consistently received TEFAP funds from USDA for decades.

106. Plaintiff States intend to seek and use TEFAP funds in fiscal year 2026.

**B. USDA distributes funding to Plaintiff States to carry out Congressional programs designed to protect our Nation's forests and to prevent and fight wildfires.**

107. USDA's Forest Service ("USFS") also administers significant grant programs, including several large formula-based grant programs. Among USFS's marquee grant programs are the Community Wildfire Defense Grant (to mitigate wildfire risk), the Urban and Community Forestry Grants (to support tree planting and management in cities), and Innovative Finance for National Forests (to address watershed protection, forest resilience, and sustainability).

108. Many Plaintiff States rely on USFS grants to provide core funding for their forestry and firefighting programs. Among these grant programs are the State Fire Capacity Program and the Volunteer Fire Capacity Program (together, the "Fire Programs").

109. The Fire Programs are authorized by the Cooperative Forestry Assistance Act of 1978, 16 U.S.C. §§ 2101, *et seq.*, and amended by the 1990 farm bill (Food, Agriculture, Conservation and Trade Act of 1990, Pub. L. 101-624, §§ 1211-1224), 16 U.S.C. § 2106. They are based on express Congressional findings, including that "fire prevention and control on rural lands and in rural communities are of continuing high priority to protect human lives, agricultural crops and livestock, property and other improvements, and natural resources[.]" 16 U.S.C. § 2106(a)(3).

110. The State Fire Capacity Program provides financial and technical support directly to the States to enhance firefighting capacity, support community-based hazard mitigation, and expand outreach and education to homeowners and communities concerning fire prevention and hazard mitigation. To support the State Fire Capacity Program, Congress directed that a minimum level of funding be allocated annually to each state to ensure a base fire management capacity (at

30

least $100,000). 16 U.S.C. § 2106(e)(2)(A)(i). Additional funds are allocated based on acres of nonfederal land, population, and required level of fire protection.

111.    The Volunteer Fire Capacity Program provides financial, technical, and other assistance to rural communities. Funds are used to address critical preparedness needs, increase initial attack capability, and provide training for local fire agencies. Since 1996, Congress has continued to fund the program as authorized in the Cooperative Forestry Assistance Act of 1978 and amended by the 1990 farm bill (Pub. L. 101-624, §§ 1215-1224), 16 U.S.C. § 2106.

112.    As with the State Fire Capacity Program, funding under the Volunteer Fire Capacity Program is provided as formula grants to state foresters or equivalent state officials. States may use the funds to support any organized, not-for-profit, fire protection organization that provides services to a community with a population under 10,000 or whose firefighting personnel is at least 80% volunteer. *See* 16 U.S.C. §§ 2106(e)(2)(A)(ii), (g)(1).

113.    The statutes authorizing the Fire Programs do not authorize conditioning funding on the Challenged Conditions.

114.    In 2022, both programs received substantial supplemental funding from Congress on a bipartisan basis under the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117-58, § 40803 (2021). The IIJA provided USFS with over $1.5 billion for FY2022 through FY2026 to support state forestry activities and reduce wildfire risk; restore healthy, productive forests; and improve environmental, recreational, and economic infrastructure.

115.    Plaintiff States rely on the Fire Programs to fund critical services and emergency preparedness.

116.    For example, for fiscal year 2025, Wisconsin received $722,710 in funding from the State Fire Capacity Program and $485,693 from the Volunteer Fire Capacity Program. These

31

funds helped Wisconsin to achieve an average 14-minute response time to wildfires; save an average of 440 structures each year (91% of threatened structures); suppress an average of 901 wildfires each year; develop formal partnerships with 753 of the 825 fire departments in Wisconsin to ensure availability and response to forest fires; and conduct Wildland Fire Training annually for roughly 500 local fire departments statewide.

117.    Plaintiff States have consistently received Fire Programs funding from USDA for decades.

118.    Plaintiff States intend to seek and use Fire Programs funding in fiscal year 2026.

**C. Congress has directed USDA to make funds available to Plaintiff States to support local agriculture.**

119.    USDA's Agricultural Marketing Service ("AMS") administers a wide range of grants aimed at supporting American agricultural products. Among these grant programs is the Specialty Crop Block Grant Program ("Specialty Crop Program"), which was authorized pursuant to Section 101 of the Specialty Crops Competitiveness Act of 2004 (Pub. L. 108-465, 118 Stat. 3882, 3883 (2004)), amended under section 10010 of the Agricultural Act of 2014, Pub. L. 113-79, 128 Stat. 649, 949 (2014). Section 2(b) of the statute authorizing the program states that the program's purpose is to "make necessary changes in Federal agriculture policy to accomplish the goals of increasing fruit, vegetable, and nut consumption and improving the competitiveness of United States specialty crop producers." Pub. L. 108-465, 118 Stat. at 3882.

120.    Congress has directed the Secretary of Agriculture to "make grants to States … to be used by State departments of agriculture to enhance the competitiveness of specialty crops." Pub. L. 108-465, 118 Stat. at 3883. States are required to submit applications to demonstrate that their agencies will carry out the purpose of the program, but once the application is approved, the amount of the grant is set by statute using a formula that considers the value and acreage of

specialty crop production in that State, with minimum grant sizes tied either to specific dollar figures or percentages of the amount given through the program overall. *Id.* §§ 101(b), (c), (f).

121.    Since the program's initiation, USDA has issued grants that have totaled over $1 billion, funding more than 12,400 projects. These projects provide a wide array of support to the specialty crop market, including efforts to increase market access, enhance food safety, develop new crop varieties, mitigate pests and diseases, increase knowledge of specialty crops nutrition, and improve sustainability and conservation.

122.    As an example of how Plaintiff States rely on the Specialty Crop Program, for fiscal year 2025 the Massachusetts Department of Agricultural Resources received $441,530 in Specialty Crop Block Grant Program grants that were passed on to seven different sub-awards. These sub-awards included efforts to promote knowledge of the Massachusetts cranberry industry, support the State's Healthy Incentives Program connected to EBT card purchases, and spread awareness of direct and sustainable access to local crops for families using SNAP benefits or living in public housing.

123.    In fiscal year 2025, Illinois received $679,005 in Specialty Crop Program funds. Those funds went to thirteen sub-awards one of which funded pest management efforts and another supported efforts to eradicate honeybee diseases and pests, and to develop treatments.

124.    California received over $24 million in Specialty Crop Program funds in fiscal year 2025, allowing it to support 50 sub-awards. These projects include support for:  (1) effective water use; (2) technological innovation; (3) small-scale farmers: (4) virus and pest surveillance, defense and treatment; (5) recruiting and training the requisite labor force; and (6) refining sanitation practices to support safe food.

125.    If the Plaintiff States no longer had access to Specialty Crop Program funds, the States' individual departments of agriculture would be hampered in their mission to promote the growth, sale, and consumption of agricultural products.

126.    Plaintiff States have applied for and received Specialty Crop Program funds from USDA since Congress authorized the program in 2002.

127.    Plaintiff States intend to seek and use Specialty Crop Program funds in fiscal year 2026.

### D.  USDA funds agricultural research pursuant to congressional mandate.

128.    USDA, through its National Institute of Food and Agriculture ("NIFA"), administers the suite of funding programs enacted by Congress to establish and support land-grant universities. The land-grant university program is governed by a number of statutes which provide for mandatory annual appropriations to be delivered to the States based on a prescribed formula, and designate program priorities and research areas. *See, e.g.*, 7 U.S.C. § 361a, *et seq.*; 7 U.S.C. § 341, *et seq.*; 7 U.S.C. § 3175; 7 U.S.C. § 3191, *et seq.*; 16 U.S.C. § 582a-1, *et seq.*; 16 U.S.C. § 1671, *et seq.*

129.    None of those operative statutes permit USDA to limit funding based on compliance with the Challenged Conditions. In fact, the Challenged Conditions are in certain instances directly at odds with congressional policy mandates.

130.    NIFA funding goes to the establishment and operation of academic departments related to the agricultural sciences, State Agricultural Experiment Stations ("SAES"), and Cooperative Extension programs (or, "Extensions"). These programs place innovative research and scientific expertise directly in the hands of farmers and the communities they serve.

131.    Plaintiff States have received funding through this system for over 100 years. This has enabled their public universities to produce important research and data to address various

critical issues such as cold hardiness, forest management activities, and mapping seasonal variation. This research benefits the general public, traditional and non-traditional agriculture, farmers, arborists, forest managers, growers, natural resources, animal health, crop yield, pesticide management, nutrition, food safety, education for future farmers, water resources, positive youth development, and community wellbeing. These programs directly impact national health, safety, and security.

132. If Plaintiff States lose these funds, the quality and quantity of land-grant university programs and research will suffer. Universities will have far fewer resources to educate the food scientists of tomorrow, or to collaborate on and advance critical research into issues that directly impact farming practices, food security, and natural resource management locally and nationally. Additionally, lower-income communities that have less access to nutritional foods and youth populations involved in 4-H Extension programs that provide hands-on learning experiences in farming and animal care will lose valuable programming that improves the health and welfare of the Plaintiff States' residents.

133. The loss of NIFA funding to support SAES across the country would threaten future food security. In Illinois, for example, the University of Illinois Urbana-Champaign ("UIUC") relies on vital USDA funding to maintain agricultural research infrastructure. Federal funding helps support the Illinois Agricultural Experiment Station, which manages the Morrow Plots—the oldest continually used experimental agricultural fields in the Western Hemisphere—and a pioneer in agricultural research. The Morrow Plots have provided farmers and the agricultural sector with invaluable data on the effects of crop rotation, natural soil-nutrient depletion, and various fertilizers and supplements on soil quality. This USDA-supported research enables UIUC students and

researchers to make scientific advancements necessary to ensure adequate food production for the Nation's future.

134.    Community partners across the Plaintiff States would also suffer. Farmers would lose access to the latest developments in scientific knowledge that support, among other things, reductions in pesticide use, improvements in soil health and nutrient management, economically efficient production, and food safety. In Massachusetts, this includes cranberry farmers who have relied on UMass Cranberry Station since 1911 and consider that support critical to the continued viability of cranberry production in the State. As the second largest global producer of cranberries, loss of Extension funding would have even an international impact.

135.    Extension programs also manage the Master Gardener program in nearly every state. The Master Gardener program trains volunteers who become indispensable to their communities by providing specialized expertise in plant management, creating gardens, conducting research, giving lectures, and contributing to other local horticultural efforts.

136.    Other impacted groups include landscape managers who maintain parks, recreational fields, golf courses, and private properties and would lose training opportunities for their staff, affecting economic competitiveness, awareness of current regulatory requirements, and the ability to adopt sustainable practices. Urban farmers and farm educators managing everything from expanding local food access for low-income households to teaching gardening skills to young people to leading neighborhood tree plantings would lose education and technical support for staff and trainees who often change from year to year.

137.    The Cooperative Extensions also manage 4-H activities. 4-H programs and clubs provide young people with opportunities to connect with their peers, to develop valuable skills in science and technology, to volunteer in their community, and to develop leadership skills such as

public speaking and resume development. These programs provide vital support for youth. For example, Extension 4-H programs partner with military members to offer specialized support for the children of deployed service members. Without Extension funding, these programs would be eliminated. This would end a critical source of learning in areas including STEM, nutrition, leadership, and public speaking. In Massachusetts in 2024, this amounted to more than 500 hours of programming across 45 schools statewide.

## II.     Defendants Impose the Challenged Conditions

138.     Since January 2025, executive agencies under the Trump Administration, particularly USDA and Secretary Rollins, have engaged in a direct and sustained effort to frustrate States' access to crucial funding streams through vague and poorly reasoned funding conditions relating to the Administration's preferred policy goals.

### A.   President Trump issues executive orders directing federal agencies to comply with newly stated policies on "DEI," "environmental justice," gender identity, women's sports, and immigration.

139.     On January 20, 2025, his first day in office, President Trump issued Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing* ("Government DEI EO"). 90 Fed. Reg. 8339 (2025). In it, Trump directed his Administration to terminate "all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government[.]" *Id.* Trump also directed agencies to terminate "'environmental justice' offices and positions" and "'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts[.]" *Id.* Nowhere is "illegal DEI," "environmental justice," or "equity" defined or further explained. Equally ambiguous is what "mandates, policies, programs, preferences, and activities" this executive order is meant to target.

140.     That same day, Trump issued Executive Order 14168 stating that it is "the policy of the United States to recognize two sexes, male and female." 90 Fed. Reg. 8615 (2025) ("Gender Ideology EO"). The order further stated that "[u]nder [his] direction, the Executive Branch will enforce all sex-protective laws to promote this reality[.]" *Id.* It defined "Gender ideology" as replacing sex "with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true" and stated that "[g]ender identity . . . does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* It further stated, "[f]ederal funds shall not be used to promote gender ideology" and "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* Agencies were directed to impose requirements on federally funded entities "to achieve the policy of this order." *Id.* The Gender Ideology EO does not describe what activities promote gender ideology.

141.     The following day, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. 90 Fed. Reg. 8633 (2025) ("DEI EO"). The order stated that it "is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* The order contrasted civil-rights protections with the "adopt[ion] and active[] use [of] dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI)… that can violate the civil-rights laws of this Nation." *Id.* The DEI EO does not provide any guidance as to when or how, in the Administration's view, DEI "violate[s] the civil-rights laws of this Nation." *Id.*

142.    On February 5, 2025, President Trump issued Executive Order 14201, *Keeping Men Out of Women's Sports*. 90 Fed. Reg. 9279 (2025) ("Sports EO"). The order stated "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities. . . . It shall also be the policy of the United States to oppose male, competitive participation in women's sports more broadly[.]" *Id.* The order did not define "fair athletic opportunities." *Id.*

143.    On February 19, 2025, President Trump issued Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders*. 90 Fed. Reg. 10581 (2025) ("Open Borders EO"). Purportedly in an effort to ensure that "no taxpayer funded benefits go to unqualified aliens," the order directed federal agencies and departments to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order[.]" *Id.*

144.    The executive orders at issue direct the conduct of federal agencies and do not themselves impose obligations on States.

### B.  USDA Begins Implementing President Trump's Executive Orders

145.    USDA promptly took steps to comply with President Trump's executive orders. On February 13, 2025, Secretary Rollins issued a memorandum that "order[ed] the rescission of all Diversity, Equity, Inclusion, and Accessibility (DEIA) programs" ("DEIA Memorandum").

146.    Immediately following the issuance of the DEIA Memorandum, USDA terminated over 1,000 training programs ostensibly to end "DEI" and "gender ideology" in the federal government. Public reporting, however, indicated that the sweeping cancellations were extremely broad, pulling in, for example, "training about preventing harassment and sexual harassment in the

workplace," trainings about autism, and Veterans Day celebrations.[16] According to USDA's own classifications, 860 courses were eliminated due to "DEI criteria," 82 for "defending women criteria," and six based on "environmental justice criteria."[17]

147.    In the DEIA Memorandum's "POLICY" section, Secretary Rollins directed that "no USDA resources [shall be] expended… in the creation, teaching, promotion, or facilitation of Critical Race Theory, DEIA, or Gender Ideology." Rollins went on to disband all groups not established by statute "whose work touches on the above stated ideologies." As with the executive orders that preceded it, the DEIA Memorandum provides no guidelines establishing the scope of the disfavored "ideologies," nor what activities are prohibited.

148.    On March 7, 2025, USDA Secretary Rollins stated on X (formerly known as Twitter) that a $600,000 grant to Southern University and A&M College in Louisiana—a large, public, historically Black university—was being revoked for studying "menstrual cycles in transgender men."[18] Rollins implored, "[k]eep sending us tips," and thanked American Principles Project, presumably for flagging the grant.[19] She continued, "[t]he insanity is ending and the restoration of America is underway."[20]

149.    The grant language contained a single reference to transgender men as among those who menstruate; transgender men were neither a focus nor a priority of the funded work.[21] Rather, the focus of the work was the development of menstrual products made from natural fibers, and "educat[ing] young women and adolescent girls" about menstrual hygiene.[22]

---

[16] *See* https://perma.cc/H24M-3HDV.
[17] *Id.*
[18] https://perma.cc/9D7K-S52X.
[19] *Id.*
[20] *Id.*
[21] https://perma.cc/6T4F-JNTM.
[22] *Id.*

150.    When asked by the press, a USDA spokesperson stated, "[t]his mission certainly does not align with the priorities and polices of the Trump Administration, which maintains that there are two sexes: male and female."[23]

151.    On March 12, 2025, Secretary Rollins posted an update regarding USDA's cancellation of a $397,000 grant which purportedly educated "queer, trans, and BIPOC urban farmers."[24]

152.    According to the grant recipients, the funded program was open to all and was focused on educating and training new farmers.[25]

153.    During a cabinet meeting early in her tenure, Secretary Rollins described the grants USDA had cancelled as "nonsensical."

154.    Secretary Rollins issued another memorandum on March 13, 2025, further directing USDA to align its policies with the DEI EO ("DEI Memorandum"). This time, Secretary Rollins tried to expand the reach of the DEI EO to the activities of grant recipients.

155.    The DEI Memorandum prioritized "ensuring that the Department's grants, cooperative agreements, and other similar arrangements… (collectively 'awards'), do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. DEI policies and practices can violate both the letter and purpose of Federal civil rights laws and conflict with the Department's policy[.]" Here again, the Secretary did not explain USDA's view on which DEI policies and practices can violate the

---

[23] https://perma.cc/KA8T-V85U.
[24] https://perma.cc/N73L-76K4.
[25] https://perma.cc/7G8T-F8CJ.

spirit, let alone the letter, of federal civil rights laws or what basis the agency could have for taking action against DEI programs if they do not violate civil rights laws.

156.    The DEI Memorandum further instructed "all USDA agencies and staff offices that issue awards" to review grant awards to "ensur[e] that the Department does not fund or no longer funds discriminatory practices—including in the form of DEI—that are either contrary to law or to the *Department's policy objectives*[.]" (emphasis added). To the extent permitted by law, Secretary Rollins directed that "[a]wards deemed inconsistent with the *Department's priorities*" be "terminated, in whole or in part, or otherwise modified[.]" The DEI Memorandum did not identify the specific "policy objectives" and "priorities" against which all USDA funding awards would be measured.

157.    On March 27, 2025, Secretary Rollins sent a letter to California Governor Gavin Newsom citing concern over "forced outing" policies.[26] In her letter, Rollins noted that "USDA will support [the Department of Education's] investigation and efforts to vigorously protect parents' rights and ensure that students do not fall victim to a radical transgender ideology[.]"[27] Secretary Rollins went on to state, "we will be reviewing our federal funding with respect to other related matters under investigation."[28]

158.    Soon thereafter, USDA attempted to coerce States to change their policies by conditioning funding on compliance with the Sports EO and its directive to "Keep[] Men Out of Women's Sports." At this time, USDA advanced a theory that the Sports EO fell within the scope of Title IX of the Education Amendments of 1972.

---

[26] https://perma.cc/TKX3-M6EV?type=image.
[27] *Id.*
[28] *Id.*

159.    On April 2, 2025, Secretary Rollins sent a letter to the governor of the State of Maine.[29] The letter stated: "Your defiance of federal law has cost your state, which is bound by Title IX in educational programming. Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools. This is only the beginning, though you are free to end it at any time by protecting women and girls in compliance with federal law."

160.    The letter further stated, "USDA, alongside other federal agencies, will continue to pause and, where appropriate, terminate categories of education programming in Maine if these Title IX violations are not resolved to the satisfaction of the Federal Government."

161.    On April 7, 2025, the State of Maine filed a complaint alleging a violation of the Administrative Procedure Act and moved for a temporary restraining order in the United States District Court for the District of Maine against USDA and Secretary Rollins, seeking to enjoin them from terminating, freezing, or otherwise interfering with Maine's access to federal funds based on alleged Title IX violations.[30]

162.    On April 11, 2025, the district court ordered the immediate release of the withheld funds, finding that Maine was likely to prevail.[31] Specifically, the district court concluded that if USDA wished to terminate or refuse Title IX funding, it must do so only after exhausting the "proper procedural steps."[32]

163.    On May 2, 2025, USDA agreed to halt efforts to freeze federal funds in Maine, in exchange for Maine's dismissal of the lawsuit.[33]

### C.  USDA Issues the 2026 Conditions

---

[29] https://perma.cc/VE4A-TNFM?type=image.

[30] Compl., *Maine v. U.S. Dep't of Agric.*, No. 1:25-cv-131, ECF No. 1 (D. Me. Apr. 7, 2025); Mot. for Emergency Temporary Restraining Order, *Maine v. U.S. Dep't of Agric.*, No. 1:25-cv-131, ECF No. 3 (D. Me. Apr. 7, 2025).

[31] *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 232, 238 (D. Me. 2025).

[32] *Id.* at 229.

[33] *See* https://perma.cc/Y3ZD-SF33.

164.    In December 2025, USDA broadened its approach from attacking individual recipients of the agency's funding to threatening all recipients of the agency's funding through its publication of the 2026 Conditions, which contain expansive provisions unlike any prior USDA funding conditions. The 2026 Conditions were published and effective on December 31, 2025, and profess to apply broadly to all recipients and subrecipients of USDA grants, cooperative agreements, and mutual interest agreements. 2026 Conditions (Exhibits A and B), § 1.1. In an accompanying Secretarial Memorandum USDA directed agency staff to "adopt and implement" the 2026 Conditions for "all future awards and for all significant modifications (as determined by [the Office of the Chief Financial Officer]) to existing and future awards, to the maximum extent consistent with law."

165.    As described above, USDA has tried various pathways to force States to adopt Trump Administration policies, as outlined in President Trump's executive orders. The 2026 Conditions reflect the agency's extraordinary, new approach—attempting to force Plaintiff States and other funding recipients to certify compliance with, among other things, "all applicable Federal anti-discrimination . . . *policies*" as a condition of funding. 2026 Conditions, § 12.2 (emphasis added).[34] Nowhere does USDA limit or define these policies. In fact, they are expressly "without limitation." *Id.*

166.    Section 12.2 of the 2026 Conditions (the "Policy Condition") provides that "[t]he recipient must comply, and certifies that it will comply, with all applicable Federal anti-discrimination laws, regulations, and policies for the duration of the Federal awards, to include the following without limitation:" (1) Title IX; (2) The Gender Ideology EO; (3) Title VI of the Civil

---

[34] *See also* Exhibit B, § 11.2. Unless otherwise indicated, citations in the text to the 2026 Conditions will be from Exhibit A, General Terms and Conditions for Federal Awards. The corresponding citation to Exhibit B, General Terms and Conditions for Mutual Interest Agreements will be in a footnote.

Rights Act of 1964; (4) the DEI EO; and (5) the Age Discrimination Act of 1975. The 2026 Conditions do not identify or define the applicable "policies," but the Gender Ideology EO purports to, among other things, make it "the policy of the United States to recognize two sexes" and to reject gender identity as a replacement for sex.

167.    The 2026 Conditions label the foregoing requirements material "conditions of payment that go to the essence of the Federal award[.]" It further states that "[p]ayments under the award are predicated on compliance with the above requirements, and therefore the recipient is not eligible for funding under the award or to retain any funding under the award absent compliance with the above requirements." This section goes on to threaten False Claims Act liability for non-compliance.

168.    Section 13[35] of the 2026 Conditions makes additional efforts to force recipients to comply with executive orders that apply only to federal agencies. Section 13 "expressly incorporate[s]" twelve executive orders and directs the recipient to "comply" with them.[36]

169.    Several of the funding restrictions listed in Section 13, as well as the underlying executive orders, are ambiguous. For example, Section 13.5[37] references the Gender Ideology EO and then states: "[n]o funding shall be used to promote gender ideology" (the "Gender Condition"). Neither the Gender Condition nor the Gender Ideology EO explains what types of USDA-funded activities the agency believes might "promote" gender ideology.

170.    Section 13.8[38] references the Sports EO and provides, "[n]o funding shall be directed towards educational programs that deprive women and girls of fair athletic opportunities.

---

[35] Exhibit B, § 12.
[36] The General Terms and Conditions for Mutual Interest Agreements add a thirteenth executive order which is not relevant to this litigation. Exhibit B, § 12.
[37] Exhibit B, § 12.6.
[38] Exhibit B, § 12.9.

No funding shall be directed towards male competitive participation in women's sports" (the "Sports Condition"). The Sports Condition is not clear as to when USDA funding is "directed towards" a program or sports participation, nor does it explain what "fair athletic opportunities" require.

171.    Likewise, Section 13.10[39] references the Open Borders EO and states, "[n]o funding shall be directed towards programs that allow illegal aliens to obtain taxpayer-funded benefits… or provide incentives for illegal immigration" (the "Immigration Condition"). The Immigration Condition does not define what constitutes "benefits" in this context nor does it explain whether it refers to federally funded or state-funded benefits. The Immigration Condition also does not explain how the condition maps onto USDA programs that serve the broad public without limitation based on immigration status, where program administrators do not know the recipient's immigration status, or onto programs wherein Congress empowered the States, not USDA, to determine whether to make the benefits available to persons other than citizens or qualified aliens. *See* 8 U.S.C. § 1615(b)(1).

### D. USDA forecasts how it will enforce the 2026 Conditions and removes preexisting guidance on antidiscrimination compliance.

172.    On December 31, 2025, coinciding with the roll-out of the Conditions, Secretary Rollins issued a memorandum titled *Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements*, attached as Exhibit C. In it, Secretary Rollins directs USDA to "require[] all recipients and cooperators to adhere to standard practices," noting that "USDA General Terms and Conditions (GT&Cs) [] will be applicable to *all* awards." (emphasis added). Secretary Rollins describes the 2026 Conditions as "implement[ing] several of

---

[39] Exhibit B, § 12.11.

USDA's policy priorities[.]" These priorities apparently include, "no USDA awards may fund or otherwise support [DEI] initiatives or any other initiatives that discriminate on the basis of immutable characteristics," or "climate change or environmental justice initiatives[.]" As before, the scope of the prescribed conduct remains hopelessly unclear.

173.    Secretary Rollins further claimed that "USDA must take decisive action to centralize award policy," presumably through the 2026 Conditions. Rather than have USDA's 29 awarding agencies consider which terms and conditions are appropriate and allowable for each of USDA's 287 distinct award programs, she declared that the "unchecked paperwork" could "no longer continue," and directed the 2026 Conditions to apply across the board.

174.    To implement the 2026 Conditions, Secretary Rollins directed "all USDA agencies and staff offices that issue awards to adopt and implement—as expediently as possible, but no later than forty-five (45) calendar days after the issuance of this Memorandum—the USDA General Terms and Conditions… for all future awards and for all significant modifications… to the maximum extent consistent with law," i.e., by February 15, 2026.

175.    Nowhere does Secretary Rollins indicate the statutory basis for such a sweeping change. By contrast, Secretary Rollins required that any requests by USDA staff to deviate from the 2026 Conditions "should indicate the statutory or regulatory basis for the deviation request[.]"

176.    Finally, Secretary Rollins established a *de facto* informant network among USDA personnel. She directed agency staff to monitor for noncompliance with "any term or condition of an award" and either address or report the noncompliance. She warned staff that failure to do so could result in disciplinary action up to and including termination.

177.    The ways in which USDA intends to enforce the Challenged Conditions are informed by USDA's recent statements and actions.

178.    For example, at least one USDA sub-agency, the National Institute of Food and Agriculture, has made publicly available its view of what actions USDA funding recipients should take to ensure substantive compliance with the 2026 Conditions.

179.    In FAQs posted to its website,[40] NIFA states, "[r]ecent EOs prohibit DEI programs and preferences [and] prohibit gender ideology…. Recipients must comply with these EOs by eliminating any prohibited DEI-related offices, titles, positions, duties, programs, and activities, as well as any prohibited promotion of gender ideology[.]" As to the Sports EO, NIFA stated, "[t]he goal of this EO is to discontinue allowing men to compete in women sports[.]"

180.    On December 10, 2025, NIFA hosted a training for grant recipients where staff "provided an overview of recent issued executive orders … and best practices for continued compliance," which included compliance with the DEI, Sports, and Gender Ideology EOs. The hour-long training was recorded and is posted on NIFA's website.[41] This guidance demonstrates that NIFA intends to force recipients to eliminate DEI-related offices, titles, positions, programs, and activities, as well as grant recipients' programs, policies and practices related to environmental justice, equity planning, and gender identity.

181.    The NIFA representative instructed, "during your scheduled review, your equal opportunity specialist will definitely work with you to make sure these [executive] orders are implemented into your programs[.]"[42] The presentation went on to indicate that NIFA "will request information about and we'll examine specific efforts made by recipients to ensure elimination of any DEI related offices, titles, positions, programs and activities, as well as environmental justice

---

[40] https://perma.cc/LG7D-LZNZ.
[41] https://www.youtube.com/watch?v=F23pYlD71ZY.
[42] *Id.*

and equity planning[.]"[43] As for the Gender Ideology EO, NIFA will "examine efforts made to ensure the elimination of the promotion of gender ideology and related practices."[44]

182.    NIFA staff further instructed that "Compliance best practices will entail revising civil rights training so as to update descriptions of prohibited actions and to expunge DEI or equity or gender ideology based civil rights practices."[45]

183.    NIFA-administered funding also flows to 4-H programs. In discussing 4-H programs, the training stated, "In essence, best compliance practices entail having policies in place to ensure that participation and access [to restrooms, changing rooms, sleeping accommodations, or locker rooms] is based solely on biological sex rather than gender identification."[46] The training went further stating that NIFA would examine 4-H curriculum to ensure that the curriculum does not promote DEI or gender ideology.[47]

184.    On January 8, 2026, USDA sent an informal memorandum over email to all USDA employees announcing that a "Golden Age of Civil Rights is here."[48] That memorandum touted Secretary Rollins's record for having already "canceled $200 million in grants so far" relating to DEI "and similar initiatives." The memorandum stated, "USDA will enforce civil rights laws to eliminate discriminatory DEI… mandates." As to the Gender Ideology EO, the memorandum made clear that USDA intends to enforce its mandates not only "in all programs under its jurisdiction and within its workforce," but against all recipients of USDA funding.[49]

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *See* https://perma.cc/T87Y-KRYX.
[49] *Id.* at 2 ("USDA will . . . ensur[e] that biological sex remains the basis for protections *in federally supported activities* . . . .") (emphasis added).

49

185.   On March 3, 2026, FNA issued a memorandum informing agencies in Plaintiff States that USDA was immediately rescinding FNA 113-1: Civil Rights Compliance and Enforcement – Nutrition Program and Activities. The purpose of FNA 113-1 was "to establish and convey policy and provide guidance and direction to [FNA] and its recipients and customers, and ensure compliance with and enforcement of the prohibition against discrimination in all FNA nutrition programs and activities, whether federally funded in whole or not." According to the March 3 memorandum, "[a]mended guidance will be released when finalized." No further information was provided about the timeline, nature, or scope of this purported amended guidance. Plaintiff States have not received amended guidance, leaving them even more vulnerable to undetermined and aggressive interpretations and applications of the vague Challenged Conditions.

### E.   NIFA has begun rolling out enforcement of the Challenged Conditions.

186.   Since January 2026, at least two public universities in Plaintiff States have received notification that NIFA is conducting a civil rights compliance review of the agricultural extension programs. NIFA's conduct in these compliance reviews demonstrates its maximalist view of the Challenged Conditions.

187.   As NIFA capacity grant recipients, land-grant universities undergo regular audits to assess compliance with federal antidiscrimination laws. In past audit years, NIFA has requested information directly related to and reasonably likely to demonstrate universities' compliance, such as copies of nondiscrimination policies or training materials.

188.   The 2026 NIFA Compliance Audits differ substantially from past agency practice, especially as to the breadth of data requested. In Section IX.7, USDA requests "a list and summary description of all community groups that have partnered with Extension, or have received any Extension funding since January 20, 2025, identifying as applicable any groups that by name or in operations have an emphasis, preferencing practice, or specific affiliation based on race, ethnicity,

national origin, or sex." NIFA also requests a list of such organizations with which the recipient has terminated its relationship since January 20, 2025.

189. Further, the 2026 NIFA Compliance Audits seek information that seems to relate only to policies purportedly identified in the Policy, Sports, and Gender Conditions.

190. In Section I.3 of the 2026 NIFA Compliance Audits, USDA requests that the recipient describe "any changes or a transition plan, that Extension and/or the university system has developed and/or implemented since January 20, 2025, to ensure the elimination of any prohibited promotion of gender ideology (E.O 14168)."

191. In Section VII.10 of the 2026 NIFA Compliance Audits, USDA requests that the recipient describe "any and all means used to notify program participants, volunteers, and members of the public of methods of reporting instances of prohibited D.E.I. efforts or discrimination based on sex and/or gender ideology[.]"

192. In Section VIII of the 2026 NIFA Compliance Audits, USDA makes seven requests related to 4-H clubs and youth extension programs. Those requests seek to identify whether those programs "comply with all applicable Executive Orders," including the Sports EO, "by guaranteeing that [girls and women] are not required to compete with any biologically male youth or adults" and are provided with separate intimate spaces based solely on sex, not gender identity.

193. Finally, the Compliance Audit seeks "a description of all 4-H program and youth curriculum, outreach materials, and training, and indicate whether the materials have been reviewed to ensure that they comply with all applicable Executive Orders."

194. In late February, NIFA told a grant applicant at one of Plaintiff States' public universities that review of their proposal "identified possible misalignment with Executive Order 14151." The applicant was directed to "provide a letter on official letterhead… clarifying that the

project aligns with Executive Order 14151[.]" Executive Order 14151 ("Ending Radical and Wasteful Government DEI Programs and Preferencing") targets DEI programs within the federal government and, as noted above, does not impose obligations on States.

## III.    The Conditions Are Unlawful

### A.    USDA cannot hold hundreds of millions of dollars hostage to vague funding terms.

195.    When the federal government places conditions on funds intended for the States, it must do so clearly. Clear conditions ensure funding recipients can accept them "knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Allowing States to make knowing and voluntary decisions "is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.).

196.    The Spending Clause of the Constitution requires federal funding conditions to be unambiguous. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst*, 451 U.S. at 17; *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 310 (D.R.I. 2025); *Illinois v. FEMA*, 801 F. Supp. 3d 75, 94 (D.R.I. 2025). This constitutional limitation applies not only when Congress attaches conditions to the receipt of federal funds but also when federal agencies apply them to funding streams authorized by Congress. *See, e.g.*, *California*, 808 F. Supp. 3d at 309–11 (holding that an agency-imposed funding condition violated the Spending Clause); *Illinois*, 801 F. Supp. 3d at 96 (same); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019) (same); *New York v. HHS*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019) (holding that an agency rule violated the Spending Clause); *New York v. DOJ*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *20 (D.R.I. Sep. 10, 2025) (same as to agency notices).

197.    All the Challenged Conditions fail *Pennhurst*'s clarity requirement.

198. The Policy Condition requires compliance with "all applicable Federal anti-discrimination laws, regulations, and policies." Requiring compliance with undefined "policies" in this manner is unconstitutionally vague in at least three independent ways.

199. *First*, USDA has never provided Plaintiff States or other grant recipients notice of the policies with which they must comply. The policies are not identified in the 2026 Conditions nor any other document. USDA has never told any recipient where to look to find such policies, or whether the term refers to USDA policies, the President's policies, or something else. This lack of notice, alone, renders the conditions unconstitutional.

200. *Second*, the Policy Condition does not identify in what ways the DEI and Gender Ideology EOs apply to and bind grant recipients. The Policy Condition confusingly states that two executive orders are "include[d]" in the "laws, regulations, and policies" with which grant recipients must comply, but executive orders cannot set policy for grant recipients. *City of Fresno v. Turner*, No. 25-CV-07070-RS, 2025 WL 2721390, at *16 (N.D. Cal. Sept. 23, 2025) ("Executive Orders bind only executive agencies, officers, and employees—not private parties or local government"). Instead, an executive order is a directive from the nerve center of the executive branch—the President—to the branch's component parts—the agencies. States fall entirely outside this chain of command, rendering unclear what it means for States to certify compliance with such directives. Furthermore, the DEI and Gender Ideology EOs themselves use only vague language when they purport to define terms.

201. *Third*, the "policies" referenced in the Policy Condition are unbounded by any timeframe. This suggests that recipients must follow future policies that USDA has not yet released. It is impossible for States to "knowingly" consent to compliance with such future policies.

202.    The Gender Condition similarly flunks the constitutional prohibition on vague funding conditions. The Gender Condition prohibits the use of funds to "promote gender ideology." The key term, "gender ideology," is itself vague, and moreover, the 2026 Conditions do not explain what activities USDA believes "promote" such a thing.

203.    The Sports Condition also fails to provide States with sufficient clarity such that States can knowingly accept its terms. The Sports Condition prevents funds from being "directed towards educational programs that deprive women and girls of fair athletic opportunities" or "directed towards male competitive participation in women's sports." But the 2026 Conditions do not explain what these phrases mean. For example, the Child Nutrition Programs provide nutritious meals at schools for millions of students. If a school uses USDA funds from the Child Nutrition Programs for lunch time meals, and later that day operates an athletics program with participation policies that deviate from USDA's expectations, like Maine did, it is not clear whether the Child Nutrition Funds were "directed towards" an impermissible program. The 2026 Conditions provide States no clarity on such basic questions, frustrating the States' ability to make a good faith assessment of their ability to comply with this condition.

204.    Finally, the Immigration Condition is also unconstitutionally vague. It forbids funding "programs that allow illegal aliens to obtain taxpayer-funded benefits, provide public resources to meet the needs of illegal aliens, or provide incentives for illegal immigration by demonstrating the availability of public benefits." But the 2026 Conditions do not explain, for example, what it means to "meet the needs" of an undocumented person, or what kinds of activity provides "incentives" for illegal immigration. For example, it is unclear whether USDA now prohibits grant recipients from providing food to a pantry that serves clients regardless of immigration status.

54

205.     Furthermore, even if USDA cured the vagueness of the Challenged Conditions, the conditions still fall short of constitutional requirements on two additional grounds. *First*, conditions must be related to the federal interest in the particular funding programs. *Dole*, 483 U.S. at 207–08. USDA's unnamed antidiscrimination "policies," its disapproval of "gender ideology," its views regarding the makeup of certain athletics teams, and its immigration-related policies bear no meaningful relationship to the core statutory purposes of many USDA programs, including nutrition assistance and agricultural support. The Challenged Conditions even apparently seek to direct States' conduct beyond the project funded by the grant, a blatantly unconstitutional attempt to require States to govern according to USDA's own policies.

206.     *Second*, the sheer size of funds threatened by these conditions creates unconstitutional coercion. States must retain a genuine choice whether to accept the conditions. Where, as here, the size of the financial inducement becomes a "gun to the head," the coercion is unconstitutional. *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.). Here, USDA threatens to withhold substantial portions of Plaintiff States' USDA funding portfolios—funding that supports critical public services like addressing child hunger—if the States do not accede to the Challenged Conditions. If Plaintiff States do not accept these terms (despite not fully understanding their meaning), they will lose funding streams that are entrenched in State and local budgets. Plaintiff States have no meaningful choice whether to accept.

**B.  USDA's imposition of the Challenged Conditions is arbitrary and capricious.**

207.     USDA's imposition of the Challenged Conditions is also arbitrary and capricious in violation of the Administrative Procedure Act. The "arbitrary and capricious" standard requires that agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agencies must provide a "satisfactory explanation" for their actions, and this must include a "rational connection between the facts found and the choice made." *Motor*

55

*Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). This "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

208. Defendants' decision to impose the Challenged Conditions was wholly unreasoned.

209. *First*, the ambiguities identified above not only violate the Spending Clause under *Pennhurst*, but they independently render USDA's action arbitrary and capricious. USDA has failed to explain how to interpret and apply the Challenged Conditions, much less provide reasoning that draws any connection between facts found and choices made by USDA.

210. *Second*, the application of the Challenged Conditions to all USDA grants across the board is arbitrary and capricious. Defendants have not explained the appropriateness of a categorical application of the Challenged Conditions, nor is there any indication that they have considered the various, complex statutory schemes and purposes underlying each of the distinct grant programs at issue. An agency simply cannot impose grant conditions without first ensuring that the relevant statute supports them. *See New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. Mar. 6, 2025) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority"), *affirmed*, No. 25-1236, --F.4th --, 2026 WL 734941, at *13–14 (1st Cir. Mar. 16, 2026); *see also, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (concluding that the Department of Justice lacked statutory authority to impose immigration enforcement conditions on Byrne JAG grants).

211. *Third*, the Challenged Conditions are arbitrary and capricious because Defendants "entirely failed to consider an important aspect of the problem[.]" *Motor Vehicle Mfrs. Ass'n, Inc.*,

463 U.S. at 43. Plaintiff States have laws and policies regarding discrimination. Plaintiff States do not know what the vague language in the Challenged Conditions means, but they face a risk that USDA will seek to enforce the conditions in a manner that conflicts with state laws and policies. USDA failed to consider this problem, offering the States no insight into how the agency's enforcement of vague conditions—none of them included in the authorizing statutes—might conflict with the laws and policies of the Plaintiff States. States are left to navigate the ambiguity and potential conflict on their own (with billions hanging in the balance). USDA's failure to consider or address this important aspect of the problem violates the APA.

212.    *Finally*, Defendants have failed to consider the substantial reliance interest of Plaintiff States. Plaintiff States' existing systems for administering and monitoring compliance with the requirements of these federal grants have not needed or included any adherence to unnamed USDA "policies," monitoring for impermissible promotion of "gender ideology," requirements regarding sports programming, nor assessments of immigration status beyond those required by statute, if any. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal citation omitted).

### C.  The Challenged Conditions violate the federal-state balance of power.

213.    USDA attempts to impose the Policy Condition not only on the entirety of the vast and varied grant programs funded (at least in part) by USDA, but also on other programs and actions of Plaintiff States. Those programs, when conducted in Plaintiff States, are subject to the laws and policies of Plaintiff States.

214.    The Gender and Sports Conditions, which prohibit USDA funds from being used to "promote gender ideology" and being "directed towards educational programs that deprive

57

women and girls of fair athletic opportunities," depending on how Defendants enforce their vague terms, may put Plaintiff States in an additional unconstitutional dilemma: either abandon or modify their own laws and policies in order to comply with USDA's directives; or risk the loss of millions of dollars in congressionally appropriated funding supporting essential nutrition, agricultural, research, and public services programs. The Constitution does not permit an executive agency to leverage entrenched and substantial funding streams to compel states to abandon duly enacted laws or to create laws or policies. *NFIB*, 567 U.S. at 580.

215. In Plaintiff States' judgment, safeguarding the rights, dignity, and full civic participation of transgender individuals is an essential exercise of their police powers and their constitutional authority to protect the health, safety, and welfare of their residents.

216. To protect these interests, in the exercise of their independent authority, many Plaintiff States have enacted a variety of measures that recognize and protect the transgender members of their communities. These measures include state constitutional protections against discrimination on the basis of sex and gender identity; laws and policies designed to protect against discrimination, bullying, and harassment, in employment, education, housing, and public accommodations; laws and policies guaranteeing the right to use facilities consistent with gender identity; and laws and policies ensuring students can participate in athletic activities consistent with their gender identity to the greatest degree possible. *See, e.g.*, Cal. Educ. Code §§ 200, 220; Cal. Gov't Code §§ 12940(a), 12955; 2 Cal. Code Reg. § 11034(e)(2), (h), (i)(4); Cal. Health & Safety Code §§ 103426, 103430; Cal. Vehicle Code § 12800; 775 Ill. Comp. Stat. 5/1-102(A); 775 Ill. Comp. Stat. 5/1-103(O-1); 775 Ill. Comp. Stat. 5/2-102(A); 410 ILCS 535/17 (1)(e); 77 Ill. Adm. Code 500.43; Mass. Gen. Laws c. 272, §§ 92A, 98; Mass. Gen. Laws c. 151B, § 4; Mass. Gen. Laws c. 22C, § 32; Mass. Gen. Laws c. 90, § 8N.

217. The Gender and Sports Conditions attempt to coerce Plaintiff States to alter or forgo implementation of these duly enacted laws and policies or commit state resources towards potentially discriminatory ends. Conditioning continued receipt of substantial federal funding on the abandonment or modification of state law or the use of resources to advance the USDA's discriminatory objectives, constitutes a profound alteration of the federal-state balance and inflicts a concrete injury on the Plaintiff States.

**D. Even if USDA cured its vagueness problems and announced specific new antidiscrimination "policies" with which States must comply, supported by reasoned decisionmaking, USDA lacks the authority to impose such policies.**

218. If USDA intends to announce new "antidiscrimination policies" or claims it has already identified such polices, and did so based on reasoned decisionmaking, the Policy and Immigration Conditions would still be unlawful under the APA.

219. The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

220. USDA has not cited any law that would empower it to impose agency-wide conditions regarding a new antidiscrimination policy, above and beyond what is already required by federal law and regulations. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. Nor has USDA identified any authorizing statute for any particular grant that provides it such power.

221. Similarly, USDA has not cited any law that would empower it to impose the Immigration Condition across all grants, nor does it cite any particular authorizing statute that would confer on it the power to craft new restrictions on the use of funds. That condition was also imposed in excess of the agency's statutory authority.

222. USDA's lack of authority to impose the Challenged Conditions is particularly acute with respect to the mandatory entitlement programs administered by the Department, including but not limited to the Child Nutrition Programs and SNAP. The mandatory entitlement structure

of those programs leaves USDA no discretion to withhold or condition funding, and Congress's express and exhaustive prescription of eligibility and participation criteria leaves USDA no room to layer on additional conditions. For example, the NSLA provides that the USDA "shall" make payments to states to reimburse qualifying meals in line with a statutory formula. 42 U.S.C. § 1753(b). Eligibility criteria under the program are also defined by statute. *See* 42 U.S.C. § 1758(b). The Child Nutrition Act has a similar statutory structure. *See* 42 U.S.C. § 1773(b). The Food and Nutrition Act, which governs SNAP, similarly provides that assistance under the program "*shall be furnished to all eligible households* who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added); *see also* 7 U.S.C. § 2015(f). Across these and other mandatory entitlement programs, Congress has foreclosed any authority Defendants may claim to impose the Policy and Immigration Conditions. Other programs have statutory or regulatory structures that prohibit the USDA from unilaterally inserting award terms and conditions.

**E. USDA cannot argue the Challenged Conditions flow from its own reinterpretation of Title IX without conceding that it violated the APA's rulemaking requirements.**

223.    Plaintiff States do not know how to interpret the Challenged Conditions, and that alone is a basis for finding them unlawful. But if USDA attempts to cure this issue by arguing that the Gender Condition and Sports Condition simply result from USDA's new interpretation of the requirements of Title IX, those conditions are unlawful for an additional reason. When an agency makes a substantive change to its prior interpretation of existing law in a manner that imposes new rights or duties or changes the legal status of regulated parties, it must go through the APA's rulemaking processes and procedures. *Tennessee v. U.S. Dep't of Ed.*, 104 F.4th 577, 608 (6th Cir. 2024). Here, Defendants have not submitted any such substantive alteration regarding its view and application of Title IX as it relates to the Gender or Sports Conditions to these rulemaking processes. Thus, the Gender and Sports Conditions are either stand-alone policies (imposed in

60

excess of statutory authority in violation of 5 U.S.C. § 706(2)(C)), *see supra* ¶¶ 216-220, or procedurally unlawful reinterpretations of existing law (imposed in violation of 5 U.S.C. § 706(2)(D)).

224.    The APA divides agency action into three general categories: legislative rules, interpretive rules, and general statements of policy. Legislative rules have the force and effect of law and are subject to notice and comment. Accordingly, an agency must publish a notice about the proposed rule, allow the public to comment on the rule, consider the comments, and issue a final rule setting forth the basis and purpose of the rule. 5 U.S.C. § 553(b)–(c); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015) (explaining application of 5 U.S.C. § 553(b) rulemaking requirements to legislative rules). These requirements do not apply to interpretive rules or general statements of policy. 5 U.S.C. § 553(b)(A).

225.    Title IX authorizes and directs federal agencies, including USDA, to effectuate the provisions of 20 U.S.C. § 1681 by issuing rules and regulations to realize Title IX's prohibition against sex discrimination. 20 U.S.C. § 1682. USDA, consistent with this statutory delegation, has adopted both substantive Title IX regulations, *see, e.g.*, 7 C.F.R. § 15a.400, and also procedural regulations, including rules regarding funding applicants' required civil rights assurances. 7 C.F.R. § 15a.115.

226.    Duly promulgated legislative rules such as USDA's Title IX regulations, which the agency developed in conformity with the APA's procedural rulemaking requirements, are not the only opportunity for executive branch agencies to share their understanding of the federal civil rights laws they enforce. Federal agencies routinely issue non-binding guidance documents and fact sheets, including those that address frequently asked questions. However, when an agency such as USDA adopts a new policy or rule that reflects a substantive change in what compliance

61

with these federal antidiscrimination laws demand of states and other funding recipients, it has gone beyond the bounds of such policy statements and interpretive rules that merely "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required" and adopted a substantive, legislative rule that must comport with the APA's notice and comment requirements. *Tennessee*, 104 F.4th at 608 (internal quotation omitted); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 74–77 (1st Cir. 2018).

227.    By failing to take the required procedural steps, any attempt by USDA to impose legislative rules onto Plaintiff States through grant conditions would be an agency action made without observance of procedure required by law.

228.    When the Biden Administration attempted to clarify the Department of Education's interpretation of Title IX following the Supreme Court's decision in *Bostock v. Clayton County, Georgia,* 590 U.S. 644 (2020), through publication of a non-binding guidance document in the Federal Register, the notice of interpretation was preliminarily enjoined as a procedurally unlawful legislative rule that failed to conform to the APA. *See Tennessee*, 104 F.4th at 607–608 (finding plaintiff states likely to succeed on the merits of their claim that the Department's published interpretation of Title IX violated the APA).

229.    Here, USDA has conducted no such notice and comment regarding any new interpretations of the federal antidiscrimination laws. It cannot, therefore, cite any such reinterpretations in seeking to clarify the meaning of the Gender Condition or the Sports Condition, nor can it rely on Title IX to find statutory authority to impose such conditions. To do so would be to concede a violation of the notice and comment procedures required by the APA. *Tennessee*, 104 F.4th at 609.

230.    If the policies USDA seeks to impose on the States via the Gender Condition and the Sports Condition are actually new interpretations of Title IX, made without adherence to the APA's rulemaking procedure, those conditions should be vacated as an unlawful agency action made without adherence to required procedure under 5 U.S.C. § 706(2)(D).

## IV.    The Conditions Irreparably Harm the Plaintiff States

231.    Plaintiff States will suffer immediate and irreparable injuries to their proprietary and sovereign interests as a result of USDA's imposition of the Challenged Conditions. Plaintiff States have received and relied on funding from USDA grant programs for over 100 years. With individual grants open for years at a time, and especially with respect to Congressionally-mandated formula funds, Plaintiff States' budgets rely on anticipated USDA funding for critical public services. For example, USDA funding pays for essential programs like school lunches, agricultural research, and fire prevention. The Challenged Conditions would force Plaintiff States to choose between forgoing critical funding or agreeing to adhere to USDA's undefined "anti-discrimination" policies and the other vague Challenged Conditions, some of which might be in conflict with state law. Both avenues result in irreparable harms that cannot be remedied after the fact.

232.    The 2026 Conditions do not provide guidance as to what conduct would be captured by the facially broad language of the Challenged Conditions, nor do they place a limit on what antidiscrimination "policies"—present or future—a recipient would be required to comply with. The lack of clarity, when paired with USDA's many indications of its intention to aggressively enforce adherence to the executive orders underlying the Challenged Conditions, is untenable. In other words, even if Plaintiff States could agree to comply with the Challenged Conditions, they may still unwittingly commit what USDA considers violations. *See supra* ¶¶ 193-202. Where the Administration has threatened to use civil and criminal enforcement mechanisms in ways

described by a federal court as designed to "harass and intimidate,"[50] the danger is clear. *See also* 2026 Conditions, § 12.2 (threatening civil and criminal liability for making false claims in relation to the Challenged Conditions).

233.    Moreover, the ambiguity of the Challenged Conditions and the risk faced by Plaintiff States is amplified because the Challenged Conditions flow through to subrecipients and recipients are responsible for monitoring subrecipient compliance with the conditions. Exhibit A, § 5.3; Exhibit B, § 4.3. These subrecipients include, for example, local school districts in Plaintiff States that receive funding under the Child Nutrition Programs.

234.    Accepting the Challenged Conditions would also create unique additional forms of irreparable harm for those Plaintiff States that have enacted laws and policies that are potentially more protective of the civil rights of individuals than the policies of federal agencies, including protections against discrimination on the basis of gender identity and sexual orientation, and commitments to social equity. If those Plaintiff States accept the Challenged Conditions, USDA could demand sweeping changes to a broad swath of state government programs—sometimes in violation of state law. The costs of compliance are many.

235.    In the first instance, those changes represent a significant administrative burden. For example, if Plaintiff States were required to conduct more exhaustive immigration status verifications, including for programs like WIC where Congress empowered States to make the program benefits available regardless of immigration status, *see* 8 U.S.C. § 1615(b)(1), that would

---

[50] *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass, 2025) ("The Administration has been explicit about its disapproval of the transgender community and its aim to end [gender-affirming care]. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion. It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect [gender affirming care] within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care.")

require them to incur the costs of developing verification systems and employing the staff to operate them.

236.    Moreover, USDA's potentially aggressive actions would place the States in the strange position of both defending against alleged violations of state law caused by compliance with the Challenged Conditions and enforcing those state laws at the same time. That tension points to the fundamental injury caused by the Challenged Conditions: by holding federal funding hostage in order to impose policy preferences on the States, the Defendants could interfere with the Plaintiff States' sovereign authority to govern themselves, and to enact laws to promote the general health and welfare of the people.

237.    Finally, submitting to the Challenged Conditions would harm Plaintiff States by forcing them to incur administrative costs and burdens from the diversion of personnel time, the development and administration of new training programs, and the creation of new guidelines for how staff must comply with these unprecedented conditions.

238.    On the other hand, if Plaintiff States do *not* agree to comply with the Challenged Conditions, they risk losing billions of dollars in essential funding. Losing USDA funding as to any one of these programs would result in substantial harm to each of the Plaintiff States—cumulatively, those losses would be devastating to public health and well-being. Ultimately, the Plaintiff States would bear the costs associated with many of these harms. The loss of funding to food and nutrition programs would lead to food insecurity, hunger, and malnutrition, which are harms unto themselves and also associated with numerous negative health outcomes in children, such as poor concentration, decreased cognitive function, fatigue, depression, behavioral problems, weakened immune system, stunted growth, insulin resistance, blindness, soft bones, and

cardiovascular issues.[51] Plaintiff States rely on the Child Nutrition Programs to ensure that children's nutritional needs are met so that they can focus on their education.

239. Adults who have adequate access to nutritious food are also healthier. Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than low-income non-participants. If residents lose access to food and nutrition programs, these benefits will be lost, and the Plaintiff States will bear the burden of those increased healthcare costs.

240. The loss of USDA funding also has economic consequences beyond hunger and public health. The infusion of billions of dollars of grant money to Plaintiff States helps keep farmers, ranchers and grocers afloat. The loss of USDA grant money would pose an existential threat to these businesses.

241. Additionally, Plaintiff States rely on USFS grants to maintain our nation's forests and sustain adequate firefighting capacity to protect their residents. Without this funding, Plaintiff States will either bear the cost of sustaining these programs, or the costs of losing them. The Plaintiff States do not have the budgetary resources or flexibility to make up for lost USFS funding without drawing funding away from other important initiatives. Without these programs, the Plaintiff States face an increased risk of lost lives, property damage, and public safety burdens. The environmental and economic consequences of climate change continue to add to these burdens, as major fires and other climate events continue to increase in frequency and intensity.

242. In sum, the harm posed to Plaintiff States is immense and immediate. USDA is trying to condition the receipt of potentially billions of dollars that the Plaintiff States have relied on for decades to provide, among other things, basic nutrition. These conditions are both unlawful and remarkably vague, making it impossible to clearly understand what USDA considers necessary

---

[51] https://perma.cc/TEJ6-6SNR.

for compliance. Especially given USDA's aggressive enforcement threats, Plaintiff States are unable to safely accept the Challenged Conditions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the U.S. Constitution
### Spending Clause

243.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

244.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, clause 1.

245.    Even when Congress has delegated some of its federal funding authority to the Executive Branch, including the authority to condition funding, there are limits to the conditions that the federal government may impose. *See Dole*, 483 U.S. at 207-08.

246.    First, the Spending Clause requires any conditions on federal funds to be imposed "unambiguously," *Pennhurst*, 451 U.S. at 17, so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation," *Dole*, 483 U.S. at 207 (internal quotation omitted). Accordingly, Congress must provide States clear notice of the applicable funding conditions. *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Here, the Challenged Conditions are impermissibly vague in violation of the Spending Clause. *See Pennhurst*, 451 U.S. at 17.

247.    Second, the federal government may not impose conditions upon funding "so coercive [upon the States] as to pass the point at which 'pressure turns into compulsion.'" *Dole*,

483 U.S. at 211. USDA's threat to restrict all agency funding to Plaintiff States "is much more than 'relatively mild encouragement'—it is a gun to the head" for Plaintiff States. *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.); *see also id.* (holding threats to funding coercive in violation of the Spending Clause because a State "stands to lose not merely 'a relatively small percentage'" of funding from the agency, "but *all* of it"). Plaintiff States receive over $74 billion annually in funding from USDA.

248.    Third, the Spending Clause requires conditions on federal funding to be related to "the federal interest in" the particular project or program. *Dole*, 483 U.S. at 207 (internal quotation omitted). The Challenged Conditions are not related to the federal interest in the projects to which they are attached—namely, Congress's long commitment to supporting domestic agriculture, protecting forests and preventing wildfires, and feeding hungry Americans. *See id.* at 207–08.

249.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327; *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (noting that plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials).

250.    Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Violation of the Administrative Procedure Act § 706(2)(A)**
**Arbitrary & Capricious**

251.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

252.    Defendant USDA is an "agency" under the APA, 5 U.S.C. § 551(1), and the USDA's imposition of the Challenged Conditions constitutes an "[a]gency action made [judicially]

reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" *Id*. § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

253.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

254.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. Thus, an agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citation omitted).

255.    USDA failed to comply with these requirements in at least four respects. First, Defendants have provided an inadequate explanation for imposing vague conditions on massive sums of funding.

256.    Second, USDA failed to consider "an important aspect of the problem," *State Farm*, 463 U.S. at 43: whether the federal grant statutes that Congress created and charged it with administering actually allowed it to condition access to grant funds on Plaintiff States' agreeing to the Challenged Conditions. USDA here appears to have made no effort whatsoever to ascertain whether these grant statutes permitted it to impose the Challenged Conditions, instead simply imposing an across-the-board set of terms and conditions that fundamentally alter the nature of the grant programs at issue.

257.    Third, USDA "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 . Plaintiff States rely on the annual receipt of funds that the Challenged Conditions now endanger, relying on billions of dollars in federal funding annually to support critical programs like nutrition for the hungry, agricultural supports, education, and fire safety. USDA not only failed to "weigh" these longstanding and substantial reliance interests "against competing policy concerns," it simply "ignore[d]" them. *Regents*, 591 U.S. at 30–33.

258.    Finally, USDA likewise "entirely failed to consider" the adverse impact on state agencies if Plaintiff States were to adhere to the Challenged Conditions. *State Farm*, 463 U.S. at 43. For years States have had systems in place to ensure that they were compliant with stable federal grant conditions. The Challenged Conditions impose an entirely new regime of compliance. For the first time ever, Plaintiff States would potentially have to stand up systems to comply with the Challenged Conditions, if they can even figure out what that means. This effort would require personnel, time, and money. USDA altogether failed to weigh these costs against its own policy preferences. It violated the APA in doing so.

259.    Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Violation of Administrative Procedure Act § 706(2)(C)**
**Agency Action in Excess of Statutory Authority**

260.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

261.    Defendant USDA is an "agency" under the APA, 5 U.S.C. § 551(1) and the USDA's imposition of the Policy and Immigration Conditions constitutes an "[a]gency action made

[judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" *Id*. § 704; *see Bennett*, 520 U.S. at 177–78.

262.     USDA's decision to adopt the Policy and Immigration Conditions and implement them across all of its programs is a final agency action subject to review under the APA.

263.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

264.     Defendants lack the statutory authority to impose the Policy and Immigration Conditions. No provision of USDA's authorizing statutes authorizes the agency to impose these terms, and the statutes and regulations authorizing Defendants to administer specific programs also preclude their imposition.

265.     This defect is particularly acute with respect to mandatory entitlement programs administered by USDA, including the Child Nutrition Programs and SNAP. The mandatory entitlement structure of those programs leaves Defendants no discretion to withhold or condition funding, and Congress's express and exhaustive prescription of eligibility and participation criteria leaves Defendants no room to layer on additional conditions. For example, the NSLA provides that the USDA "shall" make payments to states to reimburse qualifying meals in line with a statutory formula. 42 U.S.C. § 1753(b). Eligibility criteria under the program are also defined by statute. *See* 42 U.S.C. § 1758(b). The Child Nutrition Act has a similar statutory structure. *See* 42 U.S.C. § 1773(b). The Food and Nutrition Act, which governs SNAP, similarly provides that assistance under the program "*shall be furnished to all eligible households* who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added); *see also* 7 U.S.C. § 2015(f). Across these and

71

other mandatory entitlement programs, Congress has foreclosed any authority Defendants may claim to impose the Policy and Immigration Conditions.

266.    In imposing the Policy and Immigration Conditions, Defendants exceeded the statutory authority granted to USDA by Congress. The Challenged Conditions therefore must be set aside under the APA.

267.    Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act § 706(2)(D)**
**Without Observance of Procedure Required by Law**

268.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

269.    Defendant USDA is an "agency" under the APA, 5 U.S.C. § 551(1) and the USDA's imposition of the Gender and Sports Conditions constitutes an "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" *Id*. § 704; *see Bennett*, 520 U.S. at 177–78.

270.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

271.    When issuing legislative rules, federal agencies are required to follow the notice-and-comment process set forth in the APA. These require the agency to publish a "[g]eneral notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b). That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved[.]" *Id.* § 553(b)(3). The agency must further provide "interested persons" an "opportunity

to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

272.    In promulgating the Gender and Sports Conditions and applying them agency-wide, USDA adopted a new policy interpretation of Title IX.

273.    Additionally, in adopting the Gender and Sports Conditions, USDA attempted to alter the substantive requirements of Title IX. USDA acknowledged that the change constitutes a new certification requirement. USDA specifically noted that the new certification of the Challenged Conditions goes to the "essence" of the award and is therefore material, and the "certification reflects a change in the government's position regarding the materiality of the foregoing requirements[.]" 2026 Conditions, § 12.2. USDA also threatens civil and criminal liability for making false claims in relation to the Challenged Conditions.

274.    Because USDA has attempted to impose a new basis for enforcing Title IX and the withholding of *all* USDA funding on recipients, the adoption and promulgation of the Challenged Conditions constitute a legislative rule, rather than an interpretive rule or a general statement of policy.

275.    Setting aside whether USDA could legally and constitutionally promulgate a rule imposing the Challenged Conditions in the first instance, there are no circumstances that would create good cause for USDA to forgo notice and comment in adopting the policy underlying the Challenged Conditions. *See* 5 U.S.C. § 553(b)(B). Nor did USDA invoke the good cause exception for promulgating the Challenged Conditions in this manner by "incorporat[ing] the finding [of good cause] and a brief statement of reasons therefor," as required by § 553(b)(B).

276.    In adopting and promulgating the Challenged Conditions to issue an agency-wide legislative rule interpreting Title IX, Defendants have failed to follow the procedural requirements

of the APA. The Challenged Conditions must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

277.  Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act § 706(2)(B)**
**Agency Action Contrary to Constitutional Right**

278.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

279.  Defendant USDA is an "agency" under the APA, 5 U.S.C. § 551(1), and the USDA's imposition of the Challenged Conditions constitutes an "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" *Id*. § 704; *see Bennett*, 520 U.S. at 177–78.

280.  Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2)(B).

281.  The Challenged Conditions violate the Spending Clause, for the reasons set out above. *Supra* ¶¶ 242-247.

282.  Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**SIXTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act § 706(2)(A)**
**Agency Action Contrary to Law**

283.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

74

284.    Defendant USDA is an "agency" under the APA, 5 U.S.C. § 551(1) and the USDA's imposition of the Challenged Conditions constitutes an "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]" *Id*. § 704; *see Bennett*, 520 U.S. at 177–78.

285.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

286.    "An agency has an obligation to abide by its own regulations." *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008)

287.    Through the Immigration Condition, USDA could seek to require the Plaintiff States to take action in direct contradiction to statutes and regulations. For example, 8 US.C. § 1615 provides that "an individual who is eligible to receive free public education benefits under State or local law shall not be ineligible to receive benefits provided under the school lunch program under the Richard B. Russell National School Lunch Act (42 U.S.C. §§ 1751, *et seq.*) or the school breakfast program under section 4 of the Child Nutrition Act of 1966 (42 U.S.C. § 1773) on the basis of citizenship, alienage, or immigration status." If the Immigration Condition requires certain children to be considered ineligible for the National School Lunch Program or the School Breakfast Program based on citizenship, the Immigration Condition is not in accord with law.

288.    Furthermore, regulations governing TEFAP specifically provide that "identification documents shall not be used as an eligibility criterion" for that program. 7 C.F.R. § 251.5(b)(3). Again, if the Immigration Condition required the use of such documents to receive TEFAP food at local food pantries, that requirement would be contrary to this regulation, which has the "force and effective of law." *Perez*, 575 U.S. at 96 (citation omitted).

289.    Under PRWORA, Congress chose to defer to the States whether to make benefits under programs under the NLSA or Child Nutrition Act of 1966 *other than* the National School Lunch Program or the School Breakfast Program available to individuals who are not citizens or qualified aliens. 8 U.S.C. § 1615(b)(1). This includes WIC benefits provided under section 17 of the Child Nutrition Act. 8 U.S.C. § 1615(b)(2)(A). USDA's regulations recognize that State agencies are empowered to choose whether or not to "limit WIC participation to United States citizens, nationals, and qualified aliens." 7 C.F.R. § 246.7(c)(3). To the extent that the Immigration Condition could be used to substitute USDA's participation preferences for the States' decisions, or penalize the Plaintiff States for availing themselves of an option conferred by Congress, doing so would be contrary to law. To the extent that the Gender Condition or the Sports Condition, or substantively similar policies, end up applying to SNAP and the Summer Food Service Program, they could run counter to existing USDA regulations for those programs. USDA's regulations for the SNAP and Summer Food Service Program require participating States to make assurances that beneficiaries will not be excluded based on their gender identity. 7 C.F.R. § 272.2(b)(2) (SNAP); 7 C.F.R. § 225.7(n)(1) (Summer Food Service Program). If USDA is restricting eligibility for grant or program funding based on the gender identity of participating recipients, the Gender Condition and the Sports Condition violate USDA's regulations.

290.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

291.    The Challenged Conditions must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

292.    Defendants' violations of the APA have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor and grant the following relief:

1. Declare that the Defendants' adoption of the Challenged Conditions is unconstitutional and/or unlawful because they: (a) are contrary to the Constitution of the United States; and (b) violate the APA.

2. Issue a preliminary and permanent injunction prohibiting Defendants from implementing or enforcing the Challenged Conditions against Plaintiff States, including their subdivisions and instrumentalities, as to any federal funding program administered by Defendants;

3. Issue a preliminary and permanent injunction prohibiting Defendants from withholding or terminating federal funding based on the Challenged Conditions;

4. Issue a preliminary and permanent injunction prohibiting Defendants from taking adverse action against any state entity or local jurisdiction, including debarring it or making it ineligible for federal funding, based on the Challenged Conditions;

5. Vacate the Defendants' decisions adopting the Challenged Conditions, and any actions taken by Defendants to implement or enforce the Challenged Conditions;

6. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

7. Award Plaintiff States costs, expenses, and reasonable attorneys' fees; and

8. Award such other relief as the Court deems just and proper.

Dated this 14th of August 2026.

Respectfully submitted,

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*

By: */s/ Nita K. Klunder*
Nita K. Klunder (BBO No. 689304)
   *State Trial Counsel*
Hannah C. Vail (BBO No. 698577)
Jak Kundl (BBO No. 713951)
Sav Arguello (BBO No. 710710)
   *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2394
Nita.Klunder@mass.gov
Hannah.Vail@mass.gov
Jak.Kundl@mass.gov
Sav.Arguello@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
   *Attorney General of California*

*/s/ Brian Bilford*
BRIAN BILFORD*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
ALYSSA ZHANG*
LUKE FREEDMAN*
DANIEL SHEEHAN*
Deputy Attorneys General
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov
Joel.Marrero@doj.ca.gov
Alyssa.Zhang@doj.ca.gov
Luke.Freedman@doj.ca.gov
Daniel.Sheehan@doj.ca.gov

*Counsel for Plaintiff State of California*

KWAME RAOUL
   *Attorney General of Illinois*

By: */s/ Vikas Didwania*
Vikas Didwania*
Aleeza Strubel
   *Complex Litigation Counsels*
Michael M. Tresnowski
   *Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(312) 814-3000
Vikas.Didwania@ilag.gov
Aleeza.Strubel@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*

JOSHUA L. KAUL
   *Attorney General of Wisconsin*

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
   *Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Counsel for the State of Wisconsin*

78

PHILIP J. WEISER
  *Attorney General of Colorado*

By: */s/ Sam Wolter*
Sam Wolter*
  *Assistant Attorney General*
Kristopher Brambila
  *Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Samuel.wolter@coag.gov
Kristopher.brambila@coag.gov

*Counsel for the State of Colorado*

JENNIFER DAVENPORT
  *Attorney General for the State of New Jersey*

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
  *Assistant Attorney General*
Dianna Shinn*
Jonathan Allen*
  *Deputy Attorneys General*
New Jersey Office of the Attorney General
Division of Law – Environmental & Clean Energy Practice Group
25 Market Street
Trenton, New Jersey 08625-0093
(609) 696-4607
jessica.palmer@law.njoag.gov
dianna.shinn@law.njoag.gov
jonathan.allen@law.njoag.gov

*Counsel for the State of New Jersey*

WILLIAM TONG
  *Attorney General of Connecticut*

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati*
  *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

RAÚL TORREZ
  *Attorney General of New Mexico*

By: */s/ Amy Senier*
Amy Senier (BBO No. 672912)
  *Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*

KATHLEEN JENNINGS
  *Attorney General of the State of Delaware*

By: */s/ Ian R. Liston*
Ian R. Liston
  *Director of Impact Litigation*
Rose E. Gibson
Vanessa L. Kassab
  *Deputy Attorneys General*

LETITIA JAMES
  *Attorney General for the State of New York*

By: */s/ Natasha M. Korgaonkar*
Rabia Muqaddam*
  *Chief Counsel for Federal Initiatives*
Natasha M. Korgaonkar (BBO 704129)
Matthew Faiella*
  *Special Counsel*

79

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

BRIAN L. SCHWALB
  *Attorney General for the District of
  Columbia*

By: */s/ Samantha Hall*
Samantha Hall
  *Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 788-2081
samantha.hall@dc.gov

*Counsel for the District of Columbia*

ANNE E. LOPEZ
  *Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

ANTHONY G. BROWN
  *Attorney General for the State of Maryland*

By: */s/ James C. Luh**
James C. Luh
  *Senior Assistant Attorney General*

28 Liberty St.
New York, NY 10005
(212) 416-6557
rabia.muqaddam@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov
matthew.faiella@ag.ny.gov

*Counsel for the State of New York*

DAN RAYFIELD
  *Attorney General for the State of Oregon*

By: */s/ Leanne Hartmann*
Leanne Hartmann, MA BBO #667852
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

PETER F. NERONHA
  *Attorney General of Rhode Island*

By: */s/ Paul T.J. Meosky*
Paul T.J. Meosky*
  *Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2064
pmeosky@riag.ri.gov

*Counsel for the State of Rhode Island*

CHARITY R. CLARK
  *Attorney General of Vermont*

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
  *Solicitor General*

80

Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

AARON M. FREY
  *Maine Attorney General*

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
  *Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for the State of Maine*

DANA NESSEL
  *Attorney General of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

KEITH ELLISON
  *Attorney General for the State of Minnesota*

  By: */s/ Brian S. Carter*
Brian S. Carter
*Special Counsel*
445 Minnesota Street, Suite 1400

Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

JAY JONES
  *Attorney General of Virginia*

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
  *Solicitor General*
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

NICHOLAS W. BROWN
  *Attorney General of Washington*

By: */s/ Zane Muller*
Zane Muller
Erica Franklin
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Erica.Franklin@atg.wa.gov

*Counsel for the State of Washington*

AARON D. FORD
  *Attorney General for the State of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General

81

St. Paul, Minnesota, 55101
(651) 300-7403
Brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

JOSH SHAPIRO
  *Governor for the Commonwealth of Pennsylvania*

*/s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
  *Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

*pro hac vice applications forthcoming*

**CERTIFICATE OF SERVICE**

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

/s/ Nita K. Klunder
Nita K. Klunder